Ted Biddy - 11/07/08

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JOHN POLITZ AND HELEN
POLITZ

                                        PLAINTIFFS


V.                CIVIL ACTION NO. 1:08CV18-LTS-RHW


NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY, U.S.
SMALL BUSINESS
ADMINISTRATION, AND JOHN
DOES 1 THROUGH 10

                                        DEFENDANTS


VIDEO DEPOSITION OF TED BIDDY


Taken at the instance of the Defendants at Denham
Law Firm, 424 Washington Avenue, Ocean Springs,
Mississippi, on Friday, November 7, 2008,
beginning at 8:59 a.m.



APPEARANCES:

        WENDY TYNES, ESQ.
        Denham Law Firm
        Post Office Drawer 580
        Ocean Springs, Mississippi 39566-0580

            COUNSEL FOR PLAINTIFFS

Exhibit 1

a580418a-55ec-460c-950b-fdf77d5aebd7

**Page 2**

```
 1   ROBERT GILMORE, ESQ.
     Kirkland & Ellis, LLP
 2   655 Fifteenth Street, N.W.
     Washington, D.C. 20005
 3
        COUNSEL FOR DEFENDANTS
 4
 5
 6
 7
 8
 9
10   VIDEOGRAPHER: Lynda Marshall
11   REPORTED BY:  Kelly Powell, CSR
        Brooks Court Reporting, Inc.
12      Post Office Box 2632
        Jackson, Mississippi 39207
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX
 2   Style and Appearances...................   1
 3   Index  ..............................   3
 4   Certificate of Deponent  ...............  197
 5   Certificate of Court Reporter ..........  198
 6           EXAMINATIONS
 7   Examination By Mr. Gilmore .............   5
 8           EXHIBITS
 9   42   Ted Biddy Report ................   8
10   90   Plaintiff's Designation of Expert   8
11        Witnesses
12   155  Schedule of Professional Fees for   18
13        Hurricane Katrina Cases
14   156  Curriculum Vitae ................  33
15   157  Listing of Forensic Engineering .  67
16        and Expert Witness Cases by
17        Ted L. Biddy
18   159  Before the Public Service .......  69
19        Commission of the State of
20        Missouri, Report and Order
21   146  5/19/08 Letter to Mr. Biddy from   75
22        Denham Law Firm
23   147  Handwritten Notes ..............   85
24   37   Kevin Kennedy & Associates ......  149
25        Meteorological Analysis of
```

**Page 4**

```
 1        Hurricane Katrina Wind and
 2        Storm Tide
 3   162  Photograph of Greensburg, Kansas   156
 4   48   MDA Damage Assessment Worksheet .  177
 5   117  "Is it Wind or is it Water?" ....  182
 6   160  The Mississippi Press Article ...  190
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1        VIDEOGRAPHER:  This is the video
 2   deposition of Ted Biddy taken by the counsel for the
 3   defendant in the matter of Politz versus Nationwide
 4   Insurance Company, in the United States District
 5   Court, Case Number 21:18CV18-LTS-RHW, held in the
 6   office of Denham Law Firm on Friday, November the
 7   7th, 2008.  It is now 8:59 a.m.  Counsel may
 8   introduce themselves.
 9        MR. GILMORE:  Robert Gilmore, Kirkland &
10   Ellis, LLP, on behalf of defendant Nationwide Mutual
11   Fire Insurance Company.
12        MS. TYNES:  And I'm Wendy Tynes of the
13   Denham Law Firm here on behalf of the plaintiff.
14        VIDEOGRAPHER:  The court reporter will now
15   swear in the witness.
16            TED BIDDY,
17   having been first duly sworn, was examined and
18   testified as follows:
19   EXAMINATION BY MR. GILMORE:
20        Q.  Good morning, Mr. Biddy.  Again, my name
21   is Rob Gilmore.  I'm with Kirkland & Ellis.  As you
22   know, we represent Nationwide in the Katrina
23   litigation, and in particular, this case brought by
24   Mr. and Mrs. Politz.  Could you state your full name
25   for the record, please, sir?
```

Ted Biddy - 11/07/08

3 (Pages 6 to 9)

Page 6

1      A.   Full name is Ted, middle initial L.,
2   Biddy.
3      Q.   Your home address?
4      A.   7059 Blueberry Hill Drive, Tallahassee
5   32303.
6      Q.   What's your current work address?
7      A.   Same thing.  I have my office in my home.
8      Q.   When were you born?
9      A.   January 6, 1938.
10     Q.   I know you've been deposed many times
11  before so I'm going -- I'm going to cut to the
12  chase.  You know my job is to ask questions you
13  under -- that you can understand.  If you answer,
14  I'm going to assume that you understood my question.
15  Is that fair?
16     A.   That's fair.
17     Q.   Is there any reason as we sit here today
18  that you can't give full and complete and truthful
19  testimony?
20     A.   None at all.
21     Q.   And you were noticed for this deposition,
22  and we also sent a subpoena to you for documents
23  that you might have in connection with your work for
24  the -- Mr. and Mrs. Politz?
25     A.   Yeah.

Page 7

1      Q.   And I know you previously produced
2   documents to us.  Other than those that you've
3   previously provided, have you brought with you today
4   any additional documents?
5      A.   Just my report.  I assume you've got a
6   copy of it.
7      Q.   We do, and we'll take a look at that real
8   quickly just to make sure it is the one that was
9   produced by Mrs. Politz in this case.  And just so
10  -- I understand that Mr. Politz has passed away.  If
11  I refer to Mr. and Mrs. Politz, with that
12  understanding, that currently Mrs. Politz is the
13  current plaintiff.
14     A.   That's what I understand, yes.
15     Q.   Do you -- your report that you have there
16  in front of you, do you know if that has anything
17  different from the version that you've produced to
18  Mrs. Politz's counsel which they provided to
19  Nationwide?
20     A.   No, it's identical.
21     Q.   I'm sorry?
22     A.   It's identical.
23     Q.   Identical, okay.  Does your version have
24  numbers at the bottom, Politz -- beginning with
25  Politz-302?

Page 8

1      A.   No.  No, I don't have it.
2      Q.   Okay.  Well, counsel for Mr. and
3   Mrs. Politz, in the version they produced to us,
4   added page numbers which are very helpful, and I
5   mean no disrespect to you, but sometimes the
6   numbering in your report is a little hard to follow,
7   so I'd like during this deposition -- I think it
8   might save us both time if I hand you a copy of the
9   report as it was produced to us.  You can obviously
10  keep the report that you have with you, but I'm
11  going to refer to the Bates numbers that are at the
12  bottom of that report.  Here's a copy for you and
13  for you.
14        MS. TYNES:  Thank you.
15        (Exhibit 42 marked for identification.)
16     Q.   (By Mr. Gilmore)  And if you could just
17  flip through that, again, just to confirm that that
18  is identical to the report that you brought with you
19  today.
20     A.   Yes, it appears to be.  I'm not going
21  through it page by page, but it appears to be an
22  identical copy of it.
23     Q.   Mr. Biddy, I'm going to hand you what's
24  been premarked as Defense Exhibit 90.
25        (Exhibit 90 marked for identification.)

Page 9

1      Q.   (By Mr. Gilmore)  And this is Plaintiff's
2   Designation of Expert Witnesses in this case.  Have
3   you ever seen this document before?
4      A.   Yes, I have.
5      Q.   When did you see it?
6      A.   Somewhere along the line, I was shown a
7   copy of it by the Denham Firm.
8      Q.   On page 1 of Plaintiff's Designation of
9   Expert Witnesses, it designates you as someone
10  they're tendering as an expert witness in this case,
11  and it states, "Mr. Biddy is designated as an expert
12  witness in the field of forensic engineering and the
13  application of same to the facts of the instant
14  case.  Mr. Biddy's opinion and the basis for same is
15  set forth in the report entitled 'Forensic
16  Engineering Study of Damages to Residence of John
17  and Helen Politz at 116 Winters Lane, Long Beach,
18  Mississippi 39560 from Hurricane Katrina' dated July
19  14th, 2008.  A copy of Mr. Biddy's report is being
20  provided to defendant contemporaneously with this
21  designation."  Did I read all that accurately?
22     A.   Yes, you did.
23     Q.   And is that statement consistent with your
24  understanding of the expert testimony you will be
25  asked to present in this case by the plaintiff?

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 10

1    A.  Yes.
2    Q.  Now, if you read the remaining portion of
3  your designation, it goes over to the top of page 2
4  of Defense Exhibit 90.  Just take a minute.  It does
5  not reference presenting opinion or testimony on the
6  reconstruction cost of the Politz residence; is that
7  correct, the fact that it doesn't reference such
8  testimony from you?
9    A.  It says supplemental opinions, and I may
10  do that in the deposition or during testimony.
11  That's part of my report that is referred to at the
12  first page, so it's part and parcel of my -- my
13  study.
14    Q.  So is it your understanding that you will
15  be asked to present an opinion or testimony as to
16  the reconstruction cost of the Politz residence?
17    A.  I will -- in my understanding, I will be
18  asked about anything in my report and that was part
19  of my report was the reconstruction cost.
20    Q.  So it's your view that your -- your
21  testimony and opinions about the reconstruction cost
22  of the Politz residence is part of your testimony in
23  the field of forensic engineering and the
24  application of same to the facts of the instant
25  case?

Page 11

1    A.  Yes, it is.
2    Q.  Have you discussed specifically with the
3  Politz's attorneys whether you're going to be giving
4  reconstruction cost opinions or testimony in this
5  case?
6    A.  I have not.  On many other occasions, I
7  have, and I have always done so.
8    Q.  Okay.  And now you mentioned -- in this
9  designation, it also references the fact that you
10  may also express supplemental opinions in any
11  deposition or during his testimony and/or during the
12  trial of this cause of action.  That's on the top of
13  page 2.  As we sit here today, do you know what
14  supplemental opinions you might be asked other than
15  those that are in your report?
16    A.  No, but frequently it comes up as to what
17  other evidence do you have to support this, that and
18  the other such as the weather information, for
19  instance, meteorological data, and I discuss the
20  report that was made at the site, and I discuss a
21  few others that confirm it, but sometimes I'm asked
22  for -- well, what about others or what about this
23  agency or that agency or so on.  And I have a --
24  just a multitude of weather information all along
25  the coast and a lot at Long Beach, and sometimes

Page 12

1  questions about those reports, meteorology reports
2  that I have come up.  Many times they will, okay,
3  how about giving us a copy of those?  Well, you
4  know, it's overkill to put all of that in here, I
5  thought.
6    Q.  Well, I understand that you might think
7  it's overkill and your report is long.  I guess my
8  question is these other meteorology reports that you
9  are referencing, have you relied on any of those in
10  reaching the opinions that you've expressed in your
11  report?
12    A.  No.  The Calaci report is attached as
13  Exhibit I to my report.  I relied on it.  The others
14  are confirming it, and sometimes I will discuss
15  those and any subject you want to ask me about.
16    Q.  But it's your view that the other reports
17  or meteorological information that you don't have in
18  your report don't add anything to your opinions in
19  your report; is that correct?
20    A.  That's correct, just be cumulative to
21  Mr. Calaci's report.
22    Q.  So the meteorological data that you rely
23  on in your report is that that is actually attached
24  in your report?
25    A.  And include everything I discuss in

Page 13

1  Section 1 and 2 in the report, which is the history
2  and the sequence of the storm and that is included
3  in the appendices of D, E, F and I.  I guess it
4  has -- has all of the meteorological data in it.
5    Q.  Mr. Biddy, I know that you've given a lot
6  of depositions and some of the questions I'm going
7  to ask you, you've probably heard before.  You might
8  anticipate the question and think you know the
9  answer.  Just so the court reporter can have an easy
10  time transcribing everything, and I know you know
11  this, but if -- if you do your best not to -- to
12  wait until I finish answering [sic] my question, I
13  will do my best not to interrupt or move to the next
14  question before you finish your answer.  Is that
15  fair?
16    A.  That's fair.
17    Q.  Mr. Biddy, how did you prepare for your
18  deposition today?
19    A.  I simply re-read the file, and when I
20  arrived here yesterday, I drove by the site.  No
21  particular reason, just something I always do.
22    Q.  When you drove by the Politz site, that
23  was on your way to this office this morning?
24    A.  No.  I arrived yesterday afternoon late,
25  and I just drove by.  I do so many of these reports

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 14

1  sometimes they start running together as far as what
2  the ground looked like, so I just simply drove by it
3  and refreshed my memory briefly. I didn't get out
4  of the car, just windshield look and came on.
5      Q.  Is there anything you saw at the Politz
6  residence when you drove by it yesterday that is
7  significant for the opinions you express in your
8  report?
9      A.  No.
10     Q.  Have you met with Mr. and Mrs. Politz's
11  attorneys in connection with this case before today?
12     A.  Just briefly with Ms. Tynes this morning.
13  I briefly discussed it with Kristopher Carter on the
14  telephone, but I have not met with him, no.
15     Q.  Can you tell me what you and Mr. Carter
16  discussed on the telephone call?
17     A.  Nothing other than the completion date,
18  here it is, and I didn't discuss any of the
19  specifics of the report.
20     Q.  How long ago was that call with
21  Mr. Carter?
22     A.  Since July, sometime in the late summer of
23  '08, I think.
24     Q.  August about?
25     A.  Yes, about August, I would think.

Page 15

1      Q.  Is that the only time that you have spoken
2  with Mr. Carter about this report?
3      A.  Yes.
4      Q.  How many reports in Hurricane Katrina
5  litigation have you prepared for the Denham Law
6  Firm?
7      A.  I haven't counted them. It would be a
8  number. 30 probably.
9      Q.  Were all of those in lawsuits brought by
10  homeowners against insurance companies?
11     A.  Yes.
12     Q.  Other than talking with plaintiffs'
13  counsel, have you -- did you do anything else to
14  prepare for your deposition today?
15     A.  Simply re-read the file and reviewed
16  everything in the file.
17     Q.  Have you -- other -- and when you say the
18  file, do you mean your report?
19     A.  My report and the documents in my report
20  which I furnished you copies of.
21     Q.  Other than your report and the documents
22  which you produced to us, what other documents have
23  you looked at in connection with your work on the
24  Politz case?
25     A.  Well, there's certainly my engineering

Page 16

1  knowledge of structural engineering, textbook type
2  stuff. My structural calculations are included in
3  the report. I didn't have to refer to a textbook,
4  but that's where it came from in my college days.
5  I'd looked at some codes and, again, I didn't have
6  to refer to those because I knew what the loadings
7  were for certain mile per hour winds and so on, on
8  size and buildings, but that's just rudimentary
9  background of a structural engineer.
10         Other documents -- and you say specific --
11  I specifically relied on. I didn't rely on all of
12  these other meteorology reports, but I've read many,
13  many, many all along the coast including in Long
14  Beach where I've done numbers of studies.
15  Obviously, they, as I said before, are just
16  cumulative to Mr. Calaci's report as far as the
17  sequence and strength of the winds, et cetera.
18     Q.  And I know that you've looked at and --
19  received and looked at Mr. Calaci's report because
20  it's attached to your report. Have you received
21  reports from any other experts in this case, the
22  Politz case?
23     A.  No.
24     Q.  You haven't looked at the reports from
25  Nationwide's experts?

Page 17

1      A.  Let me see. I may have. I don't
2  remember.
3      Q.  Those would be Preston Campbell of Conso,
4  LeRovers & Associates and Kevin Kennedy & Associates
5  meteorology reports.
6      A.  I don't normally look at them unless they
7  give them to me, and they weren't in this case, so I
8  have not seen them, no.
9      Q.  If you had received them and reviewed
10  them, they would have been in your file?
11     A.  Yes, they would have.
12     Q.  And as we sit here today, you don't
13  specifically recall looking at the reports from
14  Nationwide's experts about the Politz case, do you?
15     A.  No.
16     Q.  Okay. Have you been asked to -- I guess
17  the answer to this is probably no, but I'll ask it
18  anyway. Have you been asked to prepare any rebuttal
19  or response to the reports of Nationwide's experts
20  in this case?
21     A.  Not yet, no.
22     Q.  And other than the documents that we've
23  just talked about today, is there anything else as
24  you sit here today that you can think of that you
25  relied on in preparing this report for the Politzes?

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

6 (Pages 18 to 21)

Page 18

1    A.  I don't think so.  It would be mentioned
2  in my report if I relied on it.
3    Q.  That's fine.  And again, I know you've
4  taken depositions before.  I will just mention this:
5  If at any time during the deposition you remember
6  something that you couldn't remember previously or
7  you think an answer you gave was somehow inaccurate
8  or incomplete, just let us know after we finish the
9  question we're dealing with, and I'll give you an
10  opportunity to supplement your answer.  Is that
11  fair?
12    A.  That's okay.  Thanks.
13    Q.  I'm going to show you what's been marked
14  as defense Exhibit 155.
15      (Exhibit 155 marked for identification.)
16    Q.  (By Mr. Gilmore)  Do you recognize this
17  document --
18    A.  Yes, I do.
19    Q.  -- Mr. Biddy?  What is this?
20    A.  This is my schedule of professional fees
21  for -- specifically for Hurricane Katrina cases.
22    Q.  And I'll represent to you this was
23  produced to us by the plaintiffs.  Is this schedule
24  the one that would be applicable for the work you've
25  done for the plaintiffs in this case?

Page 19

1    A.  Yes, it would and attached to that is a
2  copy of my invoice to the plaintiff, the Politzes.
3    Q.  And that's right, and the -- the fees
4  which we'll go over in a second, the second page of
5  this document, Politz-301, those are based on those
6  scheduled professional fees in Politz-300?
7    A.  Essentially, yes.
8    Q.  Okay.  And the first item on this schedule
9  of professional fees indicates $100 per hour for
10  your services in inspections, photographs,
11  evaluations, analyses and reports for homeowners; is
12  that correct?
13    A.  Yeah, the operative word there is "for
14  homeowners."  That's half my normal fee.
15    Q.  And so you give homeowners a break in
16  the -- the cases that you provide them expert
17  reports?
18    A.  That's correct.
19    Q.  Do you do other Hurricane Katrina work for
20  parties other than homeowners?
21    A.  Yes.
22    Q.  And can you tell me who those other
23  parties would be?
24    A.  I have done two museums, one very large
25  one in Biloxi, and another one in Ocean Springs.  I

Page 20

1  have done one very large motel.  I have done
2  several -- I can't remember how many -- commercial
3  buildings.  Probably in the neighborhood of five.
4  I've done one hotel, free-standing hotel.  I've done
5  a school building.  I've done 250 cases about, and
6  of those, probably 20 percent or so or 15 or 20
7  percent were other than residences.
8    Q.  So 80 to 85 percent of the Hurricane
9  Katrina reports you prepared are for homeowners?
10    A.  Correct.
11    Q.  And how much do you charge for parties
12  other than homeowners, hourly rate?
13    A.  It's a $200 hourly rate if I do it by
14  hourly rate.  Most times, we will negotiate a lump
15  sum for the party, but it will be based on $200 per
16  hour.
17    Q.  In the -- you gave a deposition in the
18  case Schmerman versus Nationwide back in August.  Do
19  you recall that?
20    A.  Yes, I do.
21    Q.  And during that deposition, you identified
22  one report you did for an insurance company.  Do you
23  recall that?
24    A.  Yes, I do.
25    Q.  I believe that was Fidelity; is that

Page 21

1  correct?
2    A.  Fidelity, correct.
3    Q.  Can you tell me a little bit about that
4  report?
5    A.  Well, it was a report requested by an
6  attorney with the law firm in Biloxi of Page,
7  Mannino, Peresech and others, one of their
8  attorneys.  I had done a number of reports for them
9  on wind destructed buildings, and one of their
10  attorneys came to me, and while I was there on
11  another case and asked me could I prove wind
12  destruction of a certain building in Bay St. Louis,
13  and I took a look at the location, and based on
14  others I had done in adjacent areas, I told him yes,
15  I could.  He said, well, Fidelity would like to hire
16  you to prepare such a report.  I said all right,
17  fine.  I prepared my normal report with my history
18  of the storm and sequence of the storm, my analysis
19  of the structure, went to the site and took pictures
20  and did the inspections and determined that the
21  house, in fact, did blow away and that's what they
22  wanted us -- they had paid, I think, flood damages
23  out to the house, and they wanted to prove that most
24  of the damages were caused by wind.
25    Q.  Have you given any other -- have you --

BROOKS COURT REPORTING
1-800-245-3376

Ted Biddy - 11/07/08

Page 22

1  I'm sorry.  Have you prepared any other expert
2  reports for any other insurance companies other than
3  Fidelity?
4      A.  Are you asking specifically for Katrina
5  cases?
6      Q.  For Katrina cases, yes.
7      A.  No.
8      Q.  Is it fair to say then in all of the
9  Hurricane Katrina expert reports you've prepared,
10  the parties that retained you were asserting wind
11  had caused most or all of the damage to their
12  property?
13      A.  Yes.
14      Q.  And in any of the reports that you
15  prepared for all of these parties in Hurricane
16  Katrina litigation, have you ever reached a
17  conclusion other than that wind caused most or all
18  of the damage to the property?
19      A.  Yes, I have had to assign percentages on a
20  good many occasions, which I do my best estimate so
21  much percent wind, so much percent water, especially
22  if the building remains after the storm.  And
23  sometimes it's a case where it's opened up on one
24  side and blown out on the backside, and it just
25  stands there and water comes in later and destroys

Page 23

1  whatever is left, usually.
2      Q.  How many reports -- how many Hurricane
3  Katrina reports have you prepared where you have, I
4  guess, estimated that not all of the damage was
5  caused by wind?
6      A.  I think most of my reports will state that
7  water came in later and destroyed whatever was
8  remaining.
9      Q.  Well, I guess my -- I think I understand
10  your answer, but my question was just a little
11  different.  Of the Hurricane Katrina reports you
12  prepared, how many of them -- what percentage of
13  them have you concluded the property was destroyed
14  solely by wind before water did any damage to it?
15      A.  I -- I would have to go through all of my
16  reports and tabulate them, but it would be the
17  majority.
18      Q.  It would be the majority.  And
19  specifically with respect to homeowner claims like
20  this one here with plaintiffs where their house was
21  completely destroyed, of those reports that you
22  prepared, how many did you conclude that wind was
23  the sole cause of damage to the property?
24      A.  Well, you need to further define the word
25  damage.  Structural damage comes first by the wind

Page 24

1  in this case.  Structural damage in houses that are
2  like the Politz's in which all structure was gone,
3  that was all due to wind, the structural
4  destruction.  Now, obviously, water came later and
5  whatever was left of the house or the furnishings
6  and what not were then destroyed by water, and so I
7  couldn't give you a percentage.  I'd have to go
8  through and tabulate all of my files to know, but
9  the -- even in this case, I'm sure I mentioned that
10  the water came in later and destroyed whatever was
11  left.  It's impossible for me to sit here and tell
12  you what -- what was left.  I don't know.
13  Something, of course.
14      Q.  So you wouldn't rule out the possibility
15  in this case that there's some part of the structure
16  and contents left that was then destroyed by the
17  storm surge?
18      A.  No, I wouldn't rule that out.  I think the
19  pictures, the after storm pictures kind of give you
20  a real good idea of what's -- what's left and the
21  owners around the property and the remnants of their
22  house there on the slab and a good deal of their
23  debris all around.  What final portion of that was
24  destroyed by the water, I don't know.  My conclusion
25  is that the structural part of the house was

Page 25

1  destroyed by the winds before the waters got there.
2      Q.  And we'll go through your report, but I
3  guess let me back up for a second.  Would you
4  characterize this claim as a slab claim?
5      A.  Yes, it's a slab case.
6      Q.  And of slab cases for homeowners where
7  you've prepared expert reports, how many then have
8  you concluded that the structure was destroyed by
9  wind before the water reached the property?
10      A.  Most simply because of the sequence, and
11  we can get into all of that if you'd like.
12      Q.  Would it be fair to say nearly all of
13  them?  How about a percentage?  Do your best.
14      A.  The word destruction whether it was
15  destroyed or greatly damaged, yes, the winds did its
16  work hours ahead of the water, let's just put it
17  that way, on all of them.
18      Q.  Well, I mean, and, again, we'll talk a
19  little bit more about the sequence, and I guess I'm
20  just trying to maybe define terms so that we are on
21  the same page.  When you say a residence such as
22  Politz residence was destroyed, what does that mean
23  to you?
24      A.  Structurally destroyed?
25      Q.  Structurally destroyed.

Ted Biddy - 11/07/08

Page 26

1    A.  It's gone, number one, and it was blown
2  away.
3    Q.  So there wouldn't be -- I'm sorry, I
4  didn't mean to interrupt, but -- but go ahead.
5  Complete your question -- your answer.  I'm sorry.
6    A.  What I do when -- when I do my
7  inspections, I find the mechanism of destruction of
8  the house, and that's usually pretty easy to
9  determine, especially if the house was totally blown
10  away or the great bulk of it was, and there's about
11  three mechanisms of destruction I look for and find
12  on a totally destroyed case when there's still some
13  part of the structure there and also find the
14  mechanisms of destruction.
15    Q.  And so in totally destroyed homeowner
16  cases that you've worked on, of those, is it fair to
17  say 90 percent at least, you've reached a conclusion
18  that wind caused that destruction before the water
19  reached the property?
20    A.  Yes.
21    Q.  Would it be fair to say even almost 100
22  percent?  I know you've done --
23    A.  It would be --
24    Q.  -- a lot of reports so...
25    A.  It would be fair to say that wind did

Page 27

1  whatever it could in way of destruction before the
2  water got there, ahead of the water.  Whatever
3  damage and/or destruction that these strength winds
4  could do to this -- any particular structure, it did
5  it before the water got there.
6    Q.  And you've reached that conclusion with
7  respect to residences that were totally destroyed in
8  nearly all of the cases that you've prepared expert
9  reports; is that correct?
10    A.  Yes.
11    Q.  All right.  Let's go back to Defense
12  Exhibit 155 on your schedule of professional fees
13  and your invoice to the Politzes.  You have listed
14  under the schedule a fee for inspection assistant.
15    A.  Yes.
16    Q.  And it's $75 per hour; is that correct?
17    A.  Yes.
18    Q.  And in fact, in your report, you
19  referenced relying on the work of a person Rodney
20  Shreve.
21    A.  Correct.
22    Q.  He was your inspection assistant who
23  helped you in the Politz report?
24    A.  That's correct.
25    Q.  Who is Rodney Shreve?

Page 28

1    A.  Rodney Shreve is -- that's my son-in-law
2  for one thing, but he's an expert inspector.  He's a
3  licensed electrician.  Rodney came with me on a
4  number of these inspections during this three-year
5  period.  I've had two back operations during that
6  period, and many times, I was hopping around on a
7  cane, and he was -- he was able to do some of the
8  physical climbing on debris and what not and walking
9  around and taking pictures at my direction and so
10  on, but he was just a general helper.
11    Q.  What -- what are his -- what's his
12  experience in, credentials?
13    A.  He's been in the construction industry for
14  20 years or so.  That's all.  He has a high school
15  education and a little college, I think, but he's a
16  licensed electrician.  He did not contribute
17  anything technical to this report.  He just simply
18  assisted me.
19    Q.  And when you said he simply assisted you,
20  I guess can you just describe what he did
21  specifically on the Politz report?
22    A.  Well --
23    Q.  That you didn't do, for instance.
24    A.  When we got to the site, he -- and this is
25  one of those times when I -- either my back -- had a

Page 29

1  back operation or an epidural shot or something was
2  the reason he was along because I was handicapped
3  somewhat.  He got the folding chair out of the back
4  of the car or his -- his Jeep and set it up for me
5  while I -- in a close location so I could start
6  taking notes and telling him what to do.
7    Q.  So you -- he accompanied you to the
8  Politz --
9    A.  Yes.
10    Q.  -- home site?
11    A.  Yes.
12    Q.  Was he the one who took any photographs
13  you took of the site when you visited there?
14    A.  He was.
15    Q.  Did he do anything else to help you
16  prepare this report other --
17    A.  Did he?
18    Q.  Yes.
19    A.  No.
20    Q.  Again, going back to your schedule of
21  professional fees, depositions, expert trial
22  testimony and consultations with attorneys, that's
23  $200 per hour.  Is that the charge you -- the fee
24  you charged the plaintiffs --
25    A.  Correct.

## Page 30

1    Q.  -- here?
2    A.  With a minimum of an eight hour charge on
3 the day of the deposition, and I charge travel time
4 as well.
5    Q.  Now, turning over to the next page,
6 there's an invoice addressed to Mrs. Politz in care
7 of Kristopher Carter here at the Denham Law Firm
8 dated July 15th, 2008. Do you recognize that
9 invoice?
10    A.  Yes, I do.
11    Q.  Is that your final invoice that you --
12    A.  It is.
13    Q.  -- presented to -- in connection with this
14 case?
15    A.  It is.
16    Q.  The inspection report figure of $4,500
17 listed there, that includes your services as well as
18 Mr. Shreve's?
19    A.  Yes, and that was a little bit of a
20 departure from the normal schedule because
21 Mr. Denham had given me so many cases, I had agreed
22 with him to give them a discount. If you'll note --
23 if you'll notice on the first page, I say a minimum
24 of 50 hours charge. Well, my time could be $5,000,
25 but because Mr. Denham was giving me a large volume

## Page 31

1 of work, I'd agreed the lump sum on these would be
2 4,500 each plus the cost.
3    Q.  So you've done so many cases for the
4 Denham Law Firm that you've given them like a bulk
5 discount rate?
6    A.  Yes.
7    Q.  Your normal rate is 5,000, is that --
8    A.  Yes.
9    Q.  Okay. And then you add --
10    A.  For homeowners.
11    Q.  And then you add some expenses that add a
12 little under another $1,000, correct?
13    A.  That's correct.
14    Q.  So is this total invoice figure, we'll
15 call it 5,500, is that -- he's paying you $500 lower
16 than your average report?
17    A.  That's right, uh-huh.
18    Q.  Your average report is about 6,000?
19    A.  With expenses.
20    Q.  With expenses?
21    A.  Uh-huh, about.
22    Q.  And now, I said -- earlier you said you
23 have done about 250 of these reports. Was that 250
24 figure for homeowners or total?
25    A.  No, total.

## Page 32

1    Q.  Okay. About how many homeowner cases have
2 you worked on in Hurricane Katrina litigation?
3    A.  I would say around 200.
4    Q.  Around 200?
5    A.  I think it was 50 of the others.
6    Q.  So that -- I think by my math that would
7 be about 1.2 million in fees for homeowner reports
8 if you multiply 6,000 by --
9    A.  Gross over three years, yes, that's about
10 right.
11    Q.  And then the other 50 have been -- those
12 have been higher amounts for companies or commercial
13 properties?
14    A.  As a rule, yes, they would be higher.
15    Q.  Do you know about how much above and
16 beyond the 1.2 million you've earned in fees for
17 homeowner reports you've earned for other reports
18 for other parties in Hurricane Katrina litigation?
19    A.  I have no idea, but it was some that are 7
20 or $8,000, some are 10,000. One big museum in
21 Biloxi was -- it was a $20 million project that was
22 destroyed by winds was 45,000, I believe, so I think
23 that would be the highest, but it varies.
24    Q.  Would it be fair to say when you add those
25 50 other reports in, would it carry over 2 million?

## Page 33

1    A.  No, I wouldn't say that, no.
2    Q.  Somewhere between one-and-a-half million?
3    A.  Well, let's say, I don't know what they
4 would average, but if they averaged $10,000, and
5 there were 50 of them, that would be half a million
6 dollars, wouldn't it?
7    Q.  Uh-huh.
8    A.  Yeah.
9    Q.  So maybe about 1.7?
10    A.  In that range, yeah, I think so.
11    Q.  You can set that aside. I'm going to show
12 you what's been marked as Defense Exhibit 156.
13    (Exhibit 156 marked for identification.)
14    Q.  (By Mr. Gilmore) This is a copy of your
15 CV that's been produced to us in this litigation.
16 Do you recognize it as that?
17    A.  Yes.
18    Q.  And if you turn to the back, the last
19 page, Politz-294 of Defense Exhibit 156, it says
20 updated January 31st, 2008. Do you see that?
21    A.  Yes.
22    Q.  Do you have a more current version of your
23 CV than this one here?
24    A.  Yes, I have updated it to August or so of
25 '08, but the only thing that changed is because

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 34

1  that's all I'm doing this year is between the
2  clients instead of the 200 -- it says 200 Katrina
3  cases up at the top of that page, it would say what
4  it was at that time, 220, 230, about, and --
5      Q.  And now that's 250?
6      A.  Yeah, that's right, about.
7      Q.  And I'd ask if you have an updated vision
8  of your CV, if you could provide that to counsel for
9  the plaintiffs so that they can produce that to
10 Nationwide.
11     A.  Okay.
12     Q.  Now, I know you and my colleagues talked
13 about what you had done through maybe end of August
14 the last time you sat for depositions in Nationwide
15 cases.
16     A.  Uh-huh (affirmative response).
17     Q.  Since -- I think August 22nd was the last
18 deposition.  Have there been anything in the past
19 two or three months that -- that you would not have
20 told them about that you might want to add to
21 your -- that you've added to your CV, and you think
22 is relevant to your experience?
23     A.  No.  Obviously, there was more cases, but
24 it's cumulative to what's in my CV.
25     Q.  1957, you earned a degree from The

Page 35

1  Engineer's School.  What degree is that?
2      A.  Topographic surveying at Ft. Belvoir.
3      Q.  And I guess what kind of degree is that?
4      A.  Well, the U.S. --
5      Q.  Is that a bachelors?
6      A.  No, it's not a bachelors.  I left Georgia
7  Tech, interrupted my schooling in 1957 and went in
8  the Army for three years and went back to Tech after
9  that.  As soon as I got in the Army, they sent me
10 to -- after I went through basic training, they sent
11 me to Ft. Belvoir to engineering school to study
12 topographic surveying, and then to work as a
13 topographic surveyor the time I was in the Army.
14     Q.  How long were you in the Army?
15     A.  Three years.
16     Q.  Were you -- did you receive an honorable
17 discharge?
18     A.  Yes, I did.
19     Q.  And after you left the Army, is that when
20 you resumed your schooling at Georgia Tech?
21     A.  Correct.
22     Q.  And you earned a bachelors of science in
23 civil engineering in 1963?
24     A.  Correct.
25     Q.  Do you have any minors or concentrations

Page 36

1  in earning that degree?
2      A.  No, but I took some graduate studies in
3  geodesy, which is just another field of civil
4  engineering.
5      Q.  What is geodesy?
6      A.  Geodesy is the study of the earth and its
7  shape and its position in the universe and the solar
8  system within the universe, so it's very high class
9  surveying, very precise surveying.  It's something
10 that's totally out of date now because of GPS
11 systems and satellites, but back in those days, you
12 did it by observation of stars and their
13 relationship with the earth and the celestial
14 sphere, but I did not complete that masters work
15 because I had a family and had to go to work and
16 support them.
17     Q.  I understand that.  Geodesy doesn't have
18 any application to the work you've done in the
19 Politz case, right?
20     A.  I'd say no, other than civil engineering
21 would be -- and structural engineering would include
22 an element of surveying, of course, and the -- I do
23 have in Appendix D, I have the -- a plat of the
24 house on the property and that was, of course,
25 important to know.

Page 37

1      Q.  Why was the plat important to know?
2      A.  It gives the position of the house as
3  it -- as it sits on the lot and its orientation.  It
4  is oriented north 31 degrees east, the front of it,
5  and the back of it then, therefore, is south 31
6  degrees west.  It has an entire east side that is
7  oriented to the -- to the southeast where the east
8  -- east and southeast where the strongest winds came
9  from.
10     Q.  Your looking at the plat, I mean, that
11 doesn't involve any knowledge or expertise of
12 geodesy, right?  I mean, you can just kind of look
13 at the plat and know --
14     A.  Surveying --
15     Q.  Right, in order to generate that, you
16 might need to have some knowledge of geodesy, but to
17 look at it and interpret it, a layman can see the
18 layout and the direction of the property, correct?
19     A.  I would think so, yes.
20     Q.  Other than the degrees, formal degrees
21 that you have here, are there any other educational
22 degrees that you've earned?
23     A.  No.
24     Q.  I mean, you list a number of
25 registrations.  Are these for engineering licenses

Page 38

1  you hold?
2      A.  Some are engineering licenses and some are
3  land surveying licenses.
4      Q.  That's correct, land surveyor, three of
5  them are as well.  Are all of the -- as we sit here
6  today, are these registrations -- are they current
7  and in good standing?
8      A.  Well, when you say registrations, are they
9  current and in good standing, yes.  The license
10 itself is something you renew year by year.  I don't
11 keep all my licenses active in other states when I'm
12 not working there.  Right now, I have active license
13 in Florida and Mississippi and South Dakota, the
14 three for engineering.  The others are dormant, and
15 should I need to work in Georgia, I will simply make
16 application for relicensure, which is simply paying
17 your money and sending the application in.  You
18 become registered by passing a national exam and
19 having that of record.  I did that in Mississippi in
20 1967, and that national exam has been reciprocated
21 in seven other states.
22     Q.  And those seven states, would those be the
23 ones listed here?
24     A.  Yes.
25     Q.  Florida, Georgia, Louisiana, South Dakota,

Page 39

1  Nebraska and Missouri?
2      A.  That is correct.
3      Q.  Maybe I'm missing one.  It looks like
4  those are six.  Is it seven total states in which
5  you are registered, Mississippi and then six others?
6      A.  That -- as a professional engineer that is
7  correct.
8      Q.  Okay.
9      A.  Same thing is true on land surveyor
10 license.  I keep my Florida license current, but not
11 my Mississippi and Georgia license because I don't
12 do the land surveying here.  I subcontract that out
13 to people with their own firms that used to work for
14 me.
15     Q.  Other than these states, these seven
16 states that we just talked about, have you ever been
17 licensed as an engineer in any other states?
18     A.  No.
19     Q.  Have you ever been sanctioned, disciplined
20 or reprimanded in any way by any licensing board?
21     A.  On two occasions, I guess, and I think we
22 -- I talked to this some -- with some of your people
23 before.
24     Q.  Uh-huh.
25     A.  One was a case where one of my surveyors

Page 40

1  staked some townhouses off by three point something
2  feet, and those townhouses were built, and I
3  prepared the plats and people transferred the title
4  to those townhomes by those plats, and it turned out
5  that the error was found, which I did correct all of
6  the plats, and the title -- me and the title company
7  worked out the title problems, but somebody filed a
8  complaint with the State Board of Professional Land
9  Surveyors.
10     Q.  What state was this in?
11     A.  Florida.  And they investigated and came
12 to me, and I said, well, it happened, you know, and,
13 yeah, one of my crews made a mistake, and I
14 corrected it and I essentially pled guilty that it
15 was work that didn't meet the minimum technical
16 standards, and so I went before the board, and they
17 gave me the minimum fine which was S750, and they
18 had me send in the next five surveys, I think, for
19 their review.  That was the only one of any
20 consequence and any sanction or any fine.
21        I did receive a letter of guidance one
22 time from the Florida Board of Professional
23 Engineers.  I had prepared a structural drawing for
24 an interior decorator for some shelves to carry some
25 heavy duty items in a mall for a store, and an

Page 41

1  architect complained that I was practicing
2  architecture.  Well, I wasn't, and when they came to
3  investigate, I showed them the drawings that said --
4  with my seal on it and my signature, and it said
5  "for structural only."  Well, I received a letter of
6  guidance from the state board saying put your
7  details on a separate sheet when you're doing
8  subcontract work for others like that.  Other than
9  those two, I can't remember any others.
10     Q.  Okay.  And the two, what years did those
11 occur?
12     A.  The one with the letter of guidance would
13 have been in the mid-'70s in Florida.  The one from
14 the Florida Board of Land Surveyors would have been
15 in the mid-'80s.  That's two instances in a 45 year
16 career.
17     Q.  Your -- your license was inactive in
18 Mississippi from 1990 to 2005; is that correct?
19     A.  Yes, I believe '89 was the last year it
20 was active in Mississippi until 2005, that's
21 correct.
22     Q.  And you activated your license in
23 Mississippi again specifically to work on Hurricane
24 Katrina claims?
25     A.  In the early part of 2006.

Page 42

1    Q.  Why did you allow your license to become
2  inactive in Mississippi in that 15 year time period?
3    A.  Very simply, I wasn't doing work here. I
4  was headquartered in Tallahassee, been working in
5  Florida and Georgia and spread up to some work in
6  the northwest into South Dakota and Missouri and
7  Nebraska, and I just wasn't doing work in
8  Mississippi.  My license was originally -- I was
9  originally registered in Mississippi in 1967 by
10  national exam and worked continuously until 1989, at
11  which time I moved my office to Tallahassee.
12    Q.  How long did -- how long did you live in
13  Mississippi?  Were you living here during that
14  period?
15    A.  I lived here from -- after school in 1963,
16  I went to work for the firm of Michael Baker, Jr.,
17  Incorporated in Jackson, and I worked in and out of
18  their Jackson office and all over the southeast
19  until 1969, at which point I went into business for
20  myself in Jackson and went -- the only office I had
21  was in Jackson at that time and worked then until --
22  I was a resident there until 1971, I think it was.
23  I moved my residence to Florida at that point and to
24  establish the branch office in Tallahassee simply
25  because I had a fairly large contract there.  And as

Page 43

1  time went on, the work picked up in Florida to the
2  extent it dwindled off in -- in Mississippi, and you
3  just can't spread yourself thin -- so thin that you
4  can't cover all bases, so I simply quit doing work
5  in Mississippi.
6    Q.  You -- in 1969 after you left Michael
7  Becker [sic] firm, you founded your own consulting
8  firm; is that correct?
9    A.  That's correct.
10    Q.  What was the name of that?
11    A.  The first name was Biddy & Sims, Inc.
12  S-I-M-S.
13    Q.  You were partners with someone named Sims?
14    A.  Correct.
15    Q.  Was he or she also an engineer?
16    A.  Yes, he was a structural engineer.
17    Q.  And how -- how long were you partners with
18  Mr. Sims?
19    A.  Up until probably the late '70s, I guess.
20    Q.  And then you and he separated, and you ran
21  your company by yourself?
22    A.  Yes.  It was under the name of Ted L.
23  Biddy & Associates, Inc.
24    Q.  Did you have other engineers working under
25  you?

Page 44

1    A.  Yes.
2    Q.  About how many?
3    A.  It varied from two to 10.
4    Q.  Prior to Hurricane Katrina, how many
5  hurricane-related work or properties have you done
6  inspections on?
7    A.  Many.
8    Q.  Can you give me a rough estimate?  More
9  than 100?
10    A.  No.  It wouldn't be more than 100.  It
11  would be less than 50.
12    Q.  So it's fair to say that the great
13  majority of your hurricane-related work has been
14  Hurricane Katrina cases?
15    A.  Simply because there's so much of it, yes.
16    Q.  Of the less than 50 hurricane cases that
17  you worked on before Hurricane Katrina, how many of
18  those were homeowner -- sorry, individual
19  residences?
20    A.  A few.  Most of them were in connection
21  with major projects one way or another.  For
22  instance, 1969, Hurricane Camille hit the
23  Mississippi Gulf Coast.  At that point, I was still
24  a project engineer with Michael Baker, Jr.,
25  Incorporated in Jackson.  I was the project manager

Page 45

1  and project engineer for a number of projects on the
2  Mississippi coast.  As soon as the hurricane hit,
3  they sent me here to evaluate all of those projects
4  and the effects of the hurricane on it -- of
5  Hurricane Camille on those.  That was the start of
6  it.
7    Q.  I guess can you give me a rough estimate
8  of how many pre-Hurricane Katrina residential
9  properties you inspected for hurricane damage?  I
10  mean, was it less than 10?
11    A.  No, 15.  I don't -- I'm guessing, but
12  during -- for instance, Hurricane Camille, I was
13  doing a subdivision that's just to the east of Ocean
14  Springs called St. Andrews on the Gulf.  It's a golf
15  course residential subdivision.  I did all of the
16  design work for that subdivision on infrastructure.
17  And some of the early residences, the U.S. Steel
18  was -- had a prefab steel structure at that time for
19  houses that they were promoting, and I helped them
20  with some of their design through Michael Baker's
21  firm, and some of those residences were damaged
22  during Hurricane Camille.  And of course, I did a
23  report and then ran the report to my bosses at
24  Michael Baker of the whole -- what I found and what
25  the cause of the damages were.  And also the port

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 46

1  facilities, two ship terminals, I had done at Bayou
2  Prasad in Pascagoula and one on the Pascagoula
3  River, a -- another water system I had done for
4  Standard Oil. They were our client for Michael
5  Baker, and in general, a description of all the
6  damages to the projects we had been the engineer on
7  and what damages were caused, so -- and probably
8  half a dozen houses in St. Andrews that suffered
9  varying amounts of damage that I did a report on.
10      Q.  Mr. Biddy, how many -- prior to -- prior
11  to Hurricane Katrina, how many properties of any
12  type have you inspected where the property was
13  substantially damaged by flood of any type?
14      A.  By flood of any type, a lot.
15          VIDEOGRAPHER:  One minute.
16          MR. GILMORE:  You can go off the record.
17          VIDEOGRAPHER:  Off the record at 9:57.
18  End of tape one.
19          (Off the record.)
20          VIDEOGRAPHER:  Beginning tape two.  On the
21  record at 10:11.
22      Q.  (By Mr. Gilmore)  Mr. Biddy, when we went
23  on break, I was asking about your experience before
24  Katrina handling flood claims.  Let me ask you a
25  more specific question.  Before Katrina, how many

Page 47

1  properties had you inspected that had suffered flood
2  or storm surge damage as a result of a hurricane?
3      A.  How many properties?
4      Q.  Of any type.
5      A.  That would be difficult to estimate.  I'd
6  just say Hurricane Camille would be -- I mean, 25 to
7  30.  Hurricane Frederick at Gulf Shores, Alabama
8  would be 50 to 100 maybe.
9      Q.  Well, hold on.  I'm a little confused now.
10  Earlier during the deposition, you had testified
11  that before Hurricane Katrina, you had worked about
12  50 hurricane claims or hurricane properties.
13      A.  That's true.  That was not a hurricane
14  claim, I mean, from the homeowners at Gulf Shores,
15  Alabama.  That was work under contract with the U.S.
16  Army Corp of Engineers assessing -- cataloging all
17  of the damage on the water side of Gulf Shores along
18  the highway and the beach and the different
19  condominiums and motels and et cetera along the way.
20  In other words, along the beach, we laid out a
21  baseline of several miles and took what we call
22  transections or cross sections across each one with
23  all of the elevations and all of the notations of
24  where various structures were and what condition
25  they were in, et cetera, et cetera.  Many of those

Page 48

1  had both wind and water damage.  As you can imagine,
2  a commercial building built very strongly withstood
3  the wind maybe with heavy damage, but then the water
4  came in and caused great damage, and a lot of that
5  occurred along, and that's the reason I included
6  that as -- as one.  There was a bunch of them.  I
7  didn't count them.
8      Q.  Let me ask a more precise question then.
9  Before Hurricane Katrina, how many residential
10  properties did you inspect in an effort to determine
11  cause and origin of damage where the properties had
12  suffered some storm surge damage from a hurricane?
13      A.  You want me to restrict that strictly to
14  residential structures, correct?
15      Q.  That's right.
16      A.  Hurricane Camille would be, let's say, a
17  round number of 10.  I'm guessing about 10.
18  Residential structures that I saw and cataloged
19  storm damage at Gulf Shores would be 25, I suppose.
20  Structures in Panama City after Hurricane Betsy
21  would be -- no, well, I take that back.
22  Condominiums counts as a residential structure and
23  that would be one large condominium and the
24  infrastructure that I was designing around it.
25      Q.  And I'm confining my question to storm

Page 49

1  surge damage so that the residences that you
2  inspected for Hurricane Frederick, did those have --
3  was storm surge at issue there?
4      A.  Yes, it was, in addition to -- to wind.
5  As I said, in most -- including, I think, this --
6  this case, I make the general statement that after
7  the wind did its damage, then the storm surge came
8  in and completed the damage.  And I'm trying to
9  break that down as to what percentage is beyond my
10  -- I'm not clairvoyant, I don't know, but most of
11  the damage was by wind.
12          That was not true on heavier constructed
13  structures such as condominiums, hotels, museums
14  that I had here, and some structures, some of the
15  residential structures that were built in a path,
16  you would have a half to three-quarters maybe of
17  wind damage and then water came in and did the rest.
18  You know, I can't give you blanket generalizations,
19  but if you want to talk about any specific one, I
20  can.
21      Q.  I don't -- I don't need you to talk about
22  specific ones.  I'm just trying to get a sense of
23  how much experience you had in terms of how many
24  residences you had inspected prior to Katrina that
25  has -- that had damage during a hurricane in which

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 50

1    storm surge played a part.
2        A.   They would --
3        Q.   Give me a number.  I know it's an
4    estimate.
5        A.   Well, it would be limited to Hurricane
6    Katrina -- I mean, Hurricane --
7        Q.   Camille?
8        A.   -- Camille in 1969, Hurricane Betsy in the
9    '80s and Hurricane Frederick in the '80s, I think.
10   It might have been the late '70s, but I think it was
11   the '80s.
12       Q.   Camille, Frederick, Betsy.  Can you think
13   of any others, any other hurricanes?
14       A.   Not where I did residential structures.
15   Let me explain that.  Engineers -- solely engineers,
16   as a rule, rarely get involved with houses unless
17   it's something like this where it's a massive scale
18   and people need engineers to determine the
19   causations of damages and what not.  Most of the
20   structures I would have investigated over my 45 year
21   career due to damages from wind and/or flooding
22   and/or storm surge were heavy major structures that
23   I had designed or else was looking into for the
24   owner on some basis.
25       Q.   It's fair to say before Hurricane Katrina,

Page 51

1    the great majority of your engineering work on any
2    structures that had been damaged by hurricanes was
3    on structures other than residential structures?
4        A.   Well, of course, yes.
5        Q.   You're not trained in meteorology, are
6    you, Mr. Biddy?
7        A.   Well, I've been asked that question a lot
8    of times, and my answer is yes, I am to this extent.
9    Each and every course you take in civil engineering
10   at Georgia Tech has an element of meteorology, and
11   specifically the meteorology of how that -- whatever
12   weather condition it is affects your particular
13   phase you're studying at the time.  For instance,
14   civil engineer is a broad field, as you probably
15   know, and it covers drainage, storm water
16   management, flooding, structures, utilities, roads,
17   you name it.  It was the first engineering
18   discipline that -- long before they separated out
19   mechanical and electrical and things of that sort.
20   And so meteorology is a situation that affects each
21   one of -- of an engineer's work on each one of those
22   types of projects, and so you have to learn how the
23   meteorological -- meteorological data is obtained,
24   how to -- where to go get it and how to apply it to
25   your particular situation.

Page 52

1        Q.   Mr. Biddy, you don't have any degrees in
2    -- formal degrees in meteorology, correct?
3        A.   No.
4        Q.   And you've never taken any courses solely
5    on meteorology in school; is that correct?
6        A.   No, other than just what I said, each
7    course has an element of it that you study.
8        Q.   But in terms of you never enrolled in
9    meteorology 101 in college, right?
10       A.   No.
11       Q.   Or 102 or graduate work or any
12   meteorological courses in college?
13       A.   No.
14       Q.   You never authored any publications on
15   meteorology, correct?
16       A.   That is correct.
17       Q.   You don't teach and have not taught in the
18   field of meteorology, right?
19       A.   No.
20       Q.   And you don't hold yourself out as an
21   expert meteorologist?
22       A.   I hold myself out as an expert in applying
23   meteorological data to engineering evaluations.
24       Q.   But in terms of determining and
25   accumulating and analyzing the meteorological data

Page 53

1    itself, you are not a meteorologist.  Others do that
2    work for you, correct?
3        A.   I don't generate the data, but I do
4    accumulate and analyze it and apply it.
5        Q.   Well, and when you say you apply it, you
6    take meteorological observations and data that other
7    meteorologists have prepared, correct?
8        A.   Yes.
9        Q.   And then you take those numbers and say if
10   these numbers are true, this is what could happen
11   from an engineering perspective to a structure; is
12   that correct?
13       A.   Well, there's a little more to it than
14   that but --
15       Q.   Of course, there is.
16       A.   -- essentially you're --
17       Q.   I'm just trying -- when you say that you
18   applied meteorological data, I want to make sure I
19   understand what you're saying.
20       A.   Yes.
21       Q.   And, obviously, we'll go into the process
22   of you forming your expert opinions, but I just want
23   to make sure when we're talking about that, what
24   we're talking about is you relying on reports or
25   data from other meteorological sources?

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 54

1       A.  It's the most important phase of beginning
2   a study of any structure that's been damaged by
3   weather elements is to do the proper research of all
4   the meteorological data that's been published by all
5   governmental agencies, the private meteorologists or
6   wherever it's been published, accumulate all of that
7   and analyze it and -- and determine the strength and
8   sequences of winds and water.
9       Q.  The sources of meteorological data that
10  you rely on generally in your practice as an
11  engineer, you rely on National Oceanic and
12  Atmospheric Administration, NOAA?
13      A.  Yes, that's part of it.
14      Q.  And you also look at the National Weather
15  Service?
16      A.  Yes, which is a part of NOAA.
17      Q.  Do you look at FEMA as a source of
18  meteorological information?
19      A.  Sometimes.  FEMA really just -- they come
20  in after the fact and catalog some of the data, but
21  they're not the primary ones, and they don't have
22  the expertise to do what people like NOAA and the
23  National Ocean Survey and the Weather Service and
24  expert private meteorologists do.
25      Q.  What other -- let's talk about Hurricane

Page 55

1   Katrina.  Other than the organizations we just
2   named, what other sources have you relied on that
3   you think are reliable sources of meteorological
4   data in preparing Hurricane Katrina reports?
5       A.  One that jumps out in my mind immediately
6   besides those are, number one, the readings taken at
7   the office of -- what's it called -- the Pascagoula,
8   Jackson County Emergency Management Office, EMO
9   offices.  They had two anemometers mounted on top of
10  a three story building.  They regularly reported
11  that by telephones to the New Orleans Weather
12  Service.  New Orleans received that from them up
13  until telephone service went out between Pascagoula
14  and New Orleans and recorded that in -- that's in
15  Appendix D of my report -- some of the initial
16  readings, like the 125 mile per hour winds.  This
17  was before the power went out and long before the
18  highest of the winds occurred.  They then --
19  Mr. George Sholl for one and his boss, Mr. Loper,
20  observed those gauges after that at 137 and 140
21  miles per hour.  These are, you know, public
22  officials who were doing their job in the Emergency
23  Management Office of collecting that data and
24  disseminating it to the public and the Weather
25  Service.  That was one of the many stations that --

Page 56

1   I say many, one of the few stations that National
2   Weather Service had to report the data because the
3   anemometers at the airports went down early.  They
4   blew down early in the storm, and it was on up in
5   the morning of the -- the morning of the storm, the
6   29th of August of '05 when the towers on the
7   Emergency Operation Center Building in Pascagoula
8   blew down, so they got the -- probably the -- nearly
9   the highest readings, at least.  That's one source
10  that comes to mind immediately.
11      The second source is the private
12  meteorology reports by meteorologists such as
13  Mr. Rocco Calaci, who is a noted meteorologist,
14  retired military meteorologist who's done a lot of
15  work on Hurricane Katrina and others.  Also,
16  AccuWeather from State College of Pennsylvania.
17  We've probably got 15 or 20 that they've done along
18  the Mississippi Coast.
19      Q.  That would be Steven Wistar?
20      A.  Yes, Steven Wistar of AccuWeather.  The
21  third would be Dr. Fitzpatrick -- Patrick
22  Fitzpatrick of Mississippi State, and he is attached
23  to the Geo Research Center at Stennis Space Center.
24  He has performed one comprehensive meteorology study
25  of an area, specific area in Bay St. Louis, but also

Page 57

1   in general on the coast of Mississippi.  There is an
2   organization called IPET, I-P-E-T.  It's the acronym
3   for Inner Agency something Professional Study Group
4   or whatever.  What it is or was was a group of
5   scientists, engineers, academics and others that
6   were assembled by the U.S. Army Corp of Engineers to
7   do a complete study of Hurricane Katrina.  Their
8   results, I've depended on before, and they match Mr.
9   Calaci's work, and I'm not sure I even mentioned
10  them or Dr. Fitzpatrick in my report, but those
11  are -- you were asking me what other sources I had
12  besides NOAA and the Weather Service, so those would
13  be the most of them.
14      Q.  You're aware of the anemometer readings
15  from the Northrup Grummons Ingalls Shipyard,
16  correct?
17      A.  Yes, I am.
18      Q.  Okay.  And have you reviewed those
19  readings?  Have they informed -- well, have you
20  reviewed those readings?
21      A.  I have read AccuWeather's reports where
22  they have included those in the -- their modeling
23  work, and I have seen the readings, yes.
24      Q.  You've seen the actual readings from the
25  anemometer at Ingalls?

Page 58

1    A. I've seen the reportings. I haven't seen
2  the actual readings, no.
3    Q. And you're also familiar with the readings
4  at the Stennis that I guess were prepared by Texas
5  Tech?
6    A. Yes, a research project or whatever you
7  call it out at the airfield there where they tried
8  to obtain some data on Hurricane Katrina. I am
9  familiar with -- with their readings and what they
10 did out there.
11   Q. Okay. And you -- you understand those are
12 the only two anemometers along the Mississippi Gulf
13 Coast that continuously reported throughout
14 Hurricane Katrina? Are you -- do you have that
15 understanding?
16   A. Yes I, do have that understanding.
17   Q. Okay. You've included a portion in your
18 report for the Politz case on estimating
19 reconstruction costs. Do you have any formal
20 degrees in cost estimating?
21   A. Well, as, again, you can say that --
22 answer that the same way I answered you about
23 meteorology. It is a part and parcel of every civil
24 engineering course or structural engineering course.
25 And as a matter of fact, you do a cost estimate on

Page 59

1  each and every project you do. Now, I have done so
2  for 45 years of my career, and yes, I am an expert
3  in estimating costs.
4    Q. Have you taken any courses in cost
5  estimating?
6    A. Yes.
7    Q. And what kinds of courses have you taken
8  in cost estimating?
9    A. They were labeled, the best I remember,
10 construction cost estimates at Georgia Tech.
11   Q. So that was part of your earning your
12 bachelors degree?
13   A. Yes.
14   Q. Have you ever yourself worked on
15 constructing a residential structure?
16   A. You know, I -- I've enclosed a garage one
17 time, a carport into a den one time by myself. No,
18 to answer your question, I've never worked as a
19 carpenter. I -- so when I -- I've watched a lot of
20 it done, and I've supervised a lot of construction,
21 usually heavier construction than that.
22   Q. Yeah, maybe my question was a bad
23 question. I -- I wasn't asking you if you were --
24 if you worked as a carpenter or a handyman or
25 anything like that. I guess what I meant is in your

Page 60

1  role as an engineer, have you ever been retained to
2  construct a house or a residential house?
3    A. Yes. In the early part of my career, and
4  when I left Michael Baker in 1969, my partner who
5  was a man named Mal, M-A-L, Sims, he owned a
6  franchise called Allied Building Systems. That
7  franchise did remodelings and new -- new structures.
8  I designed and supervised the construction of -- of
9  many residential either add-ons or renovations or --
10 I can't remember a brand-new structure from the
11 ground up because his primary focus of the franchise
12 he had was for remodeling and additions to houses.
13 But we did that a couple of years. It was
14 getting -- while we was getting our company off --
15 off the ground.
16   Q. The last time you did that work would have
17 been 1969, about in that time frame?
18   A. Let's say '70, '71, maybe, yeah, we was
19 actually designing buildings.
20   Q. So since -- so it's fair to say at the
21 time of Hurricane Katrina, you hadn't worked on
22 designing and building residential homes for over 20
23 years; is that accurate? Actually over 30 years.
24   A. Well, I had inspected quite a number of
25 them that had been damaged by one way or the other

Page 61

1  and determined causations of the damage.
2    Q. That wasn't my question. I'm sorry maybe
3  if I was vague. Let me -- let me rephrase my
4  question. In terms of being retained to design and
5  build a residential structure, at the time of
6  Hurricane Katrina in 2005, you hadn't done that kind
7  of work for over 30 years; is that fair to say?
8    A. If you limit it to homes, that's correct.
9  I have done condominiums and hotels.
10   Q. Yeah. In the reports that you prepared --
11 strike that question. Have you included cost
12 estimates to reconstruct residences in all of the
13 reports you've prepared for Hurricane Katrina
14 homeowners?
15   A. Not all of them.
16   Q. I guess why not all of them?
17   A. Natural question. When -- when the owner
18 and/or the attorneys had the cost of refurbishment
19 or repairing the structure and the hard numbers, and
20 they would tell me there would be no point doing a
21 cost estimate of reconstruction or repairing the
22 structures, and that's happened on a dozen occasions
23 or more.
24   Q. In those dozen occasions or more, they had
25 gotten, as you said, hard numbers from contractors;

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 62

1  is that correct?
2     A.  Or from the owners who paid the bills on
3  having it done.
4     Q.  And in those instances, because they had
5  those accurate numbers, they didn't need an estimate
6  from you as to reconstruction, correct?
7     A.  That is correct.
8     Q.  And in fact, in preparing the estimates
9  that you have done for reconstructing homes that
10  were destroyed during Katrina, you've relied on
11  information from contractors on the Mississippi Gulf
12  Coast, correct?
13     A.  That's correct.
14     Q.  Okay.  And those would be the people who
15  would be more qualified than you to address the cost
16  of building materials on the Gulf Coast, right, it's
17  fair to say?
18     A.  That is fair, yes.
19     Q.  You -- and professionally, you don't hold
20  yourself out as an expert on cost of reconstruction
21  of residential homes on the Mississippi Gulf Coast?
22     A.  Well, I just told you that I would -- that
23  I do because I've studied it, and I know what -- how
24  to do estimates, and I've done many over the years.
25  I did do investigation of what the local builders

Page 63

1  were charging here in the Mississippi coast in the
2  post-Katrina time frame, and received letters and --
3  and documentation from those contractors who told me
4  what the costs were, and I have applied those to
5  this structure as well as others.
6     Q.  Have you ever prepared an estimate, a
7  reconstruction cost estimate, for a homeowner
8  plaintiff for one of these reports where the
9  plaintiff and his or her attorney said we don't need
10  that estimate?
11     A.  Where I prepared one, and they didn't want
12  to use it?  I have prepared one -- some that they
13  did not use.  For instance, the one trial before a
14  jury I went before in the Webster case, Webster
15  versus USAA, as a matter of fact, the -- there was a
16  stipulation by the parties as -- as the agreed
17  amount of the reconstruction cost, so there were no
18  questions, and I didn't make no presentation of my
19  cost estimate on that job.
20     Q.  In fact, you are aware that your cost
21  estimate is based on the RS Means approach that
22  you've used previously were excluded in at least one
23  case, one Hurricane Katrina case, correct?
24     A.  And that is the reason I changed to the
25  making a survey of the local builders and using the

Page 64

1  actual costs that have been experienced since
2  Katrina.
3     Q.  And in this report, the Politz report, you
4  rely on, and I think in other reports that I've
5  seen, you rely on one builder named Carl Hamilton;
6  is that correct?
7     A.  Correct.
8     Q.  Okay.  And -- and you prepared a report in
9  the Ross versus Metropolitan Property & Casualty
10  case as well.  Do you recall that?
11     A.  Yes.
12     Q.  And in that case, you, in addition to --
13  or I guess maybe supplementing your RS Means
14  estimate, you included information from Mr. Carl
15  Hamilton in that report as well, right?
16     A.  I can't remember when -- whether I did or
17  not in the Ross case.  I probably did.
18     Q.  And are you aware that in the Ross case
19  that Judge Senter here in the Southern District for
20  Mississippi has excluded your estimates on that case
21  based on your information from Mr. Builder as not
22  reliable expert testimony?  Did you know that?
23     A.  We haven't gone to trial in the Ross case
24  yet.  If there's been a motion made to that effect,
25  it may be.  I -- I haven't been informed.

Page 65

1     Q.  You haven't been informed of that?
2     A.  No.
3     Q.  I'll represent to you, you may be hearing
4  that, but you weren't aware of that coming in today,
5  as we sit here today, you haven't heard?
6     A.  There's been some mention of it, but I
7  haven't seen it, no.
8     Q.  And that's the same individual,
9  Mr. Hamilton, that you relied on his information in
10  this report as well, correct?
11     A.  Well, he wasn't the only one, but he's the
12  one I was reporting and I used.
13     Q.  Have you ever prepared a publication
14  dealing with meteorological aspects of hurricanes?
15     A.  No, other than my reports always include
16  the history of the storm and the sequence of the
17  storm.
18     Q.  And other than litigation expert reports,
19  the answer is no?
20     A.  The answer is no.
21     Q.  Have you ever prepared a publication
22  dealing with the effects of hurricanes on
23  structures, again, other than your litigation
24  reports?
25     A.  Well, I've done literally thousands of

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 66

1  reports, obviously. Some were used -- were specific
2  for litigation, others were just for investigative
3  purposes.
4      Q.  And by publication, I mean something
5  that's -- well, for instance, have you ever
6  published in a peer-reviewed journal any
7  publications about the effects of hurricanes on
8  structures?
9      A.  No.
10     Q.  Have you ever published in a peer-reviewed
11 journal, a publication dealing with determining
12 whether damage to a structure was caused by wind
13 versus water?
14     A.  No.
15     Q.  And have you ever held any teaching
16 position at any college or university related to
17 those subjects?
18     A.  Related specifically to hurricane --
19     Q.  Yeah, the effects of hurricanes on
20 structures.
21     A.  No.
22     Q.  Have you ever studied how long it takes
23 winds of a certain speed to destroy a structure?
24     A.  Yes.
25     Q.  And what kind of study on that topic have

Page 67

1  you done? Can you describe it?
2      A.  45 years of calculations, observations,
3  inspecting damage that had occurred, different winds
4  and different mechanisms of destruction.
5      Q.  And other than -- again, other than your
6  litigation reports, have you ever published anything
7  in a peer-reviewed journal discussing or addressing
8  how long it takes winds of a certain speed to
9  destroy a structure?
10     A.  No, I haven't published such a document.
11         (Exhibit 157 marked for identification.)
12     Q.  (By Mr. Gilmore) Let me show you Defense
13 Exhibit 157. Do you recognize this document, Mr.
14 Biddy?
15     A.  Yes, I do.
16     Q.  This is a list of expert witness testimony
17 you've given as a forensic engineer?
18     A.  That's correct.
19     Q.  And I don't believe it's dated. Is the
20 document we're looking at current through today's
21 date?
22     A.  No, it would be -- I have a more current
23 version of the same thing. I think it would be just
24 like my CV would be, first of the year. I usually
25 try to update it once a year.

Page 68

1      Q.  As with your CV, I'd ask you to provide
2  counsel for plaintiffs --
3      A.  Okay.
4      Q.  -- a current version of your expert
5  witness testimony list.
6      A.  I will do so, but I may tell you the only
7  thing that changes on it is on the last page, I
8  think it is, the next to the last page. All of the
9  depositions that I've given, they would just be
10 added more to item 26.
11     Q.  That would be adding Hurricane Katrina
12 depositions you've given --
13     A.  That's correct.
14     Q.  -- in the past year?
15     A.  And under item 27, different -- more
16 attorneys that I've worked with, those two items
17 would be supplemented in this updated expert witness
18 list. And I think it was updated as of August
19 something, I think, and I can give you a copy of
20 that.
21     Q.  And on your list of expert testimony, you
22 have, the second one, I guess, is Missouri Office of
23 the Public Counsel?
24     A.  Yes.
25     Q.  And that was studies, investigations,

Page 69

1  reports and expert witnesses for a $76 million case?
2      A.  Correct.
3      Q.  That was before the Missouri Public
4  Service Commission?
5      A.  That is correct.
6      Q.  In that case, you had testified that a
7  decision to build a new plant was not prudent,
8  correct?
9      A.  That is correct.
10     Q.  Okay. And you also presented testimony
11 about how much it would cost to build that new
12 plant, right?
13     A.  Had they built it at the old location,
14 yes.
15     Q.  I'll hand you Defense Exhibit 159, which
16 you've probably seen before.
17         (Exhibit 159 marked for identification.)
18     Q.  (By Mr. Gilmore) And you recognize this
19 as the report and order from that proceeding before
20 the Missouri Public Service Commission?
21     A.  I do.
22     Q.  On the case that you provided expert
23 testimony for, correct?
24     A.  That's right.
25     Q.  And if you turn to page 36 of that report,

Page 70

1  the page numbers are in the top right corner.
2      A.  36?
3      Q.  Uh-huh.
4      A.  Okay.  All right.
5      Q.  And at the bottom of that page, the report
6  reads, "Additionally, the Commission notes that Mr.
7  Biddy was shown on cross-examination to be
8  inexperienced in the design of surface water
9  treatment plants.  Both Mr. Biddy and Dr. Morris
10 were shown on cross-examination to have
11 misunderstood planning and financial documents
12 obtained from the company through discovery.  Both
13 Mr. Biddy and Dr. Morris relied on very rough and
14 preliminary cost figures which they used as a basis
15 to criticize the far more detailed estimates
16 developed by MAWC.  Under all the circumstances, the
17 Commission finds the cost estimates of Mr. Biddy and
18 Dr. Morris to not be credible."  Did I read all of
19 that correctly, Mr. Biddy?
20     A.  You did.
21     Q.  And that's consistent with your
22 recollection of the Missouri Public Service
23 Commission's findings regarding your expert
24 testimony in this case, right?
25     A.  Yes, they sided with the water company

Page 71

1  rather than the Office of Public Counsel.
2      Q.  Mr. Biddy, have you ever been sanctioned
3  or reprimanded by any court?  I know we talked about
4  the licensing -- the two licensing issues in your
5  past, but has any court ever sanctioned or
6  reprimanded you in any way?
7      A.  In what way?  What are you talking about?
8      Q.  Well, in any way.  Are you aware of ever
9  being sanctioned by a judge in a court --
10     A.  No.
11     Q.  -- for any reason?
12     A.  No.
13     Q.  Have you ever been a defendant in a
14 lawsuit?
15     A.  No.
16     Q.  Either professionally or personally?
17     A.  No.
18     Q.  Have you ever been a plaintiff in a
19 lawsuit?
20     A.  Yes.
21     Q.  Can you tell me about that?  First of all,
22 how many times have you been a plaintiff in a
23 lawsuit?
24     A.  Half a dozen times, collection lawsuits in
25 business.

Page 72

1      Q.  Are all of the lawsuits in which you've
2  been a plaintiff been professional -- professionally
3  related --
4      A.  Yes, they have.
5      Q.  -- to your work as an engineer?
6      A.  Right.
7      Q.  And you said collection lawsuits.  Have
8  they all involved trying to get a client to pay a
9  bill?
10     A.  That's correct.
11     Q.  None of those cases in which you've been a
12 plaintiff have dealt with issues other than debt
13 collection?
14     A.  That's correct.
15     Q.  Have you ever been charged with a crime?
16     A.  No.
17     Q.  So you've never been convicted of a crime?
18     A.  No.  If I haven't been charged, I
19 obviously haven't been convicted.
20     Q.  Have you been informed whether Nationwide
21 has moved to exclude your testimony on Daubert
22 grounds in any cases in which you've testified
23 against Nationwide?
24     A.  I don't know.  I don't know.
25     Q.  As you sit here today -- well, let me ask

Page 73

1  you this:  Has anyone ever shown you any -- do you
2  know what a Daubert motion is?
3      A.  Yes, of course, I went through one.
4      Q.  And so I guess my question is have you
5  been shown any Daubert motions filed against you by
6  Nationwide's counsel in any of the cases that you
7  have presented expert testimony in?
8      A.  I understood that there has been
9  objections filed, but -- but the judge didn't go
10 along with it, or our case was settled before it
11 could be heard or whatever, but I only went through
12 one actual Daubert hearing.
13     Q.  And in terms of the -- you haven't been
14 provided or reviewed copies of any Daubert motions
15 filed by Nationwide?
16     A.  By Nationwide, no.
17     Q.  Okay.  Have you had any of them described
18 to you by the counsel for any of the plaintiffs that
19 you worked on in the Nationwide cases?
20     A.  I think everybody objects to my testimony
21 on every -- on each and every case, and I can tell
22 you that when I was in the courtroom with Judge
23 Minor, he said -- in answer to their objection, he
24 said, "This man is a forensic engineer, and I'm
25 going to let him testify to everything he relied on

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 74

1  in forming his opinions, overruled," and that was
2  the extent of his ruling, and then, of course, long
3  and short of their objection.
4       Q.  So it's fair to say you haven't felt the
5  need to revise any opinions that you ever reached in
6  this or any other cases in response to challenges to
7  your expert testimony; is that correct?
8       A.  Well -- well, with the exception of what
9  we discussed about the cost estimates.  Once Judge
10  Ozerden ruled that the RS Means National
11  Construction Standard estimate for the residential
12  structures was not accurate enough to present in
13  court, the numbers that I was using as a basis for
14  my cost estimates up until '07 sometime, I guess,
15  when he ruled that, that's when I changed my
16  methodology and did a survey of the local builders
17  to come up with actual costs that are being charged
18  on the Mississippi Gulf Coast at this time.
19       Q.  Did you have any prior dealings with
20  Mr. or Mrs. Politz prior to your engagement on this
21  case?
22       A.  No.
23       Q.  Did you know who they were before --
24       A.  No.
25       Q.  -- you started working on this case?

Page 75

1       A.  No.
2       Q.  I'm going to show you Defense Exhibit 146.
3            (Exhibit 146 marked for identification.)
4       Q.  (By Mr. Gilmore)  This is a document that
5  you provided to us in response to the subpoena
6  Nationwide issued to you in this case, and do you
7  recognize this document?
8       A.  Yes, I do.
9       Q.  Can you tell us what it is?
10       A.  This is a letter from Mr. Kris Carter of
11  the Denham firm to me requesting the investigation
12  and study and report for the Politz home.
13       Q.  I know we spoke previously about your
14  telephone conversations with Ms. Politz and with
15  Mr. Carter.  Other than this letter, do you have any
16  other written correspondence between you and
17  Mr. Carter?
18       A.  Only the one I've given you, and, of
19  course, that would include the invoice for the work
20  as well and the letter of transmittal.
21       Q.  Fair enough.  That's -- that's -- other
22  than those documents and this engagement letter --
23       A.  That's it.
24       Q.  Okay.  Okay.  I'm going to hand you 147.
25       A.  Can I correct one thing you said?  I don't

Page 76

1  believe I've ever spoken with Mrs. Politz.
2  Sometimes I do call and talk to the client if
3  there's something specific that I need to know, but
4  I have no notes of having called her and talked to
5  her about this.  Everything I did on the job is what
6  I gleaned from the inspections and data I furnished
7  you copies of, or is in my report.
8       Q.  So as you sit here today, you don't recall
9  having spoken with Mr. or Mrs. Politz?
10       A.  No.
11       Q.  Do you recall whether you spoke with any
12  neighbor who lived near Mr. and Mrs. Politz?
13       A.  I did not.
14       Q.  And you didn't interview any eyewitnesses
15  to the damage in the Politz -- to the Politz
16  residence, correct?
17       A.  Not to their residence, no.
18       Q.  How about in the immediate vicinity, that
19  neighborhood?
20       A.  I have eyeball witnesses, eyewitnesses
21  from Pascagoula all the way to Bay St. Louis,
22  various and sundry eyewitnesses of what they saw and
23  of the hurricane, but none right nearby there in
24  that area.
25       Q.  All right.  Mr. Biddy, I'm going to --

Page 77

1  let's look at your report.  Again, this is marked as
2  Defense Exhibit 42.  It's your report as Bates
3  numbered and produced by counsel for plaintiff for
4  Nationwide, and you looked at this at the beginning
5  of your deposition.  Is this your final report in
6  this case?
7       A.  It is.
8       Q.  As we sit here today, do you expect to
9  submit any supplemental reports?
10       A.  Only if asked to, but I have not been
11  asked to.
12       Q.  And I think you testified earlier you have
13  not been asked to provide any rebuttal reports to
14  Nationwide's experts in this case, correct?
15       A.  I have not been asked to.
16       Q.  And in fact, you haven't even reviewed
17  them?
18       A.  That's correct.
19       Q.  You are -- you were thorough in preparing
20  this report, correct?
21       A.  Yes, I was.
22       Q.  It's important to be thorough, right?
23       A.  It certainly is.
24       Q.  It's important to you to know the facts of
25  each specific case, right?

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 78

1    A.  Yes, it is.
2    Q.  Sitting here, are there any errors that
3  you know of in your report that you would like to
4  correct?
5    A.  No.
6    Q.  Is this the only report that you have
7  prepared for submission in the Politz matter?
8    A.  Yes.
9    Q.  Did you prepare any earlier drafts of this
10  report that you -- well, did you prepare any earlier
11  drafts of this report?
12    A.  No.  Only the one that was proofed in my
13  office, of course.
14    Q.  You never transmitted an earlier draft of
15  this report to either the plaintiffs --
16    A.  Nobody.
17    Q.  -- or Denham Law Firm?
18    A.  No.
19    Q.  When you say that, I guess, the first
20  draft was proofed in your office, who -- who did
21  that proofing?
22    A.  My wife is a professional proofreader.
23    Q.  Lucky you.
24    A.  She worked at it for years, and I simply
25  handed her the draft, and she finds every misspelled

Page 79

1  word and every missing comma or whatever and gives
2  it back to me.  This is all on my computer, so it's
3  a matter of easy repairs and off to the print shop.
4  Excuse me.  Can we take another break?
5    Q.  Sure.
6    A.  It's about 11:00 o'clock.
7    VIDEOGRAPHER:  Off the record at 10:59.
8  End of tape two.
9    (Off the record.)
10    VIDEOGRAPHER:  Beginning tape three.  On
11  the record at 11:09.
12    Q.  (By Mr. Gilmore)  Mr. Biddy, it's fair to
13  say that your report, Defense Exhibit 42, states the
14  conclusions that you intend to provide at trial in
15  the Politz case if it goes to trial, correct?
16    A.  That is correct.
17    Q.  When you prepared it, you intended to be
18  accurate and thorough in stating your opinions?
19    A.  Yes.
20    Q.  And the basis and reasons for your
21  opinions?
22    A.  Yes.
23    Q.  As well as the materials you relied upon,
24  correct?
25    A.  Correct.

Page 80

1    Q.  Now, you know this and the other Hurricane
2  Katrina cases you worked on are insurance disputes.
3  Do you have any training or education in insurance
4  practices?
5    A.  No.
6    Q.  So you don't intend to offer any testimony
7  regarding insurance coverage?
8    A.  No.
9    Q.  Or regarding the handling and adjustment
10  of the Politz claim, correct?
11    A.  Only causation of the damages.
12    Q.  Are there any calculations or analysis or
13  data not contained in your report that you are
14  relying on in reaching your opinions?
15    A.  I think we've discussed those already.
16    Q.  Okay.  Other than what we've already
17  discussed?
18    A.  Yes.
19    Q.  There's been --
20    A.  There is none, that's correct.
21    Q.  Okay.
22    A.  There are none.
23    Q.  Are none.  You don't recall -- you don't
24  believe that you have interviewed Mr. and
25  Mrs. Politz, right?

Page 81

1    A.  I have not to my remembrance.
2    Q.  Okay.  And I think we went over this.  You
3  haven't spoken with any neighbors or witnesses in
4  the area, correct?
5    A.  That's correct.
6    Q.  You reviewed -- have you reviewed any
7  photographs other than those that are in your report
8  of the Politz residence both before and after
9  Hurricane Katrina?
10    A.  No.
11    Q.  Okay.  Have you seen any photographs --
12  well, any aerial imagery, like satellites, for
13  instance, of the Politz house and the surrounding
14  vicinity after Hurricane Katrina?
15    A.  I have seen aerial photographs before and
16  after Katrina for the entire Mississippi coast.  I
17  did not specifically go to those to evaluate the
18  Politz residence location.  It was not necessary.
19    Q.  And when you say it's not necessary, is
20  there -- is it your view that there is nothing of
21  significance that you can see in an aerial
22  photograph of the Politz neighborhood and vicinity
23  after Hurricane Katrina?
24    A.  No, that's not my statement at all because
25  Mr. Calaci, of course, in his report presents some

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 82

1  aerial photographs that show downbursts occurring in
2  the area.  My proof of the causation was -- did not
3  rely on aerial photographs to -- for any reason.
4      Q.  Do you think that aerial photographs
5  provide any information as to causation?
6      A.  Sometimes, sometimes.
7      Q.  In what instances would they?
8      A.  Well, in this instance, Mr. Calaci
9  testifies that a circular pattern of destruction
10  around the location of the Politz house indicates a
11  downburst there, which is a huge straight down winds
12  that spreads out in all directions and destroys.
13  It's up to 150 miles or more an hour.  However, I
14  didn't go to those extremes in my analysis.  As I
15  discuss in my report, I use a conservative value of
16  135 miles per hour, just dropped the maximum back.
17      Q.  And I think I understand that you think
18  you used a conservative wind gust figure?
19      A.  That's correct.
20      Q.  But in terms of the visual evidence at the
21  Politz property and neighbor -- or vicinity after
22  Hurricane Katrina, did you see any photographs?
23  Have you, yourself, seen any photographs that show
24  these circular pattern damage that Mr. Calaci
25  states?

Page 83

1      A.  Oh, I only read his report to that effect.
2      Q.  And you would agree that putting aside the
3  timing of wind versus water, the conditions at the
4  Politz residence, storm surge washed everything in
5  the Politz property and immediate vicinity inland to
6  the extent of the debris line, correct?
7      A.  That you can't put away, number one, the
8  timing, but number two, because, obviously, the wind
9  is going to take whatever it destroys away, too, so,
10  you know, you can't say that the water came in and
11  washed away the house and so on afterwards.
12      Q.  Well, that's -- that's a fair -- and my
13  question was not precise.  Would you agree that even
14  if there had been a microburst that caused circular
15  pattern of damage that Mr. Calaci seems to think
16  there was, the storm surge would have washed that
17  debris and obscured that -- whatever evidence there
18  was of wind?
19      A.  That is correct, the --
20      Q.  And I think you've described that in your
21  report.
22      A.  Yes, it's famously called masking,
23  M-A-S-K-I-N-G, the damage to the wind, because,
24  obviously, the waters came in to a high level, you
25  know, three hours later, and you see a lot of

Page 84

1  waterborne debris on the former location of the
2  house and et cetera.
3      Q.  And it's fair to say that you can't rely
4  on the visual evidence after the storm surge --
5  after the storm surge to determine -- let me strike
6  that.  Let me rephrase my question.  It's fair to
7  say that you couldn't rely on visual evidence alone
8  to determine the nature or extent of wind damage
9  from visual evidence after the storm surge, correct,
10  because of that masking effect you were talking
11  about?
12      A.  You do have to know the history of the
13  storm, the sequence of the storm, the sequence of
14  the winds and the water, yes, combine that with the
15  visual evidence which was very apparent in this case
16  to determine causation.
17      Q.  Have you actually spoken with Mr. Calaci
18  about his opinions or testimony in this case?
19      A.  Not in this case.  On many cases, I have,
20  but not on this one.
21      Q.  When was the last time you spoke with Mr.
22  Calaci?
23      A.  Within the last two weeks.  I was with him
24  at a law office in Biloxi.  He mentioned that he was
25  going to have the deposition -- his deposition in

Page 85

1  this case, I believe, Friday of that week, but we
2  didn't discuss it.
3      Q.  Okay.  You haven't talked with him about
4  that deposition in this case?
5      A.  No, I have not.
6      Q.  Have you talked with anyone about Mr.
7  Calaci's deposition in this case?
8      A.  I have not.
9      Q.  You haven't seen the transcript of that
10  deposition, have you?
11      A.  I have not.
12      Q.  Let me hand you Defense Exhibit 147.
13          (Exhibit 147 marked for identification.)
14      Q.  (By Mr. Gilmore)  And I will represent to
15  you these are documents that you produced to us in
16  response to the subpoena.  Can you tell us what
17  these two pages of handwritten notes are?
18      A.  These are field notes of the inspection
19  that was performed at the house.
20      Q.  And it's two pages.  It's in different
21  handwriting, correct?
22      A.  Yeah, it is.
23      Q.  The first page, I believe is that your
24  handwriting?  I've seen your handwriting before in
25  your report.  Is this yours?

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 86

1    A.  I can't remember.  It looks like it,
2  doesn't it?
3    Q.  It does, but I was hoping you could
4  confirm it, but that's fine.
5    A.  I think it is.
6    Q.  Okay.
7    A.  And the second page is my inspector,
8  Rodney Shreve's.
9    Q.  Okay.  So I'm just kind of curious, if you
10  look at the -- there are several line items, and we
11  can discuss them, but the first -- the notes on --
12  that Mr. Shreve wrote on the second page of this
13  document, a lot of them, you have just rewritten
14  verbatim or almost verbatim on yours.
15    A.  Yeah.
16    Q.  What was the reason for that, for you
17  rewriting notes?
18    A.  We were both taking notes out on the job,
19  and I was telling him what to look for and so on,
20  so, you know, it's not unusual that we have the same
21  notes essentially.
22    Q.  So did you review his notes first and then
23  write yours?
24    A.  No, I -- of course, we did them together
25  some because we were right there together, but I

Page 87

1  wanted him to write them down as well, and if he saw
2  anything that I didn't, I wanted to -- I looked over
3  his to see, you know, if there's anything he -- he
4  saw that I didn't see because he was up walking
5  around.  I was sitting in a chair on the slab with a
6  note pad in my lap and, of course, if he had seen
7  something that was startling -- I mean, it was
8  different, for instance, those measurements of how
9  high the slab was off the ground, above the ground,
10  I had him go around with a tape measure and measure
11  those and call them out to me so...
12    Q.  How did you determine where the property
13  was?  You know, I -- I understand it's --
14  particularly where there's whole neighborhoods that
15  have been destroyed, sometimes it's difficult to
16  identify --
17    A.  It is.
18    Q.  -- property; is that correct?
19    A.  It is.
20    Q.  What did you do to confirm you actually
21  were at the right site?
22    A.  Well, I had a survey furnished to me by
23  the attorneys on behalf of Mrs. Politz.  That's the
24  first page of Appendix D, which Bates Politz-390 is
25  the survey performed by a local land surveyor from

Page 88

1  Bay St. Louis prepared it in 1999 showing the house
2  location on the property and in the curve of the
3  property, and I had the address, of course, and it
4  is problem sometimes in finding the exact location
5  of the house, but in this case, we had a survey.
6  And you see -- on the left-hand side of that, you
7  will see the adjacent street, Russell Lane, and the
8  dimensions from it to the house and the two lots
9  that face on to Russell Avenue with this lot that
10  occupied the Politz house and another one on the
11  curve of Winter Lane.  And of course, I had
12  generalized maps, Google maps, which are never very
13  accurate, but sometimes they will show you pretty
14  close to it.
15      In my Appendix H of my report, there's
16  also -- as I remember it, a fire hydrant in the
17  front yard of the Politz property, and it shows up
18  on some of their pictures so -- that they took of
19  the after storm destruction, and we verified that as
20  well.  So you do have to go through some hoops to
21  make sure you're at the right location when
22  everything is gone and all the adjacent houses were
23  gone.
24    Q.  If you turn to your report, Defense
25  Exhibit 42 at Politz-317.

Page 89

1    A.  317?
2    Q.  Uh-huh.
3    A.  All right.
4    Q.  You visited the site June 7th, 2008,
5  correct?
6    A.  Correct.
7    Q.  That's almost three years after Hurricane
8  Katrina, right?
9    A.  True.
10    Q.  And you didn't go there with either Mr. or
11  Mrs. Politz, just with you and Mr. Shreve?
12    A.  That's correct.
13    Q.  Okay.  In your report, you write, "The
14  site had been cleaned up of all house debris except
15  for the remaining slab and some base plates, anchor
16  bolts and metal straps from the slab to the base
17  plates."
18    A.  Correct.
19    Q.  So the visual evidence that you were
20  seeing at your site inspection was different than
21  immediately after Hurricane Katrina, obviously,
22  correct?
23    A.  Yes, and for that, I had to rely on
24  pictures that were furnished to me by the Politzes.
25    Q.  And other than the pictures that Mr. and

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 90

1  Mrs. Politz and their attorneys gave you, did you
2  have any other visual evidence of the condition of
3  the Politz property right after Hurricane Katrina?
4      A.  No.  Now, in general, I did because I've
5  been all over that area for three years up and down
6  the coast, but not specifically that site, no.
7      Q.  And do you know if you've ever even driven
8  in their exact neighborhood before?
9      A.  Yeah, I did.  I did a -- a Kangaroo store.
10  There's one within a block, I think it is, on
11  Highway 90 of this area, and I went into the back
12  area that's behind the Kangaroo store there in '06
13  sometime when I did a series of those Kangaroo
14  stores along the coastline.
15     Q.  You don't -- you don't remember ever
16  seeing the Politz property before your trip there in
17  June 2008, right?
18     A.  No, not -- I didn't examine it at all.
19     Q.  Okay.  And you mentioned that several of
20  the base plates and metal straps remained?
21     A.  That's correct.
22     Q.  Were those straps hurricane straps?
23     A.  They were the first hurricane straps that
24  were put in structures on the Mississippi coast.
25  They appeared to be on alternate stud lines, every

Page 91

1  other stud, in other words.  Today, and recognizing
2  that those were not sufficient for the kind of winds
3  we experienced with Hurricane Katrina, today, we use
4  much heavier duty anchors and ties mostly made by a
5  company called Simpson.  Simpson strong ties,
6  they're many times called.  We do some strapping.
7  Usually it's with a more heavy duty strap than
8  these.  They're not nailed on.  They're screwed on.
9  These nails pulled out of the straps.  Some straps
10  broke as you can see in the pictures, and the nails
11  simply pulled out of the intermediate studs that
12  were not strapped down so...
13     Q.  And the observations of, I guess, the
14  presence of base plates and metal straps remaining
15  on the slab, what is the significance of that
16  evidence?
17     A.  It's very clear that the -- the studs
18  pulled free from the base plates where they were
19  gone.  Where they were missing, there were some
20  nails there or nail holes where they were on 16 inch
21  centers all along, and the straps, as you can see,
22  the nails pulled free of them where they were
23  nailed -- nailed to the stud.  Where the straps
24  broke obviously means something.  In the pictures
25  that the owners furnished me, you can actually see

Page 92

1  portions of the stud left where they were broken in
2  a bending manner, so the attachment failures, I
3  think was the primary mechanism of destruction, but
4  there was some bending failures of studs, too, as
5  you can see in those pictures.  And I think those
6  attachment failures occurred first at the roof line
7  to the top plate of the top stud, and then at the
8  bottom, some of them at the bottom plate of the
9  bottom stud, and the entire building was blown away
10  with the exception of what you can see in the after
11  storm pictures of some of the broken studs.
12         What else was on that slab and left for
13  the water to then destroy, I don't know, and I'm not
14  clairvoyant, I couldn't tell you.  Obviously
15  something, you know, just wiped everything clean.
16  It's always something left, you know, but --
17     Q.  The attachment failures that you just
18  referenced, putting aside the -- again, putting
19  aside the sequence, and we will discuss the sequence
20  of wind versus water, it's fair to say that storm
21  surge can cause the same attachment failures that
22  you saw on this property, correct?
23     A.  Storm surges would have caused attachment
24  failures if there had been no wind.  However, that's
25  an impossible scenario.  Again, I always want to

Page 93

1  make that hypothetical, but it's useless because
2  it's -- there's no -- there was not such a no wind
3  situation.
4      Q.  Well, I -- I understand that you think
5  it's useless, but I -- you know, but I just want to
6  make sure that you -- that your testimony is clear,
7  though.  If -- and you're right, this is a -- a
8  hypothetical, but if this was a no wind event and
9  just storm surge or even if it was a hypothetical
10  involving -- well, just a hypothetical involving
11  just a water, then the storm surge could have caused
12  the same attachment failures that you see at the
13  Politz property, correct?
14     A.  The force of water to the height it came
15  on this building would have caused -- in the absence
16  of wind, would have caused these type of failures
17  also.  Could have.
18     Q.  Okay.  All right.  Let's turn to -- can
19  you turn to 308, Politz-308 in your report?
20     A.  Okay.
21     Q.  In Politz-308, you write, "For my
22  evaluations and structural calculations as contained
23  herein, I have selected a conservative value of the
24  wind speed gusts at 135 miles per hour, which is 10
25  to 15 miles per hour below the wind gusts as shown

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 94

1   in the Calaci report, and is much below the
2   microburst winds which probably occurred at the
3   property."  Did I read that correctly?
4       A.  Yes, you did.
5       Q.  Okay.  And so you -- you base your
6   opinions in your report on an estimate of wind speed
7   gusts of 135 miles per hour, correct?
8       A.  Yes, a conservative value of 135.
9       Q.  And what is your -- the basis for your
10  assumption of 135 mile per hour wind gust speeds at
11  the Politz -- Politz residence?
12      A.  Well, number one, Mr. Calaci states that
13  the hurricane winds at the property were 130 to 150
14  miles per hour.  I did not want to use the high end
15  extreme to evaluate this property.  I wanted to use
16  the -- near the lower end.  I also had a 135 mile
17  per hour reading from the National Weather Service
18  at Poplarville, which is not a very long distance.
19  It's north and west of this property about seven
20  miles, but it's -- it's a reading by the National
21  Weather Service, and I have the one in Pascagoula
22  where they ran it at 137, the actual anemometers.
23  These are coastline areas not inland areas such as
24  Stennis and -- and so on.
25      Q.  You referenced two anemometer readings.

Page 95

1   Can you tell me what anemometers you're referring
2   to?
3       A.  The Emergency Management Center at
4   Poplarville.  The -- in Appendix D of the report
5   show the National Weather Service reading of the
6   highest gusts there that they read before their
7   power went out and they lost telephone contact with
8   them, 135 miles an hour in Poplarville.  Also, the
9   report on that same page, Appendix D, the highest
10  reading they received from Pascagoula by telephone
11  before their telephone line went out there of 125
12  miles per hour, but the 135 was at Poplarville,
13  which would have been closer than Pascagoula is and
14  on the western part of the storm where you expect a
15  little higher.
16      Q.  Okay.  Other than the Calaci report and
17  those two anemometer readings, are there any other
18  data that you are relying on for your assumption of
19  135 mile per hour wind gust speed at the Politz
20  residence?
21      A.  Well, yes, I went through in Part 1 and
22  Part 2 of my report under history and sequence, I go
23  through a number of justifications for 135 mile an
24  hour winds.  One, for instance, will be the Navy's
25  -- part of the Navy data that I have in Appendix E,

Page 96

1   which explains in layman's terms that the winds in
2   the northeast quadrant are always higher than they
3   are at the center of the storm, and that's because
4   of the hurricane moving north, you've got to add the
5   north wind speed, it's 10 to 15 miles per hour, to
6   winds of the storm in the right-hand quadrant, which
7   is the northeast quadrant where this house was.
8           On the left-hand quadrant, which would be
9   the southwest side, you have to subtract it
10  conversely to get the wind speeds.  So the wind
11  speed as reported by NOAA at the state line, which
12  is, again, not many miles to the west of this, were
13  reported sustained at 125 miles per hour.  If you
14  add 10 to 15 miles per hour, you've got 135 and 140
15  miles per hour there.
16      Q.  Mr. Biddy, before you -- well, there are
17  other things besides that.  I have a question about
18  that one point that you just mentioned.
19      A.  Well, if you want me to go through all of
20  these that I mentioned before like -- like
21  Dr. Fitzpatrick's and AccuWeather's.
22      Q.  The -- you identified a number of
23  meteorologist -- or meteorological sources of data
24  previously.  Those are the ones that -- is it your
25  testimony that you have relied on all of those?

Page 97

1       A.  Back up.  It would just be cumulative to
2   Calaci, that's correct, yes.
3       Q.  With respect to the adding 10 to 15 mile
4   per hour, and I think you discussed that in your
5   report on page Politz-313.  So it's your view that
6   in order to accurately determine wind speeds in the
7   northeast quadrant, which I guess is where the
8   Politz residence is, you should add 10 to 15 miles
9   per hour to the NOAA reported wind speeds?
10      A.  Yes, because NOAA was reading the center
11  of the storm as it came ashore, the second landfall
12  at the Mississippi/Louisiana line of 125 miles per
13  hour.  That's what they were reporting, and,
14  therefore, if you're trying to find out what it is
15  in the northeast quadrant, you've got to add 10 to
16  15 miles per hour to it.
17      Q.  The -- and the NOAA numbers you're
18  referring to, is that the NOAA H wind analysis
19  you're -- you know what I'm referring to?
20      A.  It's in Appendix D.  It's their report,
21  preliminary report at least.  Let me find it for
22  you.  The document is entitled "Summary of Hurricane
23  Katrina," dated September 1st, 2005, by NOAA, and I
24  will have to find what Bates number it is for you.
25  It's page 5 of 7 of that document by my numbers.

Ted Biddy - 11/07/08

26 (Pages 98 to 101)

Page 98

1    Q.  I'm on the page you're referring to?
2    A.  Uh-huh, you are.
3    Q.  I am, yeah.
4    A.  What Bates number is it?
5    Q.  It looks like it's Politz-409, page 5 of
6    7.
7    A.  Let me make sure.  Yes, that's right.  The
8    second full paragraph down reads that -- as follows,
9    "Wind speeds over 140 mile per hour were recorded at
10   landfall in southeastern Louisiana while winds
11   gusted to over 100 miles per hour in New Orleans
12   just west of the eye.  As the hurricane made its
13   second landfall on the Mississippi/Louisiana border,
14   wind speeds were approximately 110 knots (125 miles
15   per hour)."
16   Q.  And that's -- this report is where you get
17   the 125 mile per hour figure from NOAA that you cite
18   in your report?
19   A.  That's correct.
20   Q.  Okay.  Do you have any idea whether NOAA
21   in putting this number -- in estimating that number
22   had already factored in the 10 to 15 mile per hour
23   adjustment that you referred to as something that is
24   understood in meteorology to -- to be an adjustment
25   that needs to be made?

Page 99

1    A.  They had not because they're measuring the
2    eye, the center of the eye where it made landfall,
3    so they're not talking about this 10 to 15 miles per
4    hour that the Navy explains in their report needs to
5    be added to winds in the northeast quadrant away
6    from the eye.
7    Q.  Well, in general, do you have -- do you
8    have personal knowledge of whether NOAA's wind
9    analysis throughout the coast of Mississippi
10   incorporates this 10 to 15 mile per hour adjustment
11   or not?
12   A.  I don't know.
13   Q.  Okay.  And --
14   A.  A report that they reported it early on in
15   September, a month after the storm, so 125 mile an
16   hour landfall, that's the eye.  Okay.  We're 30, 40
17   miles to the east in the northeast quadrant.  It's
18   common knowledge to the man on the street that's
19   been on the coast will tell you the winds in the
20   northeast quadrant are always higher than they are
21   in the west quadrants, and the Navy just simply put
22   that in succinct language in Appendix C, which I've
23   quoted in my report.
24   Q.  I guess my question to you, Mr. Biddy, is
25   do you know whether -- let me take a step back.

Page 100

1    NOAA is one of the meteorological sources that you
2    cite as a source of meteorological data that you
3    look to in preparing your reports, correct?
4    A.  Yes.
5    Q.  You don't know whether in their wind speed
6    estimates, they already incorporate adjustment for
7    northeast quadrant winds, do you?
8    A.  This reading that I'm relying on here and
9    pointing out to you was not in one of the quadrants.
10   It was at the landfall in the center of the storm,
11   at the eye of the storm.
12   Q.  That's -- my question is different,
13   though.  Do you know whether NOAA has
14   incorporated a second time, assuming that
15   estimates adjustment for northeast quadrant area,
16   southeast quadrant, do you know?
17   A.  I do not know.
18   Q.  Okay.  And if they have, it would be a
19   mistake to add that 10 to 15 mile per hour
20   adjustment a second time, correct, assuming that
21   they have already built that into their wind speed
22   estimates, correct?
23   A.  Yes, but I haven't used any other NOAA
24   readings except that one.
25   Q.  Can you turn to Politz-306 in your report?

Page 101

1    And in the middle of the page, you write, "The
2    DMD/Calaci investigation of the Politz property also
3    found strong evidence of one or more microbursts in
4    the area with winds of 150 miles per hour, stating
5    in his report that, 'It is very conclusive that a
6    microburst hit this region.'"  Did I read that
7    correctly?
8    A.  Correct.
9    Q.  Putting aside Mr. Calaci's opinion, do any
10   of your opinions depend on whether or not a
11   microburst or tornado affected the Politz property?
12   A.  It does not.
13   Q.  Okay.
14   A.  I could have used that, of course, and
15   very easily proved that it had blown away the
16   building but --
17   Q.  Well, let me ask you this question:  Based
18   on the visual evidence that you've seen in the
19   photographs immediately after Hurricane Katrina,
20   have you been able to see physical evidence of what
21   you would think to be a tornado?
22   A.  Well, at the site itself, I noted evidence
23   of extreme, extreme winds.  Whether they're from --
24   from winds just of the hurricane or isolated
25   downbursts or not, I cannot tell you, but I can tell

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 102

1    you that everything is destroyed and practically
2    everything in quite a rage.
3        Q.   Again, putting aside the timing, I know
4    that you think the wind came first and destroyed it
5    all, but you would agree the fact that everything is
6    destroyed, by itself doesn't tell you whether wind
7    or water destroyed the property, correct?
8        A.   You have to, of course, know the sequence
9    and history of the storm before you can determine
10   mechanism of destruction.
11       Q.   Okay.  Well, my -- that wasn't my
12   question.  My question was:  You would agree putting
13   aside the sequence, the timing of wind versus water
14   in the storm, you would agree that -- you would
15   agree that the storm surge also could have -- the
16   storm surge was sufficient to destroy the Politz
17   property?
18       A.   In a vacuum, yes.
19       Q.   Okay.  And in fact, your opinion as to --
20   well, your opinion that wind destroyed the property
21   before the storm surge would have inundated the
22   property, that's based on the sequence and timing of
23   the meteorological conditions at the Politz
24   residence, correct?
25       A.   And of course, my engineering application

Page 103

1    of those to the structure of the building that
2    proves the attachment failures and also proves the
3    stud failures on the building.
4        Q.   Well, it's -- it's -- and it's obvious
5    that the attachment failures and the stud failures
6    occurred, right?
7        A.   Of course.
8        Q.   You don't need to be an engineer to go to
9    the site and say -- see that evidence?
10       A.   Well, you have to be an engineer to know
11   whether or not these winds that did occur at the
12   site, according to the meteorologists, would have
13   done that.  Some winds wouldn't, you see.  Take 85,
14   90 mile an hour winds, the building would still be
15   standing there when the water got there.
16       Q.   Well, how about -- how about 105 mile per
17   hour winds?
18       A.   I don't know where the -- where the break
19   line is, but it's not much more than 105.  Wind
20   pressure on a wall varies as to the square of
21   velocity, so you start going up to 105 -- 105 to 110
22   used to be the norm where we used the 25 mile per
23   hour -- I mean 25 pounds per square foot loading on
24   buildings.  That's under the old Southern Building
25   Code back in -- that was in vogue, and it was the --

Page 104

1    the code that everybody used in Mississippi and most
2    every place else in the south up until the standard
3    building code began to be adopted in later time but
4    --
5        Q.   At -- at what maximum wind gust speed
6    would you no longer be confident in your opinion
7    that wind destroyed the Politz residence?
8        A.   You mean what's the lowest -- what's the
9    lowest where I wouldn't be confident?
10       Q.   Correct.
11       A.   I haven't run the numbers, but I would say
12   105, I would be worried.  I couldn't sit here and
13   tell you without running some numbers on it.
14       Q.   And that's for -- is that for 105
15   sustained wind speed?
16       A.   No, gusts.  Gust is what the building
17   feels and that's what the code demands that you
18   design for.  That's the force against the building
19   is the gusts.  It comes in waves, as you probably
20   know, from the storm.
21       Q.   Do you know -- do you have any
22   understanding of how many times during this storm
23   the winds reached the maximum wind gust speeds
24   regardless of what those speeds were?
25       A.   Well, it's my experience, and all the

Page 105

1    textbooks I have read tell me this, that winds come
2    in gusts and waves, pulses come and then recede,
3    come and recede.  Water does the same thing if
4    you've ever watched high tide even coming in, comes
5    and then it recedes, comes and then it recedes.
6    Many times -- let's put it that way -- many times
7    these high gusts hit the -- hit the building.
8        Q.   Well, let me -- I want to make sure you
9    understood my question.  I -- I'm not asking
10   whether -- I'm not asking whether it's true that
11   winds grow and then decline.  My question is
12   whatever the maximum wind gusts that occurred during
13   Hurricane Katrina, do you have any understanding as
14   to how many times that maximum gust, three second
15   wind gust speed was reached during the entire course
16   of the storm then?
17       A.   Well, I have the meteorology data that
18   says it occurred over at least a three-hour period
19   and before the high waters got there, so that's --
20   that's in pulses of even the height of the storm,
21   it's probably at least every 30 seconds during that
22   period of time.
23       Q.   So it's your understanding that the --
24   during a three-hour window, the maximum wind gusts,
25   whatever that figure is, would have been occurring

Page 106

1  every 30 seconds?
2      A.  And something lower than that, and
3  perhaps, something higher than that.  I've used, you
4  understand, much lower than the maximum and a little
5  higher other that the lowest as quoted by the
6  meteorologist.
7      Q.  And I'm not talking -- as I said, putting
8  aside what that maximum wind gust figure is --
9      A.  Uh-huh (affirmative response).
10     Q.  -- this is a different question.  My
11 question to you is:  Whatever the maximum wind gusts
12 that was reached during Hurricane Katrina at the
13 Politz residence, do you have any understanding as
14 to how many times the winds reached that maximum
15 wind gust speed?
16     A.  You know, by definition, maximum is the
17 peak, so that's a one -- one time event.  I believe
18 that the 135 mile per hour winds occurred many times
19 on the building.  There may have well been a few
20 150s.  I don't know.  I didn't need that to -- to
21 prove mechanism of destruction.
22     Q.  Well, how many times would the wind
23 gusts -- in your view, how many times would a wind
24 gust of 135 miles per hour need to occur for the
25 winds to destroy the Politz property?

Page 107

1      A.  Depends on what type of mechanism of
2  destruction you're talking about.
3      Q.  Well, I'm talking about the mechanisms of
4  destruction that you're talking about -- you talk
5  about in your report.
6      A.  Well, there's two different ones, though,
7  and one is time dependent, and the other one is not.
8  The attachment failures, which is the force it takes
9  to pull these nails out, once it -- it gets there,
10 and it's three times as much as the resistance of
11 the nails, it's coming free, and it may take two to
12 fully get it pulled free.  Now, stud breakage is
13 another thing.  The code allows you to load lumber
14 for a -- to a 60 percent greater than allowable
15 stress for a total cumulative duration of 10 minutes
16 during a windstorm, so it takes a little time before
17 the stud breaks under those wind conditions, but
18 not -- but a cumulative duration of 10 minutes will
19 do it.  And, obviously, it did do it because we see
20 the -- some of the studs in the after storm pictures
21 broken in two.
22     Q.  All right.  Still on Politz-306 in your
23 report, on the top paragraph, you're referring to
24 Mr. Calaci's report, you say that, "He stated that
25 the winds were from the east/northeast until the

Page 108

1  late morning of August 29th, 2005, then later
2  gradually shifted to the southeast with this wind
3  direction acting as a deterrent from any 'crashing
4  wall of water' moving onshore."  Did I read that
5  accurately?
6      A.  You did.
7      Q.  And is that consistent with your view as
8  we sit here today of the direction of the winds
9  during the morning of Hurricane Katrina?
10     A.  It is.
11     Q.  Okay.  If you can turn to 312, I think you
12 addressed this point a little further.  If you go
13 down to the second from the bottom paragraph, the
14 one that begins "the DMD report."
15     A.  Yes.
16     Q.  And there, you write in your report, "The
17 winds for the early part of the storm were blowing
18 from the northeast and east and did not shift to the
19 southeast until much later in the storm and
20 therefore kept the waters low.  The early winds of
21 the hurricane from about 6:00 a.m. until after 9:00
22 a.m. did their damage to the Politz property without
23 any possibility of structural damage being caused by
24 the storm's waters."  Did I read that correctly?
25     A.  You did.

Page 109

1      Q.  And you included this in your report.  Can
2  you explain what is the significance of the
3  direction of the winds during Hurricane Katrina?
4      A.  Okay.  It's a great significance.  If
5  you've got very, very strong winds coming from the
6  northeast and east, you're going to be pushing out
7  from the water.  You have to realize that a
8  hurricane is a wind-driven event, at least the storm
9  surge part of it is.  Granted you've got water --
10 you've got build up of winds and build up water
11 coming in, but if you've got opposite winds coming
12 from the shore onto the water, it will charge that
13 height of the water until those winds shift to the
14 southeast to help out the southeast winds and so
15 forth.
16     Q.  And so -- and so it's your view that there
17 were high winds coming from the northeast and east,
18 as you say in your report, during the morning of
19 Hurricane Katrina, that's correct, right?
20     A.  That is correct.
21     Q.  And you have an understanding that that
22 retards the rising of the storm surge, correct?
23     A.  Yes, it does.
24     Q.  It's fair to say that's a meteorological
25 opinion?

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 110

1    A.  Yeah.  I've read it in many meteorological
2  reports.
3    Q.  Right.  It's something you -- you have
4  taken that from Mr. Calaci's report and others,
5  perhaps?
6    A.  It's also an easy engineering observation,
7  too, that if you've got force opposing the water
8  coming in, these kinds of winds, as long as they
9  oppose it, it's going to retard it to some extent.
10  It's not a tsunami.  It's not a big wall of water.
11  You couple that with the eye -- eyewitness
12  testimonies that I have seen and taken myself, and
13  also the video at the Beau Rivage Casino that I have
14  a copy of, I refer to, it's created a gradual high
15  tide effect coming in rather than any wall of water
16  and big crashing waves coming in.  And
17  Dr. Fitzpatrick said that waves were no higher than
18  one to three feet over at the center of the storm.
19    Q.  Getting back to the early winds.  The --
20  you would expect that part of the structure facing
21  the direction of the winds to suffer the most
22  damage; is that correct, generally speaking?
23    A.  Well, yeah, the windward side, yes,
24  they -- they would suffer the initial damage.
25    Q.  Right.

Page 111

1    A.  The leeward sides actually have the most
2  force on them after the building is open.
3    Q.  Okay.  Before the building is open,
4  though, would you expect that structures or trees
5  closer to the direction of the wind -- I think you
6  called it is the windward side, is that --
7    A.  That's right.
8    Q.  Yeah.  They would suffer more damage than
9  structures on the leeward side, right?
10    A.  Oh, yes, that's right.
11    Q.  And the -- and the early winds in the
12  hurricane from 6:00 a.m. until 9:00 a.m., they were
13  doing their damage blowing from the northeast and
14  east; is that --
15    A.  That's right.
16    Q.  That's right, okay.  Can you turn to
17  Politz-307?  It's still kind of dealing with the
18  meteorological conditions part of your report.
19    A.  Are you going to be at a stopping place
20  for a lunch break sometime soon?
21    Q.  Yeah, if you -- let's -- let me just ask
22  you questions about this page, and then we can stop.
23  Is that fair --
24    A.  Sure.
25    Q.  -- Mr. Biddy?  If you -- just let me know

Page 112

1  if you -- if that's not, and if you need to take a
2  break.
3    A.  No, I just have to meet with Mr. Denham on
4  another matter during lunch.
5    Q.  Understood.  All right.  Okay.  On this
6  page, you're referring to a report from the U.S.
7  Navy called the -- I guess their Naval Meteorology
8  and Oceanographic Command?
9    A.  Correct.
10    Q.  NMOC?
11    A.  Yes, NMOC.
12    Q.  NMOC, okay.  We'll use your term NMOC.
13  And you relied on the NMOC report entitled
14  "Preliminary Model Hindcast of Hurricane Katrina
15  Storm Surge," correct?
16    A.  It was, as I said, about all of the other
17  meteorology reports.  It was cumulative and proof of
18  the Calaci report, yes.
19    Q.  Sure.  And I'm not saying that you relied
20  on it exclusively, but --
21    A.  Yes.
22    Q.  -- it's fair to say that you attached it
23  to your report; is that right?
24    A.  Absolutely.
25    Q.  All right.  Now, you discussed the -- I

Page 113

1  guess the graph of their model of the storm surge
2  during Hurricane Katrina, correct?
3    A.  Correct.
4    Q.  And in the middle of that large paragraph
5  in Politz-307, you write, "The graph shows the water
6  level at approximately seven feet at 7:00 a.m., at
7  13 feet at 8:00 a.m., at 18 feet at 9:00 a.m., at 22
8  feet at 10:00 a.m., and at 27 feet at 11:00 a.m."
9  Did I read all of that correctly?
10    A.  You did.
11    Q.  Okay.  Now, here and elsewhere in your
12  report, you also note that the first floor elevation
13  of the Politz house was 14.8 feet?
14    A.  That's correct.
15    Q.  Okay.  Now, given these numbers that we
16  just read, the property would begin to be inundated
17  sometime between 8:00 a.m. and 9:00 a.m. under these
18  figures, correct?
19    A.  If you read that sentence in a vacuum,
20  yeah, without reading the rest of the paragraph.
21    Q.  And we're getting -- and I know we're
22  going to talk about what you think needs to be
23  modified to these numbers, but I just want to make
24  sure, you know, just looking at these numbers that
25  come from the NMOC report itself, which you attached

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 114

1    to your report, if the Politz first floor elevation
2    was at 14.8 feet, 18 feet of water at 9:00 a.m.
3    would have put over three feet of water above the
4    first floor, right?
5        A.  If you only read those numbers, yes.
6        Q.  Yeah.  And, again, just going on these
7    numbers that are in the NMOC report that is attached
8    as an appendix to your report.  Now, above that 18
9    feet, do you know if these -- well, let me ask you
10   this question:  Do you know if these figures from
11   the NMOC report which you've included in your report
12   include waves superimposed upon the storm surge
13   height?
14       A.  No, no, I know that I read the report
15   thoroughly, and they explained very carefully that
16   their numbers are based on the height of the water,
17   maximum height of the storm surge at the water line
18   and did not include the topography of the shoreline
19   nor the bathymetry under the -- the water --
20       Q.  Right.
21       A.  -- and therefore were the -- only the
22   water elevations at the shoreline.
23       Q.  And I understand you've -- you've laid
24   that out.  You've made that clear in your report,
25   and we'll address that in just a minute.  I just

Page 115

1    want to make sure that we're on the same page.  But
2    just looking at the NMOC numbers again, you know, so
3    you don't know whether the NMOC number even include
4    waves superimposed.  It could be that the waves
5    brought the height of the water even higher than
6    three feet above the first floor elevation of their
7    property at 9:00 a.m., correct?
8        A.  Well, I don't believe that's the case.
9    They said they ran the ADCIRC model, which gives you
10   the maximum height of the water at the shoreline in
11   this case.
12       Q.  You don't know whether that includes --
13   you don't have any reason to think that includes
14   waves superimposed on that?
15       A.  I have no reason to believe that it does
16   not include those waves.
17       Q.  All right.  And even if you look at --
18   well, if there were waves superimposed on that storm
19   surge level, even the 13 feet of water at 8:00 a.m.
20   would have been impacting the property above its
21   first floor elevation before the storm surge itself
22   entered the residence, correct?
23       A.  I don't know.  13 feet at 8:00 a.m. and
24   this has a 14.8, I doubt it, no, not at 8:00
25   o'clock.  It's also --

Page 116

1        Q.  Well, you said yourself, I think, Pat
2    Fitzpatrick estimated one to three feet of waves?
3        A.  That would be 1.8 feet.  It would have to
4    have waves on top if that was the case, and it did
5    not include waves.
6        Q.  Okay.
7        A.  So you --
8        Q.  And just -- and again, I'm not -- you
9    know, I understand.  Just as we sit here today,
10   you're not sure whether the NMOC numbers include
11   waves or not?
12       A.  I do not know.
13       Q.  Okay.  Now, you referred to this before.
14   You state in your report that the NMOC numbers
15   should be lower and delayed in time; isn't that
16   correct?
17       A.  That's correct.
18       Q.  Okay.  Now, it's fair to say that's a
19   meteorological opinion, right?
20       A.  It's been shown by many meteorology
21   studies that that's the case, and I can cite some
22   including the IPET study if you'd like.
23       Q.  Well, my question to you is the actual
24   adjustments that you make in your report are not
25   found in the NMOC report, correct?

Page 117

1        A.  No, but the explanation that this is at
2    the shoreline is in the fact that the explanation
3    that it did not include topography of the inshore
4    areas nor the bathymetry of the underwater areas is
5    explained in the NMOC report.
6        Q.  Well, do -- and I've looked at the NMOC
7    report, and it does note those factors, but it
8    doesn't say whether that means you have to lower or
9    raise the storm surge levels, right?
10       A.  But I have read many, many meteorology
11   reports by AccuWeather and by Dr. Fitzpatrick and
12   IPET and others that prove that that's the case.
13   This was a --
14       Q.  And you --
15       A.  If I may explain.  I'm sorry if I --
16       Q.  No, I --
17       A.  -- interrupted you.
18       Q.  I want you to explain your answers.
19   That's fine.
20       A.  The Navy's report was put out November
21   22nd of 2005.  It was done so in a hurry to get
22   something out on the street because it was a very --
23   I mean, a great clamor for it from politicians
24   especially, and I think Representative Taylor put a
25   lot of pressure on them for one, but anyway, they

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 118

1  got it out early on.  Now, obviously, they didn't
2  have all of the data.  They didn't have the
3  bathymetry.  They didn't have the topography and
4  other things, but they put out what they had, and
5  they ran the ADCIRC model for this area, and it's --
6  it's reasonably accurate, but it's -- it was at the
7  shoreline and did not intend to be for the inshore
8  areas.
9      Q.  Mr. Biddy, everything you just said is
10  meteorological opinions, correct?
11      A.  Of course.
12      Q.  Okay.
13          VIDEOGRAPHER:  Two minutes.
14          MR. GILMORE:  It's a good stopping point.
15  Let's break for lunch.
16          VIDEOGRAPHER:  Off the record at 12:06.
17  End of tape three.
18          (A lunch break was taken.)
19          VIDEOGRAPHER:  Beginning tape four.  On
20  the record at 1:11.
21      Q.  (By Mr. Gilmore)  Good afternoon, Mr.
22  Biddy.
23      A.  Good afternoon.
24      Q.  During our break, did you talk with
25  counsel about this case or the deposition at all?

Page 119

1      A.  No.
2      Q.  We're still working on your report which
3  is Defense Exhibit 42.  Can you turn to Politz-319
4  in your report?
5      A.  All right.
6      Q.  And on that page, you reference taking
7  photographs in your site visit on June 2008,
8  correct?
9      A.  Correct.
10      Q.  And you also received photographs from the
11  owner, Mrs. Politz, right?
12      A.  Yes, through their attorneys.
13      Q.  Through her attorneys?
14      A.  Uh-huh (affirmative response).
15      Q.  And you write in your report, "The
16  photographs I obtained of the area and those
17  furnished by the owner all show extensive broken and
18  damaged large trees in the area which attest to the
19  wind's high velocity and probably microbursts in the
20  area."
21      A.  Correct.
22      Q.  Did I read that correctly?
23      A.  Yes, you did.
24      Q.  And is that your opinion today --
25      A.  Yes, it is.

Page 120

1      Q.  -- that the photographs show that kind of
2  damage which you describe there?
3      A.  Yes.
4      Q.  Okay.  So the photographs you took are in
5  Appendix A to your report, correct?
6      A.  That is correct.
7      Q.  Okay.  If you can turn to that, it begins
8  at -- I believe that begins on Politz-334.
9      A.  Okay, I'm there.
10      Q.  Okay.  And I'd like to just go through
11  these photographs.  The ones that are -- turning to
12  the first page of the photos on Politz-335, the top
13  page has one dead tree in the background, right?
14      A.  Yeah.  Broken off and then there are some
15  to the left that appear to be as well, smaller ones.
16      Q.  Could you hold up the picture and point to
17  the ones that you think are broken?
18          MR. GILMORE:  If the videographer could
19  just zoom it.
20      A.  These are on the left, appear to be, this
21  one does.  All of these are -- of course, it's three
22  years later of vegetation, but a lot of the tops
23  were broken out of them as well, the shorter ones in
24  the right background.
25      Q.  (By Mr. Gilmore)  Is there anything else

Page 121

1  of significance in these photographs here, Mr.
2  Biddy?
3      A.  Well, on -- on 335?
4      Q.  On 335, yeah.
5      A.  Well, those are general views, just long
6  shot views of the remaining concrete slab
7  foundation.
8      Q.  And if you turn to the next page, what --
9  what of significance do these photographs show here?
10      A.  Well, the top picture is beginning to get
11  a little closer to the slab to show base plates
12  still remaining and, in fact, you can see -- on the
13  top one, you can see nails still remaining on the
14  right-hand bottom of the base plates, and you can
15  see some anchor bolts.  It's not close enough to
16  show detail yet.
17      Q.  Anything else of significance?
18      A.  No, it's just the overall views of the
19  slab and getting a little closer to the closeness of
20  the slab.
21      Q.  Okay.  Turn to the next page, Politz-337.
22      A.  Yes.
23      Q.  This photograph is taken from the Politz
24  slab towards the sea, the one on the top?
25      A.  No, the one on the top is taken from the

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 122

1 road. That's the driveway, the steepest part that
2 goes up to the -- to the slab, which was their
3 driveway to the roadway. The bottom one, of course,
4 is a little closer up of the -- starting to get a
5 little closer up of the base plates and the
6 remaining nails and -- and scraps.
7     Q. You can see the water from their property?
8     A. Yes, yes, you can.
9     Q. How close -- have you measured or
10 determined how far from the property to the water
11 their house is?
12     A. It's on the order of 6 or 700 feet. I
13 haven't measured it, but just looking at it. In
14 fact, I went by there yesterday. It's -- that's an
15 approximate distance. The only thing that's in
16 between them is the back lots behind it and the
17 highway and the beach.
18     Q. The next page, Politz-338, what of
19 significance do these photographs show?
20     A. Well, these are closeups of the base
21 plates that remained, and as you can see, there is
22 nails. There are nails or studs that previously
23 were attached to the base plates. There are also
24 broken steel scraps that were -- in this case, the
25 one on the bottom picture was broken. You see a

Page 123

1 bent anchor bolt in the top area and a shattered
2 base plate. You see the two anchor bolts intact on
3 the bottom base plate.
4     Q. And is there anything that these
5 photographs show, these closeups of the base plates
6 and the connections and broken metal straps and
7 anchor bolts?
8     A. Is it of significance, you asked?
9     Q. Well, that -- that supports your
10 conclusion as to the fact that wind was what
11 destroyed the property.
12     A. Yes, the pull out failures of the studs.
13 See, there was a stud every 16 inches along this
14 base plate in all directions. You can see where the
15 stud was by the remaining nails. You can even see
16 the little nails that held the steel straps that
17 appear to be every other one, as I think we'll see
18 in some of the other pictures as we go through it.
19 But the ones on the side of the base plate, those
20 were where the strap was attached to the base plate.
21     Q. It's fair to say that that same damage
22 could have been done by the storm surge, and I think
23 the term you've used is in a vacuum?
24     A. That's correct, in a vacuum.
25     Q. And the next page, does that show similar

Page 124

1 signs of damage as to -- as Politz-338?
2     A. Yes, and you can specifically see that the
3 nail pull outs there in the strap where it was
4 nailed to the stud before, you see a rusty one.
5     Q. And again, as with Politz-338, the damage
6 shown here in Politz-339, the storm surge was
7 sufficient to do this kind of damage as well in a
8 vacuum, right?
9     A. In a vacuum, sure.
10     Q. And we don't have to belabor the point,
11 but going through 340, 341, 342, which are just
12 further closeups of what was remaining on the slab,
13 all of the damage that's shown in those photographs
14 could have been done by storm surge in a vacuum,
15 correct?
16     A. In a vacuum, that's correct.
17     Q. Politz-343 shows a closeup of the tree, I
18 think we saw in the first photo.
19     A. Yes.
20     Q. And that's a dead tree, right?
21     A. Uh-huh (affirmative response).
22     Q. Now, do you know when that tree would have
23 died?
24     A. No, but I assume it was -- you just have
25 to assume it was storm related. You can see in

Page 125

1 the -- in the lower pictures some of the limbs off
2 of the trees and what not, but it's now vegetated
3 three years later, which looks a lot better.
4     Q. And it's fair to say Politz-343, the
5 bottom photo, at least, putting aside the top photo
6 and however that tree died on the top, the trees
7 towards the bottom that are -- appear closest to the
8 water, do you see any signs of wind damage to these
9 trees?
10     A. Yes, I do. There are limbs that are
11 broken off, big limbs, as a matter of fact, on some
12 of the prongs that go out from them. I don't know
13 how many were, you know, actually taken out. I
14 didn't count stumps.
15     Q. Uh-huh.
16     A. But all trees were damaged, I can promise
17 you, because I was in that area many times, and if
18 it stood, it stood because the vegetation was blown
19 off of it and enough limbs were -- that were
20 resisting the wind broke off so that the main trunk
21 stood. Most of this is new growth you see here with
22 the --
23     Q. Well, these trees that we see still in the
24 bottom of Politz-343, I'm not a tree expert, and I
25 don't know if you're a tree expert, but they look

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 126

1   like they're old trees, right?  I mean, it seems to
2   me, and I've seen these trees all along Highway 90,
3   and they look like they're old, right?
4       A.  Oh, they've been there, yes.
5       Q.  Yeah, for a long time, and you've been a
6   long time --
7       A.  Sure.
8       Q.  -- you've been a long time -- and you
9   lived in Mississippi for a long time, and you know
10  these trees have been -- so when you see a sign of a
11  knot where a broken limb fell off, that could have
12  happened in Hurricane Camille, right?
13      A.  I doubt it.  It looks like they're a very
14  fresh broken off area to me, but --
15      Q.  And you can see that they're fresh broken
16  damage from these photographs?
17      A.  I believe I can.  I thought I saw that on
18  a sign, too.  That's the reason I labeled them as
19  damaged, and I looked at them when I was walking
20  through them.
21      Q.  All right.  Now, let's look at the
22  photographs from right after the storm that the
23  plaintiffs gave you.  I'm going to hand you -- well,
24  we can look at -- some of them are in your report.
25  Let me see.  The quality might be the same as the

Page 127

1   ones we have.  We'll just go with the ones in your
2   report for now, and I will show you some others.  If
3   you turn to the Appendix B and the photos that begin
4   in that appendix on Politz-346, these first two
5   photographs are what the Politz house looked like
6   before the storm, correct?
7       A.  Correct.
8       Q.  And -- and what is significant about these
9   photographs for any of the opinions that you reached
10  in your report?
11      A.  Well, it just shows the very -- the
12  quality of the house and how it was built.  It was a
13  gable structure.  It was on a -- a brick and wood
14  sided or else vinyl siding home.  The picture you
15  see at -- on the bottom is facing -- that's the
16  front of the house, and that faces north 31 degrees
17  east.  That side you're looking at in the top
18  picture is the eastern exposure, east and southeast
19  exposure.
20      Q.  Is there anything that you see in these
21  photographs of the Politz residence before the storm
22  that you think make your conclusions more likely
23  than not to be correct?
24      A.  In combination with what I saw when I got
25  to the site of the base plates, yes, it's a -- it

Page 128

1   was a nail on structure to base plates, and I'm
2   assuming it was from roof to top plates as well.
3   You would have to assume that --
4       Q.  Okay.
5       A.  -- if you see it on the bottom.
6       Q.  Okay.
7       A.  I see a lot of glass subject to a lot of
8   breakage from flying debris.  These things
9   invariably happen in windstorms like Katrina.
10      Q.  Is there anything else other than what you
11  just mentioned that you can look at from these
12  photographs that makes your opinions more likely
13  than not?
14      A.  It's a conventionally built house.  It was
15  not designed for 135 mile per hour winds, it looks
16  like to me in combination with my inspection of the
17  site, and my view of the pictures we're about to
18  look at that they took immediately at the site, too,
19  after the storm.
20      Q.  So let's turn to the after
21  hurricane photographs in your appendix starting at
22  Politz-350.
23      A.  All right.  I'm there.
24      Q.  Let's -- and just start with the first
25  page, which is 351.  What do you see in these

Page 129

1   photographs that you believe makes your conclusions
2   more likely than not to be correct?
3       A.  Well, you can see that what's left on the
4   slab.  This is the remnants of that wrought iron
5   fence that was on the eastern side, eastern and
6   southeastern side that you see in some of those
7   before storm pictures.  On top, the straps, you see
8   are some of them remaining that once were nailed to
9   the studs.  They're not close enough up to see the
10  actual base plate nails in that instance.  The same
11  thing is true on the bottom of the straps.
12          That's the entrance steps to the main
13  entrance on the northeast side, the view that that's
14  taken from.  You do see the damaged trees in the
15  background.  If you look at that bottom picture, you
16  can clearly see all the vegetation stripped off of
17  them, various parts of them, broken limbs and so on.
18      Q.  Okay.  When you say that all of the
19  vegetation is stripped off of them --
20      A.  The leaves.
21      Q.  Yeah, I understand what you meant,
22  foliage.  The picture at the bottom of 351, there
23  appears to be a sapling planted near the foundation
24  of the house.  Do you see what I'm talking about?
25      A.  Yes.

Ted Biddy - 11/07/08

Page 130

1    Q.   And that still has its leaves on it,
2    correct?
3    A.   Yes, it's a little -- I don't know what it
4    is, but it does appear to have some dead vegetation
5    on it.
6    Q.   Similarly, if you turn to Politz-352,
7    there's a large tree in the background that appears
8    to have its -- on the left side, that still has its
9    leaves on it, correct?
10   A.   Some, yes, it does.
11   Q.   And when you turn to --
12   A.   And if you will ask me the same question
13   about that one, I will tell you some more that this
14   picture shows that we discussed already today.
15   Q.   All right.  I'd like to hear what you
16   think is significant about any of the photos that
17   you include in your report.
18   A.   Well, in the -- I guess it's 352.  Yeah,
19   352, you see the stud, broken off stud there, the
20   remains on the slab?  You see that?
21   Q.   Yes.
22   A.   You see it's nailed in.  That one broke
23   off before it could pull loose.  You go down the
24   line to -- there's another stub of a slab -- of a
25   two by four stud that broke off, and you go on down

Page 131

1    the line, there's another one down towards the end
2    of that line that's broke off, so that's the
3    significance to show that not only did you have the
4    attachment pull outs, but you had actually broken
5    studs, which I demonstrate in my calculations would
6    occur for these kind of winds.
7    Q.   Okay.  And again, the break -- the broken
8    studs that we see in the bottom of Politz-352, that
9    had been caused by the storm surge, again, in a
10   vacuum, correct, Mr. Biddy?
11   A.   If you think there is such an impossible
12   thing, yes.
13   Q.   Well, and just to be clear, when you say
14   it's an impossible thing, you mean because you think
15   that the wind destroyed the Politz house would have
16   done this damage prior to the storm surge inundating
17   the property, that's what you mean, correct?
18   A.   Well, it's a scientific fact that storms
19   in this hemisphere rotate in a counterclockwise
20   direction around the center eye and have outer
21   bands, and I've seen many Doppler radar record
22   pictures of those outer bands, which some people are
23   calling a replacement eyewall where you have another
24   eyewall formed, but it's certain those winds
25   occurred before the high water got here and that's

Page 132

1    proved by a multitude of experts.
2    Q.   And those are all meteorological opinions
3    that you just --
4    A.   Well, of course, and I've researched.
5    Q.   And I understand you researched and
6    believe that you are applying what you think are the
7    meteorological conditions of this property.  My
8    question really was just to confirm that the storm
9    surge would have been sufficient to cause the
10   destruction we see in this picture to these broken
11   studs, correct?
12   A.   Yeah, and I'm certain I said that in my
13   report, too --
14   Q.   Okay.
15   A.   -- so we don't have to belabor that.  I've
16   admitted that, of course.
17   Q.   And the -- and I agree, you have admitted
18   that, and I don't mean to belabor it.  I'm not
19   trying to unnecessarily prolong this deposition, but
20   I just want to make -- I just want to understand.
21   You've taking these photographs because you think
22   they show something that's important to your
23   conclusions, right?
24   A.   Certainly.
25   Q.   Okay.  And what I'm trying to understand

Page 133

1    is if the storm surge could have caused the same
2    destruction, what's important about these
3    photographs?
4    A.   Oh, well, it shows the destruction and
5    given the proven fact that the sequence of the storm
6    was such that high winds occurred at least three
7    hours ahead of the high water, therefore, it had to
8    be -- based on my calculations, it had to be
9    destroyed by the winds, and it just shows the
10   evidence of the destruction.
11   Q.   Right.  It's fair to say your opinions
12   hinge on timing.  These photographs don't show
13   anything about the timing of water versus storm
14   surge -- or water versus wind, correct?
15   A.   That's correct.
16   Q.   It -- they show that the property was
17   destroyed after Hurricane Katrina, correct?
18   A.   Of course, they do.
19   Q.   Okay.  And that's important in and of
20   itself, right?
21   A.   And it shows the mechanism of destruction,
22   too, which fits perfectly with everything I've
23   analyzed.
24   Q.   And we'll talk about the mechanisms that
25   you describe in your report.  When you're referring

Ted Biddy - 11/07/08

Page 134

1   to mechanisms, you're referring not to the cause,
2   but to the actual way in which --
3       A.   It failed.
4       Q.   -- the studs failed?
5       A.   That's correct.
6       Q.   So these -- the photograph, it's important
7   that it shows that the property itself was destroyed
8   after Hurricane Katrina, right?
9       A.   That's certainly important.
10      Q.   And that's important to make sure because
11  you've reached the conclusion that the winds would
12  have blown the house away before the storm surge got
13  there, correct?
14      A.   Yes, but as you can see in the pictures,
15  as we've discussed earlier, there were, you know,
16  things there that -- that were left after the water
17  that obviously were destroyed by the water later.
18      Q.   Well --
19      A.   Behind --
20      Q.   -- tell me what you're talking about --
21      A.   Well --
22      Q.   -- on Politz-352.
23      A.   -- for instance, that -- whatever that is
24  behind Mrs. Politz on the slab there was obviously
25  not blown away subject to all of this water coming

Page 135

1   in.
2       Q.   So in other words, the -- what we see --
3   well, I'm not sure I know -- I follow what you're
4   saying, Mr. Biddy.  All that that is behind the
5   slab, you're referring to the trees that are still
6   standing?
7       A.   No, no, I'm not.
8       Q.   Are you referring to the debris behind it?
9       A.   I'm referring to the top picture behind
10  where she's sitting.
11      Q.   Uh-huh.
12      A.   There is something there that -- that
13  obviously got the effects of the sea water as well
14  as the earlier winds, but it stayed there,
15  obviously, from the earlier winds.  I can't identify
16  what that is to tell you the truth.
17      Q.   I'm -- I'm not trying to be difficult.  I
18  just -- I don't -- I'm not sure I know what you're
19  talking about in the photo.  Can you maybe point to
20  -- hold up the photo and point for the videographer
21  what it is?  You're saying things --
22      A.   (Indicating.)
23      Q.   Oh, you're talking about the top
24  photograph?
25      A.   Yeah.

Page 136

1       Q.   Okay.  I think I -- I thought you were
2   talking about the bottom photograph.  The things
3   that we see in the top photograph, that's debris and
4   remains of the house and its contents, correct?
5       A.   That is correct.
6       Q.   Okay.  And you -- you say that -- that
7   these things obviously were not blown away by the
8   wind, but were rather damaged by the storm surge.
9   Is that what you were trying to explain to me?
10      A.   That's correct, and --
11      Q.   And I guess, could you explain your basis
12  for reaching that conclusion about this photograph,
13  I mean, other than the fact that they're just still
14  sitting there?  I mean --
15      A.   They're there.
16      Q.   But, again, I'm not trying to be
17  difficult.  I just want to, you know, make sure that
18  we're on the same page here, Mr. Biddy.
19      A.   They're there.
20      Q.   So the fact that you see some debris that
21  has essentially collapsed and is sitting on the site
22  of where the house -- or the Politz property was, in
23  your opinion, that shows that some of that damage
24  was -- that was storm surge not blown away by wind.
25  Is that what you're saying?

Page 137

1       A.   And this is typical debris that's left
2   after the storm surge subsided.  It's the heavy
3   metal stuff, which that object in the -- behind her
4   obviously is, and the brick work, things of that
5   sort.  Now, other things like furniture that might
6   have been left there or any wood would have washed
7   away with the later arriving storm surge.
8       Q.   Okay.  Well, the -- the brick work -- the
9   brick work, it's brick veneer, right, on the house?
10      A.   Partial, yes.
11      Q.   Okay, partial, right.  So the bricks we
12  see, that would be kind of outside attached to the
13  stud frame, right?
14      A.   That's correct.
15      Q.   Okay.  So I guess my -- my question is:
16  Is your testimony that the bricks which have
17  collapsed, and they're still remaining on the site,
18  would have been damaged by the storm surge, but the
19  studs framing them were blown away by the house --
20  by winds?  Is that what these photographs show,
21  Mr. Biddy?
22      A.   No.
23      Q.   Okay.  Can you explain what -- what you're
24  trying to convey in our discussion of these
25  photographs?

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 138

1    A.   I said typically this is the kind of
2  debris that's left after the storm surge subsides
3  because the storm surge cannot float a brick, for
4  instance.  When the walls themself were blown in,
5  attachment failures, all of the brick veneer which
6  is just attached lightly to the outside of the brick
7  homes has no real structural strength in it.  When
8  it's just veneer, it just falls down unless it's
9  attached to something that's got some areas so the
10  wind can get it.  It doesn't fly away.  Most of the
11  time you see it, it's around the perimeter of the
12  slab that's left, and the water was not -- cannot
13  float brick and take them away, so that's what you
14  see left.  Do you want to go on to the next picture
15  now?
16    Q.   Yeah, if you want to -- the next picture,
17  it's Politz-353, 353, the next two photos.
18    A.   Yeah.
19    Q.   On the top photograph, what's the
20  significance of that photograph?
21    A.   Well, again, we're seeing stubs of studs
22  that were broken off.  Of course, we do see the
23  address of it, that 116 Winters Lane.  We see the
24  fallen down brick veneer around the edge of it on
25  the south side.  The bottom picture gives you one

Page 139

1  example of a twisted off tree that's just the stump
2  left.  If you notice right behind the fire hydrant,
3  you'll see that.
4    Q.   And that stump that's showing on
5  Politz-353, that's broken off right at the bottom,
6  right?
7    A.   No, it looks like about a foot-and-a-half,
8  two feet above it.
9    Q.   And that would have been inundated by the
10  storm surge?
11    A.   Oh, yes, later.
12    Q.   Yeah.  Well, it's fair to say just looking
13  at from this photograph that a tree broken off on
14  the ground that was inundated by storm surge and
15  impacted by debris, we can't tell if that tree was
16  broken by wind or storm surge, correct?
17    A.   I didn't analyze the tree from a
18  structural standpoint, no.
19    Q.   Okay.  Is that a correct, yes?
20    A.   Yes, you are correct.
21    Q.   Okay.  Politz-354, is there anything of
22  significance in these photographs?
23    A.   Well, again, the top one we're looking at
24  the same things, the remnants that were left after
25  the storm surge subsides plus the broken off studs

Page 140

1  and the little pieces of the bottom of the studs.  I
2  frankly don't know what automobile this was that was
3  destroyed in the storm.  Obviously, there's an
4  automobile there that's been very badly just damaged
5  or destroyed.
6    Q.   Do you have any opinion as to whether the
7  storm surge or the wind caused the damage to that
8  car back then?
9    A.   If it was in the garage, and I have to
10  caveat it that way, then it would have been very
11  heavily damaged or destroyed as the house blew away.
12    Q.   Because the debris from the house --
13    A.   Yeah.
14    Q.   -- would have collapsed on it?
15    A.   Yeah.
16    Q.   Right.  Well, and in fairness, you know,
17  if it was in the garage, no matter what destroyed
18  the house, it could be damaged, right?
19    A.   Well, that's true.
20    Q.   Okay.  Well, if it's not on -- not in the
21  garage, and I'm not sure you can really tell exactly
22  where it is or how it got there, for instance, but I
23  just -- just want to know, you took a picture of it.
24  Is there anything you can tell from that?
25    A.   I didn't -- I didn't take that picture.

Page 141

1    Q.   I apologize.  You're right, Mr. Biddy,
2  these were from -- these were being furnished from
3  Mr. and Mrs. Politz.
4    A.   Some instances, I can't possibly identify
5  the location and that's one of them.
6    Q.   Okay.  And there are pages and pages of
7  photographs.  Is there anything in the remaining
8  photographs that show something that we haven't
9  discussed that these earlier photographs show that
10  are of significance to your report?
11    A.   Well, the general nature of the same type
12  of destruction all around the building, I think is
13  important from a standpoint of it fits my proven
14  mechanisms of destruction.  Obviously, most of it is
15  cumulative.  I was here right after the storm.  It
16  looks very typical of most of the destroyed homes I
17  examined right after the storm.
18    Q.   When you say you were here, where, in this
19  neighborhood?
20    A.   Yes, I came the first time September 10th.
21  That would be 12 days after the storm, and I've been
22  here off and on ever since doing reports.
23    Q.   Well, I -- I -- not the Gulf Coast, I'm
24  sorry, Mr. Biddy.  My question was when you say
25  here, the -- I think you had testified earlier you

a580418a-55ec-460c-950b-fdf77d5aebd7

Page 142

1  didn't -- you had gone to a -- some kind of store
2  that might have been up by Highway 90, but have you
3  been to the -- have you driven through this
4  neighborhood before?
5      A.  Oh, yeah.  Specifically this property?
6      Q.  That's what I meant.  I'm sorry.  I meant
7  this neighborhood, not --
8      A.  No, I testified earlier that I had been
9  through this area and saw the devastation --
10     Q.  Uh-huh.
11     A.  -- but I didn't specifically go to this
12 property.
13     Q.  Okay.  Now, if you can turn -- there's one
14 photo I wanted to ask you a question about, and this
15 is Politz-384, if you turn to that one.
16     A.  384?
17     Q.  Uh-huh.
18     A.  Okay, I'm there.
19     Q.  Now, you see in the top photograph, and
20 this is one of the photographs that Mr. and
21 Mrs. Politz took, there is a -- a neighboring house,
22 and we don't know exactly how close it is to their
23 property, but it's a neighboring house that they
24 took a picture of that is still standing; isn't that
25 correct, Mr. Biddy?

Page 143

1      A.  Yes, it is.
2      Q.  Okay.  And then the trees around it are
3  also still standing?
4      A.  Denuded, but yes, standing.
5      Q.  Partially, I mean, some have leaves, some
6  don't, correct?
7      A.  I see a few leaves, yes.
8      Q.  Did you -- is there anything of
9  significance that this photograph shows?  I believe
10 this is the only photograph that shows a standing
11 house in any of the photographs that we've looked at
12 so far immediately after the storm in their
13 neighborhood, correct?
14     A.  Yeah, it is, and I didn't take any closeup
15 pictures of it so...
16     Q.  And I know this isn't a photograph that
17 you took.  Did you -- when you went to their
18 property in 2008, did you look to see if that house
19 was present in the neighborhood?
20     A.  There had been a couple of houses a block
21 away or so that had been built, rebuilt, but
22 surrounding this particular slab, it was just slabs
23 here adjacent.  All of the adjacent areas were just
24 total destruction as of yesterday.
25     Q.  And you didn't look to see specifically if

Page 144

1  you could find this house when you went to visit
2  their property; is that correct?
3      A.  I did not.
4      Q.  Now, a house that's still standing in the
5  neighborhood could have some information from a
6  comparative standpoint right, Mr. Biddy?
7      A.  Had I been there right after the storm, I
8  would have certainly looked at it.
9      Q.  Okay.  Right.  It could tell you how the
10 houses in the neighborhood were constructed?
11     A.  Sure.
12     Q.  It could also, since it's still standing,
13 show signs of wind damage that are visible in the
14 remaining structure, correct?
15     A.  Yes, and/or water damage.
16     Q.  Right.  It could show a water line to see
17 how high the water reached in the property, correct?
18     A.  Yeah, this is an example, as I testified
19 to earlier, of many homes that I inspected and wrote
20 reports on that were simply opened up on the
21 windward side and blown out on the leeward side,
22 therefore, leaving all the pressure on the walls,
23 and it just became a wind tunnel, and the winds just
24 blew through it for three hours and destroyed
25 whatever they could before the water got there, and

Page 145

1  then the water did its -- whatever it did to the
2  house.
3      Q.  I understand that you testified about
4  that, apparently, in other reports.  I haven't seen
5  those reports, but -- but talking specifically about
6  this house, I mean, the photo here doesn't show
7  that, right?  I mean --
8      A.  No, you can't see enough detail.
9      Q.  No, and that's my point only.  You have no
10 idea if this house was opened up and became a wind
11 tunnel as you just described, correct?
12     A.  No, I don't.
13     Q.  Okay.
14     A.  But I would assume it did.  And if you
15 want me to elaborate on that, I will.
16     Q.  Well, I'm going to venture a guess that
17 the reason you assume it did is because you think
18 the same winds and forces and sequence would have
19 applied to the houses throughout the general
20 vicinity of their --
21     A.  No, that's not quite true.
22     Q.  Okay.  Well, then--
23     A.  The rest of that is it had to be opened
24 up, otherwise the walls of the water as it got high,
25 if it was a closed structure, it would have

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

38 (Pages 146 to 149)

Page 146

1  destroyed the walls of the house, and it would have
2  been a destroyed house by the water.  Water is so
3  much heavier than, as you are saying, in a vacuum,
4  if it comes without any wind, then certainly
5  these -- these heights of water are going to crush
6  ordinary residential walls of houses.  These would
7  have been crushed down had it not been opened up
8  already.  And that -- what I mean by opened up, it
9  allows the waters to come in all sides of all walls
10  with equal height, and therefore, equal hydraulic
11  pressure, and it does not tear them down and that's
12  the importance and the proof that it had to be
13  opened up.
14     Q.  Well, that's true, Mr. Biddy, only if that
15  house was inundated by the storm surge, correct?
16     A.  True.
17     Q.  I mean, if it was at a ground elevation
18  that was above any kind of significant storm surge,
19  that -- the phenomenon you just described would not
20  necessarily be true at all?
21     A.  Well, that's true.
22     Q.  And in fact, did you observe on your visit
23  in the neighborhood or at any time whether houses at
24  higher elevations above the storm surge were more
25  likely than not to be still standing after Hurricane

Page 147

1  Katrina?
2     A.  In this area, it did not happen.  They
3  were all -- all surrounding houses to this house
4  were destroyed.
5     Q.  Okay.
6     A.  Now, this one is -- I don't know which
7  direction they were taking that picture, and I don't
8  know where that house was, but obviously, that's a
9  house in the neighborhood that some part of it
10  stood, and we don't know the extent of opening or
11  anything else because we don't have a good enough
12  picture.
13     Q.  When you said all of the houses in the
14  neighborhood were destroyed, is it your view that
15  they would have experienced the same kind of process
16  of destruction that you described in your report for
17  the Politz residence?
18     A.  It depends on how they were built, of
19  course.  If you had two by six studs or even bigger,
20  heavier framing, perhaps the studs would not have
21  broken in many.  If you had each stud with the
22  hurricane anchors on them, perhaps they would not
23  have turned loose if they were screwed in rather
24  than nailed in, as we all we do now on everything,
25  perhaps it would have stood.  You have to examine

Page 148

1  each one.  You can't generalize if you're having to
2  do that.
3     Q.  Well, I don't like you to -- I'm not
4  asking you to generalize, but I do want to
5  understand if you have a neighborhood -- if we're
6  looking at the neighborhood where the Politzes
7  lived, where would you -- I guess, how -- how far --
8  I mean, you would expect the same meteorological
9  conditions that you were relying on in your report
10  to be present within a certain vicinity, correct?
11     A.  Sure.
12     Q.  And that -- and that would be, given the
13  size of the storm, pretty -- pretty extensive?
14     A.  Sure.
15     Q.  And I've seen a number of your reports,
16  Mr. Biddy, and the 125 to 135 miles per hour wind
17  range, that's present in a lot of areas throughout
18  the Coast?  I mean --
19     A.  Yeah.
20     Q.  And you wouldn't expect -- you would
21  expect similar constructed houses to show the same
22  patterns of destruction as the Politz's within
23  that -- subject to the same meteorological
24  conditions; is that correct?
25     A.  I would expect it to be true, but I always

Page 149

1  have to find mechanisms of destructions before I can
2  be certain from an engineering standpoint of what
3  happened.
4     Q.  That's fair, and I think that is what
5  anyone would expect, but it's fair to say that if
6  houses that had similar design features that you
7  described the Politz property having that were
8  subject to the same meteorological conditions,
9  particularly the wind, would likely have suffered
10  the same fate as the Politz residence?
11     A.  Oh, absolutely, yes.
12     Q.  Okay.  And that, you think, is broadly
13  true throughout the Gulf Coast region, certainly
14  without -- throughout the Long Beach area where we
15  are here?
16     A.  That's a general statement you can make.
17  I have seen vast subdivisions with just slab after
18  slab after slab that I've done half a dozen detailed
19  inspections of, and they all show the same things,
20  either the pull outs or the stud failures, one of
21  the two.
22     Q.  I want to show you Defense Exhibit 37.
23        (Exhibit 37 marked for identification.)
24     Q.  (By Mr. Gilmore)  Specifically if you
25  could turn to -- it's marked as Figure 2 in the

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 150

1  report.  It's pretty early on.  It's not -- I think
2  it's in the first appendix of materials right after
3  the signature of the report.  I'll represent to you
4  this is a report prepared by Kevin Kennedy &
5  Associates.
6      A.  What page is the signature page?
7      Q.  If you --
8      A.  Does it have a page number?
9      Q.  Well, the signature page is shortly after
10  that.
11      A.  I see.
12      Q.  That page you have right there.
13      A.  Okay.
14      Q.  Okay.  It's -- so you recognize that it's
15  entitled "Aerial View of Hurricane Katrina Damage
16  near the Politz site."  Have you ever seen an aerial
17  image, a satellite image, for instance, that shows
18  the Politz property, their neighborhood?
19      A.  I've seen the ones that Mr. Calaci has in
20  his report only.
21      Q.  Uh-huh.  Well, you worked on the Schmerman
22  case as well.  They were also in Long Beach, I
23  believe, right?
24      A.  Either that or Gulfport, I've forgot.
25      Q.  I believe Long Beach.

Page 151

1      A.  If could have been.
2      Q.  And do you recall seeing overhead photos
3  in that case?
4      A.  Yes.
5      Q.  Uh-huh.  And this photograph shows a
6  debris swath, correct?
7      A.  That's correct.
8      Q.  Okay.  And that debris swath basically
9  parallels the coast in this picture; is that
10  correct?
11      A.  Yes, it does, and it's obviously the point
12  of the high -- where the high water extended when it
13  met land and couldn't float it any further, and it
14  just dumped it at that spot.
15      Q.  And if you look from the south -- to the
16  south, all of the houses there are destroyed,
17  correct?
18      A.  Yes, they are.
19      Q.  Yeah, and that's consistent with what you
20  saw when you went to the Politz site even in 2008,
21  right?
22      A.  That is correct.
23      Q.  With the exception of a few houses that
24  had been rebuilt totally, obviously?
25      A.  A few, but not any adjacent ones.

Page 152

1      Q.  For the most part, you saw for yourself
2  that from -- this whole area that's shown in this
3  photograph towards the coast were just slabs for the
4  most part?
5      A.  Yes.
6      Q.  Okay.  North of the debris swath, you see
7  intact buildings, correct?
8      A.  Well, I see a few.  I see, you know, a
9  few, like I say, that I can identify as still
10  standing.
11      Q.  Uh-huh.  And -- and you can see -- and
12  given that this is a satellite image, but you can at
13  least see that the roofs are visible in the
14  buildings north of the debris swath, correct?
15      A.  Well, as I say, a view.  How many of those
16  are slabs I'm looking at, I would bet that there
17  were a lot of them, but I'd just have to look at it,
18  of course.
19      Q.  Okay.  Right.  Well, in the -- the houses
20  that are actually north in this photograph, at
21  least, and, you know, I'm not representing this is
22  the entire coast obviously, but in this photograph,
23  at least, you would agree that the houses in the
24  north and the kind of upper left quarter of this
25  photograph above the debris swath, you can still see

Page 153

1  their roofs whereas the houses to the south of the
2  debris swath appear to be slabs; is that correct,
3  Mr. Biddy?
4      A.  There are some houses to the north with
5  the roofs.  I assume you mean a blue where they put
6  the blue tarp on already.  Is that what you're
7  referring to as roofs intact in the top left-hand
8  corner?
9      Q.  Well, they're -- whether they have some
10  kind of damage, and if those are tarps or not, the
11  houses are still standing, let's put it that way,
12  otherwise you wouldn't have a tarp to put on it.
13      A.  It appears that there are a few, yes.
14      Q.  Okay.
15      A.  I can count one, two, three, four, five,
16  six, seven with blue tarps on them.
17      Q.  And even kind of further looking at the
18  very top, if you want to hold the photograph up, you
19  can -- you can take that apart, that photo apart,
20  and just hold that photograph up just so the
21  videographer can zoom in on what we're talking about
22  here.
23      A.  (Witness complies.)
24      Q.  And can -- the houses that you've just
25  referenced that appear to have -- still standing

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 154

1  that have tarps on them, perhaps the blue, can you
2  point those -- just point your finger on them so we
3  all understand what we're talking about visually?
4      A.  They're in the -- as you look at the
5  picture, the upper left-hand corner, which would be
6  the northwest corner of the photograph.
7      Q.  You see this also shows the Politz site,
8  right?
9      A.  Yes, it does.
10     Q.  And again, given it's at a distance above
11 the earth, but does that fit with your understanding
12 based on looking at Google maps and having been to
13 the site, that's --
14     A.  And the survey, yes --
15     Q.  Okay.
16     A.  -- which was in that curve, that's
17 correct.
18     Q.  It's in the curve on that Winters Lane
19 Road, correct?
20     A.  It is.
21     Q.  And the figures approximately 190 yards to
22 approximately 400 yards -- approximately 190 yards
23 from the coast to the Politz site, you have no
24 reason to doubt that is basically accurate, right?
25     A.  No, it's approximately, what, 5 -- 550

Page 155

1  feet or so, 600 feet.
2      Q.  About 600 feet.
3      A.  That's about what I testified to is my
4  best estimate.
5      Q.  I believe so.  And then 400 yards to the
6  debris swath north of the Politz site, which would
7  be about 1200 feet, I don't know if you have any
8  basis to know whether or not that's accurate, but
9  you don't have any basis to think that's inaccurate,
10 right?
11     A.  I don't know either way, but I assume it
12 is accurate.
13     Q.  Okay.
14     A.  They measured that accurately.
15     Q.  You can put that down.  We've looked at a
16 lot of photographs.  One of the reasons that it's
17 important to look at the photographs of the
18 property -- the condition of the property after
19 Hurricane Katrina is to make sure that it's
20 consistent with how you describe it in your report,
21 right?
22     A.  Absolutely.
23     Q.  And if there's any inconsistency between
24 what the photographs show and the post-Katrina
25 condition of the property versus what any expert

Page 156

1  says was the condition of the property after
2  Hurricane Katrina, that would be a problem for the
3  expert's testimony; wouldn't you agree?
4      A.  I would say so, yes.
5      Q.  Have you seen a tornado do damage to
6  properties?
7      A.  Yes.
8      Q.  Have you seen the aftermath?
9      A.  Yes.
10     Q.  Okay.  Let me show you -- you might have
11 already seen this photograph in a prior deposition.
12 I just -- I can't recall off the top of my head, and
13 I'll just ask you real quickly about it.  That's
14 Defense Exhibit 162.
15         (Exhibit 162 marked for identification.)
16     Q.  (By Mr. Gilmore)  This is a photograph of
17 a picture in Greensburg, Kansas after a devastating
18 tornado according to the caption from the Sun
19 Herald, and you must have seen the Wizard of Oz, and
20 know Kansas gets tornadoes, right?
21     A.  Of course.
22     Q.  And you -- you would agree that this
23 photograph shows damage consistent with a tornado,
24 right?
25     A.  It does.

Page 157

1      Q.  A very damaging tornado.
2      A.  I have seen this picture, and I've seen
3  others at this same location for the whole swath of
4  the tornado.
5      Q.  And all -- all the trees appear to be
6  snapped off at the top, right?  It looks like
7  someone just come in and chopped them off?
8      A.  The ones that are still standing are
9  completely denuded.
10     Q.  Uh-huh.  There are no canapes left on any
11 of the trees I can see in this photograph, right?
12     A.  Well, tornadoes with super cells in Kansas
13 have winds of over 200 miles per hour.
14     Q.  In the bottom right corner, you see a
15 house that's still standing, correct?
16     A.  Yes, of sorts, that's damaged.
17     Q.  It's severely damaged and the roof has
18 been -- it looks like it's essentially been caved in
19 or crushed, correct?
20     A.  Yes.
21     Q.  And looking at that pattern of damage, you
22 would agree that the tree -- and you can hold this
23 picture up for the camera -- the house that's shown
24 in the bottom right, that shows a pattern damage
25 that you would think is representative of high wind

Ted Biddy - 11/07/08

Page 158

1  or tornado damage, correct?
2      A.  Well, a tornado, yes, except if you will
3  look at the pictures, and I have seen them of this
4  entire swath, you -- you see houses still standing
5  like this one or less damage sometimes and total
6  devastation in some swaths.  Wind in a -- in an
7  erratic tornado or downburst or other mini burst or
8  other phenomena are in an erratic pattern.  You just
9  don't get a straight wind like so, you know, just
10  straight swath.  You get a -- kind of a jagged path,
11  and it will completely destroy here, and it may
12  leave a house right beside it basically intact.
13  I've seen that many times.
14      Q.  It's fair to say that the swath of damage
15  that you see all along the coast, and particularly
16  in the aerial photograph that we just saw of the
17  Sanders -- of the Politz house, pardon me, is just a
18  big swath of damage, right?  Everything south of
19  that debris line we saw was completely destroyed,
20  correct?
21      A.  In that particular area.
22      Q.  Turning back to your report, Defense
23  Exhibit 42.
24      A.  Page number?
25      Q.  On Politz-321.

Page 159

1      A.  All right, I'm there.
2      Q.  You describe in the third paragraph down
3  that begins, "The most probable sequence of failure
4  of the structure occurred as follows."
5      A.  Okay.
6      Q.  And in there, you -- you -- it's your
7  opinion that, "The most probable sequence of failure
8  is that the roof structure pulled free" -- pardon me
9  -- "the roof structure pulled free from the nailed
10  connections from -- the wind would have caused the
11  roof structure to pull free from the nailed
12  connections and to rise up and fly away as an
13  airfoil due to both the positive forces on the
14  windward sides of the structure and the negative
15  outward and upward wind forces on the lee sides of
16  the structure."
17      A.  That's correct.
18      Q.  From the photographs that we've looked at
19  post-Katrina taken by the plaintiffs, you weren't
20  able to identify any remaining portions of the roof
21  structure, were you?
22      A.  No, I was not.  It's usually taken to
23  foreign distance places, and it usually
24  disintegrates in pieces if it's winds that strong.
25  Sometimes you find a whole roof that will be a block

Page 160

1  or two away, just a whole roof sitting there.  It's
2  damaged, but it's sitting there, and it's clearly
3  identifiable as a roof, and in this case, it was
4  not.
5      Q.  So I'm clear, the presence or absence of a
6  large portion of intact roof near the property, does
7  that tell us one thing or another about whether wind
8  caused the destruction to the property?
9      A.  No, I don't think it does.  I think had it
10  been water, I think the whole structure would have
11  been crushed down on the site.  The wall -- if a --
12  if it had been a closed structure without any
13  breakage or openings in the house, it's no question
14  that the water would have crushed the building down,
15  and how much of that would have been washed away
16  then, I don't know.  Many times you can see crushed
17  down structures that were obviously in very, very
18  low lying areas that were crushed by water.
19      Q.  And you then go on to say at the bottom of
20  Politz-321, "If the roof structure of the house and
21  attached garage do not blow away first, then it's
22  certain that the entire structure blew away in the
23  early winds of the storm due to the inadequate
24  anchorage of the bottoms of walls to the base
25  plates."

Page 161

1      A.  That's correct.
2      Q.  Do you have an opinion -- well, does the
3  evidence, the photographic evidence of the debris
4  and the remains of the property, tell you one way or
5  the other which of these two scenarios is more
6  likely?
7      A.  It's my opinion, and I've stated the most
8  probable sequence is that the roof attachments
9  pulled free.  That's -- I had to, of course, assume
10  that the same type of attachments that existed on
11  the studs to the bottom base plate existed from the
12  studs to the top base plates.
13      Q.  Is that assumption borne out by
14  inspections of standing losses?
15      A.  No.
16      Q.  Okay.
17      A.  It's just a general assumption that
18  construction is usually consistent with that.
19      Q.  And if you turn to Politz-325, it's the
20  section of your report where you discuss how
21  elements of the design of the house might be failed,
22  correct.
23      A.  Yes.  It discusses wind loadings on --
24  from storms on various elements of the house and
25  mechanisms of destruction that I have seen

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

42 (Pages 162 to 165)

Page 162

1  predominantly along the coast.
2      Q.  And we talked about a number of these
3  already, Mr. Biddy.  In interest of not belaboring
4  the point as you had said, I'm just going to ask you
5  a general question.  The phenomenon that you
6  described here in terms of how the design failed,
7  these failures could have happened from storm surge
8  in a vacuum, again, putting aside your views as to
9  the sequence and timing of wind versus water,
10 correct?
11     A.  If you know the truth of the winds coming
12 first, yes, that's true.  If the waters had come
13 first, it could have destroyed those walls, of
14 course, it's over nine feet of water.
15     Q.  Okay.  And each of these design
16 failures -- well --
17     A.  No, not design.
18     Q.  I'm sorry.  I --
19     A.  Mechanisms of destruction.
20     Q.  Each of these -- I'll use your term,
21 that's more accurate, you're the engineer.  Each of
22 these mechanisms of destruction that you lay out
23 here, there's nothing in the physical evidence
24 showing these mechanisms to the extent there is any
25 that makes it more likely than not that wind versus

Page 163

1  water caused the damage, correct?
2      A.  Well, as I said in my report, it's
3  absolutely crucial that you know the sequence of the
4  winds and the water in order to identify what
5  caused -- what forces were on the building first.
6          VIDEOGRAPHER:  Two minutes.
7          MR. GILMORE:  Let's take a break.
8          VIDEOGRAPHER:  Off the record at 2:09.
9  End of tape four.
10         (Off the record.)
11         VIDEOGRAPHER:  Beginning tape five.  On
12 the record at 2:17.
13     Q.  (By Mr. Gilmore)  Mr. Biddy, we talked a
14 little bit previously during the deposition about
15 the data from Ingalls Shipyard anemometer.  Are you
16 aware that the highest one minute sustained wind
17 speeds measured during Hurricane Katrina at the
18 Ingalls Shipyard was 87 miles per hour?
19     A.  I had heard that, yes.
20     Q.  Okay.  And that the highest gust measured
21 at the Ingalls Shipyard was 117 miles per hour?
22     A.  I had heard that, yeah.
23     Q.  And do you know that the Ingalls
24 anemometer measured that highest gust speed only
25 twice during the entire storm?

Page 164

1      A.  I didn't know that, but that's one spot.
2      Q.  Okay.
3      A.  There's a multitude of other spots that
4  are, in fact, right there close in Pascagoula that's
5  read anywhere from 125 miles an hour that was
6  reported by telephone to the New Orleans Weather
7  Bureau, and then the later readings of 137 and 140
8  miles an hour before the towers blew down.
9      Q.  And in fairness, the equipment that
10 stopped working malfunctioned because of the damage
11 from the storm, right?
12     A.  Yes.
13     Q.  Okay.  The other anemometer that kept
14 working besides the Ingalls anemometer was the one
15 that the Hurricane Katrina Deployment Survey Group
16 from Texas Tech Hurricane Research Team was
17 monitoring that was at Stennis Airport, right?
18     A.  Eight miles inshore from the coastline,
19 yes.
20     Q.  And that's right, that was inland.  And
21 you might have been asked this before during
22 depositions, but are you aware or maybe you're aware
23 now that those Texas Tech researchers were staying
24 at a hotel in Gautier.  Did you know that?
25     A.  I understood that, yes.

Page 165

1      Q.  Yeah.  And you -- you might also have
2  heard that they estimated, based on their experience
3  staying -- riding out the storm in Gautier, the
4  meteorologists estimated that the strong tropical
5  storm sustained wind speeds with gusts of Category 1
6  suggested sustained one minute wind speed to 65 to
7  70 miles per hour.  That's from the Texas Tech
8  report.  I can show it to you if you'd like.
9      A.  Yeah, I've read that.  These are graduate
10 students that are doing this for their research
11 project.  They are not meteorologists of
12 long-standing experience.  The great weight of the
13 evidence by the meteorologists who have done these
14 studies, and I've named a bunch of them.  I can go
15 back through them if you'd like.
16     Q.  There's no need.  You've identified who
17 they are.
18     A.  Come up with totally different
19 conclusions.
20     Q.  Okay.  In fairness -- well, in fairness,
21 so far as you know, the Texas Tech meteorologists,
22 you might call -- you want to call them grad
23 students.  I'm not sure their status, but they
24 obviously were researching and prepared a report on
25 Hurricane Katrina, but so far as you know, they

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

43 (Pages 166 to 169)

Page 166

1  haven't provided litigation reports in any Hurricane
2  Katrina cases, right?
3      A.  I don't know of any that they've provided.
4      Q.  Okay.  They also stated in their report
5  that there was little evidence of significant wind
6  damage to residential structures near their team's
7  location in Gautier.  You've read that as well?
8      A.  I have read it, and I think it's a very
9  foolish statement.
10      Q.  Okay.  In fact, you prepared a report for
11  a property in Gautier, the Sanders property at 408
12  Graveline Drive, right?
13      A.  I've prepared several properties.  That's
14  one of them, yes.
15      Q.  I know that one because that's a case that
16  I've worked on as has the Denham Law Firm here.  And
17  in that report, and perhaps in your other reports in
18  Gautier -- for properties in Gautier, you estimated,
19  you know, wind speeds of 125 to 135 miles per hour,
20  correct?
21      A.  Correct.
22      Q.  Okay.  When you prepared those reports for
23  the properties in Gautier, were you even aware of
24  the Texas Tech report?
25      A.  I gave it no credibility if I was aware of

Page 167

1  it.
2      Q.  My question was do you -- do you recall
3  whether you had actually read it at the time you
4  prepared this report?
5      A.  I don't recall.
6      Q.  Okay.  I'm not surprised it doesn't change
7  your opinion, but I was just curious if you were
8  aware of it.  Let's turn to Politz-332.  And this is
9  a summary of conclusions section in your report,
10  correct?
11      A.  Yes.
12      Q.  You would agree with me that you have them
13  lettered here, conclusions A through G are all
14  meteorological opinions, right?
15      A.  Based on my research, yes.
16      Q.  Right.  This is just you're relying on
17  meteorologists that you believe are credible?
18      A.  Yeah, a multitude of them, yes.
19      Q.  Uh-huh.  Okay.  So the remaining
20  conclusions starting with conclusions H through K
21  are not meteorological, they are actual engineering
22  conclusions, right?
23      A.  Yes, they are.
24      Q.  Okay.  They depend and rely on the
25  meteorological data that you discuss in conclusions

Page 168

1  A through G, right?
2      A.  Absolutely.
3      Q.  Okay.  So if the meteorological
4  conclusions in A through G aren't accurate, that
5  would render the remaining conclusions, at least H
6  through J, inaccurate, right?
7      A.  That's obvious.
8      Q.  Okay.  And then conclusion K is just your
9  estimate of the current replacement cost which we'll
10  address briefly at the end of the deposition.
11  Opinion J, which is on Politz-333, you state, "Based
12  upon my forensic engineering study, I conclude that
13  the root cause of all of the structural destruction
14  of the Politz house and attached garage was the
15  early winds of Hurricane Katrina."  Did I read that
16  correctly?
17      A.  You did.
18      Q.  That fairly summarizes your ultimate
19  conclusion in this case --
20      A.  It does.
21      Q.  -- right, as to the cause and origin of
22  the damage to the --
23      A.  Structural damage.
24      Q.  Structural?
25      A.  As I mentioned, it may have been things

Page 169

1  there on -- in the house, whatever was left that the
2  waters hadn't destroyed.  All I can address is the
3  structural capacities of this --
4      Q.  And you're talking about the inside,
5  perhaps, contents?
6      A.  Yeah, contents, whatever was in the inside
7  of the house.
8      Q.  Okay.  You're not rendering any opinion
9  about the contents that were destroyed by wind
10  versus water, correct?
11      A.  I don't know.  I simply am not offering no
12  opinion other than knowing that winds blew through
13  the house for three hours or in it, through it,
14  taking it away.  I don't know what was left there
15  exactly.  Probably the heaviest things were left.
16      Q.  And I'm not -- I mean, you don't address
17  it in your report.  I just want to make sure, you
18  know, you've never -- you haven't gone through a
19  contents list --
20      A.  No.
21      Q.  -- of the Politz's possessions --
22      A.  No.
23      Q.  -- of wind, water, wind, water?
24      A.  I had nothing to do with that.
25      Q.  And you don't intend to do that?

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

44 (Pages 170 to 173)

Page 170

1    A.  No.
2    Q.  That's not part of your expert testimony
3  that you will be giving in this case, right?
4    A.  No, I do not --
5    Q.  Okay.
6    A.  -- intend to do contents.
7    Q.  And if you turn to Politz-324.
8    A.  All right.
9    Q.  Okay.  And on the first full paragraph on
10  Politz-324, you write, "It would be tempting to try
11  and draw a dividing line at the so-called high water
12  line and attribute all damages from this line and
13  below to flood waters, and all damages above the
14  line to wind storm.  However, this simplistic
15  explanation will not answer the question of which
16  set caused the other damage or caused the mechanisms
17  of structural failures to occur."  Did I read all
18  that correctly?
19    A.  You did.
20    Q.  Okay.  And that's your opinion that you
21  can't divide between wind and water damage in this
22  case, right?
23    A.  No, you have to know the sequence of when
24  it occurred, when winds occurred and were they
25  strong enough to destroy before the water got there.

Page 171

1    Q.  And in fact, trying to divide would be
2  irrelevant for your expert analysis in this case,
3  right, Mr. Biddy?
4    A.  No, that would be just a -- some sort of a
5  wild guess.
6    Q.  Uh-huh.  Okay.  So you would have made no
7  effort and will make no effort to divide between
8  damage between wind and water in this case, correct?
9    A.  I didn't say that.  I said all structural
10  damage was attributable to wind.  The destruction of
11  the building was attributable to wind.  Whatever was
12  left there perhaps was destroyed by water.  I don't
13  know what was left there.
14    Q.  Well, I think you've answered -- my -- my
15  question was a little different.  Forgive me if it
16  was vague.  I was referring to your statement that
17  it would be tempting to draw -- to try and draw a
18  dividing line at the so-called high water line and
19  attribute wind and water damage accordingly.  You
20  haven't done that, and you're not going to try to do
21  that in this case?
22    A.  No, I will not.
23    Q.  And the reason why you're not going to try
24  and do that in this case is because you think the
25  structural damage was completely done by wind prior

Page 172

1  to the arrival of water, correct?
2    A.  That's correct --
3    Q.  Correct.
4    A.  -- because of the sequence I proved.
5    Q.  I'm going to show you --
6      MR. GILMORE:  Can we go off the record for
7  a minute?
8      VIDEOGRAPHER:  Off the record at 2:28.
9      (Off the record.)
10      VIDEOGRAPHER:  On the record at 2:29.
11    Q.  (By Mr. Gilmore)  You have a
12  reconstruction cost estimate in your report, right?
13    A.  Yes, I believe it's Appendix G.  Hold on
14  one second.
15    Q.  And I believe that starts at 46 -- 461 of
16  your report.
17    A.  Yes, sir.
18    Q.  Politz-460, 461?
19    A.  That's correct.
20    Q.  In previous reports, you prepared a
21  cost estimate based on the RS Means data alone,
22  right?
23    A.  Prior to late summer, early fall of '07,
24  yes.
25    Q.  And you no longer use that data alone,

Page 173

1  right?
2    A.  That's correct.  Judge Ozerden, who I
3  don't agree with, ruled that that was not accurate
4  enough to present to a jury, simply a preliminary
5  estimate as all estimates are, unless the
6  contractor's actually giving you a bid for the job,
7  but anyway, since he ruled that, I went another
8  direction and made an interview with the local
9  homebuilders and determined what they were charging
10  now, and I use those numbers now.
11    Q.  Now, you could actually ask a local
12  contractor to make a bid to reconstruct the Politz
13  residence, right?
14    A.  You could.  You would have to do a
15  detailed take off of, you know, every piece of
16  material and his labor and apply that.
17    Q.  That would be more accurate than using --
18  would that be more accurate than using the RS Means
19  approach, right?
20    A.  More accurate than using RS Means, yes.
21    Q.  Okay.  And the approach you've used in
22  your new methodology, you use a base cost per square
23  foot, correct?
24    A.  That is correct.
25    Q.  And that base cost is just -- it's a

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

45 (Pages 174 to 177)

Page 174

1  number that you determined after speaking with --
2  when you refer to local contractors, you identify
3  one, right, Carl Hamilton?
4      A.  Well, I have another one.  Both of them
5  which gave me letters, Mr. Carl Hamilton of Hamilton
6  Builders and one from Plumb Builders.
7      Q.  Is that referenced in this report?
8      A.  I don't think the Plumb -- I don't think I
9  made reference to Plumb, but I have those letters if
10  you'd like them.
11     Q.  And in fact, I would like them.  Are
12  they -- since they're not referenced in your report,
13  is it correct to assume that in your report and in
14  your methodology, you were relying on the Carl
15  Hamilton information?  You would have disclosed the
16  Plumb letter in your report if it was something that
17  you relied upon, right?
18     A.  Plumb -- Carl Hamilton was more recent.
19  Plumb was a year or more before I talked with Carl
20  Hamilton.  Hamilton gave me -- I had two or three
21  telephone conversations with him in which he cited
22  numbers of houses that he had built pre-Katrina,
23  partially finished before Katrina, and then finished
24  after Katrina, and then after Katrina occurred, and
25  gave me the square foot prices for average, good

Page 175

1  quality and high quality homes, and he described to
2  me what each one meant as far as high quality and
3  good quality and very -- you know, very -- you might
4  call them deluxe homes.
5      Q.  I've seen a few of your reports based on
6  using this methodology.  The 175 per square foot
7  number, that's the mid tier number?
8      A.  No, no, that would be the -- according to
9  Mr. Hamilton, that would be the deluxe homes.
10     Q.  Oh, that's the deluxe home.  I thought
11  there was a 200 square foot figure I had seen in
12  some of your reports.
13     A.  Well, 200 per square foot was --
14     Q.  200 per square foot, I apologize.
15     A.  Plumb Builders quoted 150 to 200 a square
16  foot.  The reason I didn't cite this is, like I just
17  said, it's a year older than the Hamilton Builders,
18  and Hamilton gave me a letter stating all of this,
19  so I will give you those -- a copy of those letters.
20     Q.  Yeah, I would ask you if you could provide
21  copies of any letters and correspondence you have
22  with Mr. Hamilton and Plumb Builders --
23     A.  Okay.
24     Q.  -- regarding your reconstruction cost
25  estimates for properties during Hurricane Katrina.

Page 176

1      A.  All right.  I will do that.
2      Q.  And I would ask that those be produced to
3  Nationwide.  Of the two -- other than Plumb Builders
4  and Carl Hamilton, can you name any other
5  contractors that you've had similar kinds of
6  discussions regarding reconstruction costs on the
7  Mississippi Gulf Coast?
8      A.  No, not to the extent that I went to Plumb
9  Builders and with Carl Hamilton for whole houses.  I
10  have discussed materials with contractors, different
11  contractors over a period of three years.  They tell
12  me -- at first, they said roofing was going up 10
13  percent every Monday, for instance.  I remember that
14  quote, and I've talked to numbers of homeowners who
15  could not get the contractors to start because there
16  was just no labor to be had in this area at least
17  the first year or two.
18     Q.  Of the two external sources that you've
19  had substantive information from, you think that
20  Hamilton is probably more accurate than the Plumb
21  information because it's more current?
22     A.  Yes, it's more current, and it would take
23  into account the fact that there is more labor now.
24  He told me that one of the biggest reasons that the
25  costs were more now than before Katrina was because

Page 177

1  of labor.  The carpentry type labor went from 10 to
2  $12 a square -- an hour for that kind of labor up to
3  20 and $22 per hour.  It almost doubled, and that
4  fits with what I saw in this area, and I don't know
5  if it's still true or not, but even convenience
6  stores had signs up of wanted -- help wanted, $8 an
7  hour and a $500 sign-on bonus just for the clerks,
8  so the labor was next to nonexistent because there
9  was no place to stay.  People were having to drive
10  in from places north of here.
11     Q.  Okay.  Let me just hand you Defense
12  Exhibit 48.
13         (Exhibit 48 marked for identification.)
14     Q.  (By Mr. Gilmore)  Have you seen this kind
15  of document before?
16     A.  I'm not sure if I have or not.  I may
17  have.  It's some type of a grant for -- to help
18  people rebuild, I guess.
19     Q.  Uh-huh.  And this is -- I'll represent to
20  you this is a document produced by the Mississippi
21  Development Authority in this case in response to a
22  subpoena regarding the grant application of Mr. and
23  Mrs. Politz for damage to their property.
24     A.  Is that a question?
25     Q.  The -- you'll see due to the -- at the

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 178

1    bottom, there's a determination the house was 100
2    percent damaged by high winds and flood water. I
3    guess you would agree with respect to the high
4    winds, right, Mr. Biddy?
5        A.   Yes.
6        Q.   And disagree that the flood water caused
7    any structural damage to the property. That would
8    be --
9        A.   Structural damage, that's correct, I would
10   disagree on that.
11       Q.   Uh-huh. And are you familiar with the
12   fact that as a requirement to receive a grant from
13   the MDA, you have to -- your property has to have
14   suffered flood damage, correct?
15       A.   Well, I think obviously the property did
16   suffer a lot of flood damage after the fact, after
17   the structural part of it was destroyed.
18       Q.   And in terms of -- just so I'm clear, your
19   view, insurable -- the insurable loss was caused
20   by -- under the homeowners policy was caused by
21   winds --
22       A.   Well, I don't know --
23       Q.   -- not flood?
24       A.   I don't know what was insured and what
25   wasn't. I have no -- I've never seen a policy. I

Page 179

1    don't know if contents was insured, appliances,
2    built-in stuff. I don't -- I don't know how to
3    answer your question.
4        Q.   That's fine. Let me put it this way:
5    It's your view that the structural damage was caused
6    by winds prior to arrival of the storm surge?
7        A.   Certainly, absolutely.
8        Q.   And so if someone is applying for a grant
9    that requires the property to have suffered flood
10   damage to its structure in order to get money to
11   rebuild that structure, you would think that that
12   requirement would be met in this case; is that your
13   view?
14       A.   I've just seen this document. I don't
15   know. You know, obviously some parts of the house
16   were -- were damaged or destroyed by water. For
17   instance, floor coverings. All of the floor
18   coverings were obviously destroyed by the later
19   arriving waters. Built-in appliances, there may
20   have been bookcases left. There's no way for me to
21   tell. I'm not clairvoyant. I know the structure
22   failed due to the winds --
23       Q.   Well --
24       A.   -- three hours ahead of the water getting
25   there.

Page 180

1        Q.   Well, Mr. Biddy, when -- so when you say
2    that the house blew away, as you've said in your
3    report, and we can go through each instance where
4    you say it.
5        A.   Of course.
6        Q.   But what -- you don't mean -- you don't
7    actually mean that it blew away, do you?
8        A.   Yes, I do.
9        Q.   Well, there was things -- you just said
10   that there were things left of it. Now, I mean,
11   maybe -- so I'm not trying to be glib. I just want
12   to understand, you know, what extent do you think it
13   was left? Floor coverings, when we're talking about
14   floor coverings, you mean like wood floors?
15       A.   Carpets --
16       Q.   Carpets --
17       A.   -- wood flooring, the tile or linoleum,
18   whatever was on the floors was destroyed by the
19   later arriving waters. The winds didn't pick up
20   carpet off the floor in most instances and blow it
21   away. You know, I don't know what part of the
22   electrical wiring in the walls might have been left
23   there that the waters then came in and destroyed.
24   Who knows? Obviously, there was some water damage.
25   I can't tell you how much. I know the structure

Page 181

1    failed due to wind. It blew away due to wind. Now,
2    what was left on the slab, remnants of this, that
3    and the other, plus some furnishings and so on, you
4    know, I don't know.
5        Q.   So I'm just asking -- I just want to make
6    sure that I've asked you. You understand why I'm
7    asking you these questions because I want to make
8    sure that when we get to trial that you -- I know
9    what to expect. I've had a fair opportunity to
10   understand your opinion as to the extent of the
11   damage, what damage was caused by wind versus what
12   damage, if any, was caused by water, and I'm not
13   asking you to be clairvoyant, but if you don't know,
14   then I want you to tell me that you don't know.
15       A.   The one thing I see about this document
16   that you handed me is the bottom line, the total
17   cost to reconstruct, $151,000, that would be less
18   than $100 a square foot, which is just totally
19   unreasonable with the market that's here now based
20   on my survey of the builders.
21       Q.   And that's based on your -- the
22   methodology that you use in the report, your
23   estimate?
24       A.   That's correct. That would have been --
25   even under RS Means standards, this would have been

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

47 (Pages 182 to 185)

Page 182

1  too low.
2     Q.  Right.  Under -- under either of the
3  methodologies that you've tried to use, you disagree
4  with the estimate.  I understand that.  Let me show
5  you 117.
6        (Exhibit 117 marked for identification.)
7     Q.  (By Mr. Gilmore)  I guess -- I guess I
8  just have one question, I mean, about the MDA grant
9  application.  If you have to say the structure of my
10 house was destroyed by flood in order to get money
11 to rebuild the structure of your house, do you think
12 it's wrong for Mr. and Mrs. Politz to make this
13 application for the MDA grant?
14    A.  That's what a layman calls his house.  It
15 probably includes everything, includes floor
16 coverings, furnishings, his built-ins.  I will pass
17 no moral judgments on what they did.  I have no
18 earthly idea whether they understood it just meant
19 the structural portion of the house.
20    Q.  Sure.  Well, if you were the owners of
21 this property, would you have gone to the government
22 and said my house was destroyed by flood damage, and
23 I should -- and I'm asking for this money?
24    A.  Well, I would have taken them an
25 engineering report and, hopefully, I would have

Page 183

1  taken the evidence that I saw on the property piece
2  by piece of destroyed stuff that remained on the
3  property that didn't blow away, and I would have
4  described it and what the cost of it was and so on,
5  and said so much was water damage and so much was
6  wind damage.  That's the way I would have presented
7  it, but I'm an engineer.  And, of course, these are
8  just laymen.  They knew their house was gone and
9  nothing was salvageable to speak of.
10    Q.  I think that you've probably seen this
11 document before.  I'm going to ask you a few
12 questions about it.  It's marked as Defense Exhibit
13 117.  This is a document entitled "Federal Emergency
14 Management Agency, Is it wind or is it water?"
15 You're familiar with this document, right?
16    A.  I have seen it, yes.
17    Q.  Do you consider it an authoritative source
18 of information regarding -- well, to help in
19 determining whether a property during Hurricane
20 Katrina was damaged by wind versus water?
21    A.  The answer -- the short answer is no.
22    Q.  No, you do not?
23    A.  No.
24    Q.  It's not something that you would rely on
25 in reaching any of your opinions?

Page 184

1     A.  No, indeed.
2     Q.  Okay.  Turn to page 13 of the report and
3  you have to flip a few pages.  It's the page numbers
4  at the bottom.
5     A.  I see it.
6     Q.  Again, I'm sure you've been asked this
7  question before, and I think you would agree with
8  this statement, the first statement on that page,
9  "Even with its high speeds, wind is less destructive
10 than storm surge, wave action and flooding directly
11 related to the hurricane which can cause more
12 property damage and more loss of life."
13    A.  If the storm surge comes first or
14 concurrent even with the -- the wind speeds that
15 were destroyed, yes, obviously, the wind -- the
16 water is much heavier than wind, and it doesn't take
17 but about three feet, 3.75 feet to start caving in a
18 two by four stud wall.
19    Q.  Okay.  If you turn to the next page, page
20 14, "The storm surge and wave action are as deadly
21 as they are because of the intense power of moving
22 the water."  Do you agree with that statement?
23    A.  If it's -- again, if it's striking a
24 closed structure, yes, and if -- if you have the
25 type of waves that would produce that kind of force.

Page 185

1  You see what that ignores is that waves dissipate as
2  they go inland at the shoreline unobstructed, and if
3  you have those waves, you get a tremen -- they're
4  moving seven to 10 miles an hour and has tremendous
5  force, of course.
6     Q.  Okay.  You believe that the waves and the
7  storm surge during Hurricane Katrina dissipated
8  significantly as they came inland?
9     A.  Significantly, yes.
10    Q.  And so a property that was 190 yards
11 inland like the Politz property, you think -- 190
12 yards inland, you think the storm surge waves would
13 have dissipated significantly?
14    A.  I'm certain they did.
15    Q.  And you're certain.  And why are you
16 certain?
17    A.  Well, I have viewed the Beau Rivage video.
18 Have you?
19    Q.  I have.
20    A.  You can see as the -- the surge comes in,
21 it comes in, you can see some swells out in the Gulf
22 a hundred yards.  As it comes to the shore line,
23 those have dissipated into just a washing up to --
24 to a height and backing off, and it just keeps
25 getting a little higher and a little higher until it

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 186

1  finally gets to Highway 90.  Finally gone on over
2  Highway 90 into under I-110 and into downtown Biloxi
3  in a gradual manner like a high tide comes in.  And
4  this is because of those northeast and east winds
5  that kept the wall -- any wall water down.
6      Q.  So Mr. --
7      A.  I'm sorry.
8      Q.  I'm sorry.  I didn't mean to interrupt.
9      A.  Let me explain this.  A tsunami, which
10  people fantasize about in hurricanes, is caused by a
11  earthquake at sea, which -- which creates waves that
12  propagate out in the center.  A hurricane is not
13  like that.  A hurricane is a wind driven event.  It
14  depends on wind.  The wind blowing in the opposite
15  direction from the eye, from the center, usually the
16  counterclockwise motion of the storm, it's going to
17  hold the water back until such time as the -- the
18  winds wrap around from the southeast or the south,
19  and then that's when you get the high water.  That's
20  the reason it's delayed.  That's always the case.
21  There's some delay, and I think all authorities
22  recognize that.  I mean, these --
23      Q.  And those authorities would be
24  meteorologists, right?  Everything you just said are
25  meteorological opinions, right, Mr. Biddy?  I

Page 187

1  understand they're your opinions --
2      A.  That's true.  That's true.
3      Q.  -- but it's meteorological opinions it's
4  fair say?
5      A.  Of course.
6      Q.  And if I play the -- the -- the videotape
7  that you're talking about, you know, that shows the
8  Beau Rivage --
9      A.  Uh-huh (affirmative response).
10      Q.  -- are you telling the jury here that if
11  we play that tape at trial that they would not see
12  waves not just far out in the Gulf, but waves
13  inundating properties that were damaged by storm
14  surge; is that your testimony?
15      A.  I'm saying there's no wall of water and no
16  high waves at all when it gets to shoreline.
17      Q.  That's your testimony that's what the Beau
18  Rivage video in its entirety shows?  I know the part
19  you're talking about, but in the entirety of the
20  video, is it your testimony that it shows that there
21  were no high waves as part of the storm surge
22  inundating the land and the property that was
23  destroyed during Katrina?
24      A.  It's my testimony that it shows a gradual
25  coming in of a storm.  Now, of course, it was a

Page 188

1  storm tide, but it wasn't some wall of water like a
2  tsunami.  What's interesting about that video, too,
3  is this -- this was a storm chaser who was there
4  specifically to make that video.  He kept coming
5  back at the beginning and at the middle and at the
6  end to a brown pelican and then some more pelicans
7  sitting off to the side there in the water.  They
8  stayed there the whole time, weren't -- didn't fly
9  off, weren't disturbed at all.  Had there been any
10  high crashing waves, they wouldn't have set there.
11      Q.  And I know the pelican you're talking
12  about, and it's true the pelican was sitting in
13  water that was sheltered by the Beau Rivage,
14  correct?
15      A.  There was not only that one particular
16  pelican that was 50 yards or so from the -- from the
17  Beau Rivage, but there were three others out even
18  further.  They were still there.
19      Q.  And have you seen any other videotapes
20  taken from residents who rode out the storm and
21  videotaped what the storm surge looked like to
22  corroborate your view that there were no serious
23  waves during the storm surge if you go inland?
24      A.  I have sworn affidavits from a number of
25  them, yes.

Page 189

1      Q.  Okay.  Have you ever seen videotape taken
2  by Tommy Luke in the Eagle Point neighborhood?
3      A.  No.
4      Q.  And if you saw the video -- if you saw a
5  videotape that showed two to four foot white caps on
6  storm surge, that might cause you to change your
7  opinion, correct?
8      A.  If it was at the shoreline, and if it was
9  at this location, yes, I would say, yeah, there was
10  some waves crashing in the shoreline.
11      Q.  And if it was --
12      A.  We got waves -- and if you remember from
13  the Beau Rivage video, they were breaking a hundred
14  yards out.  The white caps and breaking of the waves
15  were way out in the water and then it just came on
16  in in swells.
17      Q.  And if this videotape -- you know, we can
18  show it at trial if need be, but if the videotape --
19  well, I don't think we need to show the videotape
20  because the videotape showed a property that was
21  1000 yards inland sitting on a canal way off the
22  Gulf that showed two to four foot waves with white
23  caps high enough to make a former FBI agent think
24  that his house was going to be destroyed by a storm
25  surge, that might cause you to change your opinions

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 190

1  as to the storm surge waves, right, Mr. Biddy?
2      A.  That's his opinion.  You're asking me to
3  speculate on something that I don't know nothing
4  about.
5      Q.  I withdraw the question.  That's fine.
6  The probably not fair since you haven't seen that
7  videotape.  I represent to you, you would change
8  your view if you had.  Mr. Biddy, is there a -- is
9  there anything significant about your conclusions or
10  your testimony that I haven't asked you questions
11  about during this deposition?
12      A.  I can't think of anything.  I think we've
13  covered the waterfront.
14      MR. GILMORE:  Let's go off the record.  I
15  want to just take a few minutes and see if I have
16  anything else.
17      VIDEOGRAPHER:  Off the record at 2:55.
18      (Off the record.)
19      VIDEOGRAPHER:  On the record at 3:07.
20      Q.  (By Mr. Gilmore)  Mr. Biddy, I'm going to
21  hand you what's been marked as Defense Exhibit 160.
22      (Exhibit 160 marked for identification.)
23      Q.  (By Mr. Gilmore)  Or I was going to hand
24  you Defense Exhibit 160.  Sorry.  Let me go off the
25  record one second.

Page 191

1      VIDEOGRAPHER:  Off the record at 3:08.
2      (Off the record.)
3      VIDEOGRAPHER:  On the record at 3:09.
4      Q.  (By Mr. Gilmore)  As I was saying, Defense
5  Exhibit 106, you might have seen this before.
6      A.  I have, yes.
7      Q.  For 15 minutes of fame, perhaps.  It's an
8  article in The Mississippi Press.  It's an interview
9  of you, right, Mr. Biddy?
10      A.  Yes.
11      Q.  Okay.
12      A.  Well, no, it was -- I gave a talk to the
13  Rotary Club and the --
14      Q.  Right.
15      A.  -- reporter was there.
16      Q.  And on the second page of Defense Exhibit
17  160, you say -- well, the report says that the storm
18  made its way inland several hours before the storm
19  surge and that caused most of the damage that you
20  have seen during your tour of the coast, right?
21      A.  Yes.  I don't know which paragraph you're
22  reading from, but that's true.
23      Q.  I'm reading from the very beginning.
24      A.  Oh, okay.
25      Q.  And they quote you as saying, "The

Page 192

1  insurance companies won't admit to that, he said.
2  They want you to believe that the storm surge caused
3  90 percent of the damage.  It didn't.  I think
4  everyone knows that in a hurricane, the winds come
5  first, then the water.  Everyone, that is, but
6  insurance companies.  The winds caused the
7  destruction, and they did the destruction before all
8  of the water got there."  I read all of that
9  correctly, right?
10      A.  True statement.
11      Q.  And I think you've said things to that
12  effect during this deposition today, correct?
13      A.  I have, yes.
14      Q.  It's still your view today, right?
15      A.  It is.
16      Q.  Now, it's not true that everyone except
17  the insurance companies has a contrary view, right?
18  I mean, for instance, FEMA has the same view as
19  insurance companies, right?
20      A.  FEMA -- some -- that document you gave me
21  that says wind or water does side with the water
22  destruction more than wind.
23      Q.  I know you've seen this fun document here?
24      A.  Yes, I have.
25      Q.  This is not the 1989 wind or water

Page 193

1  document.  This is actually FEMA's Hurricane Katrina
2  and the Gulf Coast Litigation Assessment Team Report
3  prepared in July 2006.  This is FEMA's authoritative
4  report on Hurricane Katrina, correct?
5      A.  Yes, it is.
6      Q.  I will hand this to you.
7      MR. GILMORE:  Counsel, do you want a copy?
8      MS. TYNES:  No thank you.
9      Q.  (By Mr. Gilmore)  If you turn to page
10  1-30.
11      A.  Would that be early on in the --
12      Q.  It would be, actually, yeah.  It's
13  pretty -- pretty early on.  It's marked with the
14  Bates number Politz-1256.  I'm sorry, NWPOL 1256.
15  This was produced by Nationwide.
16      A.  1256.  Page 1-30, okay.
17      Q.  Uh-huh.  This is a section that it
18  compares Katrina versus Camille, right?
19      A.  Yes, it does.
20      Q.  Okay.  And it states, "Hurricane Camille
21  1969, the previous 'hurricane of record' for the
22  Mississippi Gulf Coast quoted a 25 foot storm surge,
23  and its peak strength over the Gulf, 910 millibars
24  and 175 miles per hour sustained winds.  Katrina
25  intensity was comparable to Camille's, but at

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

## Page 194

1  landfall, Katrina's measured winds, 127 miles per
2  hour sustained, were lower, and its central
3  pressure, 920 millibars was higher than Camille's
4  estimated landfall measurements of 190 to 210 mile
5  per hour gust speeds and 909 millibar central
6  pressure." Did I read all of that correctly?
7      A.  You did and that is a true statement.
8      Q.  Okay.  All of the things there were true,
9  right?
10     A.  Yeah, and you have to remember that 127
11 mile per hour sustained means you have to multiply
12 that by 1.3 to get gusts.
13     Q.  The 1.3 is -- that's not a precise ratio,
14 right?
15     A.  Most authorities will agree that 1.3 or
16 more is to be used to multiply sustained to get
17 gusts.  I don't think I've read any authoritative
18 meteorologist who would go lower than 1.3, 1.25,
19 1.3.
20     Q.  Well, I mean, if you had measured a gust
21 with an anemometer, that's the number you use,
22 right?
23     A.  Of course.
24     Q.  And so the -- and kind of extrapolate
25 generally is the idea that the -- there's that ratio

## Page 195

1  between the sustained wind, which you apply if you
2  don't have a gust measurement.  Is that the idea?
3      A.  Well, yes, I think it was substantiated in
4  Hurricane Andrew that it was as much as 1.5, but
5  that's beside the point.  127 sustained is about
6  right at landfall on the Mississippi coast.
7      Q.  Okay.  And -- and again, that -- the
8  number that you have used, which you call
9  conservative, 135 miles per hour, that's a gust?
10     A.  Correct.
11     Q.  The sustained winds based on that gust
12 would then be lower, right?  They would be --
13     A.  Much lower.
14     Q.  -- whatever the ratio is --
15     A.  Yeah.
16     Q.  -- that's the ratio?
17     A.  Much lower.
18     Q.  Okay.  Okay.  If you turn to 1-31, first
19 paragraph at the top of that page about halfway down
20 the report says, "Although not as powerful as
21 Hurricane Camille according to wind speed and
22 pressure measurements at landfall, Hurricane Katrina
23 was a much larger diameter storm.  The most
24 overwhelming source of damage was Katrina's record
25 breaking storm surge along the Mississippi coast,

## Page 196

1  which topped Camille's surge elevations by several
2  feet in most areas." Did I read that correctly?
3      A.  You read it correctly.
4      Q.  Do you agree that the most overwhelming
5  source of damage was Hurricane Katrina's record
6  breaking storm surge along the Mississippi coast?
7      A.  Obviously not.
8      Q.  And even without respect to a specific
9  property for which you've prepared a report, you
10 think, generally speaking, that is not a true
11 statement?
12     A.  Not a true statement at all.  The very
13 opposite is true.
14     Q.  Okay.  So you would think that the broad
15 swath of destruction along the coast, the
16 overwhelming source of that damage was winds not
17 Katrina's record breaking storm surge?
18     A.  That is correct.
19         MR. GILMORE:  I tender the witness.
20         MS. TYNES:  I don't have anything.
21         VIDEOGRAPHER:  Off the record at 3:17.
22 End of deposition.
23         (Time Noted:  3:17 p.m.)

## Page 197

1          CERTIFICATE OF DEPONENT
2  DEPONENT: TED BIDDY
   DATE:  November 7, 2008
3  CASE STYLE: Politz, et al. vs. Nationwide, et al.
   ORIGINAL TO:  ROBERT GILMORE, Esq.
4      I, the above-named deponent in the
   deposition taken in the herein styled and numbered
5  cause, certify that I have examined the deposition
   taken on the date above as to the correctness
6  thereof, and that after reading said pages, I find
   them to contain a full and true transcript of the
7  testimony as given by me.
       Subject to those corrections listed below,
8  if any, I find the transcript to be the correct
   testimony I gave at the aforestated time and place.
9  Page    Line        Comments
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  This the ____ day of _____, 2008.
18          _____
                TED BIDDY
19
20 State of Mississippi
   County of _____
21
   Subscribed and sworn to before me, this the
22 ____ day of _____, 2008.
23
24 My Commission Expires:
25

a580418a-55ec-460c-950b-fdf77d5aebd7

Ted Biddy - 11/07/08

Page 198

```
 1          CERTIFICATE OF COURT REPORTER
 2          I, Kelly Powell, Court Reporter and Notary
 3   Public, in and for the State of Mississippi, hereby
 4   certify that the foregoing contains a true and
 5   correct transcript of the testimony of TED BIDDY, as
 6   taken by me in the aforementioned matter at the time
 7   and place heretofore stated, as taken by stenotype
 8   and later reduced to typewritten form under my
 9   supervision by means of computer-aided
10   transcription.
11          I further certify that under the authority
12   vested in me by the State of Mississippi that the
13   witness was placed under oath by me to truthfully
14   answer all questions in the matter.
15          I further certify that I am not in the
16   employ of or related to any counsel or party in this
17   matter and have no interest, monetary or otherwise,
18   in the final outcome of this matter.
19          Witness my signature and seal this the
20   10th day of November, 2008.
21
22
       _____
23              KELLY M. POWELL
     My Commission Expires:
24   March 2011
25
```

BROOKS COURT REPORTING
1-800-245-3376

a580418a-55ec-460c-950b-fdf77d5aebd7