IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


JOHN POLITZ AND HELEN POLITZ                    PLAINTIFFS


     V.            CIVIL ACTION NO. 1:08CV18-LTS-RHW


NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,
U.S. SMALL BUSINESS ADMINISTRATION,
AND JOHN DOES 1 THROUGH 9                       DEFENDANTS



DEPOSITION OF HELEN POLITZ


Taken at the instance of the Defendants at the
offices of taken at Watkins Ludlam, Gulfport,
Mississippi, Mississippi, on November 13, 2008,
beginning at approximately 9:00 a.m.


APPEARANCES:


D. JASON EMBRY, ESQ.
Denham Law Firm
Post Office Drawer 580
Ocean Springs, Mississippi  39566-0580


COUNSEL FOR PLAINTIFFS


ELIZABETH M. LOCKE, ESQ.
Kirkland & Ellis, LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005


COUNSEL FOR DEFENDANTS

**Page 4**

Also Present    Lynda Marshall, Videographer

Reported By:    Julie Brown, CSR #1587
Brooks Court Reporting
Post Office Box 2632
Jackson, Mississippi 39207
(601) 362-1995

Exhibit 6 - Property Loss Report by          141
Mr. Phillips
Exhibit 7 - 10/1/2005 Nationwide             150
Document
Exhibit 13 - 10/1/2005 Claim Check           152
Exhibit 17 - Reservation of Rights           154
Letter
Exhibit 14 - 11/9/2005 Check                 155
Exhibit 11 - Loan Receipt                    159
Exhibit 18 - 1/10/2006 Letter                164
Exhibit 8 - Itemized List                    167
Exhibit 15 - 5/2/2006 Check                  168
Exhibit 20 - 4/18/2007 Letter                169
Exhibit 10 - 7/17/2007 Nationwide Report     170
Exhibit 16 - 7/19/2007 Check                 171
Exhibit 77 - Letter                          178
Exhibit 46 - First Horizon Statement         192
Exhibit 51 - Tax Assessor's Document         194
Exhibit 49 - Mississippi Development         199
Authority Flood Elevation Grant Program
Application
Exhibit 44 - Document from MDA Grant         203
Application
Exhibit 45 - 4/19/2006 Document from MDA     205
Grant Application
Exhibit 50 - MDA Document, "Closing          206
To-Do List"
Exhibit 68 - Complaint                       214

**Page 3**

INDEX

PAGE

Appearances                              1

Index                                    3

Certificate of Deponent                  252

Certificate of Court Reporter            253

EXAMINATIONS
PAGE

Examination By Ms. Locke                 5

EXHIBITS

PAGE

Exhibit 102 - Layout of Floor Plan       33
Exhibit 23 - Photographs                 36
Exhibit 29 - Map                         43
Exhibit 30 - Map                         45
Exhibit 30A - Map                        46
Exhibit 2 - Declaration Page             89
Exhibit 1 - Homeowners Policy            100
Exhibit 22 - Photographs                 127
Exhibit 12 - 9/8/2005 Check              137

**Page 5**

```
 1        VIDEOGRAPHER:  This is the video
 2   deposition of Helen Politz taken by the counsel for
 3   the defendants in the matter of Politz versus
 4   Nationwide Insurance Company in the United States
 5   District Court, Case Number 1:08CV18-LTS-RHW, held
 6   in the office of Watkins Ludlam on Thursday,
 7   November 13, 2008.  It is now 9:00 a.m.  Counsel may
 8   introduce themselves.
 9        MS. LOCKE:  I'm Elizabeth Locke for
10   Nationwide Insurance Company.
11        MR. EMBRY:  Jason Embry for John Politz
12   and Helen Politz.
13        VIDEOGRAPHER:  The court reporter will
14   now swear in the witness.
15              HELEN POLITZ,
16   having been first duly sworn, was examined and
17   testified as follows:
18   EXAMINATION BY MS. LOCKE:
19        Q.   Good morning, Ms. Politz.
20        A.   Good morning.
21        Q.   My name is Libby Locke.  I represent
22   Nationwide Insurance Company.
23        A.   Okay.
24        Q.   I just met you earlier.  I want to go
25   over some ground rules today so we can make the
```

accc5f30-2973-4075-b796-fbf68e721559

**Page 6**

1  morning and the afternoon go as quickly as possible.
2      A.   Okay.  Sounds good to me.
3      Q.   Okay.  Have you ever been deposed before?
4      A.   What do you mean by "deposed"?
5      Q.   Have you ever sat in a room like this
6  under oath and given a deposition?
7      A.   No, I haven't.
8      Q.   Okay.  Well, my job today is to ask you
9  questions that you can understand and that you can
10  hear.
11      A.   Okay.  Excuse me.  Can I say one thing?
12      Q.   Sure.
13      A.   I did do a -- a type of deposition
14  before, but not like this.
15      Q.   Okay.  Okay.  Well, my job is to ask you
16  questions that you can understand and that you can
17  hear.  And your job today is to answer those
18  questions as fully and completely and truthfully as
19  you can to your -- the best of your ability.  Is
20  that fair?
21      A.   Sure.
22      Q.   Let me know if you don't hear or you
23  don't understand a question that I ask.  If that's
24  the case, then I'll be happy to rephrase the
25  question for you.  Okay?

**Page 7**

1      A.   Okay.
2      Q.   If you do answer though, I'm going to
3  assume that you heard the question and you also
4  understood the question.  Is that fair?
5      A.   Yes.
6      Q.   Okay.  You need to answer out loud.  We
7  have a court reporter here who's taking down
8  everything that you say.  And so if you nod your
9  head or say uh-huh (affirmative response), it's
10  difficult for her to get the transcript down.
11      A.   I understand.
12      Q.   So in addition, sometimes my questions
13  are going to be very obvious to you and you're going
14  to know the answer before I finish my question.  But
15  in order to get a clean transcript and a clean
16  record, if you can wait until I complete my question
17  and then I'll stop and allow you to complete your
18  answer.  Is that fair?
19      A.   Okay.
20      Q.   Let me know if you need to take a break
21  for any reason.  We can stop.  But if you do need to
22  take a break, what I'd ask is that you answer the
23  question that I've asked you before we stop and
24  break.  Is that fair?
25      A.   Yes.

**Page 8**

1      Q.   Can you state your full name for the
2  record?
3      A.   Helen J. Politz.
4      Q.   And what is your home address?
5      A.   1244 Harbor Drive, Unit 118, Slidell,
6  Louisiana.
7      Q.   And what is your date of birth?
8      A.   1/2/41.
9      Q.   Is there any reason why you cannot give
10  full and fair and complete answers today?
11      A.   Not that I know of.
12      Q.   How did you prepare for your deposition
13  today?
14      A.   I just came.
15      Q.   Did you meet with counsel from the Denham
16  Law Firm?
17      A.   Yes.
18      Q.   Who did you meet with?
19          MR. EMBRY:  Mr. Embry.
20      A.   Mr. Embry.  I'm sorry.  I just met him
21  this morning and the names skipped me.  Sorry about
22  that.
23          MR. EMBRY:  That's fine.
24      Q.   And you met him this morning you said?
25      A.   Yes.

**Page 9**

1      Q.   And approximately how long did you meet
2  with him?
3      A.   About 20 minutes.
4      Q.   Have you met with anyone else with the --
5  at the Denham Law Firm to prepare for your
6  deposition today?
7      A.   Yes.  Oh, not for today, but before.
8  There was a mix-up in the timing somehow.
9      Q.   Okay.  And who did you meet with then?
10      A.   I met with Christopher Carter.
11      Q.   Anyone else?
12      A.   And I met with his secretary, Elizabeth I
13  think is her name.
14      Q.   Do you recall when you met with them?
15      A.   Not the exact dates, but more than once.
16      Q.   How many times?
17      A.   Probably three or four.
18      Q.   Did you -- and you say "three or four,"
19  on three or four separate days?
20      A.   Yeah, separate occasions.
21      Q.   Did you review any documents with
22  counsel?
23      A.   Yes.
24      Q.   Do you recall what those documents were?
25      A.   No, not right now.

accc5f30-2973-4075-b796-fbf68e721559

Page 10

1    Q.   Do you know how many documents you looked
2  at?
3    A.   I don't remember.
4    Q.   Did any of those documents help refresh
5  your recollection about the matters in this case?
6    A.   Yes, somewhat.
7    Q.   If you could think back, what was the
8  subject matter of these documents?
9    A.   The subject matter of the documents, I
10  just don't remember right now that much.
11    Q.   Well --
12    A.   I remember things we talked about, but
13  not specifically documents.
14    Q.   Okay.  But it is your testimony that you
15  did look at documents?
16    A.   Yes.
17    Q.   Can you give me a range of about how many
18  documents you looked at?
19    A.   Can I ask you a question?
20    Q.   Sure.
21    A.   Does that mean all the documents that I
22  have gotten through the mail from the law firm
23  keeping me updated as to what's happening?
24    Q.   What I'm asking is, when you were meeting
25  with counsel on the three to four occasions, can you

Page 11

1  give me a range, and during those meetings,
2  approximately how many documents you looked at?
3    A.   I don't know.  Maybe five.
4    Q.   Okay.  And do you know -- and you said
5  they helped refresh your recollection.  In what way
6  did they do that?
7    A.   Well, at the time, it helped me to
8  understand what was happening in the process between
9  using an attorney and my case.  And kind of helped
10  me to understand what was going on.
11    Q.   Okay.  When you say helped you understand
12  the process and helped you understand what was going
13  on, what did it inform you of?
14    A.   Of what has to be done, like depositions
15  that may come up, mediations that came up.
16  Different things like that, that in the processing
17  things to get -- to try to get things settled or
18  either go to court.
19    Q.   What I'm trying to understand is you say
20  that you looked at documents.  They refreshed your
21  recollection.  I'm trying to understand how they
22  refreshed your recollection if you don't -- you
23  don't know what those documents were?
24    A.   Well, some of the documents that I
25  received from them was just a copy of people that

Page 12

1  they were subpoenaing.
2    Q.   Okay.
3    A.   And that refreshed my memory as to
4  whether I knew that person or not.
5    Q.   Okay.
6    A.   And the memory of where I had saw that
7  person and what had been said and what had been
8  done.
9    Q.   Okay.  Do you recall what person you're
10  talking about?
11    A.   Yeah.  One in particular from Florida,
12  Kalachi (phonetic).
13    Q.   Okay.
14    A.   I think they are subpoenaing him.  He's a
15  meteorologist.
16    Q.   Anyone else that you remember?
17    A.   Well, Nationwide sent an attorney for a
18  mediation.  And that's the first person that I
19  seen from Nationwide.
20    Q.   Okay.
21    A.   I had talked to several and I had asked
22  to meet with them, but they found a reason not to
23  meet with me.  They didn't let me know when they
24  were going to be at my home doing things so that I
25  could be there to talk with them and to understand

Page 13

1  what was going on.
2    Q.   Let me ask -- let me go back to the
3  documents that refreshed your recollection.
4    A.   Okay.
5    Q.   We can -- we can get to that a little bit
6  later this afternoon.
7    A.   Okay.
8    Q.   But when you talk about you said you saw
9  documents about subpoenas and people that were being
10  subpoenaed.
11    A.   Uh-huh (affirmative response).
12    Q.   And you mentioned Mr. Kalachi, are there
13  any other documents that you recall reviewing with
14  your counsel?
15    A.   Well, one document that when he filed
16  suit of what he was sending to Nationwide, the
17  reason for this lawsuit.
18    Q.   Was it a letter?
19    A.   It was a document letter of some sort.
20  It was a copy of the document that he sent to
21  Nationwide to let them know we were filing suit.
22    Q.   Okay.  So aside from the subpoena of
23  Mr. Kalachi and this document that your attorney
24  sent to Nationwide, any other documents that you
25  recall reviewing with counsel?

Helen Politz  -  11/13/08

Page 14

1      A.   Not -- not at this moment.
2      Q.   Okay.  Ms. Politz, how old are you?
3  What's your age?
4      A.   67.
5      Q.   And where did you go to high school?
6      A.   I went to Walker High School.  I mean,
7  Doyle High School.  Walker Elementary.  Both little
8  schools.
9      Q.   Where is -- where is Doyle High School?
10     A.   It's in Livingston Parish in Louisiana.
11     Q.   And what year did you graduate?
12     A.   '59.
13     Q.   Did you attend college after graduating
14 high school?
15     A.   No, I didn't.
16     Q.   Do you have any additional education
17 beyond high school degree?
18     A.   No.  Actually, I did not graduate at the
19 school.  I graduated later.  Not graduated, but I
20 went to GED.
21     Q.   Okay.  How many years of high school did
22 you complete at Doyle?
23     A.   At Doyle, I think I went through two.
24 Eighth and ninth, I believe.  And then I quit
25 school.  That was something quite common out there

Page 15

1  where I lived in the country back then.  But later
2  on, I went to a vocational school in Baton Rouge and
3  got a GED and went to LSU and took a test and passed
4  and got my GED through LSU.
5      Q.   What year did you receive your GED; do
6  you recall?
7      A.   I don't remember for sure.  It was '80 or
8  '81, something like that.  It was quite a few years
9  later.
10     Q.   After you left Doyle High School, what
11 did you?
12     A.   I got married.  Had children.
13     Q.   When did you -- when did you get married?
14     A.   In '55.
15     Q.   And how old were you at that time?
16     A.   14.
17     Q.   And did you marry Mr. Politz at that
18 time?
19     A.   No.  I married a Mr. Rabalais.
20     Q.   And who is his first name?
21     A.   Ernest.
22     Q.   Is he still living?
23     A.   No, he's deceased.
24     Q.   And how long were you married in your
25 first marriage?

Page 16

1      A.   From '55 to '87.
2      Q.   And what --
3      A.   So I guess 22 -- 32 -- it would be
4  32 years.
5      Q.   And what was the reason for the
6  dissolution of the marriage?
7      A.   He died.
8      Q.   During that marriage, did you work
9  outside the home?
10     A.   Yes, I did.
11     Q.   What jobs did you have?
12     A.   I worked at grocery stores.
13     Q.   In what capacity?
14     A.   I worked in meat markets, eventually
15 cashiering, then office, then all over the grocery
16 store.
17     Q.   Do you have any children from your first
18 marriage?
19     A.   Three.
20     Q.   And what are their names and ages?
21     A.   Shellene.  Do you want her married name?
22     Q.   Is that her first name, Shellene?
23     A.   Uh-huh (affirmative response).
24     Q.   And yes, what's her last name?
25     A.   Blount, B-L-O-U-N-T.

Page 17

1          COURT REPORTER:  Can you spell that for
2  me?
3      A.   S-H-E-L-L-E-N-E.
4      Q.   And how old is Ms. Blunt?
5      A.   She was born in '59.
6      Q.   And your second child out of your first
7  marriage?
8      A.   Ernie.  Well, he's Ernest, Jr.  We call
9  him Ernie.  Rabalais.
10     Q.   And what year was he born?
11     A.   '61.
12         COURT REPORTER:  Can you spell that last
13 name for me?
14     A.   R-A-B-A-L-A-I-S.
15     Q.   And who was your third child out of your
16 first marriage?
17     A.   Deborah, D-E-B-O-R-A-H.
18     Q.   And her last name?
19     A.   Khul, K-H-U-L.
20     Q.   And what year was she born?
21     A.   '63.
22     Q.   When were you married to Mr. Politz?
23     A.   I married him in December the 9th, 1990.
24     Q.   Do you have any children with Mr. Politz?
25     A.   No.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  - 11/13/08

6 (Pages 18 to 21)

Page 18

1     Q.   Your three children, Mrs. Blunt,
2  Mr. Rabalais?
3     A.   Rabalais.
4     Q.   Rabalais, and Ms. Khul?
5     A.   Khul.
6     Q.   I apologize.
7     A.   That's okay.
8     Q.   Where does Ms. Blunt live?
9     A.   She lives in Walker.
10    Q.   Where is Walker?
11    A.   Walker, Louisiana.
12    Q.   Is that near the coast?
13    A.   No.  It's about 20 miles east of
14  Baton Rouge.
15    Q.   Okay.  So it's inland?
16    A.   Huh?
17    Q.   It's inland?
18    A.   Oh, yeah, inland.
19    Q.   And your son, where does he live?
20    A.   Birmingham, Alabama.
21    Q.   And your third daughter, where does she
22  live?
23    A.   She lives in Satsuma, Louisiana.  And
24  it's also inland.
25    Q.   Inland.  So none of your -- none of your

Page 19

1  children live near the coast?
2     A.   No.
3     Q.   What about any brothers and sisters?  Do
4  you have any?
5     A.   Yeah, I have some.  They are all
6  scattered out in different states.  None of them
7  live in the State of Mississippi.
8     Q.   Do any of them live in the Gulf Coast
9  area?
10    A.   No.
11    Q.   Okay.  So is it fair to say that you
12  don't have any family members who also have
13  insurance disputes resulting from hurricane Katrina?
14    A.   Oh, yeah, it's fair to say that.  I mean,
15  they might have gotten a little wind, but nothing
16  major.
17    Q.   None of your siblings have lawsuits
18  against insurance companies; is that correct?
19    A.   No, not that I know of.
20    Q.   What was your last job outside the home?
21    A.   I'm working right now.
22    Q.   And what is your -- what is the nature of
23  your employment?
24    A.   I work at the Motor Vehicle Office in
25  Slidell, Louisiana.

Page 20

1     Q.   And what is your position there?
2     A.   An analyst.
3     Q.   And what type of -- what type -- what do
4  you do as an analyst at the DMV?
5     A.   I help people get their reinstatements
6  for their license straightened out, and that type of
7  thing.  You know, I work in the reinstatement
8  department of it more than -- than in the giving out
9  the driver's license.
10    Q.   In your role as an analyst, do you have
11  to deal with insurance companies at all?
12    A.   I haven't yet.  I haven't been there that
13  long.  And the ones that are much more experienced
14  than I am have been dealing with that.  Eventually
15  probably I will.  You know, mostly by car insurance.
16    Q.   Okay.
17    A.   That kind of thing.
18    Q.   How long have you been employed with the
19  Motor Vehicle Department?
20    A.   I've only been there going on five
21  months.
22    Q.   And were you employed previously before
23  that, immediately before that?
24    A.   No.  I had not worked from the Friday
25  before Katrina.  I was working part-time as a

Page 21

1  cashier at the Save-A-Center in Long Beach.  I
2  worked in the mornings, every morning in -- in the
3  week.  Not on weekends and not nights.  And if they
4  got in a bind, I'd work a couple of hours in the
5  afternoon.  But mostly it was morning work.  And
6  when Katrina hit, my house was gone.  My store was
7  gone.  I had -- you know, it took everything.  So I
8  didn't have a job anymore.
9     Q.   How long had you worked at Save-A-Center
10  before hurricane Katrina?
11    A.   Five years.
12    Q.   Before your position at Save-A-Center,
13  where did you work before that?
14    A.   At the Lady of the Lake Hospital in
15  Baton Rouge.
16    Q.   What was your position there?
17    A.   I worked insurance claims.
18    Q.   You did?
19    A.   Uh-huh (affirmative response).
20    Q.   What was your job involving?  What did
21  you do in working insurance claims?
22    A.   Just posting checks mostly.  When I would
23  get checks from insurance companies, they might --
24  say Blue Cross might send us a $500,000 check and
25  they might have 30 people.  I had to figure out how

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 22

1  much each one, you know, was and posting, that type
2  of thing.  And tracing down some of them that wasn't
3  always clear.  And I'd have to call the insurance
4  company and find out.  You know, and go to the one
5  that issued the checks and find out exactly so I
6  could post it all right, that type thing.  But it
7  was mostly just dealing with -- with paying claims
8  to the hospital that I had to allow so much per
9  person to different people, different things.
10     Q.  In your job at the hospital in working
11  with insurance companies, were you ever responsible
12  for reviewing an insurance contract?
13     A.  No.
14     Q.  So you never had to look at insurance
15  language and interpret it?
16     A.  No.  My supervisors did that.
17     Q.  Where did you live before you lived at
18  Winters Lane?
19     A.  I lived in Baton Rouge.
20     Q.  Before your -- how long were you in
21  Baton Rouge?
22     A.  From the time I got married in '90 until
23  I think it was '98 or '99 when we moved to the
24  coast.  Or ninety -- I don't know.  It could have
25  been '97.

Page 23

1     Q.  Okay.
2     A.  I don't remember exactly.
3     Q.  And where did you live before 1990 when
4  you were in Baton Rouge?
5     A.  Walker.
6     Q.  That's Walker, Louisiana?
7     A.  Walker, Louisiana.  Uh-huh (affirmative
8  response).
9     Q.  Near Baton Rouge?
10     A.  Yeah, I lived there for 50 years.
11     Q.  So is it fair to say that your length of
12  time on the coast is between 1990 and hurricane
13  Katrina?  Oh, I apologize.
14        Is the length of time you were on the coast
15  between approximately 1998 when you moved to the
16  coast and hurricane Katrina; is that correct?
17     A.  Yeah.
18     Q.  Do you recall living on the coast during
19  hurricane Georges?
20     A.  Yes.  Well, no, I wasn't living here.  I
21  don't think I was living here when Georges hit.  But
22  we had a little condo in Pass Christian and I come
23  to check on it.  And it was fine.
24     Q.  What about hurricane Camille?  Where --
25     A.  No.  I never really knew anything about

Page 24

1  Camille except the name.
2     Q.  And hurricane Frederic in 1979?
3     A.  I don't even remember that.
4     Q.  And hurricane Elana in 1985?
5     A.  I don't even remember.  I never had a
6  reason to find out anything about them.  I didn't
7  live here.
8     Q.  You said that you have a -- you had a
9  condo in Pass Christian; is that right?
10     A.  Yes.
11     Q.  And do you still own that condo?
12     A.  No, I had sold it.
13     Q.  When did you sell it?
14     A.  When we bought our house in Long Beach.
15     Q.  How long did you own it before that?
16     A.  Four or five years.
17     Q.  Is hurricane Georges the only hurricane
18  that had hit that affected your condo and -- or put
19  --
20     A.  It was the only hurricane that hit as I
21  can remember during that time.  But it didn't do any
22  damage.
23     Q.  Did you make any preparations to that
24  condo before or in preparation for hurricane Georges
25  when it arrived?

Page 25

1     A.  Yeah.  I went down there and put all of
2  the things on the back porch into the kitchen and
3  closed the door.
4     Q.  What -- what type of condo was it?  Was
5  it on the same level as the -- as the -- is it on
6  the first level?
7     A.  There were only two highs and it was on
8  the second level.
9     Q.  So when you went down to prepare your
10  condo for hurricane Georges, you said that you moved
11  stuff off of the back porch and put it in the
12  kitchen.  Did you -- and closed the door.  Did you
13  make any other preparations for the hurricane?
14     A.  No, not really.
15     Q.  Did you move any things off of the floor
16  at all?
17     A.  No.
18     Q.  Did you file an insurance claim as a
19  result of the --
20     A.  No.
21     Q.  Did you own a home in Baton Rouge before
22  you bought a home on Winters Lane?
23     A.  Yes.
24     Q.  Did that home require you to have flood
25  insurance at all?

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

## Page 26

1      A.   No.
2      Q.   Have you ever been a plaintiff in a
3   lawsuit before?
4      A.   No.
5      Q.   Have you ever been a defendant in a
6   lawsuit before?
7      A.   No.
8      Q.   When did you purchase your home on
9   Winters Lane?
10     A.   I don't remember for sure, either in '97,
11  '98, something like that.
12     Q.   When you purchased the home, did you
13  secure a mortgage on it?
14     A.   Yeah.
15     Q.   Do you recall the mortgage company that
16  you used?
17     A.   I don't remember it.  See, all of those
18  records were lost.
19     Q.   When was the home built on Winters Lane?
20     A.   Four years before I bought it.
21     Q.   Does 1995 sound like the right date?
22     A.   It sounds like it could be.
23     Q.   Okay.  Were you the first owners of the
24  home?
25     A.   No.  They had one couple lived in it

## Page 27

1   before.
2      Q.   I want to discuss the type of
3   construction the Winters home was.  Is it correct
4   that it was built on a slab foundation?
5      A.   It was on a slab.
6      Q.   And it was a single-story home; is that
7   correct?
8      A.   Yes.
9      Q.   And it was approximately 1400 square
10  feet; is that correct?
11     A.   Yes.
12     Q.   Did it have an attic at all?
13     A.   Enough that I could store some things.
14     Q.   But no living space?
15     A.   Oh, no.
16     Q.   And how many bedrooms were in the home?
17     A.   Two.
18     Q.   And how many bathrooms were in the home?
19     A.   Two.
20     Q.   They were both full bathrooms?
21     A.   Full.
22     Q.   What other rooms were there in the home
23  besides the bedrooms and the bathrooms?
24     A.   Living room, dining, and kitchen areas
25  that all opened up and flowed together.

## Page 28

1      Q.   Okay.  Anything other?
2      A.   And a sunroom.
3      Q.   Was that an enclosed sunroom?
4      A.   Yes.
5      Q.   It had an attached garage, correct?
6      A.   No.  The garage was built in the house.
7      Q.   It was attached to the home, right?
8      A.   Yes.
9      Q.   It was within the home, correct?
10     A.   Yeah, it was within the home.
11     Q.   And it also had a patio on the back; is
12  that correct?
13     A.   Yes.
14     Q.   And it had an iron fence around the
15  patio; is that correct?
16     A.   Correct.
17     Q.   I want to hand you what's been marked as
18  Defense Exhibit -- Defense Exhibit 102.  That is
19  sketch of your home that has been prepared by
20  Nationwide.  And I want to see if you can -- we can
21  walk through it together just to verify the location
22  of rooms and the layout of your home.
23     A.   Okay.
24     Q.   Do you recognize this as -- as --
25     A.   The floor plan.

## Page 29

1      Q.   -- as the floor plan of your home?
2      A.   Yes, I do.
3      Q.   If you look at the bottom right corner,
4   there's a large square.  Is it correct to say that
5   that's where the garage would have been?
6      A.   That was the garage, yes.
7      Q.   Okay.  And looking -- there's a --
8   there's a little doorway between the garage and
9   another room.  Can you identify what the smaller
10  square room immediately above the garage would have
11  been?
12     A.   A second bedroom.
13     Q.   And then there are two small boxes
14  immediately to the left of the second bedroom.  What
15  were those?
16     A.   The larger one was a utility room with my
17  washer and dryer.  And the smaller one was a closet?
18     Q.   And then immediately to -- to the --
19  above the washer and dryer and the room, there's an
20  L-shaped area.  Do you see that?
21     A.   Oh, yeah, that's had a hallway.
22     Q.   Okay.  And then there's a doorway from
23  the hallway going to the right and then sort of a
24  rectangular-shaped room.  Is that a room?
25     A.   That was an entrance to the master

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 30

1  bedroom.
2      Q.   Okay.  And then immediately to the right
3  of the entrance to the master bedroom, there's sort
4  of a what looks like another L-shaped, but upside
5  down L-shaped area.  What was that?
6      A.   Like this area right here?
7      Q.   No.  Immediately to the bottom of that.
8  Immediately to the right.
9      A.   Here?
10     Q.   This area right here.
11     A.   Well, they've got this wrong.
12     Q.   Okay.
13     A.   This was a bathroom.
14     Q.   Okay.
15     A.   That was open all the way to this wall.
16 And this that they have looks like a closet was on
17 the backside.  So you walked in the bedroom.  No,
18 I'm sorry.  The bedroom is the one that had the long
19 big closet.
20     Q.   Okay.  So --
21     A.   All this was bath.  This was a large
22 bathroom.
23     Q.   Okay.  So the -- the -- the box at the
24 very top right of the page, that would have been the
25 master bedroom; is that correct?

Page 31

1      A.   Uh-huh (affirmative response).  Correct.
2      Q.   And the -- L-shaped area immediately
3  below the bedroom, that would have been a bedroom?
4      A.   That was a master bath.
5      Q.   Are you saying that the entrance to the
6  bedroom is incorrect?
7      A.   No, the entrance -- I'm having to stop
8  and think a second.
9      Q.   Sure.
10     A.   The entrance to the bedroom came in
11 through hallway here.  Okay.  And then they are
12 showing this here.  This was the second bath, I
13 guess, not a closet.
14     Q.   Okay.
15     A.   That was the second bath.  You entered it
16 from the hallway right here.
17     Q.   Okay.
18     A.   And the first bath was here and they had
19 a large closet across the bedroom.
20     Q.   So on the far right side --
21     A.   On the back.
22     Q.   On the far right side on the box,
23 immediately on the top right of the page, there
24 would have been a closet?
25     A.   Yes, a closet all the way across the

Page 32

1  room.  It was a long closet.  It had two doors.  You
2  could go in it from either side.
3      Q.   Okay.  And the -- so the smaller
4  bathroom, is that correctly placed on the diagram?
5      A.   Yeah, basically.
6      Q.   Okay.  And then, moving to the left side
7  of the diagram.
8      A.   Okay.
9      Q.   Starting at the bottom, there's a -- a
10 rectangular-shaped area at the bottom and it jets up
11 with a narrow space and it forms a backwards L.  Do
12 you see where I'm indicating?
13     A.   Are you talking about this right here, a
14 backwards L?
15     Q.   The bottom area.
16     A.   Oh, this.
17     Q.   Yes.  And it jets up to a --
18     A.   This was a sunroom.
19     Q.   This was a sunroom?
20     A.   Okay.  It went into a hallway.  From the
21 sunroom and another hallway into the living -- the
22 hallway just went.  There was no doors.
23     Q.   Okay.
24     A.   They were both open areas that you could
25 walk into.  Or you could go in this way into the

Page 33

1  kitchen.
2      Q.   Okay.  So the sunroom -- so there's a box
3  immediately, a square box immediately above the
4  sunroom with an open area, that would have been the
5  kitchen?
6      A.   Right.
7      Q.   Okay.  And then the kitchen immediately
8  to the -- above the kitchen area, would have been
9  the living room; is that correct?
10     A.   This is -- was the dining area.
11     Q.   Okay.  So where the -- where it --
12     A.   This is the living room.
13     Q.   Where it jets out to the left a little
14 bit, that would have been the dining area?
15     A.   That was the dining area.
16     Q.   And then that opened up to a living area;
17 is that correct?
18     A.   Right.
19     Q.   And then immediately above that would
20 have been the outdoor patio; is that right?
21     A.   Right.  French doors going out there.
22 Everything else just opened and flowed together.
23          (Exhibit 102 - Layout of Floor Plan
24 marked for identification.)
25     Q.   Okay.  And just for the record, we are

accc5f30-2973-4075-b796-fbf68e721559

Page 34

1  looking at the document where the Defendants'
2  Exhibit 102 label is on the top right of the page,
3  just so we have it all straight when I say up and
4  down.
5      A.  Okay.
6      Q.  So this is a fair and accurate, to the
7  best of your recollection, depiction of the layout
8  of your floor plan?
9      A.  Well, the patio went all the way to the
10 back of the house.
11     Q.  Okay.  So the patio would have been
12 extended out over to the bedroom?
13     A.  Yeah.  It went all the way to the back.
14 It had the -- this was made even with the floor in
15 here.  You just stepped out onto the patio.  Then it
16 had some steps going down here, three steps, that
17 had like a cement walkway.  And on both sides there
18 was dirt for my flower, gardens on both sides.
19     Q.  So aside from the diagram not extending
20 out the full length of the master bedroom,
21 everything else looks as it should be; is that
22 correct?
23     A.  Pretty much.
24     Q.  Thank you.  You can set that aside.
25     A.  Okay.

Page 35

1      Q.  Did you have any other sheds or buildings
2  on your property aside from the main residence?
3      A.  No.
4      Q.  In the kitchen, what appliances did you
5  have in the kitchen?
6      A.  Refrigerator, microwave, dishwasher,
7  stove, the usual.
8      Q.  Refrigerator, microwave, dishwasher,
9  stove.  Anything else?
10     A.  The refrigerator had a freezer on top of
11 it.  And in the sunroom, I had a chest-type freezer,
12 one of those smaller chest types, about
13 three-by-three, I guess, about three feet high.
14     Q.  Did your stove also have an oven in it?
15     A.  Yes.
16     Q.  So aside from the refrigerator and
17 freezer in the kitchen, the freezer in the -- in the
18 sunroom, the microwave, the dishwasher, and the
19 stove/oven combination, were there any other
20 appliances in your kitchen?
21     A.  Just coffee pots and stuff like that.
22     Q.  Handheld type appliances?
23     A.  Yeah.  I think.  I can't remember
24 anything else right now.
25     Q.  How old were your appliances?

Page 36

1      A.  Four years old.
2      Q.  Did you -- so you replaced them when you
3  -- I'm sorry.  Let me take this -- let me -- let me
4  start over.
5      A.  When I bought the house.
6      Q.  When you purchased the home, they were
7  the same that had been originally put in the house
8  when it was first built; is that correct?
9      A.  Yeah.  Right.  They never had used most
10 of it.  They had never hooked up the water to the
11 refrigerator.  They had never hooked up the vents to
12 -- it was kind of like the stove was, I can't think
13 of the name of it, but it's the one that has the
14 vents that draws all of the air out and everything,
15 and it's piped outside.  They had never hooked that
16 up.
17     Q.  Had anyone lived in the home before you?
18     A.  Yeah, this young couple.  And he was
19 becoming a doctor and he was doing some residents, I
20 believe.  Was doing his residency at Keesler.  And
21 his wife was, I believe, I heard she was a nurse.
22 So I guess they mostly just ate out.  There was --
23 it was all -- all of the appliances was like new
24 when I moved in.
25         (Exhibit 23 - Photographs marked for

Page 37

1  identification.)
2      Q.  I'm going to hand you what's been marked
3  as Defense Exhibit 23.  If you could turn, do you
4  see at the bottom of the page, it says,
5  "Politz 150."  Do you see that?
6      A.  Yes, I do.
7      Q.  Those are called Bates numbers.  So when
8  I refer to the term "Bates numbers," you'll know
9  what I mean.
10     A.  Okay.  Thank you.
11     Q.  If you could -- if you could turn to
12 Bates number 181.  Some of the pictures are a little
13 dark at the bottom so sometimes it's hard to see.
14 But it's a picture --
15     A.  I'm getting there.  181?  Okay.
16     Q.  Okay.  Beginning on page 181, going
17 through page 184, do you recognize these photos?
18     A.  Yes, I do.
19     Q.  Are these all the photos that you have
20 left of your home before hurricane Katrina?
21     A.  I'm not sure if it's all of them, but it
22 was all I could put -- put -- you know, my hands on
23 at the time.
24     Q.  Have you found any additional photographs
25 since you gave these to your attorneys?

accc5f30-2973-4075-b796-fbf68e721559

Page 38

1    A.   I don't remember finding any.
2    Q.   Would you be willing to go back and look
3 to see if you have any additional photographs?
4    A.   Sure.
5    Q.   Okay.  Beginning on page 181, the very
6 top photograph.
7    A.   Okay.
8    Q.   Can you tell me -- can you tell me where
9 in the home, and if we need to pull back Defense
10 Exhibit 102 to point out, where in the home is it
11 that we're looking at?
12    A.   Right here in the corner of the living
13 room.  Wait, wait, wait.
14    Q.   That's -- let's try it this way.
15    A.   Right here in the living/dining room area
16 right up in here.
17    Q.   Okay.  So you're -- you're pointing to
18 the dining area and the open living room and --
19    A.   Yeah.
20    Q.   -- the square.  You're pointing to the
21 bottom right corner; is that correct?
22    A.   Yes.  That buffet was right here against
23 the wall and a table was here in front of the
24 window.
25    Q.   The door that's -- that's in the

Page 39

1 foreground of the picture on the right side --
2    A.   Uh-huh (affirmative response).
3    Q.   -- do you see there's a knob on the door?
4    A.   Yeah.
5    Q.   What was that a door to?
6    A.   That was a door to this closet right
7 here.
8    Q.   Okay.  And the door immediately behind
9 it, that was the utility room?
10    A.   That was my double doors to the utility
11 room.
12    Q.   Okay.  And then the door straight back,
13 if you were walking down the hall, was that a door
14 into the second bedroom?
15    A.   That was going into the second bedroom,
16 yes.
17    Q.   Thank you.
18    A.   Uh-huh (affirmative response).
19    Q.   The photo at the bottom of the page --
20    A.   Uh-huh (affirmative response).
21    Q.   -- of page 181, is this on your patio
22 outside?
23    A.   Yes, it is.
24    Q.   If you could turn to the next page,
25 Defense Exhibit 23 at page 182.

Page 40

1    A.   Okay.
2    Q.   Can you identify on Defense Exhibit 102
3 where this photograph was taken?
4    A.   Yes.  This was a fireplace in the living
5 room right there in that corner.
6    Q.   So you're pointing to the living room in
7 the top left corner of the -- of that room?
8    A.   Yes.
9    Q.   Okay.  If you could turn the page.  We're
10 looking at page 183 of Defense Exhibit 23.  Are
11 these photographs of your back patio area?
12    A.   Yes, they are.
13    Q.   Okay.  In the top photograph, there's
14 someone standing at the iron gate looking away.
15    A.   Uh-huh (affirmative response).
16    Q.   From that vantage point, are you able to
17 see the Gulf of Mexico?
18    A.   Yes, you could see it.
19    Q.   Approximately how far from that vantage
20 point, the person that's standing there, about how
21 far away is the Gulf of Mexico?
22    A.   Probably about a quarter-of-a-mile from
23 that point to the water.  They had beach area in
24 between.
25    Q.   About how long would it take someone to

Page 41

1 walk there?
2    A.   Five minutes or so.
3    Q.   Not very far?
4    A.   Five or ten minutes, depending on young
5 or old or what.
6    Q.   But it's fair to say it wasn't very far
7 from the water?
8    A.   Not too terribly far.
9    Q.   If you could turn the page of Defense
10 Exhibit 23 to page 184.
11    A.   Okay.
12    Q.   The very top photograph, we're looking at
13 the outside of the home.
14    A.   Uh-huh (affirmative response).
15    Q.   Can you show me what angle or what area
16 we would be looking at on Defense Exhibit 102?
17    A.   The side here faced the gulf.  You pulled
18 in.  This end faced Winters Lane.  And this was the
19 garage.  You pulled in there and you come in from
20 the garage into the house.  That had a door there.
21 And this -- all of this faced the gulf.
22    Q.   Okay.  So we see the garage on the far
23 right corner of the picture?
24    A.   Right.
25    Q.   Is this an entrance on the -- just in

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz - 11/13/08

Page 42

1  front of the garage?  Is that -- is that the main
2  entrance to the house?
3      A.   Yeah.  They had a cement driveway where
4  you turned in from Winters Lane and you drove all
5  the way into the garage.  The bushes in the front,
6  kind of the landscaping kind of hides that.
7      Q.   Looking at Defense Exhibit 102, would
8  this have been that entrance at the very bottom just
9  next to the garage?
10     A.   There was a front door right here.
11     Q.   Okay.
12     A.   A big beautiful door.  Okay.  And they
13  had a curved sidewalk from it, a little -- they had
14  like a little entrance.  You can see it right here.
15     Q.   Okay.  And you are pointing to the
16  picture?
17     A.   With the white poles, yeah.  Okay.  And
18  this entrance right here had a little, it was
19  probably six-by-six, something like that.  And it
20  had a -- one step down and it curved around here and
21  met the garage driveway.
22     Q.   Okay.
23     A.   So you could go --
24     Q.   And you can see that on the bottom
25  picture of page 184; is that correct?

Page 43

1      A.   Oh, yes.  Okay.
2      Q.   You can see the front walkway?
3      A.   Yeah.  You can see how that does.  Yeah.
4      Q.   And the bottom picture of page 184, it's
5  fair to say that if you were standing at the bottom
6  of Defense Exhibit 102 taking a photograph looking
7  forward, that this would be the -- the vantage
8  point; is that correct?
9      A.   I don't understand.
10     Q.   Okay.  If you were -- does this picture,
11  the bottom picture on page 184, reflect the garage
12  and the front entrance as you would be standing at
13  the bottom of Defense Exhibit 102?
14     A.   Yeah.  Yeah.  This was the front entrance
15  on Winters Lane.
16     Q.   Okay.  So on Defense Exhibit 102,
17  Winters Lane would have been at the bottom of this
18  page; is that correct?
19     A.   Correct.  Uh-huh (affirmative response).
20     Q.   All right.  Again, with the Defense
21  Exhibit 102 sticker on the -- top right side of the
22  page.
23          (Exhibit 29 - Map marked for
24  identification.)
25     Q.   I'm handing you what's been marked as

Page 44

1  Defense Exhibit 29.  I'll represent to you that this
2  is a map that Nationwide and -- and counsel for
3  Nationwide has prepared on Google, which is an
4  internet website where you're able to map out the
5  location of an address.  And what I'm hoping you can
6  do is you'll see in the middle of the page it says
7  "116 Winters Lane, Long Beach."  That's your former
8  address, correct?
9      A.   Correct.
10     Q.   And there's a pinpoint there.  Is that
11  the accurate location from an aerial perspective of
12  where your home would have been?  Sometimes these
13  can be off.  And so what I'm trying to do is verify
14  that if it needs to be moved to the right or to the
15  left.
16     A.   I think it needs to be moved a little
17  this way.
18     Q.   And you're pointing to the right?
19     A.   Uh-huh (affirmative response).  Because
20  this is the street, Winters Lane, that's got the
21  curve in it.
22     Q.   Okay.
23     A.   And I lived right in this curve.
24     Q.   Okay.  So you're actually pointing to the
25  left, and you're identifying the curvature of the

Page 45

1  street that's to the top and to the left of the
2  yellow pinpoint mark; is that right?
3      A.   I think -- yes.  I think this little spot
4  right here would have been my -- my house.
5      Q.   Okay.  I'm going to hand you another map
6  that's not been marked and we can mark it.
7      A.   Okay.
8      Q.   You can set that aside.
9          (Exhibit 30 - Map marked for
10  identification.)
11     Q.   Okay.  I've got two of these.  One I want
12  to identify and then the other one we can mark on.
13  So I'm going to hand you what has been marked as
14  Defense Exhibit 30.
15          This is a photograph that was taken of the
16  same location or approximately the same location as
17  the Google map that I just showed you in Defense
18  Exhibit 29.  But this was taken a couple of days
19  after hurricane Katrina.
20          Do you recognize the curvature of the
21  street, the same curvature of the street?
22     A.   Yes, I do.
23     Q.   And that would be Winters Lane; is that
24  correct?
25     A.   Yes.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 46

1    Q.   And it's your testimony that your home
2  would have been in the middle of the curvature of
3  that street; is that right?
4    A.   Yeah.  Like right here, this little white
5  spot.
6    Q.   Okay.
7    A.   I think that would have been my slab.
8  And my driveway right here.
9    Q.   Okay.
10   A.   Do you see where I'm pointing?
11   Q.   I'm going to put this aside and hand you
12  the exact same map which is marked as Defense
13  Exhibit 30A.
14       (Exhibit 30A - Map marked for
15  identification.)
16   Q.   And I'm going to hand you a marker.  And
17  if you could draw a box outlining where you believe
18  your home would have been.
19   A.   You need it drawn over here?
20   Q.   No, if you could leave that one blank.
21  So the black box you've just drawn, this is the
22  place that you believe your home was located before
23  hurricane Katrina; is that correct?
24   A.   That's what I believe, yes.
25   Q.   You can -- you can give him his pen.

Page 47

1       MS. LOCKE:  Did you get a copy of 30A?
2       MR. EMERY:  No.
3    Q.   (By Mr. Locke)  Okay.
4    A.   This is the box that I drew.
5    Q.   What I -- what I would like to do is
6  actually take 30A and make a photocopy of it a
7  little bit later so we can enter 30A in the box that
8  she drew so we know exactly where the home is
9  located.  So I'm going to set this aside for now.
10       Did you after purchasing your home in
11  approximately 1998, 1999, did you make any additions
12  or renovations to the home?
13   A.   We had remodeled, not -- we didn't make
14  any additions other than the patio.  But we had just
15  redone the home completely because we got termites
16  and they had done some damage.  So we had just spent
17  like over $20,000 on our house because we had to
18  replace -- there was areas where there was no brick.
19  It was kind of like a wooded material termites get
20  into and they had done some damage.  So we hired
21  someone to come in and replace everything.
22       First of all, the termite man had to come
23  and drill and put the stuff in, kill all the
24  termites and everything.  We got all that done and
25  then we repaired and replaced everything that needed

Page 48

1  to be done.  And that called for a paint job
2  afterward.  So we had the house repainted.  All the
3  windows redone.  We had just gotten through with
4  putting all the, you know, the -- I'm trying to
5  think of the word.  The mortar that sort of goes
6  against your window to hold the window in?
7    Q.   The window seal?
8    A.   Yeah.  It had some crack spaces in it.
9  We had someone, the painters clean all of that old
10  out, put all new in, and everything.  And so it was
11  all redone.
12   Q.   Let's take this step-by-step.
13   A.   Okay.
14   Q.   The termite damage that needed to be
15  repaired, was that all to the exterior of the home?
16   A.   Yeah.
17   Q.   All right.  And what precisely?
18   A.   Well, it -- I'm sorry.  Except for the
19  French doors.  They found them by the French doors
20  and the patio.  And the wood around the French doors
21  had to be -- some of it had to be replaced and
22  repainted and everything.
23   Q.   What on the exterior of the home was
24  replaced because of termite damage?
25   A.   Some of the construction like

Page 49

1  two-by-fours or two-by-sixes or something like that
2  on the front entrance had to be redone.  Some of the
3  corners of the house had gotten not only -- the
4  termites was mostly on the patio.  But this type of
5  material that they had used that had gotten rotted
6  on the ends where it touched the dampness of the
7  morning dew every day, and that type thing.  We had
8  all of those corners replaced with treated wood and
9  everything, that type of thing.
10   Q.   Were -- did the home have to be opened up
11  in any way in terms of -- when you say two-by-fours,
12  I'm trying to understand where the two-by-fours were
13  on the exterior of the home?
14   A.   They were on the outside.  Everything
15  that had to be replaced was on the outside except
16  around the French doors.
17   Q.   Okay.  When you said the home had to be
18  repainted, is that an exterior repaint job?
19   A.   Yeah.
20   Q.   Did you have any interior repainting
21  done?
22   A.   No, I didn't.
23   Q.   Okay.
24   A.   Now, I had replaced the floors.  We had
25  put in wood floors because the carpet was bad and

Helen Politz - 11/13/08

Page 50

1  needed to be redone and we just put in wood floors
2  instead of new carpet.
3      Q.   Okay.  We'll get there.  I've got a list.
4  We'll go through one-by-one.
5      A.   Excuse me.
6      Q.   No.  You're fine.  You're fine.  So the
7  exterior of the home was painted.  You replaced
8  windows.  Did you -- did you replace the glass in
9  the windows?
10     A.   No, not the glass.
11     Q.   Just the exterior wood portions of the
12  windows?
13     A.   The support for the glass.
14     Q.   Okay.  The French doors, were those
15  wholly replaced, the doors themselves?
16     A.   No.  They -- it was mostly in the frame
17  around the doors.
18     Q.   Okay.  So the framings of the French
19  doors had to be replaced.  Any other exterior
20  replacement or upgrades that were made at that time?
21     A.   The French doors were painted on both
22  sides.  The front door was weather-beaten.  It
23  wasn't -- it wasn't termites.  It was weather-beaten
24  and it had to be redone, taken off and revarnished
25  and everything.

Page 51

1      Q.   And then moving to the interior of the
2  home.  Anything else from the outside that you can
3  think of?
4      A.   Not at this moment.
5      Q.   Okay.  All right.  Moving to the interior
6  of the home.  You said you had the carpet replaced
7  and you had it replaced with wood floors; is that
8  right?
9      A.   Yeah.
10     Q.   In how many rooms did you do that?
11     A.   Both bedrooms.  Everywhere there was
12  carpet.  I took all carpet out.  Tile, I had some
13  tile all in the front of the house.  The two
14  bedrooms and the hallways had carpet.  So I replaced
15  -- it wasn't real wood.  It was a laminate wood.
16     Q.   And that was not because of termite
17  damage?
18     A.   No.
19     Q.   That was just wear-and-tear?
20     A.   No, just wear-and-tear.  It needed to be
21  done.  We had no idea we was fixing to lose it all.
22     Q.   Any other interior upgrades that you made
23  before hurricane Katrina?
24     A.   We had switched out some fans.  Put new
25  fans in.

Page 52

1      Q.   How many new fans?
2      A.   Two or three.
3      Q.   Anything else?
4      A.   I think we had put in a light fixture, a
5  couple of light fixtures and made them look nicer.
6      Q.   Can you approximate how many light
7  fixtures you had replaced?
8      A.   I know one was with a fan.  And I think
9  one was by itself.
10     Q.   So aside from the wood floor, two or
11  three new fans, and a couple, two or so, light
12  fixtures, any other interior upgrades you can think
13  of?
14     A.   I can't think of any right now.
15     Q.   You said the total to replace the termite
16  damage was approximately $20,000; is that right?
17     A.   That was for all of it.  That was for the
18  termite and the weatherworn things that was rotted
19  on the ends and boards that needed to be replaced
20  and --
21     Q.   Did that also include damage -- I'm
22  sorry.  Did the $20,000 also include the cost to
23  upgrade the wood floors the fans and the light
24  fixtures?
25     A.   Yeah.  It was about 20,000 for the labor

Page 53

1  and the upgrading and the termites.
2      Q.   Do you know -- did you file an insurance
3  claim at all for the termite damage?
4      A.   No, I don't think I had termite -- I
5  don't think I had insurance.  I never filed
6  anything.
7      Q.   Who was your mortgage with at the time of
8  hurricane Katrina?
9      A.   It was with First Horizon at that time.
10     VIDEOGRAPHER:  Two minutes until end of
11  tape.
12     Q.   Do you know -- do you recall what the
13  balance was at the time of hurricane Katrina,
14  approximately?
15     A.   Approximately 130,000, 128, 130,
16  something like that.
17     Q.   And you've since paid that balance off;
18  is that correct?
19     A.   Yes.
20     Q.   Okay.  And you paid it off by the use of
21  funds that you received from the SBA; is that
22  correct?
23     A.   Correct.  Well, actually, I couldn't pay
24  it off.  I had to apply my funds from SBA and from
25  the grant to SBA.  And I couldn't afford both house

Page 54

1  notes.  So we got them to increase our loan so that
2  we could pay off one note and have everything under
3  one at a cheaper rate of interest rather than lose
4  it.
5       Q.   We'll go step-by-step through --
6       A.   Okay.
7       Q.   -- the SBA funding.  But for now, the
8  First Horizon, the mortgage on your home at
9  Winters Lane is currently paid off, correct?
10      A.   It's -- it's paid off, but in one way.
11  In one way it isn't because it's through an SBA
12  loan.  SBA still has -- holds the mortgage together
13  with my house in Gulfport.
14      Q.   Okay.  So the SBA holds the title to the
15  property at Winters Lane; is that correct?
16      A.   Yes.  Yes.
17      Q.   Okay.  But First Horizon has been paid?
18      A.   First Horizon has been paid off.
19           VIDEOGRAPHER:  Off the record at
20  10 o'clock.  End of tape one.
21           (Off the record.)
22           VIDEOGRAPHER:  Beginning tape two.  On
23  the record at 10:07.
24      Q.   (By Ms. Locke)  Do you know if your home
25  was in a flood zone?

Page 55

1       A.   It was not in a flood zone.
2       Q.   How did you know that it was not in a
3  flood zone?
4       A.   I had a FEMA certificate stating that it
5  was not in a flood zone.  And I was told by
6  Nationwide it was not in a flood zone.
7       Q.   When did you get that FEMA certificate?
8       A.   It was in the documents when we bought
9  the house.
10      Q.   Did you provide that certificate to your
11  attorney?
12      A.   I did.
13      Q.   And you said that Nationwide told you
14  your home was not in a flood zone?
15      A.   Right.
16      Q.   Who at Nationwide told you that?
17      A.   I don't remember the girl's name, but she
18  was the girl that worked in the office when we
19  purchased -- when we purchased -- you know when you
20  go to make a loan you have to purchase your
21  insurance and all?  So Nationwide was an office
22  right a couple of blocks over and behind us, and I
23  heard of them.  I thought they were, you know, a
24  good company to be with.  I had no doubt.  So I went
25  and seen them.

Page 56

1       Q.   And the woman that you spoke with there
2  also told you you were not in a flood zone?
3       A.   I don't remember.  Yes, she did tell me
4  that because she -- I asked her about the flood.
5  When she wrote up the insurance, I did not -- I had
6  never lived anywhere where I needed flood insurance
7  so I was not aware of everything like I am now.  Not
8  that I'm aware of everything.  But you know what I'm
9  saying?  Okay.
10           So when I came there and I went to get
11  insurance, I told her that we needed all of our
12  bases covered because we had retired and we didn't
13  want to have to worry about not being safe or not
14  having something covered.
15           And John French was the representative.  He
16  was sitting in another room joining ours with the
17  door open between us at the desk.  So he could hear
18  -- we could hear him talking on the phone.  So I
19  know he could hear us talking.
20           And when she finished everything, I looked
21  at it and I said, "But you don't have flood coverage
22  here."  And she said, "You don't need flood
23  coverage."  And I said, "Well, FEMA said we're not
24  in a flood zone, but I thought since the water is so
25  close from the gulf that we would probably need it."

Page 57

1  She said, "You've got all the coverage you need
2  there.  Every base is covered."
3       Q.   I want to come back to that conversation
4  in just a minute.
5       A.   Okay.  Sure.
6       Q.   Do you know if your mortgage company
7  required you to have flood insurance?
8       A.   Evidently they didn't.  They never asked
9  for it.
10      Q.   Did you ever speak with your mortgage
11  broker at First Horizon about flood insurance?
12      A.   No.
13      Q.   Aside from your mortgage at
14  First Horizon, did you have any other second
15  mortgages on the property?
16      A.   No.
17      Q.   Is that the only mortgage you ever had on
18  the home?
19      A.   No.  We had redid our mortgage.  And I
20  don't remember all the names.  It went to different
21  ones.  Like we refinanced it and then they sold it
22  to someone else, and I think they sold it to someone
23  else.  And we wound up with -- with First Horizon.
24  And that's who we was with when hurricane Katrina
25  hit.

Helen Politz  -  11/13/08

Page 58

1      Q.   In all the different companies, did you
2  ever have a conversation with a mortgage broker
3  about the flood insurance?
4      A.   No.  I had been told I didn't need it so
5  I didn't -- I didn't ask any questions other than
6  that.  I accepted it.
7      Q.   Fair to say you never asked your mortgage
8  company if you needed flood insurance?
9      A.   No.  I asked Nationwide if I needed it.
10 Oh, mortgage company?  Yeah.  I never asked them.
11     Q.   Okay.  Aside from the flooding that
12 occurred during hurricane Katrina, was there any --
13 did you ever have a flood in your home at
14 Winters Lane before that?
15     A.   No.
16     Q.   At the time you purchased your home in
17 approximately 1998, did you obtain homeowners
18 insurance on the property when you purchased it?
19     A.   Yes, I did.
20     Q.   What carrier did you use?
21     A.   Nationwide.
22     Q.   So was Nationwide the first policy you
23 had on your home?
24     A.   They were -- yeah.  They were the only
25 ones I ever used.

Page 59

1      Q.   And John French was the agency -- his
2  agency is the agency you first used?
3      A.   Correct.
4      Q.   Aside from the claim that you filed for
5  damage as a result of hurricane Katrina, had you,
6  before that time, filed a claim with Nationwide
7  Insurance Company for the home at Winters Lane?
8      A.   No, I had never filed a claim.
9      Q.   You had other insurance with Nationwide,
10 didn't you?
11     A.   I don't think so.  Just my homeowners.
12     Q.   Did you have car insurance with
13 Nationwide?
14     A.   No.
15     Q.   Did you ever --
16     A.   Well, I don't remember for sure on the
17 car, but I don't -- I think it was just the home.
18     Q.   All right.  Did you ever seek or -- seek
19 a quote for car insurance from Nationwide?
20     A.   I don't know.  I don't remember.
21     Q.   You had two cars though, correct?
22     A.   Yes.
23     Q.   You had two Fords; is that correct?
24     A.   No.
25     Q.   No?

Page 60

1      A.   One was a Hyundai and one was a Ford, a
2  Mustang.  I lost it in the --
3      Q.   What -- what year was the Mustang?
4      A.   I think it was a 2002.
5      Q.   It was 2002?
6      A.   Yeah, I believe.
7      Q.   Did you ever have a 1998 or 1999 Ford
8  make car?
9      A.   '98, '99?  Yeah.  A Grand -- what was it
10 -- it was made by Ford.  Crown Royal.
11     Q.   Okay.  Could it --
12     A.   My husband's car.
13     Q.   Could you have had Nationwide car
14 insurance on the Crown Royal?
15     A.   Maybe so.  I don't -- I don't remember.
16 That's so far away.
17     Q.   But when did you -- do you recall when
18 you purchased the Crown Royal?
19     A.   I think so.  I think we purchased it
20 after we moved to the coast from the Ford dealership
21 in Gulfport.
22     Q.   Was it approximately 1998 or 1999 when
23 you purchased the car?
24     A.   Probably.
25     Q.   Okay.  So you can't dispute that you got

Page 61

1  a quote from Nationwide for that --
2      A.   No, I can't dispute it.  I can't remember
3  it, but I can't dispute it.
4      Q.   Okay.  Aside from your home at
5  Winters Lane, you've mentioned that you had a condo
6  in Pass Christian that you sold.  Did you have any
7  other homes?
8      A.   No.  We had the condo when we lived in
9  Baton Rouge.  And once we moved here and we decided
10 we liked it.  We wanted to stay here.  We decided.
11 It was a very small condo and so we bought a house
12 and we put the condo up for sale.  And it didn't
13 sell right away so we rented it until we sold it.
14     Q.   You said that the first policy,
15 homeowners policy on Winters Lane was through
16 Nationwide and through the John French Insurance
17 Agency.  Do you recall when you first secured
18 homeowners insurance at Winters Lane?
19     A.   When I was buying the home, you know.
20 When we signed all of the agreements at the mortgage
21 company and everything, the insurance was there in
22 front of us.
23     Q.   Is it possible that it was in early
24 February 1999?
25     A.   It could have been.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz - 11/13/08

Page 62

1    Q.    How did you know about French Insurance
2  Agency?
3    A.    Because I saw it on Jeff Davis, going up
4  and down Jeff Davis.
5    Q.    Jeff Davis is a highway?
6    A.    Yeah, it's a street in Long Beach.
7    Q.    So you saw the sign on the street and
8  that's what prompted you to seek insurance from --
9    A.    Well, I saw the office there.
10    Q.    Had you ever met Mr. French before
11  purchasing insurance from him?
12    A.    No.
13    Q.    And so is it fair to say he wasn't a
14  friend of yours?
15    A.    No, he wasn't.  Just a business deal.
16    Q.    So it being a business deal, you didn't
17  have any particular reason to go to Mr. French as
18  opposed to another insurance company, did you?
19    A.    No.  I just thought Nationwide was a good
20  insurance.  And it was there and I needed insurance.
21    Q.    Had any of your friends or family used
22  Mr. French?
23    A.    No.  None of them lived over here.
24    Q.    So you didn't have any reason to trust
25  Mr. French anymore than you would someone who's

Page 63

1  selling you another type of product; is that
2  correct?
3    A.    Correct.
4    Q.    In purchasing insurance from Mr. French,
5  did you develop a relationship with him in any way
6  that made you feel like you should not review the
7  insurance policy that he sold to you?
8    A.    He was very friendly, especially with my
9  husband.  My husband liked history.  He liked
10  history.  And he had some photographs in his office
11  about the Civil War and that type thing.  He's in --
12  at that time, I don't know now, but at that time he
13  was into reenactment of the Civil War, like people,
14  you know, do that type of thing.  And my husband
15  liked to watch movies and read books about the
16  Civil War.  So they started chatting a little bit
17  about that.  And he seemed like a really nice guy.
18  Seemed trustworthy.  And I had no problem with him
19  in any way.  But I didn't -- no, I didn't know him
20  real close.
21    Q.    And you said this was a business
22  transaction, correct?
23    A.    It was.  But you know how sometimes you
24  just casually talk during doing a business deal.
25    Q.    How did you first purchase your

Page 64

1  Nationwide policy with Mr. French?  Did you go into
2  the office?
3    A.    Uh-huh (affirmative response).
4    Q.    Is that a yes?
5    A.    Yes.  Sorry.
6    Q.    That's okay.  So it was not over the
7  phone, correct?
8    A.    Correct.
9    Q.    When you first went into Mr. French's
10  office who --
11    A.    Excuse me just a moment.  I did make a
12  call to him telling him I needed to come in and see
13  someone about some insurance because I had to
14  purchase some insurance.
15    Q.    Okay.
16    A.    And they gave me a time to come in and I
17  went, but I had not met him before.
18    Q.    So aside from the brief call that you had
19  to schedule an appointment --
20    A.    Right.
21    Q.    -- then you went in during your
22  appointment time to meet with him; is that correct?
23    A.    Right.
24    Q.    Did you go alone to purchase your policy?
25    A.    No, my husband was with me.

Page 65

1    Q.    So you and your husband went.  Was anyone
2  else there, your friends and family, were with you?
3    A.    No.
4    Q.    When you went to Mr. French's office who
5  was there to meet you?
6    A.    He opened the door and introduced
7  himself.  And turned around and introduced us to the
8  girl that wrote up the policies for him.  And I
9  don't remember her name.
10    Q.    Okay.  So aside from Mr. French and this
11  woman, whose name you don't remember, is there
12  anyone else at Mr. French's office there when you
13  went to purchase your policy for the first time?
14    A.    I don't think so.  I don't remember
15  anyone else.
16    Q.    When you went to buy insurance from
17  Mr. French's office, what type of insurance were you
18  looking to purchase?
19    A.    Windstorm, fire, theft.  The normal
20  homeowners policy.  Something that the mortgage
21  company would accept also.
22    Q.    Okay.  Was the price of the policy a
23  factor in determining whether you would purchase it?
24    A.    I don't know if it was or not because I
25  didn't go anywhere else.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 66

1    Q.    Okay.
2    A.    I was satisfied with what I thought I
3    had.
4    Q.    Okay.
5    A.    I never -- I never tried anyplace else.
6    Q.    Were you looking for more or less
7    coverage based on the price that they gave you?
8    A.    I thought I was covered pretty well.
9    Q.    Did you negotiate at all on the price
10   with them?
11   A.    No.  They told me how much it was going
12   to be.  I was new in the area.  I didn't -- I didn't
13   know what other people were paying or who they were
14   with or anything.  So I had nothing to compare it
15   to.
16   Q.    At the time you went in to purchase the
17   policy, were you aware of the existence of flood
18   insurance?
19   A.    I guess I was aware of it that some
20   people needed it.  I had never lived where I needed
21   flood insurance.  And when I was told I didn't need
22   it, I was surprised because I had paid it at the
23   condo in Pass Christian.  I had flood insurance
24   there.  It was -- it was demanded through the
25   mortgage company.

Page 67

1        And so I said, "Well, I've never had flood
2    insurance."  And they said, "Well, you have to have
3    flood insurance here."  I said, "Fine."  So I bought
4    flood insurance.
5    Q.    So you had purchased flood insurance
6    policy before for your condo; is that correct?
7    A.    Yes.
8    Q.    Do you recall when you purchased that
9    flood insurance in Pass Christian?
10   A.    When I bought the condo and mortgaged it.
11   Q.    Do you know when that was?
12   A.    In the 90's at some point, probably
13   around ninety -- it was before '96 because my
14   husband retired in '96.  And that's when we started
15   coming over here quite a bit.  So it must have been
16   around '94, '95.
17   Q.    Okay.  Do you know what insurance company
18   purchased your flood policy through?
19   A.    I don't remember.  It was a condo deal.
20   It was paid in the escrow and they had the insurance
21   certificates and all.  And I had to, you know, pay.
22   It was all in with the condo fees.
23   Q.    Okay.  So you were aware because of your
24   experience in Pass Christian with your condo that
25   flood insurance was a separate policy from

Page 68

1    homeowners insurance?
2    A.    No, I wasn't because all the insurance
3    was -- it had to have flood insurance and you had to
4    have homeowners insurance and it was all together in
5    one condo fee.  So I wasn't sure.  I just never
6    thought about it.
7        I paid it all under one condo fee.  And I
8    had insurance that they demanded I had, which was
9    homeowners and flood.
10   Q.    So they demanded that you have
11   homeowners, but they also made -- this is the condo
12   association or the mortgage company --
13   A.    Uh-huh (affirmative response).
14   Q.    -- in Pass Christian?
15   A.    Uh-huh (affirmative response).  It was
16   condo association.
17   Q.    They demanded you have homeowners
18   insurance, but they also demanded that you have
19   flood insurance, correct?
20   A.    Right.
21   Q.    So you understood based on your
22   experience with condo in Pass Christian that flood
23   insurance was additional to homeowners insurance; is
24   that right?
25   A.    I guess I did, but I really had never

Page 69

1    thought about it that much.  But I did think about
2    it when I purchased insurance and I saw no flood was
3    covered and I asked her about it.
4    Q.    Okay.
5    A.    And I -- so and that's when she said,
6    "You don't need it here.  You've got everything you
7    need.  Before the water would ever get to your
8    house, it would be blown away."  That's what I was
9    told at John French's office.
10   Q.    So the woman -- again, I want to step
11   back and we'll talk about this conversation.
12   A.    Okay.
13   Q.    Based on your experience in
14   Pass Christian, and did you know that flood
15   insurance was optional at -- that you could purchase
16   flood insurance as an additional part of your
17   coverage?
18   A.    No, I didn't.  I thought if you had to
19   have flood insurance, you had -- the mortgage
20   company demanded it.  And you had to have it, so.
21   Q.    Did you think that you would -- you were
22   not able to purchase flood coverage?  For example,
23   if -- if you did not -- if the mortgage company did
24   not require you to have flood coverage, did you
25   think that you wouldn't be able to secure it?

accc5f30-2973-4075-b796-fbf68e721559

Page 70

1      A.  I figured I could probably buy it.  But I
2  was told I didn't need it.  And I had a FEMA
3  certificate saying I didn't need it.  So I mean,
4  that it wasn't a flood zone.  So I was not here
5  during Camille.  I never knew that it flooded
6  before.  I just assumed that it had never flooded
7  before.
8      Q.   Okay.  But based on your experience, you
9  had an understanding that even if the flood -- even
10  if the mortgage company did not require flood
11  insurance, you could purchase flood insurance?
12      A.   Yeah.  I knew some people had flood
13  insurance.
14      Q.   All right.  Now, let's talk about when
15  you went to Mr. French's office.
16      A.   Okay.
17      Q.   And the woman that was there and the
18  conversation you had with her.  Tell me -- first of
19  all, let's talk about this woman.  Do you recall --
20  you said you don't recall her name.  Do you recall
21  what her position was in the office?
22      A.   She wrote up the policies and stuff like
23  that.  So I'm -- I would imagine she worked as a
24  clerk, as an insurance person, you know, just all
25  different tasks that needed to be done.

Page 71

1      Q.   Do you recall what she looked like?
2      A.   Not really.  I mean, she was white.  She
3  was medium.
4      Q.   Medium in?
5      A.   In size.  In looks.  She was nothing
6  outstanding in any way.  She wasn't ugly.  She
7  wasn't pretty.  Nothing that I remember
8  specifically.  An average person at work.
9      Q.   Do you recall the color of her hair?
10      A.   Kind of blondish-reddish I believe, maybe
11  a light brown.
12      Q.   Blondish-reddish, light brown.  Anything
13  --
14      A.   It wasn't black and it wasn't real
15  blonde.
16      Q.   Okay.
17      A.   I can put it like that.
18      Q.   Do you recall approximately how tall she
19  was?
20      A.   Probably about 5'3", maybe 4.
21      Q.   Okay.  And you said she was white?
22      A.   Yeah.
23      Q.   Was she an older woman?  Was she a
24  younger woman?
25      A.   I think she was a little younger than me.

Page 72

1  At this time she probably would have been in her
2  50's.  Not at that time, you know.
3      Q.   At that time she would --
4      A.   She was probably -- probably would have
5  been in her late 30's or early 40's.
6      Q.   Okay.  But that conversation -- that
7  conversation took place in -- well, would it be fair
8  to say -- let me strike that.
9          That conversation might have taken place in
10  approximately 1999; is that correct?
11      A.   Probably.
12      Q.   So at that time, your testimony is that
13  in 1999 she probably would have been in her late
14  30's or early 40's; is that right?
15      A.   Yes.
16      Q.   Where in the office did the conversation
17  take place?
18      A.   In the -- when you went into the office
19  they had John French's to the left and the office
20  that we went in went to the right.
21      Q.   Okay.  And you said that Mr. French's
22  office door was open; is that right?
23      A.   Yes.
24      Q.   And he was on the phone; is that right?
25      A.   Yes.  Well, at some point, not the whole

Page 73

1  time I don't guess, but at some point I remember him
2  being on the phone.
3      Q.   If he was on the phone, he wasn't in the
4  office with you during this conversation; is that
5  correct?
6      A.   He wasn't in there.  He might have came
7  in and out.  I don't remember for sure.  But he was
8  around and he was in that office next door.
9      Q.   And he was not the person whom you had a
10  conversation about flood insurance; is that right?
11      A.   No.  I didn't have the conversation with
12  him.
13      Q.   Okay.
14      A.   It was with the girl that worked in his
15  office.
16      Q.   Approximately how long did the
17  conversation last?
18      A.   Probably 30, 40 minutes.
19      Q.   And of that 30 or 40 minutes,
20  approximately how long did you speak with this woman
21  about flood insurance in particular?
22      A.   I never -- not long.  Maybe one minute.
23      Q.   Okay.
24      A.   Because I asked her about flood insurance
25  and she said, "You don't need it.  You've got all of

accc5f30-2973-4075-b796-fbf68e721559

Page 74

1  your bases covered. Everything you need is there."
2      Q.   So aside from the woman and you, was
3  anyone else in the room?
4      A.   My husband was in the room.
5      Q.   As best as you recall, what did you say
6  to her or ask her?
7      A.   I said, "You don't have me down for flood
8  insurance, do you?" She said, "No, you don't need
9  it."
10     Q.   Okay.
11     A.   And I said, "But I had it at
12 Pass Christian." And she says, "Well, you're not in
13 a flood zone. You don't need it."
14     Q.   Do you remember anything else about that
15 conversation aside from that?
16     A.   No. Really, she said, "You've got all of
17 your bases covered." And she said, "You're
18 protected." She said, "If you ever need" -- I said,
19 "But we live" -- "we" -- "our house is pretty close
20 to the water." I remember saying that. She said,
21 "Before the water would ever get to you," she said,
22 "your house would be blown away." And so she said,
23 "You've got all of the coverage you need. You've
24 got fire, wind, hail." I said, "Okay. As long as
25 we've got all of our bases covered."

Page 75

1          And then the mortgage company accepted it
2  and, like I said, I had a certificate from FEMA
3  saying I was not in a flood zone. And I thought,
4  "Well, this is all" -- "they're professionals in
5  their line of business," and I believed them.
6      Q.   Did you look at the flood map with her
7  while you were in your -- while you're in her
8  office?
9      A.   No. We didn't discuss it that much.
10     Q.   Okay. So you understood when you
11 purchased the policy that it did not cover flooding;
12 is that correct?
13     A.   I understood that, yes.
14     Q.   Okay. How did you -- you said that --
15 earlier in your testimony that you looked at
16 something and realized that flooding was not covered
17 in the policy. How did you know that flooding was
18 not covered in the policy when you're in her office?
19     A.   Because when I was looking at hail, wind,
20 fire, and all the different categories that it
21 covered, I didn't see "flood" marked.
22     Q.   Okay.
23     A.   And I asked her, I said, "Well, I don't
24 see any flood insurance." And she said, "You buy
25 that from someone else," I think, something like

Page 76

1  that. And she said, "And you don't need it anyway."
2  And so I just dismissed it.
3      Q.   So you had a concern that you needed
4  flood insurance when you were sitting there with
5  her; is that correct?
6      A.   Well, I thought it would be part of the
7  package, just like in the condo package was. I
8  thought I would pay some flood insurance, yeah. I
9  thought I would have it. But then I was told I
10 didn't need it. So I didn't -- I didn't go out and
11 purchase it.
12     Q.   You were concerned because you knew that
13 your home was so close to the ocean; is that
14 correct?
15     A.   I knew -- yeah.
16     Q.   And you've testified that she said, "You
17 don't need it." Did you ask her what she meant by,
18 "You don't need it"?
19     A.   No.
20     Q.   You said that she said you were fully
21 covered. Did you ask what she meant by "fully
22 covered"?
23     A.   Well, I told her I wanted all of my bases
24 covered. And then when I didn't see "flood" marked
25 like on the other parts of it, where it was

Page 77

1  explaining what it was on the coverage, I asked her
2  about the flood. I said, "I don't see any flood
3  coverage." And that's when she told me, "You don't
4  need it." So I wasn't -- like I said, she told me
5  that and I had the certificate saying I didn't need
6  it. The mortgage company didn't demand it.
7      Q.   The FEMA certificate didn't say, "You
8  don't need flood insurance"?
9      A.   No, it didn't. It said I'm not in a
10 flood zone.
11     Q.   Is it fair to say that when she said,
12 "You don't need it," you understood that to mean
13 that it's not required because of the FEMA
14 certificate?
15     A.   No. I didn't think about it not being
16 required. I just thought it had never flooded there
17 and, therefore, I didn't need flood insurance.
18     Q.   And so you did understand that you did
19 not have flood coverage under your homeowners policy
20 when you purchased -- purchased it on that day; is
21 that correct?
22     A.   Yes, I knew that.
23     Q.   Okay. You said that she told you that
24 the home would blow away before water ever got to
25 your property; is that correct?

accc5f30-2973-4075-b796-fbf68e721559

Page 78

1     A.   Yes.
2     Q.   Are those her precise -- precise words
3  that you can remember that she used?
4     A.   I said, "I don't see any flood coverage."
5  And she said, "Oh, you don't need any flood
6  coverage.  You got all your bases covered.  Before
7  any water would ever get to you, the house would be
8  blown away."  That's -- that's what she said.
9     Q.   Did you ever seek a second opinion from
10  anyone?
11     A.   I never did.
12     Q.   Did you ever ask to speak with Mr. French
13  directly about flood insurance?
14     A.   No.  He was sitting there with the door
15  open when she told me all of that, so.
16     Q.   He wasn't in the room though?
17     A.   He was not in the room, but he was in the
18  room next to me with the door open, and I'm assuming
19  he heard what she said.
20     Q.   You can't be sure that he heard what she
21  said?
22     A.   I cannot.
23     Q.   Did you ever call anyone else at
24  Nationwide to seek a second opinion about flood
25  insurance?

Page 79

1     A.   No.
2     Q.   Did you ever discuss with your husband
3  the fact that you didn't have flood insurance?
4     A.   No.  He was with me when that happened
5  and he -- he agreed with me.  When we left, I said,
6  "Are you satisfied with our policy?"  He said,
7  "Yeah, I think we've got good coverage."  That was
8  it.
9     Q.   Did Nationwide ever provide you a flood
10  insurance quote?
11     A.   No, not that I remember.
12     Q.   Do you -- can you dispute the fact that
13  Nationwide did provide you a flood insurance quote?
14     A.   I can't dispute it, but I don't remember
15  it.
16     Q.   So it's a possibility that Nationwide
17  provided you with flood insurance quote?
18     A.   It's a possibility.
19     Q.   Do you dispute the fact that you declined
20  to purchase flood insurance after --
21     A.   No, I don't dispute that.  Because I
22  don't remember ever talking to them other than the
23  one time about flood insurance.
24     Q.   Is it possible that Nationwide provided
25  you a flood quote which you declined to purchase?

Page 80

1     A.   Anything is possible, but I don't
2  remember it.
3     Q.   So you can't dispute that you declined
4  flood insurance?
5     A.   Right.
6        MR. EMBRY:  Object to the form.  I don't
7  think she said it was ever offered to her.
8        MS. LOCKE:  She -- that's fine.
9     Q.   (By Ms. Locke)  At the time you purchased
10  -- strike that.
11        After you purchased your policy on that
12  initial visit, how did you receive your policy?
13     A.   I think I got a copy when I left the
14  office of the date of standard protection.  But then
15  I think the policy itself came in the mail a couple
16  of weeks later.
17     Q.   Okay.  Did you read it when you received
18  it?
19     A.   No.  I just looked to see if it was the
20  same coverage and it was the same thing I had, so I
21  just stuck it in a fireproof box.
22     Q.   But you did review the policy to ensure
23  that it was what you had purchased while you were at
24  Mr. French's office; is that correct?
25     A.   Yeah.  Just to see if it matched what I

Page 81

1  had a quote for from when I left their office.
2     Q.   Was there anything different or missing
3  from what you had purchased as to what was provided
4  in the policy?
5     A.   Not that I remember.
6     Q.   Did you renew your policy every year
7  since the time you purchased your policy from
8  Mr. French?
9     A.   Yeah.  It was renewed through them each
10  year.
11     Q.   Okay.
12     A.   It might have changed a little bit
13  because it came out I think one time and assessed
14  the property.  And it went up a little bit.  And
15  then I think the insurance might have went up a
16  little bit or something.  I don't remember for sure.
17  But basically it was the same thing.
18     Q.   Did you receive a renewal each year and
19  now that had new pages that would list your policy
20  amounts on it?
21     A.   I think so.
22     Q.   Did you review those each year when they
23  came in?
24     A.   I glanced at them.
25     Q.   Okay.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz - 11/13/08

22 (Pages 82 to 85)

Page 82

1    A.   I didn't read the whole thing.  I mean, I
2    thought I knew what I had.
3    Q.   Okay.  When you left Mr. French's office
4    after purchasing your homeowners insurance policy,
5    you fully understood that if there was a flood at
6    your home, you would no longer -- you would not be
7    covered for that damage; is that right?
8    A.   Right.  I knew when Katrina hit that I
9    was going to take a loss for flood because I heard
10   water came.  But I thought I would get, you know, a
11   big portion for windstorm.
12   Q.   So you're not -- so to the extent that
13   your home was damaged by flood, I'm not saying you
14   agree with me that it was, but to the extent your
15   home was damaged by flood, you agree that Nationwide
16   -- your policy, Nationwide policy does not cover
17   that damage; is that correct?
18   A.   The flood part.
19   Q.   Correct.  So you understand that to the
20   extent your home was damaged by flood in hurricane
21   Katrina, you are not covered for that flooding; is
22   that right?
23   A.   For the flooding only.  But I feel like
24   -- like she told me I had my furniture coverage.  I
25   had extended living.  I had all of those things.

Page 83

1    And I feel like with a storm beating for 12 hours
2    like that before it ever -- before the water ever
3    touched, that I had gotten some damage.  I had trees
4    all around me.  And I probably got a lot of damage
5    from the storm before the water ever got there.  And
6    I felt like I should be compensated for it.
7    Q.   Did you have any other conversations with
8    this woman or Mr. French about your homeowners
9    policy?
10   A.   I don't remember.  Every now and then
11   they might change it up a little or have something
12   different.  I called and talked to her a time or
13   two.
14   Q.   Do you recall ever discussing flood
15   insurance again with her?
16   A.   No.  I never discussed flood insurance
17   again.
18   Q.   Okay.  Do you ever recall discussing the
19   fact that flooding or water damage would not be
20   covered under your policy with her?
21   A.   They came out with something a year or so
22   before Katrina about backup flooding.  And I did
23   talk a little bit about that.  And what it was is
24   they -- they made an increase in the policy, I
25   believe, about like if the sewage lines gets stopped

Page 84

1    up -- the drain system on the street, if that got
2    stopped up or something, and water -- because water
3    had never even gotten in my yard.
4        And if that ever happened and the water
5    backed up and got into your house, they added that
6    to the policy, I believe, something like that.  And
7    that's when I called her and asked her what did that
8    mean because that was something new.  And she said,
9    "Oh," she said, "the policy was just a little
10   increase on the account of your backup," and that's
11   when she explained what the backup flooding meant.
12   And so she said, "We just put that in the policy."
13   And I said, "Fine."
14   Q.   Did you believe that -- you didn't
15   believe that that had anything to do with hurricane
16   storm surge though, correct?
17   A.   No, I didn't.
18   Q.   Okay.  Aside from that conversation with
19   her about the backup flooding provision in your
20   policy, do you recall any other conversations that
21   you had with this woman or Mr. French about flood
22   insurance or water damage being covered under your
23   policy?
24   A.   Well, when we were talking about that, I
25   said, "Well, what happens if the toilet starts

Page 85

1    leaking or something like that and I get water in
2    the house?"  She said, "You're not covered under
3    that.  You're just covered under backup water from
4    the street."  I said, "Okay."  So I understood what
5    she was talking about.  And that's the only time I
6    ever talked about it.
7    Q.   In approximately February 2002, there was
8    a change of coverage on your property increasing it
9    to approximately $126,000 for replacement cost of
10   the dwelling.  Do you recall making that change?
11   A.   I remember something about that at one
12   time.
13   Q.   Do you recall any conversation that you
14   might have had with -- with this woman or Mr. French
15   at that time?
16   A.   Replacement cost.  It seemed like that's
17   when they might have assessed the property.  And it
18   went up in value a little and so they increased it
19   a little bit.  And --
20   Q.   Do you recall an inspection report that
21   you provided to Nationwide?
22   A.   I don't really remember.  Now that you
23   bring it up, it seems like that might have happened.
24   Q.   Do you recall why -- why you would have
25   provided this report or why you would have increased

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 86

1   the coverage on your property?
2       A.   Just the value of it went up and I just
3   wanted to be covered.
4       Q.   So aside from the backup water
5   conversation that you had with this woman in
6   Mr. French's office, the original conversation you
7   had about flood insurance, do you recall any other
8   conversation that you had with Mr. French or this
9   woman in his office or anyone else at Mr. French's
10  office about specific policy provisions in your
11  homeowners insurance?
12      A.   No.
13      Q.   You cancelled your insurance policy in
14  approximately March of 2006 with Nationwide; is that
15  correct?
16      A.   Yes.
17      Q.   How did you cancel that policy?
18      A.   I called and told them I wanted to cancel
19  it. They billed me for it and I didn't have a house
20  anymore. So why would I pay insurance on a house
21  that I didn't even have anymore? I had nothing but
22  a slab.
23      Q.   Did you do it in person or over the
24  phone?
25      A.   I did it over the phone to start with. I

Page 87

1   started it when I was still in Alabama when I got
2   billed for the insurance. And I said, "I'm not
3   paying that. I don't have a house anymore."
4       Q.   Do you recall who you spoke with?
5       A.   I called John French's office, and I'm
6   not sure who I talked with that time. But then they
7   told me that I would have to come in in person
8   because I said, "And I would like to have a refund
9   back since the storm," because they were not paying
10  me. And I felt it was unfair. And so he says -- or
11  whoever I talked to -- I mean, not "he," because I
12  don't remember for sure who I talked to. There was
13  a lot going on then. But they told me I would have
14  to come into the office to get the refund. And I
15  said, "Well, I'm coming back down that way in a
16  couple of weeks. When I get there, I'll come see
17  you."
18          So I went to the office and I talked to
19  John French that day and told him. And that I
20  wanted to cancel the insurance and I wanted a refund
21  back from everything that I had paid since Katrina.
22  And because it was in escrow and I couldn't get out
23  of it.
24      Q.   What --
25      A.   And so he said okay.

Page 88

1       Q.   Did you discuss anything else with
2   Mr. French at that time?
3       A.   I don't remember much of a conversation.
4       Q.   Okay. Was anyone else there aside from
5   Mr. French and you?
6       A.   There was a couple of ladies or maybe at
7   least one lady, maybe two working around in the
8   office. One directed me where to go.
9       Q.   Okay. But as part of your conversation
10  with Mr. French, it was just the two of you; is that
11  right?
12      A.   Just the two of us.
13      Q.   Did you discuss the handling of your
14  insurance claim with him?
15      A.   I told him I was not happy with it.
16      Q.   Anything else you recall about that
17  conversation?
18      A.   Nothing particular.
19      Q.   You don't -- do you recall anything that
20  he said to you?
21      A.   Well, he said something like, "If it
22  makes you feel any better, I didn't get paid
23  either." And I said, "And you're still working for
24  them?" That's approximately. He said, "Yes, I'm
25  still working." But it's -- "My office is my only

Page 89

1   expense." I thought that's not very smart.
2       Q.   Anything else that you remember about
3   that conversation?
4       A.   No.
5       Q.   Okay. Have you spoken with Mr. French or
6   anyone else?
7       A.   Since then?
8       Q.   Since that night?
9       A.   Not that I remember.
10          (Exhibit 2 - Declaration Page marked for
11  identification.)
12      Q.   I'm going to hand you what's been marked
13  as Defense Exhibit 2. Do you recognize what this
14  document is?
15      A.   Yeah. It's a coverage on the insurance.
16      Q.   Okay. Did you receive a document like
17  this every year from Nationwide?
18      A.   Similar. Uh-huh (affirmative response).
19  I think every year. I think I did every year.
20      Q.   And this is the declaration page that was
21  in effect on your property at the time of hurricane
22  Katrina; is that correct?
23      A.   As far as I can remember, yes.
24      Q.   Okay. Do you have any other documents
25  that would reflect, aside from this one, that would

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz - 11/13/08

| Page 90 |
| --- |

1  reflect the insurance coverage that you had on your
2  property at the time of hurricane Katrina?
3      A.   No.
4      Q.   You see that sort of third -- about a
5  fourth of the way down the page, it says, "Policy
6  Period From"?  Do you see that, on the first page?
7      A.   Okay. "Policy Period From."
8      Q.   And it --
9      A.   Oh, yeah, I see it now.  Okay.
10     Q.   And it says, "January 08, 2005 to
11  January 08, 2006."  Do you see that?
12     A.   Correct.  Uh-huh (affirmative response).
13     Q.   And that would have been the period
14  during which Katrina happened; is that right?
15     A.   Yes.
16     Q.   Okay.  If you looked down the page where
17  it says "Section One, Property Coverages," do you
18  see that?
19     A.   "Property Coverages," where at?
20     Q.   If you look midway down the page where it
21  says, "Section 1."
22     A.   Oh, "Property Coverage," yes.
23     Q.   "Property Coverage."
24     A.   Uh-huh (affirmative response).
25     Q.   And it says -- and it has a list of

| Page 91 |
| --- |

1  Coverage A through D.  Do you see that?
2      A.   Yes, I see that.
3      Q.   Starting with the first one, it says,
4  "Coverage A, Dwelling." And if you move across the
5  line, it says, "$106,800."  Do you see that?
6      A.   Yes, I do.
7      Q.   Do you have any reason to disagree that
8  this number accurately reflects the value of your
9  home, the dwelling, your home at the time of
10  hurricane Katrina?
11     A.   Yes.  It wasn't enough insurance to cover
12  my home.  My husband and I had talked about that.
13  Well, since we just remodeled and put so much money
14  into it, we need to increase the insurance, but we
15  had not got around to doing it yet.
16     Q.   Okay.  Do you understand that this number
17  means that for damage to the home itself you are
18  only entitled to recover $106,800 for the actual
19  cash value of your dwelling?
20     A.   No.  We had somewhere in our policy, I
21  remember that it -- it was supposed to cover, I
22  forgot what they call it, replacement coverage.
23     Q.   Replacement cost coverage.
24     A.   Yes.  Replacement cost coverage.  So I
25  understood when I was talking to the girl about

| Page 92 |
| --- |

1  that, she said, "This is a replacement cost coverage
2  policy," so it would cover more as time goes on
3  because of the expense going up all the time?
4      Q.   If you turn to page two.
5      A.   So I thought that I might have a little
6  more coverage.  I know it's not a lot, but just like
7  things go up.
8      Q.   If you look at the second category, it
9  says, "Options Available."  Do you see that?
10     A.   The second -- oh, yeah.
11     Q.   "Options Available."  And the second one
12  down says, "Option K, Replacement Cost Plus
13  Dwelling."  Do you see that?
14     A.   Okay.  Wait, wait, wait.  "Options
15  Applicable"?
16     Q.   Yeah.  And then the second one down says
17  "Option K, Replacement Cost Plus Dwelling."  Do you
18  see that?
19     A.   "Option K, Replacement Cost Plus
20  Dwelling," yeah, applies.
21     Q.   I think that's what you're referring to.
22     A.   That's what I was talking about, yeah.
23     Q.   Do you understand that "Option K,
24  Replacement Cost Plus" only applies if you rebuild
25  your home?

| Page 93 |
| --- |

1      A.   No.
2      Q.   Okay.  If you could turn back to the
3  first page.
4      A.   Okay.
5      Q.   Looking at "Coverage B, Other
6  Structures," it lists the dollar value of "$10,680."
7  Do you see that?
8      A.   I do.
9      Q.   But you have already testified that you
10  didn't have other structures on your property; is
11  that correct?
12     A.   Right.  That's just something that came
13  with the policy she said.
14     Q.   Okay.
15     A.   I told her I didn't have anything for
16  that.
17     Q.   So you would -- you would agree that that
18  coverage would not apply in your circumstances; is
19  that correct?
20     A.   Yeah, that was supposed to be outside
21  buildings and stuff, which I had none.
22     Q.   Okay.
23     A.   But she said it just come along with the
24  policy, so.  And in case I'd ever get a shed or
25  something and put some tools in it, it would be

accc5f30-2973-4075-b796-fbf68e721559

Page 94

1  automatically covered, but I had not done that.
2      Q.   Okay.  The next one down says,
3  "Coverage C, Personal Property," and it lists the
4  value as "$74,706"; is that correct?
5      A.   Correct.
6      Q.   Do you have any reason to disagree that
7  this would be the value -- this would be an accurate
8  measure of the value of the contents of your home?
9      A.   My contents was worth more than that.
10     Q.   What's the basis for your -- for that
11 opinion?
12     A.   About -- I had added it all up one time,
13 about 99,000, that it would have taken to go out and
14 replace everything I had.  Now, this was things like
15 in the garage, lots of fishing equipment and --
16 well, not lots of it, but some fishing.  I gigged.
17 I had gig lights, underwater lights, and stuff like
18 that.
19     Q.   You said you went through --
20     A.   And my furniture.
21     Q.   You said you went through and added up
22 the value.  When did you do that?
23     A.   After the storm.
24     Q.   So this would have been a post Katrina
25 list that you prepared?

Page 95

1      A.   No.  It was after Katrina.
2      Q.   Okay.  I think you -- I think I might
3  have misspoke or you misheard me.  But when you went
4  through your home and added up all of the totals,
5  that list you prepared would have been after
6  hurricane Katrina, correct?
7      A.   Correct.
8      Q.   And it would have been a list that you
9  prepared with insurance coverage in mind; is that
10 correct?
11     A.   Yes.
12     Q.   How did you -- how did you decide what
13 the value of each item listed was?
14     A.   Because I -- I made a list of each item
15 as I thought about it.  It took me weeks.  I just
16 put a tablet, a book type thing on the table.
17 When I'd think of something, I'd write it down under
18 which room it was, under what area.  And then after
19 a few months when I thought I had remembered
20 everything, then I -- I realized I either thought
21 about how much I had paid for it or if I had to go
22 buy it again how much it would cost me.  And I used
23 that as a figure.
24     Q.   Okay.  So you didn't -- you either used
25 the cost that you paid for it originally or what you

Page 96

1  thought it would cost you to replace it after
2  hurricane Katrina; is that correct?
3      A.   Correct.
4      Q.   So those -- those two different ways that
5  you came to a value amount --
6      A.   Uh-huh (affirmative response).
7      Q.   -- how did you decide which way it would
8  apply to which item?
9      A.   Well, everything was gone.  So I had to
10 assume that if I wanted to buy maybe I had ten
11 purses.  Okay.  And if I wanted to buy ten purses I
12 would estimate what I had actually paid for the ten
13 I had.  And claim that as a loss.
14     Q.   Did you ever provide this list to
15 Nationwide?
16     A.   No.  They never asked for it.
17     Q.   Did you ever provide it to your attorney?
18     A.   I did, but somehow or other it got lost.
19 And I don't know if they give it back to me and I
20 lost it in moving, or if it got lost somewhere at
21 their office.  And -- but no one has found it.  I
22 haven't found it.  As far as I know, they haven't
23 found it.  But I do know that I had used one of the
24 FEMA booklets as a guide.  It wasn't just a regular
25 tablet.  It was like an area in the FEMA booklet of

Page 97

1  losses.  And they are the ones that had the rooms
2  divided out.  And I thought, "Well, that's a good
3  idea because everything that would have been in this
4  room I put on the list."  And I just started using
5  it like that.  And I don't remember.
6      Q.   Did your attorneys ever tell you that
7  Nationwide requested that document from you?
8      A.   I don't remember it.
9      Q.   Okay.  Do you recall what the total value
10 you came to in that document was?
11     A.   Yeah.  It was around 99,000.  I
12 remembered thinking it's pretty close to a hundred
13 thousand, but it was 99 something.
14     Q.   And that 99,000 -- approximately $99,000
15 reflected the totality of all of your personal
16 property in the home as you remembered it after
17 hurricane Katrina?
18     A.   Yes.
19     Q.   If you look down to "Coverage D" where it
20 says "Loss of Use."
21     A.   Uh-huh (affirmative response).
22     Q.   And it says "$21,360."  Do you see that?
23     A.   Yes, I do.
24     Q.   And you agree that was the coverage that
25 was in place at the time of hurricane Katrina?

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz - 11/13/08

Page 98

1      A.   Yes.
2      Q.   I don't think I asked you that question
3  with respect to A, B, and C.  Do you agree that for
4  all of the coverages listed on this document those
5  were the coverages that were in effect at the time
6  of hurricane Katrina?
7      A.   Yes.
8      Q.   Okay.  Focussing on "Loss of Use," do you
9  understand that you're only entitled to this $21,360
10 for the loss of use of a home if that home is
11 damaged by something that Nationwide covered?
12     A.   Uh-huh (affirmative response).
13     Q.   Do you understand that?
14     A.   Yeah.  I couldn't live in the home.
15     Q.   But do you understand that if your home
16 is destroyed by a peril that is not covered under
17 your insurance policy that you're not entitled to
18 this dollar amount?
19     A.   I don't understand why I didn't get it
20 because I had the coverage and I lost my home.  And
21 in good faith, I thought Nationwide would take care
22 of me.
23     Q.   Okay.  Hypothetically speaking, if a home
24 was destroyed by flooding, you understand that under
25 a standard homeowners policy like yours, flooding is

Page 99

1  not covered, right?
2      A.   Right.
3      Q.   So hypothetically speaking, if a home was
4  destroyed completely by water, you understand that
5  the homeowner who had this policy would not be
6  entitled to the loss of use coverage.  Do you
7  understand that?
8      A.   I understand what you're saying, but I do
9  not believe for one second that my home was
10 destroyed by water.
11         VIDEOGRAPHER:  Two minutes.
12     Q.   Okay.  If you could turn the page to the
13 next page two.  We've already discussed Option K, so
14 let's move down to the second to last bold heading
15 towards the bottom of the page where it says "Forms
16 Endorsement Made Part of Policy."  Do you see that?
17     A.   I do.
18     Q.   Okay.  And it says HO23-A.  Do you see
19 that?
20     A.   I see that.
21     Q.   And across it says "Homeowners Policy."
22 Do you see that?
23     A.   Yes.
24     Q.   Okay.
25         VIDEOGRAPHER:  Off the record at 11:05.

Page 100

1  End of tape two.
2          (Off the record).
3          VIDEOGRAPHER:  Beginning tape three.  On
4  the record at 11:09.
5      Q.   (By Ms. Locke)  Just before we took a
6  break, we were looking at Defense Exhibit Number 2.
7  And you had -- we had just looked at the -- the bold
8  heading that said "Forms and Endorsements," HR23-A.
9  Do you see that?
10     A.   Yes, I do.
11     Q.   So you would agree that would be part --
12 the HO23-A would be part of your policy?
13     A.   As far as I can tell.
14         (Exhibit 1 - Homeowners Policy marked for
15 identification.)
16     Q.   Okay.  I'm going to hand you what's been
17 marked as Defense Exhibit Number 1.  Defense Exhibit
18 Number 1 is a certified copy of your homeowners
19 policy.  And if you turn to, again, using the Bates
20 numbers at the bottom.
21     A.   Uh-huh (affirmative response).
22     Q.   The Bates number ending in 444.
23     A.   Oh, okay.
24     Q.   And actually, I'm sorry.  If you turn to
25 Bates number 445.

Page 101

1      A.   Okay.
2      Q.   Do you see at the lower bottom left
3  corner, it lists the number HO-23-A.  Do you see
4  that?
5      A.   Yes.
6      Q.   And that number matches the number that
7  we just looked at in Defense Exhibit 2, correct?
8      A.   Correct.
9      Q.   Do you understand that this policy, the
10 certified policy was the policy that was in effect
11 during hurricane Katrina?
12     A.   Yes.
13     Q.   Do you understand that your insurance
14 policy is a contract between Nationwide and you?
15     A.   Yes.
16     Q.   And you understand that this policy sets
17 out all of the items that will be covered under your
18 policy?
19     A.   Yes, I guess.
20     Q.   And you understand that this -- this
21 policy sets out all the types of coverages that
22 would be provided under your policy?
23     A.   I guess so.
24     Q.   Do you also understand that this policy
25 sets out certain types of damages that are excluded

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 102

1 under your policy?
2     A.   I guess.  I haven't read every little
3 word of the policy.  I wouldn't understand it if I
4 read it all.
5     Q.   Have you ever -- so you've never read the
6 entire policy?
7     A.   No.
8     Q.   Okay.  Turn to page D-1, which is found
9 at Bates number 456.
10     A.   456.  Okay.
11     Q.   The top of the page is titled "Property
12 Exclusions."  Do you see that?
13     A.   Yes.
14     Q.   And if you look at item number one, I'm
15 going to read item number one, and then subpart B.
16 It says, "We do not cover loss to any property
17 resulting directly or indirectly from any of the
18 following.  Such a loss is excluded even if another
19 peril or event contributed concurrently or any
20 sequence to cause the loss."
21         Subpart B states, "Water or damage caused
22 by waterborne material.  Loss resulting from water
23 or waterborne material damage described below is not
24 covered, even if other perils contributed directly
25 or indirectly to cause the loss.  Water and

Page 103

1 waterborne material damage means," and in part one
2 reads, "Flood, surface water, waves, tidal waves,
3 overflow of a body of water, spray from these,
4 whether or not driven by wind."  Do you see that?
5     A.   I do.
6     Q.   Do you understand that this language
7 means that flooding, whether it's flooding damage
8 caused to your home is not covered by this policy?
9     A.   The flood only.  Not only flood.
10     Q.   Okay.  Do you understand that damage
11 caused to your home by flooding, whether caused
12 concurrently or in any sequence along with wind is
13 also not covered under your policy?
14     A.   I don't understand that.
15     Q.   Again, let's look at the top, the very
16 first -- first line one.  The second sentence, "Such
17 a loss is excluded even if another peril or event
18 contributed concurrently or in any sequence to cause
19 the loss."  Do you see that?
20     A.   I do.
21     Q.   Okay.  And then under Section B, if you
22 look again at the second sentence under
23 Subsection B, "Loss resulting from water or
24 waterborne material damage described below is not
25 covered even if other perils contributed, directly

Page 104

1 or indirectly, to cause the loss."  Do you see that?
2     A.   I do.
3     Q.   And then under line one under Subpart B,
4 it describes water damage to be "flood, surface
5 water, waves, tidal waves, overflow of a body of
6 water, whether or not driven by wind."  Do you see
7 that?
8     A.   Yes.
9     Q.   Do you understand that damage caused by
10 flooding in any sequence -- let me rephrase that.
11 Do you understand that damage to your home that is
12 caused concurrently or in any sequence by wind and
13 flooding is not covered under your policy?
14         MR. EMBRY:  Object to the form.  She's
15 already answered that question I believe.
16     Q.   You can answer.
17     A.   I prefer not to.
18     Q.   I understand that you prefer not to, but
19 you're required to answer the questions.
20     A.   I understand about the water part of it,
21 but I will -- I will not admit in any way that the
22 water got there before the wind.  Okay.
23     Q.   I understand that, but --
24     A.   And we have wind damage.  Had wind
25 damage.

Page 105

1     Q.   You agree that you had -- you agree that
2 water did get to your property; is that correct?
3     A.   I agree that water got there.  But when
4 --
5         MR. EMBRY:  By "property," are you
6 meaning to where her house was, her land?
7         MS. LOCKE:  Let me rephrase.  That's a
8 fair point.
9     Q.   (By Ms. Locke)  You agree that storm
10 surge reached your property at Winters Lane during
11 hurricane Katrina; is that correct?
12     A.   I was told that.  I wasn't there to see
13 it.
14     Q.   Okay.  By reading this language that I've
15 just read to you, you agree that it says, "Flood is
16 not covered whether or not driven by wind."  Do you
17 see that?
18     A.   Uh-huh (affirmative response).
19     Q.   Is that a yes?
20     A.   Excuse me.  To some point.  I think that
21 you would either have to work in insurance or you'd
22 have to be a lawyer to interpret all of these words.
23 So I really -- that's why I don't want to comment on
24 it because I am not educated in insurances and I am
25 certainly not educated in law.  And, therefore, I --

Helen Politz  -  11/13/08

Page 106

1  all I can say is I was paying for a coverage in good
2  faith. I thought I was protected. And if that's in
3  the policy, I think it can be interpreted.
4      Q.   Okay. Did you ever read this language
5  prior to hurricane Katrina?
6      A.   Not really. I never studied it. I might
7  have glanced at the policy. I did glance at the
8  policy, but just mostly the coverage that I had.
9  And like I said, I was paying in good faith for the
10 coverage I had. So I -- I never really read the
11 policy, no.
12     Q.   But the language that I just read to you,
13 did you ever read that before hurricane Katrina?
14     A.   I don't think so.
15     Q.   I want to move to the date of the storm,
16 or the days immediately preceding the storm. How
17 did you prepare for hurricane Katrina?
18     A.   I did not prepare until Sunday morning
19 because I didn't think it was going to be much of a
20 storm. And then Sunday morning they started
21 announcing on the radio and TV that it was getting
22 bad and they started talking about a mandatory
23 evacuation and all of that.
24     So I -- just in case we had to leave, I had
25 plugged in my screwdriver, my electric screwdriver

Page 107

1  so that I could close my shutters and put the iron
2  bars up. I had the iron shutters and bars and all
3  that to protect my home. And so that was a selling
4  point when I bought it. And when we had to leave
5  for a storm I would do that.
6      So Sunday morning, I got out. Instead of
7  packing up things and trying to take it with me, I
8  spent my time trying to protect my house. I picked
9  up every garden hose, every lawn chair, everything,
10 and put it in the garage and all that kind of stuff.
11 And I boarded up. I mean, I closed all of those
12 things and put the iron bars in and everything. And
13 locked the door behind me and barred it up. Took
14 the electric drill with me, screwdriver, so I'd have
15 a way in when I got back.
16     Q.   Did you move any of the items off of your
17 floor to the attic?
18     A.   No. I didn't do that. I didn't have
19 room in my attic. I couldn't pick them up myself.
20     Q.   Were you concerned about flooding at all?
21     A.   No, not really. I didn't think I would
22 flood. I never picked up a thing.
23     Q.   Did you pack any of your valuables and
24 take them with you?
25     A.   I did. I got three of the plastic

Page 108

1  containers that you have in closets with stuff. And
2  I dumped them and I put my papers out of my
3  fireproof box, which was my insurance policy and a
4  few other things. Because I couldn't pick up the
5  fireproof box. So I put it in the plastic thing and
6  took it with me and a few other things.
7      And then I started getting mostly just
8  pictures, pictures of my kids. And it's not that I
9  thought the water was going to come in from flood.
10 I never thought that. I thought one of those tree
11 limbs would probably fall on my house and damage it
12 and the rain would come in and get on my pictures
13 and furnitures and stuff.
14     So I said I can replace furniture, but I
15 can't replace these family pictures. And I took
16 pictures and a few important papers and that was it.
17     Q.   Where did you go when you evacuated?
18     A.   Birmingham.
19     Q.   How long did you stay in Birmingham?
20     A.   Five months.
21     Q.   Did you -- during that five months, was
22 there a period when you returned to your home at
23 Winters Lane to assess the damage?
24     A.   Two weeks later.
25     Q.   All right. Do you recall when precisely

Page 109

1  it was that you returned to Winters Lane?
2      A.   The date? No, I don't remember the date.
3  It was really hot. I remember that.
4      Q.   Is it fair to say it was early September?
5      A.   Yeah, yeah. I guess it was around the
6  middle of September. A couple of weeks after my son
7  brought me back.
8      Q.   Why did you stay away for two weeks?
9  What made you -- what led to the decision?
10     A.   Because I saw on TV. I saw Long Beach
11 and I -- they showed the area that I lived in. And
12 I seen there was no houses there. So that's when I
13 made my claim.
14     Q.   This --
15     A.   I made it before I saw the property.
16     Q.   That's what I was going to ask you. Did
17 you -- had you seen your property at all before you
18 filed your insurance claim?
19     A.   No. But I had a friend -- one of the
20 neighbors that lived close to us, and he went over
21 there and looked at the property and called us and
22 told us we didn't have a house left. And that's
23 when I called the insurance company.
24     Q.   When you returned two weeks later to
25 Winters Lane, can you describe what you saw?

Page 110

1    A.  It's like the pictures, everything was
2  tore up, everything was messed up.  There was
3  nothing -- nothing on my slab except a statue of
4  St. Francis sitting there when I came home.
5    Q.  Let's take a moment to look back at
6  Defense Exhibit 23.  Do you recognize these as the
7  photographs that you took after hurricane Katrina?
8  If you want to take a moment to flip through them.
9    A.  Basically they are similar if they are
10  not ones I took.  My son and I took pictures that
11  day together.  It might have been off of his camera.
12  Some of them.  But yeah, I recognize them.
13    Q.  Looking at the -- if you turn to the very
14  first page, the Bates number is Politz 150.
15    A.  Okay.
16    Q.  Is this -- is this the foundation, the
17  slab foundation of your home on the left side?
18    A.  Right.  Right there where you see all the
19  white.
20    Q.  And in the background of the picture, is
21  that the Gulf of Mexico?
22    A.  Yes, uh-huh (affirmative response).
23    Q.  So this would be looking south; is that
24  correct?
25    A.  Correct.

Page 111

1    Q.  The next picture on the same page,
2  Defense Exhibit 23, page 150, there's a van, what
3  appears to be a van.  Do you see that?
4    A.  I do.
5    Q.  Do you know whose van that was?
6    A.  I have no idea.
7    Q.  Do you know was this on your property?
8    A.  No.
9    Q.  What are we looking at here?
10    A.  I don't know.  Just I think it was maybe
11  where the Waffle House used to be.  And I just seen
12  one tore up real bad.  And I just took a picture to
13  explain -- to show my husband.  He didn't come with
14  me on the trip.
15    Q.  It was just you?
16    A.  My son and myself, yeah.
17    Q.  Look back at the first picture on, I'm
18  sorry, the first picture on page 150.
19    A.  Okay.
20    Q.  How many homes were between your property
21  -- approximately how many homes were between your
22  property and the Gulf of Mexico before hurricane
23  Katrina?
24    A.  There was two.  And they had a, I can't
25  think of the word I want to say, servitude between

Page 112

1  two houses.  That gave me a view of the gulf.  They
2  had two houses actually that were town homes so each
3  one of them was two houses together.
4    Q.  So --
5    A.  It was like two houses and four families
6  in front of me.  One kind of on each end of my
7  house.
8    Q.  So really it would have only been a
9  single row of houses.  They were disconnected by the
10  single group of houses.  They were deep between you
11  and the gulf?
12    A.  I don't know exactly what you're saying.
13    Q.  Sure.
14    A.  Deep?  I'm sorry.
15    Q.  It's okay.  That's a bad question.  Let
16  me try to rephrase.  If you had to walk from your
17  home to the Gulf of Mexico, how many -- how many
18  different homes would you pass along the way?
19    A.  Just the two, one on each side of the
20  servitude.
21    Q.  But they were --
22    A.  I would walk through the servitude
23  because I did this all of the time.  I would walk
24  over there almost every day and take my dog walking
25  on the boardwalk.  And there was one town home on my

Page 113

1  left and one on my right, and each of them had two
2  -- two units.
3    Q.  Were they approximately equal distance
4  from the Gulf of Mexico to each other?
5    A.  Yeah.
6    Q.  So what I'm trying to get at is if you're
7  -- there was really only one level of home between
8  your property and the Gulf of Mexico?
9    A.  Right.
10    Q.  Okay.  Sorry.  I had sort of a difficult
11  way to describe it.
12    A.  Yeah.
13    Q.  Okay.  Do you know would we have --
14  before hurricane Katrina, would we have seen the
15  town homes in this photograph at the top of the
16  page?
17    A.  Oh, yeah.
18    Q.  So --
19    A.  They were much bigger than my house.
20    Q.  They were completely destroyed as a
21  result of hurricane Katrina?
22    A.  Yes.  Every house on that street was.
23    Q.  If you could turn to page 153 of Defense
24  Exhibit 23.
25    A.  153?

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

30 (Pages 114 to 117)

Page 114

1    Q.   Yes, ma'am.  The top page is a photograph
2  of an upside down vehicle.
3    A.   Uh-huh (affirmative response).
4    Q.   Do you recognize where this was in
5  relation to your property?
6    A.   It was -- I'm not real sure, but I think
7  it was kind of across the street and back a little
8  bit.  My son just -- he took that picture.  He was
9  just walking around taking pictures.
10   Q.   When you say "across the street and
11 back," was it closer or farther away to the Gulf of
12 Mexico to your home?
13   A.   I think it was a little bit further.
14   Q.   Was there significant amount of sand
15 around your property when you returned?
16   A.   No.  I was very surprised.  I thought
17 there'd be piles of sand, but there really wasn't.
18 My -- my slab didn't have any sand on it.
19   Q.   What about around the car?  It appears
20 that there's sand sort of piled around the car.
21   A.   Well, yeah, it might have been piled
22 around a little bit.
23   Q.   Do you know if that -- if it was or was
24 not in this car in this picture?
25   A.   I'm not sure.  I don't know that I even

Page 115

1  really looked at it that much.  That was a -- a
2  traumatic day for me.
3    Q.   If you could turn the page to page 154 of
4  Defense Exhibit 23.
5    A.   Okay.
6    Q.   In the top picture, is that -- is that
7  you in the photograph?
8    A.   That's me.
9    Q.   Is that your driveway?
10   A.   I'm not sure if that was my driveway or
11 if that was the street.  I think that was the
12 street.  I think my son must have been like by my
13 driveway or something and he just took that one of
14 me on the street.
15   Q.   Do you think your son was standing in
16 your property taking that photograph?
17   A.   I think so.
18   Q.   Would this have been looking north?
19   A.   That would have been looking -- yeah, I
20 think so, north, more or less.
21   Q.   Is that Winters Lane you would have been
22 standing on?
23   A.   That would be Winters Lane and so the
24 background behind it would have been north.
25   Q.   In that picture, was there sand in the

Page 116

1  street; do you -- do you remember?
2    A.   I remember a little sand, but nothing
3  piled up.  I was surprised by the piles of sand that
4  wasn't there.
5    Q.   But there was sand that had certainly
6  been washed into the street; is that right?
7    A.   They had some sand, yeah.
8    Q.   Sand wasn't normally in Winters Lane, was
9  it?
10   A.   No.
11   Q.   If you could turn to -- to the next page,
12 page 155 of Defense Exhibit 23.  Looking at the
13 bottom picture.
14   A.   Uh-huh (affirmative response).
15   Q.   Where are you standing?
16   A.   That was my front yard.  The street
17 behind me is Winters Lane.  That was a tree I had
18 planted when I first bought that house.  I planted a
19 tree there.
20   Q.   The tree that you're standing --
21   A.   Yeah.
22   Q.   The stump you're standing in front of was
23 the tree?
24   A.   Right.
25   Q.   And Winters Lane behind you, this picture

Page 117

1  reflects the curvature that we discussed earlier in
2  one of the maps of Winters Lane, correct?
3    A.   Yes.
4    Q.   If you could turn to the next page,
5  page 156.  Were these pictures of your property?
6    A.   No.  This was pictures of the property
7  right across the street from me, my neighbor's home.
8    Q.   Was this across on Winters Lane?
9    A.   Yes, it was.
10   Q.   Was this farther to -- closer -- was this
11 closer or further away to the Gulf of Mexico than
12 your home?
13   A.   It was almost the same.  Because it was
14 across the street from me, but on an angle where
15 they would put us both pretty close to the same
16 water area.  I might have been a little hair closer,
17 but not much.
18   Q.   Do you recall did you spend time walking
19 around the neighborhood when you returned?
20   A.   I stayed there for a couple of hours.
21   Q.   Did you venture to the north of your
22 property at all?
23   A.   I went all over my property.  I didn't
24 have a very big lot.
25   Q.   I'm sorry, let me rephrase the question.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 118

1    Did you venture to the north of your property into
2    the rest of the neighborhood into the rest of
3    Long Beach?
4        A.   Not really.  I spent most of my time
5    trying to find something that might have gotten left
6    from the storm.
7        Q.   Did you see any homes that remained
8    standing?
9        A.   Oh, there was none.
10       Q.   You didn't see any homes in Long Beach
11   that remained standing?
12       A.   Not where -- not in that area.
13       Q.   Any -- in any of the areas in Long Beach
14   did you see any homes standing?
15       A.   At that -- that day?  No.  Well, further
16   back, further back, you know, close to the tracks.
17   I saw some houses leaning and some standing and
18   they'd all took a bad hit.  But then across the
19   tracks, they had like the store, Choice, was
20   standing.
21       Q.   Let's look at -- turn back to Defense
22   Exhibit 30A.  That's the -- leave those where they
23   are because we'll come back to Defense Exhibit 23.
24       A.   Okay.
25       Q.   But let's look at Defense Exhibit 30A.  I

Page 119

1    believe it might be under all of the piles of
2    exhibits.  Here we go.
3        A.   All right.
4        Q.   Are you able to tell from this map where
5    the -- the store you recall is -- was standing?
6        A.   The what was?
7        Q.   I thought you just testified that there
8    was a store, a Save-A-Lot?
9        A.   Oh, a Save -- yeah, but that would be
10   across the railroad tracks back here.
11       Q.   So the railroad tracks is not reflected
12   in the -- can you tell if they were reflected in
13   this picture?
14       A.   I can't tell.
15       Q.   Okay.
16       A.   I think maybe this is it.
17       Q.   Okay.
18       A.   It's possible.
19       Q.   But you're not sure?
20       A.   No, I'm not sure.
21       Q.   Okay.  But all of the homes south of
22   Winters Lane, to the best of your knowledge, were
23   destroyed; is that correct?
24       A.   How far south, I mean?
25       Q.   I mean, here you've indicated on Defense

Page 120

1    Exhibit 30A the box where your home was.
2        A.   All of them right along there were
3    destroyed.  Back in here, they had some that still
4    had some material standing.
5        Q.   So back towards the -- the top of the
6    picture, there were homes that remained standing; is
7    that correct?
8        A.   Partially standing.
9        Q.   Did you view those?  Did you see those
10   when you were --
11       A.   Well, I drove in from the back.
12   Highway 90 was closed.  We couldn't get -- and I
13   come in through that way and I saw -- before I found
14   mine, I said, "God, everybody has
15   taken a bad hit."  And then when I got up there, I
16   had nothing left.
17       Q.   So there was a -- would you say it's fair
18   to say there was a line at which south of that line
19   very few homes remained standing, and north of that
20   line, there were more homes that did remain
21   standing?
22       A.   Yes.  I would say yes.
23       Q.   Can you tell looking at Defense
24   Exhibit 30A if that line is reflected here in this
25   picture?

Page 121

1        A.   No, I can't tell.
2        Q.   Okay.  Let's turn back to Defense
3    Exhibit 23, photographs.  If you turn to page 158 of
4    Defense Exhibit 23.
5        A.   Okay.
6        Q.   Is this -- the picture that's on the top,
7    is this the picture from your property?
8        A.   Yeah, toward the -- toward the gulf.
9        Q.   Towards the gulf?
10       A.   Yeah.
11       Q.   So we're looking south towards the water
12   in this picture; is that correct?
13       A.   Yes.
14       Q.   And there are many trees, big trees that
15   remain standing south of your property towards the
16   Gulf of Mexico after Katrina, correct?
17       A.   Yeah.  We still have some.
18       Q.   They weren't blown down by the winds; is
19   that right?
20       A.   Not all of them, but a lot of them were.
21   My tree was blown down.  It was twisted off.
22       Q.   Do you know if you have any pictures of
23   that?
24       A.   I showed you one awhile ago with the
25   stump.

Page 122

1    Q.  The stump, that's the --
2    A.  That was a Bradford Pear tree that I had
3  planted, and it was totally twisted off.
4    Q.  And if you turn back to page 155.
5    A.  155.
6    Q.  I just want to make sure we're talking
7  about the same picture.
8    A.  Okay.  Sure.
9    Q.  The bottom -- the bottom picture?
10    A.  Uh-huh (affirmative response).
11    Q.  Is this the Bradford Pear tree that
12  you're talking about?
13    A.  It is.
14    Q.  It's your testimony that you saw it
15  twisted off?
16    A.  It was twisted.  I told that to my son.
17  I said, "That tree just twisted off."  He said, "It
18  sure did."  He said, "Let me take a picture of
19  that."  And he did.
20    Q.  What made you think that it was twisted?
21    A.  Because if it would have broken, it would
22  have had a different type wood imprint.  This had a
23  twisted imprint in the wood.  So I could tell it had
24  been twisted.
25    Q.  But you're not an expert?

Page 123

1    A.  I'm not a tree expert, no.
2    Q.  And you don't study wind damage patterns,
3  do you?
4    A.  No.
5    Q.  So --
6    A.  But I know a twist from a break.  Trust
7  me, it was a twist.
8    Q.  Okay.  Let's turn now to page 163 of
9  Defense Exhibit 23.
10    A.  Okay.  Okay.
11    Q.  The bottom picture is a statue.  Is this
12  the statue of St. Francis?
13    A.  That's St. Francis, yes, it is.
14    Q.  Did this remain standing during the
15  storm?
16    A.  I doubt it.  I think somebody knew it was
17  mine.  Probably the friend that called me and picked
18  it up and put it on my patio.
19    Q.  You found it when you returned?  It was
20  like --
21    A.  It was just sitting there when I returned
22  like that.  And I never did think about talking to
23  him about it.  So I don't know who -- who put it
24  there.  But I had a Blessed Mother and she was
25  laying down in the grass by the patio.  So I don't

Page 124

1  know how St. Francis could have stood and the
2  Blessed Mother would have laid in the grass because
3  she was heavier than him.
4    Q.  I won't tell her you said that.
5    A.  Okay.
6    Q.  Okay.  Let's turn to -- I'm not going to
7  go through all of these, but I'm just trying to get
8  an idea.
9    A.  Okay.
10    Q.  Oh, if you could turn to page 174,
11  Defense Exhibit 23.  Do you know what this is a
12  picture of?
13    A.  I'm trying to figure out if that was a
14  picture of my house, but I -- I think it was, but
15  from a different angle.
16        MR. EMERY:  Do you know?
17    Q.  It's fine if you don't.  I'm just trying
18  to get an idea if this is the same property or if
19  we're looking at something different here.
20    A.  I don't know for sure, but I think that
21  is my property.  I think that's my house, but not
22  from the driveway and from the end where the patio
23  was.
24    Q.  So this would be looking north; is that
25  right?

Page 125

1    A.  Looking north, yes.  Or actually east.  I
2  think it would have been looking east more than
3  north.
4    Q.  But looking away from the Gulf of Mexico?
5    A.  Yeah, yeah.
6    Q.  If you could turn to page 178.  This will
7  be one of the last ones we look at.  The top
8  picture, do you recall where this was taken?
9    A.  I don't remember for sure where that was
10  taken.
11    Q.  Do you see over on the far right side, it
12  appears that there's a structure, a building there?
13  Do you see that?
14    A.  Uh-huh (affirmative response).
15    Q.  It's got windows.
16    A.  Yeah.
17    Q.  Do you see that?  Does that help you
18  figure out where this might have been?
19    A.  No.  I think that -- I think that was
20  across the railroad tracks, just somewhere where we
21  were driving on the street trying to leave town.
22  And I -- I was -- my son was driving then, and I was
23  taking a few pictures at that point.  And this was
24  the same way.  I don't know what that was.
25    Q.  Do you have any idea about how far away

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 126

1  from your property this would have been?
2      A.   I really don't know.  I couldn't say.
3      Q.   This was not in the immediate vicinity of
4  your property; is that correct?
5      A.   No.  This was probably somewhere in
6  Long Beach because we just -- the National Guard had
7  told us to just go into our area and leave.  And we
8  stayed there a couple of hours and we left.  And on
9  the way out, we took pictures of different things we
10  saw.
11      Q.   Do you recall which way you left when you
12  exited Long Beach?
13      A.   Yeah.  I went as far as I could.  I got
14  to Jeff Davis and crossed over back away from the
15  gulf.  We couldn't -- we couldn't travel on 90 at
16  that time.  And I hiked -- well, not hiked, but I
17  felt like we were hiking, going through this mess.
18  And we finally got over to another street.  And I
19  got -- I wanted to go see my church, and I went to
20  St. Thomas.  And we went backstreets in and out.  I
21  don't know exactly how we did it.  And we come up
22  through the back.  And we got to see that St. Thomas
23  was gone too.
24      Q.   How far was St. Thomas from your home?
25      A.   About a half-a-mile, maybe a mile.

Page 127

1      Q.   Looking at Defense Exhibit 30A, is there
2  any -- do you have any idea where in relation to
3  your property St. Thomas might have been?
4      A.   It wasn't right there.  It was further
5  down.  About a mile down the road probably.
6      Q.   Okay.  Okay.  You can set Defense
7  Exhibit 23 aside.
8      A.   Okay.
9      Q.   I do have more pictures though, just some
10  exhibits.
11         (Exhibit 22 - Photographs marked for
12  identification.)
13      Q.   I'm going to hand you what's been marked
14  as Defense Exhibit 22.  I'm not going to go
15  one-by-one through these.  These are photographs
16  that I will represent to you were taken by
17  Nationwide when looking at your property.  And what
18  I was hoping you could do is just flip through
19  these, one-by-one, taking your time if you need to,
20  to look at the photographs and tell me if they are
21  photographs of your property as you recognize your
22  property after hurricane Katrina.
23      A.   This first one is.  That was my house.
24  The second one is.  The tile stuck.  Most of the
25  tile was still there.  This one is, the third,

Page 128

1  because that's all my tile that was in the kitchen,
2  an open area.  And yes, I remember this one was.
3      Q.   This is 534.
4      A.   534?  Oh yeah.  This is the walkway as it
5  come in from the garage where we walked up.  This
6  was the front entrance to my house where the steps
7  -- that one step was.
8      Q.   And 535?
9      A.   Okay.  That's my house.
10      Q.   And 535 shows also the Gulf of Mexico, so
11  this would be looking south?
12      A.   Yeah, from the corner backyard looking
13  south.
14      Q.   Okay.  Let's do 536 and 537 together.
15  Those both look like your --
16      A.   Yeah, this is mine.  It's all that tile
17  on it.  It's still on it.  It's still out there like
18  that.  Okay.  And this is --
19      Q.   538 is.  And 539?
20      A.   I think 538 is.  I think that's mine,
21  but.
22      Q.   On the top left corner --
23      A.   Uh-huh (affirmative response).
24      Q.   -- it appears like some iron fencing,
25  would that be --

Page 129

1      A.   Oh, yeah, that's the -- yeah, that's
2  mine, because that's the end of where the fence was.
3      Q.   Okay.
4      A.   The wrought iron.  Remember, I told you
5  it come down by side of the house.  That's the end
6  of the patio.  Yeah, that was it.  And this was it.
7  It's a chair I found out there in the garbage and
8  sit down.
9      Q.   On 539?
10      A.   Oh, the slab, yeah.  I sat in that one.
11      Q.   So Defense Exhibit 22, looking at
12  page 540.
13      A.   That was one of my bathrooms.
14      Q.   Okay.  Page 541, would this be looking
15  north?
16      A.   I don't know.  Probably so.  Yeah, I
17  think so, northeast.
18      Q.   Okay.  And page 542, was this
19  Winters Lane?
20      A.   Yes.
21      Q.   Do you recognize the --
22      A.   This was my house, so this was looking
23  directly across the street.  This was the house
24  where the hot tub and the swimming pool was, right
25  across the street.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  - 11/13/08

Page 130

1    Q.   So this would be across the street from
2 Winters Lane?
3    A.   Yes.
4    Q.   Not the home to the north or, you know,
5 away from the Gulf of Mexico?
6    A.   John Bull owned this one.  Him and his
7 wife Lisa owned that house.
8    Q.   I'm sorry.  What was his name?
9    A.   John Bull.  He lived in that house.
10    Q.   And that home was destroyed and nothing
11 but the slab remained after Katrina?
12    A.   Right.  And this is just another picture
13 of the same area.
14    Q.   Okay.  Picture 543 is what you're
15 referring to?
16    A.   Yes.
17    Q.   And page 544?
18    A.   It was same area, but closer to the gulf.
19    Q.   Okay.  If you could look at 545 through
20 550 just very briefly and tell me if these also are
21 in the immediate vicinity of your home?
22    A.   Well, 547, this is a part of my house
23 here.  That is part of my wrought iron fence --
24    Q.   Okay.
25    A.   -- up there in that corner, I believe.

Page 131

1 And this was -- I think that was a chimney that
2 angled.  The top of the chimney in one of the town
3 homes in fronts of me.  So this was looking south
4 toward the gulf.
5    Q.   What about 548?
6    A.   548.
7    Q.   Again, that shows the -- the wrought iron
8 fence.
9    A.   This was looking west, yeah.  This is the
10 house that was behind me.  Do you see this area
11 right here?
12    Q.   To the sort of bottom right about
13 two-thirds of the way down --
14    A.   Yeah.
15    Q.   -- the picture on the right side?  Yes.
16    A.   That was a huge tree was in there.  And
17 he had built a patio around that tree and had the
18 wall there, and that divided our homes.
19       MR. EMBRY:  Ms. Politz, I think she
20 really just asked you to go through and identify
21 them if you could --
22       THE WITNESS:  Okay.
23       MR. EMBRY:  -- as being in your area.
24       THE WITNESS:  Okay.
25    Q.   (By Ms. Locke)  In looking at them, why

Page 132

1 don't we do it this way?  In looking at the rest of
2 the pictures, from page 549 to 573, will you tell me
3 if there are any pictures that are not of the
4 immediate vicinity of your property?
5    A.   Okay.  I think they were all in that
6 vicinity.
7    Q.   Okay.  None of them looked like they were
8 taken at a place that wasn't your home?
9    A.   No.  It looked like either my house or my
10 neighbors' areas.
11    Q.   Okay.  You can set that to the side.  Do
12 you know of any of your neighbors' home that
13 remained standing after hurricane Katrina?
14    A.   They didn't have any standing.
15    Q.   No standing?
16    A.   None of my neighbors.
17    Q.   When did you file your insurance claim
18 with Nationwide?
19    A.   I don't remember the date, but I think it
20 was like one or two days afterward.  As soon as my
21 neighbor and friend called and told me that I had no
22 house, everything was gone, I called Nationwide as
23 soon as I hung up.
24    Q.   Could it have been September 2nd?
25    A.   It could have been.

Page 133

1    Q.   And you said you were still in Birmingham
2 at the time?
3    A.   Right.
4    Q.   So you called and filed it over the
5 phone?
6    A.   Yes, I did.
7    Q.   How did you know who to call?
8    A.   I had my Nationwide policy with me.
9    Q.   Do you know who you spoke with when you
10 filed the claim?
11    A.   I probably got it on a note somewhere.  I
12 think they put me with Brian somebody that's no
13 longer with them.
14    Q.   I'm sorry.  Let me -- I think you're
15 probably referring to Brian Phillips, who was a
16 Nationwide adjustor.
17    A.   Right.  Right.
18    Q.   When you first phoned in to tell
19 Nationwide that you had lost your home, do you
20 recall who you spoke with at that time?
21    A.   No.
22    Q.   Do you recall any of that conversation
23 about what you said?
24    A.   I just told -- I remember telling them
25 that I had not seen my home, that a neighbor had

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 134

1  called and told me I had no home anymore, so I
2  wanted to file a claim.
3      Q.   What did the Nationwide person tell you
4  in response?
5      A.   They said, "Fine."  They gave me a number
6  and said they would look into it.  And I asked them
7  to send me a check because I knew I had living
8  expense money.  And I don't know -- I think they put
9  me with an adjustor, and then I think he's the one,
10  Mr. Phillips.  I think he's the one approved the
11  first check that came to me for $3,000 for living
12  expenses.
13      Q.   Okay.  We're going to go through
14  step-by-step of all of the payments --
15      A.   Okay.
16      Q.   -- and the checks that were issued.  But
17  on the first phone call that you made to Nationwide,
18  do you remember anything else about the conversation
19  aside from you telling them that your home was
20  destroyed and them getting you -- providing you a
21  number you said; is that correct what you said?
22      A.   Yes.
23      Q.   Do you remember what was the number for?
24      A.   For when we communicated, it was like a
25  file number or something like that basically.

Page 135

1      Q.   Do you recall anything else about that
2  conversation?
3      A.   Not -- not really.  Just I was reporting
4  it and they were taking the -- the information down.
5      Q.   Do you recall calling Nationwide again
6  the following day on September 3rd asking about tree
7  removal?
8      A.   I don't remember.  It could have
9  happened.
10      Q.   Okay.  Do you recall calling a second
11  time on the same day to advise Nationwide that you
12  were -- you could be reached at your son's cellphone
13  number?  Do you recall making that phone call?
14      A.   Yeah, because I was having so much
15  trouble with my cellphone that I couldn't -- I
16  couldn't get the coast.  I couldn't get people here
17  that much.
18      Q.   Do you remember anything else aside from
19  giving them your cellphone number?
20      A.   I just wanted to give them the
21  information as to where I was so that they could get
22  in touch with me.  And I gave them the phone number
23  of my son and the address.
24      Q.   Do you recall anything else about that
25  conversation?

Page 136

1      A.   Not really.
2      Q.   Do you recall making a phone call on or
3  around September 8th, or let me rephrase that.  Do
4  you recall receiving a phone call from Nationwide on
5  or around September 8th, and at that point, you had
6  informed them that you had found a place to stay?
7  Do you recall that?
8      A.   I don't know if it was the 8th or not.
9  But we had talked -- we had talked to someone
10  because we was in a little small house with my son
11  and them.  And they didn't -- they had room for us
12  for a weekend, but not as, you know, we couldn't
13  stay there forever.  We didn't know what we were
14  going to do so we started looking for a place.
15      Q.   So you looked for a place in Birmingham?
16      A.   Yeah.
17      Q.   While you evacuated, you were staying
18  with your son; is that correct?
19      A.   Only for ten days, two weeks, something
20  like that.  Then we rented a house.
21      Q.   Okay.  And it was at that time,
22  approximately September 8th, that you had requested
23  an advance payment for living expenses; is that
24  right?
25      A.   Yeah.

Page 137

1      (Exhibit 12 - 9/8/2005 Check marked for
2  identification.)
3      Q.   I'm going to hand you what's been marked
4  as Defense Exhibit 12.  This is a check that's dated
5  September 8th, 2005.  Do you see that?
6      A.   Yeah, okay.
7      Q.   And the check -- is that correct?
8      A.   It could -- I mean, I'm sure it was.
9      Q.   Okay.
10      A.   I have no reason to doubt it.
11      Q.   And the check --
12      A.   But I don't know the exact dates.  I
13  don't remember.
14      Q.   The check was made for $3,000.  Do you
15  recall receiving a check for $3,000 around this
16  time?
17      A.   I received two.  One at this time and one
18  a little later.
19      Q.   Okay.  But you do recall receiving the
20  first check was $3,000?
21      A.   Yes, I remember that.
22      Q.   Nationwide also attempted to reach you at
23  least four times between September the 17th and
24  September the 18th.  Do you recall Nationwide
25  leaving voicemails on your son's cellphone around

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 138

1   that time?
2       A.  I don't remember.  I remember different
3   people calling, and Nationwide could have been one
4   of them.  If I got the call, I think I did -- they
5   did call, and I think that I returned some calls.
6       Q.  Okay.
7       A.  But I don't remember what it was about at
8   that time.
9       Q.  But you don't dispute that Nationwide was
10  attempting to get in contact with you and trying to
11  stay in contact with you in the aftermath?
12      A.  I don't dispute that.
13      Q.  Do you recall making a phone call to
14  Nationwide on or around the middle of September,
15  approximately September 21st, explaining that you
16  had wanted an adjustment on your property as soon as
17  possible?
18      A.  Yeah, I remember wanting an adjustment on
19  it because I didn't know if I was going to get paid
20  or what.
21      Q.  Right.
22      A.  I mean, I thought they'd be right out to
23  take care of it and it was starting to be almost a
24  month away.
25      Q.  Do you recall receiving -- Nationwide

Page 139

1   returning your call the same day?
2       A.  They returned it, but they never let me
3   know when they was going to do it.
4       Q.  Did you know that on approximately
5   September 27th or 28th, Mr. Phillips went out and
6   inspected your property?
7       A.  Yeah.
8       Q.  Were you aware of that?
9       A.  He called me from my house, from there.
10  I said, "Well, why didn't you let me know? I wanted
11  to be there to meet with you."  "Well, I was working
12  the neighborhood.  I didn't know exactly when I
13  would be here."  That was their excuse, something
14  like that.
15      Q.  So it's your testimony that he called you
16  while he was at your property; is that correct?
17      A.  He told me he was there.
18      Q.  How --
19      A.  Because I had to help him find it.  He
20  called me from his car.  And he was in the area and
21  he couldn't find it exactly.  And I told him if he
22  would go down a certain street, that they had one
23  piece of a two-by-four left at my house.  And my son
24  spray-painted the address on it, "Winters Lane,"
25  "116 Winters Lane."  And so I told him to look for

Page 140

1   that two-by-four, and he found it.
2       Q.  But you recall requesting that Nationwide
3   adjust your claim as soon as possible about a week
4   earlier than that, right?
5       A.  Probably.
6       Q.  So --
7       A.  Yeah.  I needed to know what direction I
8   was going in.
9       Q.  So Mr. Phillips called you and you
10  directed him to your property; is that right?
11      A.  Right.
12      Q.  How long of a conversation did you have
13  with Mr. Phillips?
14      A.  I don't remember.  I don't know if it was
15  five minutes or 15 minutes.  I just don't remember.
16      Q.  Was it a half-an-hour?
17          MR. EMBRY:  She says she doesn't
18  remember.
19      A.  I don't remember.
20      Q.  Can you give me a range?
21          MR. EMBRY:  She did.
22          MS. LOCKE:  No, she didn't.
23      A.  Between one and 30 minutes.
24      Q.  (By Ms. Locke)  Okay.  So no more than a
25  half-an-hour?

Page 141

1       A.  No more than a half-an-hour.
2       Q.  Do you recall what you spoke about on the
3   phone?
4       A.  The house.  And he was there to adjust --
5   adjust it.  And I remember telling him that I had
6   asked them to let me know when they was going to
7   send an adjuster there because I'd like to be there
8   and meet with him.  And I gave you already the
9   answers to what they -- what he said there.  And
10  when he called me, he was right there on the street.
11  He just didn't know which house was mine.  And I
12  helped him find it over the phone.
13      Q.  Did he ask you any questions when you
14  spoke with him?
15      A.  Yeah.  He wanted to know if I had my
16  insurance policy, and if I had flood insurance.
17      Q.  And what did you tell him?
18      A.  I told him I did not have flood
19  insurance.  I had my policy, and I didn't have flood
20  insurance.
21      Q.  Did he ask you any other questions that
22  you remember?
23      A.  No, nothing that I remember specifically.
24          (Exhibit 6 - Property Loss Report by
25  Mr. Phillips marked for identification.)

accc5f30-2973-4075-b796-fbf68e721559

Page 142

1    Q.   Okay.  I'm going to hand you what's been
2  marked as Defense Exhibit 6.  This is a report that
3  was prepared by Mr. Phillips after looking at your
4  -- or in adjusting your claim and looking at your
5  property.  Understanding -- have you ever seen this
6  document before?
7    A.   No, I haven't.
8    Q.   Okay.  Understanding --
9    A.   Not that I remember.
10   Q.   Understanding that you have not seen this
11 document before --
12   A.   Uh-huh (affirmative response).
13   Q.   -- I want to go through and ask if some
14 of these things that he wrote in the report refresh
15 your recollection and refresh your memory about a
16 conversation that you might have had with him.
17   A.   Okay.
18   Q.   If you turn to Bates number 95.
19   A.   Okay.
20   Q.   Where it says "Building," it says,
21 "According to PH," that stands for policyholder,
22 there are no witnesses as to what happened to this
23 home."  Do you remember telling Mr. Phillips that
24 there were no witnesses to the --
25   A.   As far as I knew.

Page 143

1    Q.   Okay.  But you recall making that
2  statement?
3    A.   Yeah.  I think he asked me if I knew
4  anyone had seen it.
5    Q.   Okay.
6    A.   Or was there.  And I told him no, that as
7  far as I knew everyone had gone, all of my neighbors
8  was leaving and I left.  And so if anyone saw it I
9  didn't know who it was.
10   Q.   It says, "Policyholder" -- if you look
11 third sentence down, "Policyholder is very adamant
12 that low pressure and high winds destroyed home
13 prior to surge wave action from hurricane."  Do you
14 recall telling Mr. Phillips that your home was
15 destroyed by wind before water came?
16   A.   I don't remember telling him that because
17 I don't know that for a fact, but I remember
18 believing that because once I came here, my home
19 looked like it had been bombed.  All of the bricks
20 was laying at different angles and stuff like that.
21 I may have told him that.  That's how I felt about
22 it.
23   Q.   So it's your testimony you don't know for
24 a fact that your home was destroyed totally by wind?
25   A.   No.

Page 144

1        MR. EMBRY:  She's testified earlier she
2  wasn't there.
3    A.   I wasn't there.
4    Q.   Just so I can get a -- a clear record,
5  it's your testimony that you don't know whether your
6  home was destroyed by wind before it was destroyed
7  by water; is that correct?
8    A.   I don't know for a fact, but I believe it
9  was.
10   Q.   Okay.  This -- does this paragraph
11 refresh your recollection about any other questions
12 that Mr. Phillips may have asked you?
13   A.   Well, I think he asked me about, "What
14 makes you think that?"  Or something like that.  And
15 I told him because of the way the bricks was laying,
16 it wasn't like the water just washed in and laid
17 them all down.  They looked like somebody had threw
18 a bomb in the front door and it exploded.  And I
19 found some things that was in my refrigerator, like
20 jars of pickles and relish and stuff that was
21 underneath the bricks.  And I don't understand if
22 the wind hadn't got there first and tore my house
23 apart, how it got out of the refrigerator and got
24 trapped underneath the bricks.  The bricks fell on
25 it after it was there, so that's what made me think

Page 145

1  it was wind.
2        MS. LOCKE:  We need to take a break.
3        VIDEOGRAPHER:  Off the record at 12:08.
4  End of tape three.
5        (Off the record).
6        VIDEOGRAPHER:  Beginning tape four.  On
7  the record at 12:56.
8    Q.   (By Ms. Locke)  When we went off the
9  record we were -- before I had my coughing fit, we
10 were discussing Defendants' Exhibit Number 6, and
11 this was a property report -- property loss report
12 prepared by Mr. Phillips.
13       My question is for you, and we had been
14 looking at page 95 of -- of the -- Bates number 95,
15 page two of your report, where --
16       (Off the record.)
17   Q.   Just before we left the break, we were
18 discussing Defendants' Exhibit Number 6, and we were
19 looking at page two of that report.  And I was
20 asking if these comments in the report refresh your
21 recollection about a conversation you had with
22 Mr. Phillips.
23       My question is, how did you know that or
24 how do you believe that the home was destroyed by
25 wind if you had not seen the property at the time of

accc5f30-2973-4075-b796-fbf68e721559

Page 146

1  this conversation?
2      A.  Because they was saying how much the wind
3  was -- TV.  See, we had TV in Birmingham.  And they
4  was showing scenes of it, and I could see the
5  clothes all up in the trees and everything.
6      Q.  Did you -- you didn't see your property
7  on TV though, did you?
8      A.  Yes.
9      Q.  You did see your property on TV?
10     A.  It's in the hurricane book too.
11     Q.  Really?
12     A.  Uh-huh (affirmative response).
13     Q.  Do you recall what -- how it showed up on
14 TV?
15     A.  Yeah, how it showed up on TV.  And I
16 could see all of the clothes up in the trees and lot
17 of trees still standing with clothes.  A lot of
18 trees down and so --
19     Q.  And so your particular property was on
20 TV?
21     A.  Yeah.  It showed at one scene, I think,
22 that, you know, it wasn't a close-up.  It was an
23 area when they were flying over.  And I said, "Oh,
24 they are going over Long Beach now.  Let's watch."
25 And we were watching.  And I -- I feel pretty sure I

Page 147

1  saw the area, and I didn't see a house standing.
2      Q.  Uh-huh (affirmative response).
3      A.  So I assume mine was gone too.
4      Q.  The second sentence of the same box says,
5  "When policyholders returned they found the house
6  completely gone."  You hadn't returned at the time
7  you had first spoken with Mr. Phillips though, had
8  you?
9      A.  No, I don't think so.
10     Q.  Is it possible that this report reflects
11 more than one conversation?
12     A.  No.  I had been told by my neighbor that
13 I had no more house.  It was gone.  Everything was
14 gone.  And then when I saw it on TV, I saw all of
15 the clothes up in the trees like I'm, you know,
16 telling you.  Bedspreads and everything else up in
17 the trees.  Well, you know how it looked.
18     Q.  Did you have more than one conversation
19 with Mr. Phillips about your property damage?
20     A.  I don't know.
21     Q.  Do you recall any other conversation
22 besides the first one that you had with him?
23     A.  I think I talked to him once or twice
24 after, and then I called him.  And they told me he
25 was no longer with the company.

Page 148

1      Q.  In any of these subsequent conversations,
2  did you speak with him specifically about the damage
3  to your home and what it looked like when you
4  returned to the home?
5      A.  Nothing more than what I've said already.
6      Q.  What I'm trying to get at is I don't
7  understand how you could have known -- or let me
8  rephrase.  I don't understand how -- why he would
9  have said, "When the policyholders returned they
10 found the house completely gone," if your
11 conversation with him was before you returned.
12     A.  Well, then evidently, that was after I
13 had been there.  I talked to him two, three times,
14 maybe four possibly, before he disappeared.  I
15 didn't know what happened to him.  They just said,
16 "He's no longer with the company."
17     Q.  So it's possible that you did have a
18 conversation with him after?
19     A.  Well, if I told him that, I did, yeah.
20     Q.  But you don't recall any -- any
21 conversations specifically you had with him after
22 you returned; is that correct?
23     A.  No, I think I talked to him afterward.  I
24 think so.  I think I talked to him afterward because
25 I came two weeks afterward.  And I talked to him

Page 149

1  probably off and on for the first month.
2      Q.  Okay.  When you say you talked to him off
3  and on for the first month, can you give me an
4  estimate of how many times you spoke with him?
5      A.  Three or four.
6      Q.  Three or four.  And that would be in
7  addition to the conversation you had with him?
8      A.  No, that's all total.
9      Q.  Total.  So it's fair to say that there
10 were no eyewitnesses that you're aware of that
11 witnessed the damage to your property during
12 hurricane Katrina?
13     A.  That's fair to say.
14     Q.  It's fair to say you weren't there to
15 measure the wind speeds or the low pressure that you
16 claim was there?
17     A.  I was not there.
18     Q.  So you didn't measure them -- the wind
19 speed or the low pressure in the area; is that
20 right?
21     A.  No.  I just heard about it on TV.
22     Q.  Does this document make you recall
23 anything else about the conversations that you had
24 with Mr. Phillips about the damage to your property?
25     A.  No, not really.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 150

1          (Exhibit 7 - 10/1/2005 Nationwide
2     Document marked for identification.)
3          Q.   I'm going to hand you what's been marked
4     as Defense Exhibit Number 7.  You can take a moment
5     to just flip through this, and look it over.  And
6     tell me if you recognize it as a document that you
7     received from Nationwide?
8          A.   I think I got a copy of this or something
9     similar.
10         Q.   The date on DX-7, if you look at the
11    first page, it says "Date Entered."  Do you see on
12    the first page, middle of the way down?  "Date
13    Entered" and the date entered is "October 1st,
14    2005."  Do you see that?
15         A.   Yeah.  Oh, no.  I'm looking at 8/29/05.
16         Q.   If you look at "Date Entered" across the
17    way.
18         A.   Oh, okay.  I see it now.
19         Q.   Do you see it says --
20         A.   "10/1/2005," yeah.
21         Q.   It says, "October 1st, 2005."  Do you see
22    that?
23         A.   Yes.
24         Q.   If you flip to the second page of Defense
25    Exhibit 7, which is Bates numbered 176.

Page 151

1          A.   Okay.
2          Q.   There are two items that are listed in
3     the middle of the page, "Live Tree Debris Removal
4     and Refrigerator Property."  Do you see that?
5          A.   I do.
6          Q.   And each of those is listed, if you
7     follow the way the column all the way across, under
8     "ACV," I'll represent to you that means actual cash
9     value.  And under each of those is listed $500.  Do
10    you see that?
11         A.   Right.
12         Q.   And the total on the report is a thousand
13    dollars for live tree debris removal and
14    refrigerator property.  Do you see that?
15         A.   Yes.
16         Q.   If you turn to the third page.  The third
17    page provides the line item total of a thousand
18    dollars, which we just looked at on the previous
19    page.  Do you see that?
20         A.   Yeah.
21         Q.   On the very top of the page.
22         A.   Yeah.
23         Q.   And then it subtracts out your deductible
24    of $500.  Do you see that?
25         A.   Uh-huh (affirmative response).

Page 152

1          Q.   Is it your understanding that your
2     deductible was $500?
3          A.   Yes.
4          Q.   Yes.  So the net claim was $500.  Do you
5     see that?
6          A.   Yes.
7          Q.   Do you recall receiving a check for $500
8     from Nationwide around October 1st?
9          A.   Yes.
10         (Exhibit 13 - 10/1/2005 Claim Check
11    marked for identification.)
12         Q.   I'm going to hand you what's been marked
13    as Defense Exhibit 13.  This is a copy of a claim
14    check from Nationwide's file.  Do you see on the
15    check that the check is dated October 1st, 2005?  Do
16    you see that?
17         A.   Yes.
18         Q.   And it's listed for $500.  Do you see
19    that?
20         A.   Uh-huh (affirmative response).
21         Q.   And this is consistent with your memory
22    of receiving a check for $500; is that right?
23         A.   Yes.
24         Q.   Do you recall after receiving this check
25    for $500 speaking with Mr. Phillips sometime shortly

Page 153

1     after you received this check?
2          A.   I think I -- I talked to him once or
3     maybe more than once.  I'm not sure.
4          Q.   Okay.
5          A.   But I think I did.
6          Q.   But for the conversation that took place
7     on October 6th, around October 6th, you don't recall
8     the specifics of that conversation, do you?
9          A.   What are you -- what are you meaning
10    "specifics"?
11         Q.   Do you remember a call that took place
12    between you and Mr. Phillips on October 6th?
13         A.   I think I called him to see if that's all
14    that they were going to pay me for my claim.
15         Q.   Do you recall what he -- do you recall
16    what your question was precisely?
17         A.   I think I said, "Is this $500 check all
18    I'm going to be getting?"
19         Q.   Do you recall what he said in response?
20         A.   And he said, "It was all being
21    evaluated."
22         Q.   Did he say anything else?
23         A.   Not that I remember.
24         Q.   Did he --
25         A.   He said, "That was for your refrigerated

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 154

1  items and freezers."  It's a loss that was to the
2  policy, an amendment to the policy.
3      Q.  Do you recall anything else about that
4  conversation?
5      A.  Not really.
6          (Exhibit 17 - Reservation of Rights
7  Letter marked for identification.)
8      Q.  I'm going to hand you what's been marked
9  as Defense Exhibit 17.  This is a copy of what's
10 called a reservation of rights letter.  Looking at
11 both pages of the exhibit, do you recall receiving a
12 reservation of rights letter from Nationwide on or
13 around October 1st, 2005?
14     A.  I could have.  I don't remember right
15 away, but I could have.
16     Q.  So you don't dispute that you did receive
17 that?
18     A.  I'm not saying yes or no because I don't
19 really remember.
20     Q.  If Nationwide claims that they sent this
21 reservation of rights letter, do you dispute that
22 they did send it?
23     A.  No, I don't dispute it.  If they claim
24 they sent it, they probably did.
25     Q.  Do you recall in early November of 2005

Page 155

1  placing a call to Nationwide and speaking with
2  someone there about additional living expenses?
3      A.  Yeah.
4      Q.  You do recall that?
5      A.  I do.
6      Q.  Describe for me what that conversation
7  was like.
8      A.  I told them I needed -- I had run out of
9  money and I had rented a house and I needed money to
10 buy groceries and clothes.  And so I asked them to
11 please send me another check for living expenses.
12 And I don't remember who I talked to, but they said,
13 "Yes, we can send you another 3,000."
14     Q.  Okay.
15     A.  So they sent me another $3,000 check.
16         (Exhibit 14 - 11/9/2005 Check marked for
17 identification.)
18     Q.  I'm going to hand you what's been marked
19 as Defense Exhibit 14.
20     A.  Okay.
21     Q.  If you turn to page two of Defense
22 Exhibit 14, do you see the check is dated
23 November 9th, 2005?  Do you see that?
24     A.  Yes.
25     Q.  And that the check is listed for $3,000;

Page 156

1  is that correct?
2      A.  Right.  I got two of them, this one and
3  the other one.
4      Q.  So this is consistent with your memory of
5  receiving the second check of $3,000?
6      A.  Yes.  Uh-huh (affirmative response).
7  Yes.
8      Q.  So you understand that Mr. Phillips had
9  already inspected your property at this time when
10 you received the second $3,000 check?
11     A.  Probably.  I would think so.
12     Q.  So that's consistent with your
13 understanding of the timeline?
14     A.  Yes.
15     Q.  Do you understand that Nationwide had a
16 question as to the causation of damage to your home
17 as of November 9th, 2005?
18     A.  Is that when he sent the second check?
19     Q.  Yes.
20     A.  At that time I still thought I was going
21 to be paid for my loss.
22     Q.  My question was do you understand that
23 Nationwide had a question about coverage because
24 Nationwide was investigating the cause of -- the
25 cause of damage to your home as of November 9th,

Page 157

1  2005?
2      A.  I really don't remember.
3      Q.  Nationwide had denied your claim as of
4  November 2005; is that correct?
5      A.  I don't remember when.  They denied it,
6  but I don't remember when exactly.  I don't have the
7  letter.  I haven't seen it in probably two or three
8  years.
9      Q.  You understand that ultimately Nationwide
10 concluded that part of your -- part of your claim
11 would not be paid because it concluded that your
12 home was damaged by flood, correct?
13     A.  Right.  They sent me a letter of denial.
14     Q.  But before that time, they paid you
15 $6,000 in alternative living expenses, correct?
16     A.  Correct.
17     Q.  So Nationwide was still conducting an
18 investigation while it was paying you, while it paid
19 you $6,000 in alternative living expenses; is that
20 right?
21     A.  Yes.
22     Q.  So you understand that Nationwide paid
23 you $6,000 in alternative living expenses although
24 it suspected, and ultimately concluded, that your
25 home was destroyed by flooding?

accc5f30-2973-4075-b796-fbf68e721559

Page 158

1    A.   I understand that that's the conclusion
2  they came to.  Not that I agree with them, but I
3  understand that that's their conclusion.
4    Q.   And you understand that they were
5  continuing to pay you under a provision of your
6  insurance contract that they are not required to pay
7  you on if your home is destroyed solely by flood?
8  Do you understand that?
9    A.   I do not understand that totally.  I
10  think they paid me while they looked for an excuse
11  to keep from paying me what they owed me.  That's
12  how I see it.
13    Q.   Do you have anything to support your
14  opinion that Nationwide was trying to prolong paying
15  you under your claim?
16    A.   Yes.
17    Q.   What evidence or what --
18    A.   I don't have evidence.
19    Q.   Okay.  What --
20    A.   I have a suspicion.
21    Q.   Okay.  Do you have anything to support
22  that suspicion?
23    A.   Yeah.  Why didn't they take care of me
24  right away when I needed the money when I lost my
25  home?  I was paying them in good faith.

Page 159

1    Q.   We just looked at Defense Exhibit 11.
2    A.   Uh-huh (affirmative response).
3    Q.   Which Nationwide paid you $3,000 in
4  November of 2005, early November 2005, correct?
5    A.   Right.
6    Q.   And before that time, before Nationwide
7  ever even inspected your property, Nationwide paid
8  you $3,000 on the basis of your statement that your
9  home was destroyed; isn't that correct?
10    A.   Right.
11    Q.   And you hadn't even inspected your
12  property at that time; is that correct?
13    A.   The first check I think so.
14    Q.   So based on your word alone --
15    A.   Uh-huh (affirmative response).
16    Q.   -- without you inspecting the property,
17  without Nationwide inspecting the property, they
18  issued a check for $3,000 to cover expenses that
19  they ultimately concluded they were not obligated to
20  pay under the policy?  Do you understand that?
21    A.   Yeah.  And at the same time, I remember
22  getting a note that if for some reason they decided
23  they had paid wrongly, they could request it back.
24  So they covered themselves.
25    (Exhibit 11 - Loan Receipt marked for

Page 160

1  identification.)
2    Q.   I'm going to hand you what's been marked
3  as Defense Exhibit 11.  I think this is the document
4  you're talking about.  This is a loan receipt that
5  Nationwide asked you to sign.  Or this the loan
6  receipt that you -- do you -- do you recognize this
7  as a loan receipt?
8    A.   Yeah, that's what I was just telling you
9  about.
10    Q.   Okay.  I don't see that your signature is
11  on here, but do you recognize this document?
12    A.   I recognize the document, yeah.
13    Q.   And this loan, this loan receipt
14  basically states, and your understanding is, that
15  Nationwide would issue a loan of $3,000 contingent
16  upon there is coverage for your -- for the loss of
17  your home; is that right?
18    A.   I feel that Nationwide issued me the
19  $3,000 check at that time because they knew I had
20  lost my home and I was insured with them, and they
21  had not come to a conclusion yet.  So they made it
22  into a loan so they could get it back if they needed
23  to.
24    Q.   So your understanding is that --
25    A.   They didn't give it to me.  They loaned

Page 161

1  it to me.
2    Q.   Your understanding was that it was a loan
3  that Nationwide would provide you -- so it was your
4  understanding that Nationwide was loaning you this
5  $3,000 contingent on its investigation; is that
6  right?
7    A.   Yes.
8    Q.   Nationwide ultimately concluded that
9  flooding was the cause of damage to your home,
10  correct?
11    A.   That's their conclusion.
12    Q.   It's their conclusion.  Nationwide has
13  never asked for you to return that $3,000, have
14  they?
15    A.   Not yet.
16    Q.   And, in fact, Nationwide hasn't requested
17  that you repay any of the $6,000 that you've
18  received under your policy, have they?
19    A.   Not yet.
20    Q.   Are you aware that Nationwide hired an
21  independent engineer to conduct an inspection of
22  your property?
23    A.   Yes.  That was one of the things
24  Mr. Brian and I talked.
25    Q.   It was.  So that refreshes your memory

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz - 11/13/08

Page 162

1  about --
2      A.   Yes, I remember it now.
3      Q.   Tell me what you recall about that
4  conversation.
5      A.   That's about all I recall.  They hired
6  their own man out of Baton Rouge, I think, if I
7  remember correctly, to come and inspect it.
8      Q.   Did you ever meet or speak with
9  Nationwide's independent engineer?
10     A.   Nope.
11     Q.   Do you know that the Denham Law Firm also
12 hired an engineer to inspect your property?
13     A.   Yes.
14     Q.   Do you know who -- who it was?
15     A.   I don't know right off who it was.  I
16 have -- I have it on a list where they sent me a
17 letter, but I don't have it in front of me.  I don't
18 remember the name.
19     Q.   If I told you his name was Mr. Biddy,
20 Mr. Ted Biddy, does that --
21     A.   Yeah, that refreshes my memory.  I
22 remember that name.
23     Q.   Have you ever spoken with Mr. Biddy?
24     A.   No, I haven't.
25     Q.   He never called to interview you?

Page 163

1      A.   No, he didn't.
2      Q.   Do you know if he ever went to your
3  property to inspect it?
4      A.   I'm assuming he did.
5      Q.   Did he ever call you to seek permission
6  to inspect it?
7      A.   No.  I don't remember.  Wait a minute.
8  He might have called.  It seems like somebody might
9  have called me and told me someone was going to be
10 inspecting it.  Maybe it was him.  I don't remember
11 for sure.  It's a possibility, but I don't remember.
12     Q.   Do you recall approximately when that
13 call might have been made?  Was it fairly recently?
14     A.   It was within the past year --
15     Q.   Yeah.
16     A.   -- I would say.
17     Q.   Nationwide requested to reinspect your
18 property and have its engineer, independent engineer
19 go out and reinspect your property.  Could that have
20 been the phone call you're thinking of?
21     A.   It might have been.  It might have been.
22     Q.   So it's fair to say you've never spoken
23 with an engineer about the damage to your -- I
24 apologize.  I didn't mean to kick you under the
25 table.  Let me start over.

Page 164

1          It's fair to say you've never spoken with
2  an engineer, whether it be one that was employed by
3  Nationwide or employed by the Denham Law Firm, about
4  the damage to your property?
5      A.   I have not spoken to an engineer.
6          (Exhibit 18 - 1/10/2006 Letter marked for
7  identification.)
8      Q.   Let me hand you what's been marked as
9  Defense Exhibit 18.
10     A.   That I can remember.
11     Q.   Do you recognize this letter?
12     A.   Yeah.  That's when they denied my claim
13 basically.
14     Q.   Did you receive this letter?
15     A.   Yes.
16     Q.   Okay.  And it's consistent with your
17 memory that you received it around or approximately
18 around January 10th, 2006?
19     A.   I don't remember when I received it.  I
20 just remember seeing it before.
21     Q.   And so you understand that Nationwide
22 partially denied your claim because of the
23 inspection Mr. Phillips did, the inspection that his
24 engineer did, and it concluded that flooding was the
25 damage, the cause of damage to your property?  Do

Page 165

1  you understand that?
2      A.   Yes.
3      Q.   Okay.  If you turn to page two of the
4  letter.  If you look at the first full paragraph
5  after number three, do you see where I'm pointing?
6  It begins with "If."
7      A.   Okay.
8      Q.   Do you see that?
9      A.   Uh-huh (affirmative response).
10     Q.   The letter states on page two, Defense
11 Exhibit 18, "If you become aware of any additional
12 facts or damages which you believe Nationwide has
13 not had an opportunity to review and consider,
14 please let us know as soon as possible to allow us
15 to review your claim."  Did you read that language
16 when you received this denial letter?
17     A.   I guess I did.  I don't remember that
18 specific paragraph, but I remember the letter so I
19 must have read it.
20     Q.   Did you provide Nationwide with any
21 additional facts or information to consider in
22 adjusting your claim?
23     A.   No.  I had told them everything I knew
24 already.
25     Q.   And is your testimony earlier that you

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 166

1  had prepared a contents list of your home, but did
2  not provide that to Nationwide; is that correct?
3      A.  I don't think I had even prepared it at
4  that time.
5      Q.  But later you had prepared it?
6      A.  Yeah.
7      Q.  But did not provide it to Nationwide; is
8  that right?
9      A.  Uh-huh (affirmative response).
10     Q.  Is that a yes?
11     A.  Yes.
12     Q.  After you found a home in Birmingham,
13  Alabama to live in, you lived there for
14  approximately five months; is that correct?
15     A.  Correct.
16     Q.  And the rental cost was $750 a month; is
17  that right?
18     A.  Correct.
19     Q.  So 750 times five months, is it fair to
20  say that you paid approximately $3,700 in rent for
21  the five months you lived in that home?
22     A.  It sounds pretty close.
23     Q.  How soon after hurricane Katrina did you
24  move into this home in Birmingham, Alabama?
25     A.  In a couple of weeks.

Page 167

1      Q.  About two weeks or so?
2      A.  Similar, yes.  It could have been two.
3  It could have been four.  Somewhere in that area.
4      Q.  After you moved out of the home in
5  Birmingham, Alabama, you moved into a FEMA trailer;
6  is that right?
7      A.  Correct.
8      Q.  Do you recall when you moved into the
9  FEMA trailer?
10     A.  Uh-huh (affirmative response).  It was in
11  I think January, maybe the end of January.  It was
12  cold.
13     Q.  January of '06?
14     A.  Yes.
15         (Exhibit 8 - Itemized List marked for
16  identification.)
17     Q.  I'm going to hand you what's been marked
18  as Defense Exhibit 8.  If you turn to the second
19  page -- oh, I'm sorry, the third page, which is
20  Bates number 195 of Defense Exhibit 8.  You see
21  there's a couple of things that are itemized
22  underneath the description.  The first is "Food
23  Spoilage."  Do you see that?
24     A.  Yes.
25     Q.  And it lists $500.  Do you see that?

Page 168

1      A.  Yes.
2      Q.  And under the second description it says
3  "Tree Removal and Disposal."  Do you see that?
4      A.  Yes.
5      Q.  Do you receive -- do you remember
6  receiving this document in the mail from Nationwide?
7      A.  Yes, I remember looking at it.
8      Q.  If you turn to the -- to the third page,
9  fourth page, which is Bates numbered 196, there's a
10  line total is $500.  Do you see that?
11     A.  Yeah.
12     Q.  Do you recall receiving a second check
13  from Nationwide for $500 for --
14     A.  I do.  It was while I was in the FEMA
15  trailer.  So it was sometime between six months and
16  a year afterward.
17         (Exhibit 15 - 5/2/2006 Check marked for
18  identification.)
19     Q.  Okay.  I'm going to hand you what's been
20  marked as Defense Exhibit 15.  If you turn to the
21  second page.  This is another check which is dated
22  May 2nd, 2006 for $500.  Do you see that?
23     A.  Yeah.  That's about right.
24     Q.  So this would be consistent with your
25  memory of receiving a second $500 check from

Page 169

1  Nationwide?
2      A.  Yeah.  Like I said, it was between the
3  six months and a year period.  So it's five months
4  is pretty close.
5      Q.  Set that aside.  Hopefully not too many
6  more of these.
7      A.  Huh?
8      Q.  Hopefully not too many more of these.
9      A.  Okay.
10         (Exhibit 20 - 4/18/2007 Letter marked for
11  identification.)
12     Q.  This is Defense Exhibit 20.  It's a
13  letter dated April 18, 2007 sent from Nationwide to
14  the Denham Law Firm.  Do you ever remember receiving
15  a copy of this letter from Nationwide?
16     A.  They've sent me a lot of letters that
17  Nationwide has -- has sent to them.  They sent me
18  copies of it.  And I'm not sure if this was one of
19  them or not.
20     Q.  So you don't recall if the Denham Law
21  Firm forwarded this to you?
22     A.  I can't remember.
23     Q.  The third paragraph down, Nationwide
24  invited -- invited you to provide any additional
25  information.  And -- I'm sorry, strike that.

Page 170

1     Do you -- so you cannot say with certainty
2  that Nationwide did not send this letter; is that
3  right?
4     A.  I received this letter, but I don't
5  remember if it come from Nationwide or if it came to
6  me from the Denham Law Firm.
7     Q.  Okay.  So you do recall seeing this?
8     A.  I remember seeing this letter, yes.
9         (Exhibit 10 - 7/17/2007 Nationwide Report
10  marked for identification.)
11     Q.  Let me hand you what's been marked as
12  Defense Exhibit 10.  That is a report Nationwide
13  prepared to see -- again, where it says "Date
14  Entered" in the middle of the page, it says,
15  "July 17th, 2007."  Do you see that?
16     A.  In the middle of the page?
17     Q.  In the middle of the page where it says
18  "Date Entered."
19     A.  Yeah.  "July 17th, '07."  Yes.
20     Q.  If you flip through this, do you recall
21  receiving this document from Nationwide?
22     A.  I think so.
23     Q.  If you turn to the Bates number
24  Politz 139.  After rereviewing your property --
25     A.  Yeah, I remember getting this letter.

Page 171

1     Q.  After rereviewing your property,
2  Nationwide concluded at the very bottom that it
3  would issue an additional payment of $30,339.57.  Do
4  you see that line?
5     A.  Yes.
6     Q.  Do you remember receiving this letter?
7     A.  I do.
8     Q.  Is it consistent with your memory of
9  Nationwide issuing you an additional check of
10  $30,339.57?
11     A.  They issued it to the attorney.
12     Q.  To the Denham Law Firm; is that correct?
13     A.  Yeah.
14         (Exhibit 16 - 7/19/2007 Check marked for
15  identification.)
16     Q.  Let me hand you what's been marked as
17  Defense Exhibit 16.  Will you turn to page two,
18  which is Bates marked 18.  The date on the check is
19  July 19th, 2007, and the check is issued in the
20  amount of $30,339.57.  Do you see that?
21     A.  Uh-huh (affirmative response).
22     Q.  Do you recall receiving this check?
23     A.  No.  They sent it to the Denham Law Firm.
24     Q.  It was paid to the order of you and
25  Mr. Politz, correct?

Page 172

1     A.  I think it was, but I think they sent it
2  to the Denham Law Firm.
3     Q.  The reason for that being once you retain
4  an attorney, Nationwide cannot speak with you
5  directly without your counsel present.
6     A.  Right.
7     Q.  So that's why they would send it -- send
8  it to the Denham Law Firm.  Did you ever cash this
9  check?
10     A.  No, I didn't.
11     Q.  Why not?
12     A.  Because I felt that they -- that was all
13  they planned on paying me.  I didn't trust them
14  anymore at that point at all.  And I was not willing
15  to accept 30,000 for my home.
16     Q.  Understanding that you've already
17  testified that you agree that Nationwide is not
18  responsible to pay for damage caused by flooding to
19  your home, correct?
20     A.  Right.
21     Q.  How much -- what number is it that you
22  believe Nationwide is responsible for paying?  What
23  number is it that you think was caused by wind
24  damage?  Do you have a dollar number?
25     A.  I don't have it.  I'm not an expert in

Page 173

1  any of that.  I do feel that, for instance,
2  New Orleans flooded.  They had homes flooded
3  everywhere and the homes was still there.  Ours
4  flooded and our homes was no longer there.  And I
5  think the wind did more damage than the water.
6  That's how I feel.  And so I was not willing to
7  accept 30,000.  Maybe if they had took 30,000 off
8  the total amount for the water damage then I could
9  have considered it.  I could have thought maybe.
10  But when they only offered me 30,000 for it, I said,
11  "I'd rather see them in court than accept it."  I
12  didn't feel like it was a fair offer at all.
13     Q.  What dollar amount?
14     A.  I don't have a dollar amount.
15     Q.  After you moved from Alabama to the FEMA
16  trailer, that was approximately January -- late
17  January 2006; is that correct?
18     A.  I think so.
19     Q.  How long did you live in the FEMA
20  trailer?
21     A.  Six months.
22     Q.  That would have been July, early July; is
23  that correct?
24     A.  Yeah, because we bought our house and
25  moved in it around the middle of July.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

45 (Pages 174 to 177)

Page 174

1    Q.   Where did you purchase the home?
2    A.   In Gulfport.
3    Q.   Is that where you currently live?
4    A.   I still have my house there.  I've got it
5  up for sale.  I got a job in Louisiana and I'm --
6  I'm still coming here and living on weekends, but
7  during the week I'm staying over there so I can be
8  close to my job.
9    Q.   The home address that you gave in the
10  beginning of this deposition, is that the address of
11  the home in Gulfport?
12    A.   No, that's where I'm living at right now
13  most of the time, all week when I'm working.
14    Q.   What is your address?  What's the home
15  address of the home in Gulfport?
16    A.   13446 Huntington Circle in Gulfport,
17  Mississippi 70458.  Wait, I'm sorry.  That's the
18  Slidell.  39505, I believe is the one in Gulfport.
19  I'm getting all of these mixed up.
20    Q.   So you purchased that home in July of
21  '06; is that right?
22    A.   Yes.
23    Q.   And then -- and you still own that home
24  today?
25    A.   Yeah, I'm trying to sell it.

Page 175

1    Q.   Can you tell me when you applied for a
2  FEMA trailer?
3    A.   Probably about six weeks after the storm.
4  Maybe a little sooner.  As soon as I heard about it,
5  that they were offering it.
6    Q.   So it's fair to say that it was probably
7  in early to mid October?
8    A.   Yeah.
9    Q.   And how much did you pay per month to
10  live in the FEMA trailer?
11    A.   I paid I think it was $200 a month to
12  park it in someone's yard, I think.  I'd have to
13  look at my bank statements and all to know for sure.
14    Q.   So it's fair to say that many of your
15  neighbors completely lost their homes on the coast
16  in the Mississippi area?
17    A.   Yeah.
18    Q.   Do you agree that it has taken a long
19  time to reconstruct homes on the coast after the
20  hurricane?
21    A.   I agree.
22    Q.   And you agree that to rebuild a home from
23  the slab up, from the ground up, would take a
24  significant amount of time?
25    A.   I agree.

Page 176

1    Q.   And this would be particularly true where
2  there's a shortage of labor; do you agree with that?
3    A.   Yes.
4    Q.   And it would be true if there was a
5  shortage of building supplies, correct?
6    A.   Yes.
7    Q.   And so it would certainly take longer to
8  rebuild your home than the six weeks it took for you
9  to get into a FEMA trailer; is that right?
10    A.   Oh, it took me longer than that to get
11  the FEMA trailer.
12    Q.   What --
13    A.   I lived in that house I rented for five
14  months.
15    Q.   I'm sorry.  Let me take a step back.
16    A.   Okay.
17    Q.   When you -- the hurricane was late
18  August 2005, and you moved into the FEMA trailer in
19  late January 2006?
20    A.   Yes.
21    Q.   So it was approximately six months later;
22  is that right?
23    A.   Yes.
24    Q.   Would you agree that it would take longer
25  than -- but you applied for the FEMA trailer six

Page 177

1  months -- I'm sorry.  Start over.
2    You applied for the FEMA trailer
3  approximately six weeks out, early October; is that
4  right?
5    A.   Yeah, probably.
6    Q.   You agree that at that time you applied
7  for the FEMA trailer, there would have been no
8  possible way to rebuild your home from the ground
9  up; is that right?
10    A.   Well, yeah, I agree.
11    Q.   And do you agree with me that even when
12  you moved into the FEMA trailer in January of '06,
13  six months later, that still would have been
14  incredibly difficult time period in which to rebuild
15  your home?
16    A.   We couldn't.  There was no utilities.
17    Q.   Okay.  So you agree with me that even if
18  Nationwide paid all of your claim that you requested
19  on the day after the storm --
20    A.   Uh-huh (affirmative response).
21    Q.   -- that you still would have been forced
22  to live elsewhere during that period of time; is
23  that correct?
24    A.   Oh, yeah.  I couldn't have got back in my
25  house.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 178

1    Q.   There were no utilities?
2    A.   Right.
3    Q.   No water; is that right?
4    A.   Right.
5    Q.   No electricity available; is that right?
6    A.   Nothing.
7    Q.   Did you receive any other assistance or
8    funds from FEMA aside from the trailer?
9    A.   I did.
10   Q.   Do you recall what that was?
11   A.   I remember -- I remember FEMA sent me, I
12   think, around 2,000, maybe a little bit more, to
13   help me with the rent on the house. And then they
14   sent me a $10,000 check.
15   Q.   So your recollection is you received
16   approximately $12,000 from FEMA?
17   A.   Yeah, maybe -- maybe 12,5. I'm not sure.
18   Somewhere in between that.
19   Q.   And you applied for an SBA loan; is that
20   right?
21   A.   Yes.
22   Q.   And you were awarded that loan; is that
23   correct?
24   A.   Correct.
25        (Exhibit 77 - Letter marked for

Page 179

1    identification.)
2    Q.   I'm going to hand you what's been marked
3    as Defense Exhibit 77. This is a letter addressed
4    to you from the SBA. Do you recognize the letter?
5    A.   Yeah. That was the one I was talking
6    about that they had paid me some money for my rent,
7    rental house. A couple of thousand, maybe a little
8    bit more. It looks like it was 23,4.
9    Q.   This letter states -- maybe I'm confused,
10   but it says, "We are" -- the SBA writes, "We are
11   pleased to inform you that your loan request has
12   been approved in the amount of $234,000." Do you
13   see that?
14   A.   Oh, I'm sorry. I mislooked at it. Yeah.
15   That's when they approved the loan for us to buy a
16   house.
17   Q.   Okay. Is this --
18   A.   Okay. If we could find something.
19   Q.   Is this the total amount of loan you
20   received from the SBA, $234,000?
21   A.   At one time it was that. But then I went
22   back and asked for them to increase this loan.
23   Q.   And did they do so?
24   A.   And they -- yes, after several months
25   they did. We worked together on it for awhile.

Page 180

1    Q.   And how much did they increase it by?
2    A.   To 340.
3    Q.   So in total you received $340,000 from
4    the SBA?
5    A.   I think that's what it was. It could be
6    -- it could vary a little one way or the other, but
7    I think it was around 340.
8    Q.   Okay. So working -- let's start with the
9    $234,000 figure that you were first granted in loan
10   money from the SBA. Do you have any understanding
11   of how the SBA came to that figure?
12   A.   No. They actually figured it out and
13   sent me what they approved, a statement showing what
14   it was approved for.
15   Q.   Did you --
16   A.   Except they asked me the value of my home
17   and a questionnaire like that I filled out and sent
18   to them. So I'm assuming they took it from that.
19   Q.   Do you recall on that piece of paper how
20   much you valued -- how much you said your home was
21   valued at at the time?
22   A.   Yes, I do.
23   Q.   What was that value?
24   A.   $300,000.
25   Q.   How did you come to that number?

Page 181

1    A.   Because I was thinking about after we had
2    put so much money into it and everything.
3    Everything around us was selling real good. It was
4    a hot market then. And we decided -- we had a child
5    at that time, one child in Mississippi. I had
6    forgot about him. He was working at hospital in
7    Gulfport. And we -- they just had twin babies. And
8    we thought they were going to be here. They had
9    only been here for around a year.
10   Q.   This is an additional child that you
11   have?
12   A.   No, it was my husband's child.
13   Q.   So Mr. Politz had a child from a previous
14   marriage?
15   A.   Yes, he had four children from a previous
16   marriage. And this one moved here. He was -- he
17   was living in Austin, Texas. And he got a job here
18   and moved here. And we didn't even know he was
19   looking at it until he did it and he surprised us.
20   And it was off of Cowan Morain Road.
21   Q.   Is that in Long Beach?
22   A.   No, that's in Gulfport. And they just --
23   they had a little boy and they just had twin girls
24   and we was going down there constantly to see the
25   kids and to try to help her with the new twins when

Page 182

1    she had them.
2        And we thought that we might just go ahead
3    and sell ours and see if we could get in a smaller
4    -- not a smaller house. We had one as small as we
5    could use, but something a little bit off the beach,
6    more back closer to them because they lived off the
7    beach. And we just wanted to get closer to them and
8    something a little cheaper while the market was
9    good. And maybe we could come out with a house paid
10   for.
11       Q.   How -- so how did that decision to sell
12   your house form the basis of your $300,000 estimate
13   of what your house was worth?
14       A.   Because the one right next to me had just
15   sold for 425,000.
16       Q.   This was on Winters Lane?
17       A.   It was on Russell Avenue. It's the one
18   that backed up to my house.
19       Q.   Okay. Was that also a two-bedroom,
20   two-bathroom; do you know?
21       A.   No, it was a three-bedroom. I said,
22   "Well, if they get 419 for a three-bedroom and
23   two-bath, I should be able to get three in my area."
24   We was right there together. For mine, and it had
25   just been redone completely. And another house in

Page 183

1    the subdivision had just sold that was basically the
2    same thing, just a couple more hundred feet a square
3    than mine, and a couple hundred square feet more
4    than mine.
5        Q.   And it had sold in the 400 something
6    range?
7        A.   And it had sold for 425. So I said,
8    "Well, mine is a two-bedroom. It's a little
9    smaller." So I assumed 300 would be a fair price.
10   So I told the real estate agent I would like
11   300,000, plus her fees, whatever she charged. And
12   she said, "Well, we'll come Tuesday and I'll measure
13   it and make a listing."
14       Q.   Okay.
15       A.   And that was planned. The storm
16   happened. The -- it never went through.
17       Q.   So your home --
18       A.   So that's why I estimated it at that.
19       Q.   So your home was actually listed on the
20   market at the time of Katrina?
21       A.   It was not. It was going to happen that
22   Tuesday. The storm happened that Monday.
23       Q.   Do you recall the name of the real estate
24   agent?
25       A.   Yeah. Terry. I can't think of her last

Page 184

1    name now. It'll come to me.
2        Q.   Do you recall what company she worked
3    for?
4        A.   I'm not sure about that either right now.
5    I have a card at my home. I can get it for you if
6    you need it.
7        Q.   Okay. We'll -- we'll make a request for
8    the pictures and the realty card. But your -- she
9    came to your home and actually measured the home; is
10   that right?
11       A.   No, she did not.
12       Q.   Oh, she did not?
13       A.   We had an appointment to do that that
14   Tuesday at two o'clock I believe is when it -- and
15   she lost her home too. She was living in the Villas
16   down there.
17       Q.   So she never actually came to your
18   property and looked at it?
19       A.   She had been my neighbor before so she
20   knew the property.
21       Q.   Okay.
22       A.   She had been my neighbor and that's where
23   we met and become friends. And not real close
24   friends. She only lived there for a year or so and
25   then she moved. But she had given -- she took her

Page 185

1    real estate course while she was living there. She
2    said, "If you ever decide you need a real estate
3    agent, please think of me. I'm getting into that
4    business." She gave me a card. So when I decided
5    -- my husband and I decided to do it, I looked her
6    card up and called her.
7        Q.   Do you know if she ever had run
8    comparables in your neighborhood?
9        A.   Yeah, because she had sold hers. She
10   owned one of the -- one-half of the townhomes.
11       Q.   That was in front of your house --
12       A.   Yeah.
13       Q.   -- towards the -- towards the Gulf of
14   Mexico?
15       A.   Yeah. And that was another thing because
16   she said -- I think she told me she got 300 for her
17   half of the townhome. So I figured if somebody
18   would give that for a townhome, then they'd probably
19   give it for a complete home, even though it might
20   have been a little different square footage or
21   something.
22       Q.   But the $300,000 that you estimated, that
23   would also include the value of the land; is that
24   right?
25       A.   Yes, that was the whole place.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz - 11/13/08

48 (Pages 186 to 189)

Page 186

1  Q. So SBA somehow came to a determination
2  that they weren't going to give you a full $300,000.
3  They were going to give you $234,000, correct?
4  A. Yeah. I think they -- they thought I was
5  gonna -- well, I know they thought I was going to
6  rebuild on the same property.
7  Q. How do you know that?
8  A. Well, because they -- they mentioned
9  rebuilding a few times. But then I told them -- and
10  they wanted -- they give me a few rules, guidelines
11  to go by. And I went to the town hall and asked
12  them how long they thought it would be before I
13  could get utilities there. And they said a year or
14  two.
15  Q. Is your understanding that the SBA
16  required you to rebuild in order to receive the loan
17  money?
18  A. Yes, they did require in the beginning.
19  And that's why I figured that plus the point. Like
20  I say, I went and tried to find out and find out I
21  couldn't. My husband was highly claustrophobic. He
22  was in that FEMA trailer. And I had to get him out.
23  He was -- it was really stressful for him.
24  So I called SBA. We started looking for
25  apartments. I was going to get him out of that FEMA

Page 187

1  trailer, one way or the other. So we started
2  looking for apartment and we couldn't find anything
3  for rent. They had waiting lists everywhere we
4  went.
5  So we looked at this house. We just ran
6  across it. We looked at it just to see if we could
7  rent it and they wouldn't rent it. So we called SBA
8  to see if they would increase our loan amount and we
9  bought it. And I didn't have intentions of staying
10  there the rest of my life when I bought it. It was
11  just a way to get him out of a bad situation, and
12  myself too for the time being.
13  Q. Is it your understanding that SBA at some
14  point went back on its requirement that you rebuild
15  on the property to take SBA funding?
16  A. Yes, they did. They did a relocation
17  loan for me.
18  Q. Okay. And was that the additional -- was
19  that the $340,000? I'm sorry, I'm just a little
20  confused.
21  A. No, no. They did a relocation loan so
22  that we could get into a house and get out of the
23  trailer. And --
24  Q. How much was that for?
25  A. I guess it was the 234. I'm not sure. I

Page 188

1  think it was the 234.
2  Q. Okay. So the 234 --
3  A. Certain requirements had to go. So much
4  for the house, so much for furniture, so much for
5  the yard. And all this and they had it all divided
6  out as how much I could spend in each area.
7  MS. LOCKE: For the record, Nationwide
8  has requested that plaintiffs' counsel sign a
9  Privacy Act release waiver to allow Nationwide
10  access to the SBA file. Plaintiffs' counsel has
11  refused to sign that and has objected to that. It's
12  now subject to motion that's pending before the
13  court.
14  I would like to reserve Nationwide's
15  right to reopen this deposition if and when we need
16  to, if and when we are able to get access to these
17  documents so we can fully understand and explore the
18  SBA loan amounts.
19  VIDEOGRAPHER: One minute.
20  MS. LOCKE: Why don't we switch tapes?
21  VIDEOGRAPHER: Off the record at 1:55.
22  End of tape four.
23  (Off the record.)
24  VIDEOGRAPHER: Beginning tape five. On
25  the record at 1:55.

Page 189

1  Q. (By Ms. Locke) So to the best of your
2  understanding, the $234,000 was a relocation loan;
3  is that --
4  A. A relocation loan, yes.
5  Q. How did you spend the $234,000 that you
6  received from the SBA?
7  A. We spent 189,000 -- no, 183,000 for the
8  house.
9  Q. When you say "for the house," what house
10  are you talking about?
11  A. For the house at Huntington Circle in
12  Gulfport that I now have up for sale.
13  Q. Okay. So you spent $183,000 to purchase
14  a new home in Gulfport, Mississippi?
15  A. Yeah.
16  Q. What did you do with the 50 or so
17  thousand dollars that remained?
18  A. We spent most of it on buying furniture
19  and supplies for the house. Bedding. I mean, I had
20  to buy everything. I had lost everything. I didn't
21  have a tablespoon. So I had to buy everything for
22  the house, plus furniture.
23  Q. Then at some point you went back to SBA
24  and requested and received an additional
25  approximately 100,000; is that right? You said you

accc5f30-2973-4075-b796-fbf68e721559

Page 190

1  received 340 in total; is that correct?
2      A.   Yeah, it was a little over a hundred I
3  think.
4      Q.   Okay.  What did you do with -- do you
5  know when you received the additional $100,000?
6      A.   It was after the Mississippi grants come
7  out.  I don't remember exactly when it was.
8      Q.   Give me a rough estimate.
9      A.   It was probably nine months maybe after
10  we moved in, maybe a year.  We moved in in July of
11  '06.  So sometime between July '06 and July '07 I
12  would say.
13      Q.   Okay.  Maybe approximately nine months
14  after July '07, so sometime early --
15      A.   Yeah.
16      Q.   -- '07, somewhere around there?
17      A.   Uh-huh (affirmative response).
18      Q.   Okay.  What did you do with the
19  additional $100,000 from the SBA loan?
20      A.   Paid off Nationwide.  I mean,
21  First Horizon.  Sorry.
22      Q.   I was going to say I don't think we
23  received a check from you, nor would we request it.
24      A.   First Horizon was -- was the mortgage
25  company.

Page 191

1      Q.   That you had a mortgage on at
2  Winters Lane?
3      A.   Yeah.  And interest rates was like around
4  eight percent.  So we paid them off.  And then we
5  started paying -- it increased our loan, you know,
6  from the first loan to the -- they increased the --
7  the size that we paid each month.
8      Q.   To the SBA?
9      A.   Yeah, at the SBA, but it was on a
10  2.8 percent interest rate.
11      Q.   So it was a good rate?
12      A.   So we could handle that.  We couldn't
13  handle both loans anymore.
14      Q.   And you paid off First Horizon
15  completely, correct?
16      A.   Correct.
17      Q.   And that was approximately $130,000; is
18  that correct?
19      A.   Yeah, somewhere around that.
20      Q.   Where did you come up with the additional
21  $20,000 or so to pay off First Horizon?  You said
22  the additional $100,000 you used to pay -- from SBA
23  you used to pay First Horizon, but the balance of
24  your mortgage was about 130.
25      A.   Well, then we must have gotten around

Page 192

1  130.  How much -- I forgot just how much.  All these
2  figures and so much has happened.  I mean, I have to
3  stop and figure it out.  I could look at it on
4  paper.  Look at my books and get you the correct
5  answers.
6      Q.   Okay.  And do you have -- do you have
7  documents that would provide this information?
8      A.   Oh, yes.
9      Q.   Okay.  We'd also like if you could go and
10  look at those.  We'd like to receive a copy of
11  those.
12      A.   You want to receive a document for how
13  much the loan was and then how much we paid for the
14  house and how much we paid for -- we got for the
15  second loan and paid?
16      Q.   We're basically trying to understand the
17  financial breakdown of the SBA loan, where it went,
18  how much you received in total.  We don't have any
19  of that information.
20          MR. EMBRY:  Just bring whatever you've
21      got to us, if we don't have it.
22      A.   Okay.
23          (Exhibit 46 - First Horizon Statement
24      marked for identification.)
25      Q.   I'm going to hand you -- this might help

Page 193

1  out a little bit.  I'm going to hand you what's been
2  marked as Defense Exhibit 46.  This is a statement
3  from First Horizon.  This is a document that we
4  received from not the FDA, but actually the MDA.  Do
5  you see on the left side of the page it says,
6  "Current Principle Balance, $126,944"?
7      A.   That falls into that category as well.
8      Q.   Is that consistent with your memory of
9  approximately how much the loan was remaining --
10  mortgage was remaining on your property at
11  Winters Lane?
12      A.   Yeah, that's about right.
13      Q.   And it says, "Paid 4/13/06."  Is that
14  consistent with your memory of when you might have
15  paid off that loan from the SBA funds?
16      A.   Yeah, that's my handwriting.
17      Q.   Oh, this is your handwriting?
18      A.   Yeah.  That's my check number.
19      Q.   You seem to keep very good records.
20      A.   I try.
21      Q.   So this says, "Paid April 13, 2006."
22      A.   Uh-huh (affirmative response).
23      Q.   Is it possible that you received the
24  additional SBA, the additional 100 or $120,000 from
25  SBA at that time?

accc5f30-2973-4075-b796-fbf68e721559

Page 194

1    A.   Yeah, that's what I paid.  That's what I
2  used to pay that off, this off.  That's my writing
3  there on the other side too.
4    Q.   It says, "Sent a Tax Form From" --
5    A.   Evidently that's what they requested.
6    Q.   Okay.  Let me -- let me just finish my
7  question.
8    A.   I'm sorry.
9    Q.   No, it's okay.  It says, "Sent a Tax Form
10  From Tax" -- I don't know -- "Assessor's Office."
11    A.   Right.
12    Q.   Do you see that?  Do you recall what that
13  form was?
14    A.   No.
15    Q.   No.
16    A.   I assume it was a request from them and I
17  went to the assessor's office and got it and sent
18  it, but I don't remember what it was.
19        (Exhibit 51 - Tax Assessor's Document
20  marked for identification.)
21    Q.   I'm going to hand you what's been marked
22  as Defense Exhibit 51.  Do you recall this form?  It
23  says "Tax Assessor" at the top and it says "Harrison
24  County Online."
25    A.   That might have been the paper they

Page 195

1  requested.  It might have been the one I sent to
2  him.
3    Q.   Do you recall that it was?
4    A.   No.
5    Q.   Okay.  Let me ask you while we're on this
6  document.  Let me ask you a couple of questions
7  about it.
8    A.   Okay.
9    Q.   At the -- at the very small lettering in
10  the middle of the page, it says, "2005 Official Land
11  Roll Information."  Right here in the middle of the
12  page.  Do you see that?
13    A.   Oh, yeah.
14    Q.   Okay.  And it says -- if you follow the
15  -- if you follow the document down to the very
16  bottom where it says, "Acres 0, Land Value 50,000."
17  Do you see that?
18    A.   Yeah.
19    Q.   Do you have any reason to think that the
20  land value -- this is -- do you have any reason to
21  dispute that the land value was $50,000 in 2005?
22        MR. EMBRY:  By what standard?  Market
23  value, tax value.
24    Q.   This is a -- this is a tax assessor form.
25  This is a form that presumably the Harrison County

Page 196

1  -- Harrison County assessed.
2    A.   I really couldn't say because every time
3  I thought about the land, I thought about the land
4  and the house.
5    Q.   Okay.
6    A.   I never value -- put a value on the land
7  itself.
8    Q.   It says -- it says "Improvements" one
9  line over.  It says "94,491."  And then the
10  following column "Total Value" is "144,491."  Do you
11  see that?
12    A.   Yeah.
13    Q.   That adds together the land value and the
14  improvements.  Do you see that?
15    A.   Yeah.
16    Q.   Okay.  The $144,491, do you have any
17  reason to dispute that that was the fair market
18  value of your home in 2005?
19    A.   I think my home was worth more than that.
20  I had put a lot more money into it and redid it
21  probably by the time they did this and the time the
22  storm happened.
23    Q.   But this does break down the value of the
24  land versus the value of the improvements on the
25  land, correct?

Page 197

1    A.   According to the paper it does.
2    Q.   Had you ever received a copy of your tax
3  assessment on the value of your land leading up to
4  -- in the years before hurricane Katrina?
5    A.   I really don't remember.
6    Q.   Did you pay property tax on your land?
7    A.   Yes, I did.
8    Q.   Did you ever disagree with the amount of
9  property tax you paid on your land at the time?
10    A.   I thought we were paying a lot of tax.
11  But the one in front of us closer to the beach was
12  paying a lot more.
13    Q.   And the value of the amount of tax is
14  directly related to the value of the land and the
15  property on the land; isn't that right?
16    A.   Yeah.
17    Q.   Did you ever appeal and say, "I think my
18  land is worth more than this.  I should be paying
19  more taxes"?
20    A.   No.  I thought about 1200 a month -- I
21  mean, year was enough.
22    Q.   And so you paid about -- it's your
23  testimony you paid about 1200 a year in property
24  taxes?
25    A.   It was around that.

Page 198

1    Q.   Do you agree that if the value of your
2  land and your home had been $300,000, you would have
3  had to have paid more; is that correct?
4    A.   I agree.
5    MR. EMBRY:  Are you talking about tax
6  value?  There's a difference, obviously.
7    MS. LOCKE:  Well, the tax assessment
8  value, I mean.
9    MR. EMBRY:  There's a difference between
10  that and market value.
11    Q.   (By Ms. Locke)  I want to talk a little
12  bit about the -- the MDA, Mississippi Development
13  Authority.  You applied for and received MDA grant
14  money; isn't that correct?
15    A.   Yes.
16    Q.   Do you recall how much money you were
17  awarded under the MDA grant program?
18    A.   Yes.
19    Q.   How much was that?
20    A.   150,000.
21    Q.   And that application process required you
22  to fill out a lot of forms; is that right?
23    A.   Correct.
24    Q.   And you had to certify to a lot of things
25  and make a lot of promises as part of that

Page 199

1  application process; isn't that correct?
2    A.   Yes.
3    (Exhibit 49 - Mississippi Development
4  Authority Flood Elevation Grant Program Application
5  marked for identification.)
6    Q.   I'm going to hand you what's been marked
7  as Defense Exhibit 49.  Do you recognize this as
8  your writing in the top right?
9    A.   Yes.
10    Q.   Where it says "Helen J. Politz," that's
11  your writing?
12    A.   Yes.
13    Q.   Is it also your writing for your
14  husband's name?
15    A.   Yes, I probably filled it out.
16    Q.   And do you see at the top of this
17  document it says, "Mississippi Development Authority
18  Flood Elevation Grant Program Application."  Do you
19  see that?
20    A.   Yes.
21    Q.   Do you recall filling out this form?
22    A.   I did fill it out.
23    Q.   Okay.  Do you see in section -- when you
24  filled it out, you listed your address at
25  116 Winters Lane; is that correct?

Page 200

1    A.   Correct.
2    Q.   You had listed your Gulfport address as
3  your mailing address; is that right?
4    A.   That's where we were living at the time,
5  yes.
6    Q.   If you could look at section two.  It
7  says, "Grant Eligibility and Provisions."  Do you
8  see that, in the black box?
9    A.   Oh, that's number three?
10    Q.   Number two, "Grant Eligibility and
11  Provisions."  "Grant Eligibility and Provisions."
12    A.   The elevation eligibility -- yeah.
13    Q.   "Grant Eligibility and Provisions."  Do
14  you see that?
15    A.   Oh, yeah.  Okay.  I see it now.  Yeah.
16    Q.   Okay.  And then number two it says,
17  "Elevation Eligibility Criteria."  Do you see that?
18    A.   Yes.
19    Q.   Did you read this form?
20    A.   I'm sure I must have.
21    Q.   Okay.  So the eligibility criteria are --
22  if you look at bullet point one, "Applicant owned
23  and occupied his or her home as of August 29th,
24  2005."  Do you see that?
25    A.   Right.

Page 201

1    Q.   "The home was located in Harrison,
2  Hancock, Jackson, or Pearl River Communities,
3  Mississippi."
4    A.   Yes.
5    Q.   Is that correct?
6    A.   Uh-huh (affirmative response).
7    Q.   Okay.  Is it a true statement that you
8  owned or occupied your residence as of August 29,
9  2005?
10    A.   Yes.
11    Q.   And it's true statement that your home
12  was located in Harrison, Hancock, Jackson, or
13  Pearl River Counties?
14    A.   Yes.
15    Q.   The third bullet says, "The home was the
16  applicant's primary residence on August 29, 2005."
17  Do you see that?
18    A.   Yes.
19    Q.   And that's a true statement?
20    A.   Yes.
21    Q.   It says, "The home was located outside
22  the pre Katrina designated flood zone" -- "FEMA
23  designated hundred year flood zone on August 29,
24  2005."  Is that a correct statement?
25    A.   Yes.

accc5f30-2973-4075-b796-fbf68e721559

Page 202

1    Q.   The fifth bullet says, "The home received
2  flood damage as a result of hurricane Katrina." Is
3  that a true statement?
4    A.   Yes.
5    Q.   "The applicant maintained homeowners
6  insurance on their home." Is that a -- that's a
7  true statement?
8    A.   Yes.
9    Q.   Subject to this dispute. "The homeowner
10  is being elevated in accordance with newly
11  recommended FEMA flood map and is being rebuilt in
12  accordance with the International Residential Code
13  of 2003." Do you see that?
14    A.   Yes, I do.
15    Q.   Okay. Do you recognize your signature at
16  the bottom of this page?
17    A.   Uh-huh (affirmative response).
18    Q.   And that's your signature?
19    A.   Yes, I'm sorry.
20    Q.   And you signed this form on January 11th,
21  2007?
22    A.   Yes.
23    Q.   And when you signed this form, you were
24  certifying that the above were true; is that
25  correct?

Page 203

1    A.   Yes.
2    Q.   Do you also recognize your husband's
3  signature on this page?
4    A.   Yes.
5    Q.   And he signed this?
6    A.   Yes.
7    Q.   Were you there when he signed it?
8    A.   Yes.
9    Q.   And you remember watching him sign?
10    A.   Yes.
11    Q.   If you look at section three where it
12  says "Grant Provisions." These are promises that
13  you made as a result of the MDA grant money. "The
14  homeowner will obtain and maintain flood insurance."
15  Do you see that?
16    A.   Yes.
17    Q.   And as a result of receiving MDA flood
18  money, you applied for flood insurance; is that
19  correct?
20    A.   I haven't applied for it there because I
21  have no home there.
22    Q.   Okay.
23    A.   But when I could rebuild I would.
24    Q.   Okay. You can put that document aside.
25      (Exhibit 44 - Document from MDA Grant

Page 204

1  Application marked for identification.)
2    Q.   I'm going to hand you what's been marked
3  as Defense Exhibit 44. This is another document
4  from your MDA grant application. Do you recognize
5  Mr. Politz's signature at the bottom of the page?
6    A.   John Politz?
7    Q.   Yes.
8    A.   Yeah.
9    Q.   And is that his signature?
10    A.   Yes.
11    Q.   Do you remember watching him sign this
12  page?
13    A.   I don't remember. I'm sure I was with
14  him.
15    Q.   Okay. If you look at item two, says,
16  "Applicant asserts and certifies that all the
17  information on this application and any attachments
18  are true to the best of the applicant's knowledge
19  and may be relied upon to provide disaster
20  assistance. All damages claimed are a direct result
21  of the declared disaster. Applicant understands
22  that he/she could lose benefits and could be
23  prosecuted by federal, state, and local authorities
24  for making false, misleading, and/or incomplete
25  statements." Do you see that?

Page 205

1    A.   Yes, I do.
2    Q.   Is your understanding that Mr. Politz
3  signed this document certifying that the information
4  in the MDA grant application was true to the best of
5  his knowledge?
6    A.   Yes.
7      (Exhibit 45 - 4/19/2006 Document from MDA
8  Grant Application marked for identification.)
9    Q.   I'm going to hand you what's been marked
10  as Defense Exhibit 45. This is the same document.
11  Do you recognize your signature at the bottom of
12  this document?
13    A.   Yes.
14    Q.   And the date says April 19, 2006.
15    A.   Uh-huh (affirmative response).
16    Q.   Do you see that?
17    A.   Yeah.
18    Q.   Do you recall signing this document?
19    A.   Yeah. Evidently, I signed it at the same
20  time he signed his.
21    Q.   And again, item two of the applicant
22  acknowledgment states that, "Applicant asserts and
23  certifies that all the information on this
24  application and any attachments are true to the best
25  of the applicant's knowledge and may be relied upon

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 206

1    to provide disaster assistance.  All damages claimed
2    are a direct result of the declared disaster.
3    Applicant understands that he/she could lose
4    benefits and could be prosecuted by federal, state,
5    and local authorities for making false, misleading,
6    and/or incomplete statements."  Do you see that?
7        A.    Uh-huh (affirmative response).
8        Q.    And did you certify that the information
9    in your MDA grant application was true and accurate
10    to the best of your ability?
11        A.    Yes.
12        Q.    And that's what you understood you were
13    doing when you signed this document?
14        A.    Yes.
15            (Exhibit 50 - MDA Document, "Closing
16    To-Do List" marked for identification.)
17        Q.    I'm going to show you what's been marked
18    as Defense Exhibit 50.  This is also a document that
19    we received from the MDA.  If you could look at
20    Bates number 5 at the bottom of the page.  Do you
21    recognize this document at all?  It says, "Closing
22    To-Do List."  Have you ever seen this before?
23        A.    Yeah.  It looks like the closing -- when
24    they issued us the $150,000 check.  It shows that
25    starting value of 150 and what happened to it and

Page 207

1    how much they allowed us and they put it on the
2    house we lived in.
3        Q.    When you say "they," do you mean the MDA;
4    is that correct?
5        A.    Yeah, MDA.
6        Q.    And so it says that the starting value of
7    your grant was $150,000; is that correct?
8        A.    Yes.
9        Q.    And it deducted $10,500 from -- for the
10    FEMA proceeds; is that correct?
11        A.    That's right.  That paid them back for
12    what they had given me.  I didn't remember the 500,
13    but I was so happy to get the money that I didn't
14    fuss.
15        Q.    Sure.
16        A.    I said so much happened, I couldn't
17    remember.
18        Q.    So your total MDA grant award was
19    $139,500; is that correct?
20        A.    Yes.
21        Q.    Did you receive that money or did you --
22    did that money go directly to the SBA?
23        A.    I think I received it, but we had to make
24    it payable.  I think we had to sign it and turn it
25    over to SBA.  I'm not sure.  It had to go on the SBA

Page 208

1    loan.
2        Q.    Okay.  To pay the SBA loan off; is that
3    correct?
4        A.    I don't remember if they paid that.  I
5    think they sent it to us and we signed it on over to
6    them.
7        Q.    Okay.
8        A.    If I remember correctly.
9        Q.    Do you know approximately what your
10    current SBA loan balance is now?
11        A.    Right now it's I think around 195,000.
12        Q.    Of the three hundred -- approximately
13    340,000?
14        A.    Of the 340,000.
15        Q.    So this $139,500 was a substantial chunk
16    to pay back the SBA; is that your understanding?
17        A.    Yes, it was.
18        Q.    And as a result of your certifying to the
19    things we just looked at that your home was in
20    counties and that your home received flood damage,
21    you were able to receive this $139,500; is that
22    correct?
23        A.    I think I received it for a certain
24    percentage of the whole home being destroyed.  I
25    don't think it was just on flood damages.  It was

Page 209

1    for a certain percentage.  More than 50 percent or
2    more than 80 percent or something like that.
3        Q.    Okay.  If you look at this --
4        A.    I forgot how they based it exactly.
5        Q.    If you look at the document, look at the
6    insurable value.  Do you see at the top line it
7    says, $117,480.  Do you see that?
8        A.    Uh-huh (affirmative response).
9        Q.    That's the SBA's assessment of what the
10    insurable value of your home is.  Do you see that?
11        A.    Yes.
12        Q.    Okay.  SB -- I'm sorry, I said SBA.  Let
13    me correct that.  The insurable value that the MDA
14    said on your home was $117,480.  Do you see that?
15        A.    Uh-huh (affirmative response).
16        Q.    And then the MDA multiplied that number
17    by 1.35 and reached a value of $158,598; is that
18    correct?
19        A.    Correct.
20        Q.    And then MDA conducted a damage
21    assessment and concluded that a hundred percent of
22    your home was damaged.  Do you see that?
23        A.    Yeah.  That's what I meant.  It was on
24    some kind of percentage.
25        Q.    Okay.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 210

1    A.   I don't remember exactly.  I didn't
2    remember exactly if it was 90 percent or hundred or
3    -- or what.
4    Q.   Okay.  But the -- the maximum that you
5    could receive under the MDA is $150,000 according to
6    this next line.  It says, "Over 150K Max."  Do you
7    see that?
8    A.   Yes.
9    Q.   So you received -- you were granted the
10   full amount, correct?
11   A.   Correct.
12   Q.   And you were granted that amount because
13   you certified that your home had flood damage; is
14   that correct?
15   A.   I guess it is.  I don't remember how
16   exactly I filled out the paper.  I just showed it
17   like it was.
18   Q.   Let's talk about a couple of your
19   neighbors.  Do you know a Mr. Donald McKinion, who's
20   the Director of Emergency Operations Center for
21   Jones County?
22   A.   No.
23   Q.   Do you know where Laurel, Mississippi is?
24   A.   I know the area.  It's kind of north of
25   here.

Page 211

1    Q.   Inland, correct?
2    A.   Yeah, inland.
3    Q.   Okay.  So you would agree with me that if
4    Mr. McKinion was in Laurel, Mississippi during
5    hurricane Katrina, there's no possible way he could
6    have witnessed the damage to your home during that
7    time; is that correct?
8    A.   It doesn't make any sense to me.  I don't
9    know.  He might have been -- I don't know where he
10   was at.  I don't even know him.
11   Q.   Assuming for argument sake that he was,
12   and he certifies that he was in Laurel, Mississippi,
13   there would be no way he would be able to see the
14   damage to your home taking place as it happened
15   during hurricane Katrina; is that correct?
16   A.   I guess not.
17   Q.   Do you know a Ms. Ann Faulk?
18   A.   Yes, I do.
19   Q.   How do you know her?
20   A.   She's my neighbor.
21   Q.   She lived on Beach Boulevard; is that
22   correct?
23   A.   Yes.  She lived in one of the townhomes
24   that faced Beach Boulevard.
25   Q.   Kind of -- what type of relationship did

Page 212

1    you have with Ms. Faulk?
2    A.   Very good.  Nice.  Nice, friendly
3    neighbors.
4    Q.   Would you socialize with her?
5    A.   Absolutely.
6    Q.   Do you consider her a friend?
7    A.   Yes.
8    Q.   And she was in the townhome so her home
9    was completely destroyed as well; is that correct?
10   A.   Correct.
11   Q.   Do you know who she had homeowners
12   insurance with?
13   A.   I'm not sure.
14   Q.   Did you ever discuss homeowners insurance
15   issues with her?
16   A.   We talked a little bit, but I never asked
17   her who she was insured with.
18   Q.   When you talked a little bit, what did
19   you talk about with respect to insurance?
20   A.   Well, I asked her -- I think I asked her
21   if she had flood insurance.  And I think she said
22   yes, if I remember correctly.
23   Q.   Do you recall when you had this
24   conversation with her?
25   A.   No, not really.

Page 213

1    Q.   Do you know if before hurricane Katrina
2    or after?
3    A.   Oh, it was after.  We never talked about
4    it before.  We never thought it was going to happen.
5    Q.   And you believe she did have flood
6    insurance?
7    A.   Yeah.  I think she -- I think she might
8    have been required to.  I'm not sure.  But if not, I
9    guess she showed she knew more about it than I did
10   evidently.  She chose to have it.
11   Q.   Do you know how -- have you spoken with
12   her about how her insurance claim was paid?
13   A.   No.  She just said -- I said, "Did your
14   insurance take care of you?"  She said, "Yes."  And
15   I said, "Well, mine denied me."  That's about what
16   all -- I mean, we might have talked a little, but
17   nothing stands out.
18   Q.   Do you know which insurance carrier or
19   which policy paid her?
20   A.   No.
21   Q.   Do you know if she had a wind pool
22   policy?
23   A.   I have no idea.  I never knew about a
24   wind pool policy until this.
25   Q.   When did -- when did you discover that

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz - 11/13/08

Page 214

1    Mrs. Faulk's claim had been paid?  Was it two weeks
2    after the storm?  Was it --
3        A.   Oh, no.  It was probably six months
4    afterward.
5        Q.   Okay.
6        A.   When I moved back down here from Alabama.
7        Q.   So January of 2006?
8        A.   Oh, it probably wasn't quite that soon.
9        Q.   Okay.  Sometime in 2006?
10       A.   Probably.  Yeah, I would say sometime
11   during 2006.
12       Q.   But long before you filed this lawsuit,
13   correct?
14       A.   I don't really remember.
15       Q.   You filed this lawsuit in 2008, correct?
16       A.   I don't remember.
17           THE WITNESS:  When did I file it?  Do you
18   remember?
19           MR. EMBRY:  If you don't know, don't
20   remember, that's fine.
21       A.   That's fine.  I think it was -- I thought
22   it was in 2007, but it could have been 2008.
23           (Exhibit 68 - Complaint marked for
24   identification).
25       Q.   (By Ms. Locke)  I'm going to hand you

Page 215

1    what's been marked as Defense Exhibit 68.  And
2    unfortunately I may only have one copy.  No, I have
3    more.  Let me hand you what's been marked as Defense
4    Exhibit 68.  This is the complaint.  This is the
5    original document that was filed in this case.
6        A.   Oh, in January of 2008.
7        Q.   Have you seen this document before?
8        A.   Yeah, think so.
9        Q.   Did you review it before it was filed?
10       A.   Yeah, I think so.
11       Q.   So if the lawsuit -- is this consistent
12   with your memory of when the case was filed,
13   probably in January of 2008?
14       A.   It sounds about right.
15       Q.   So your conversation with Mrs. Faulk
16   would have been well before January 2008?
17       A.   It was before this, yeah.
18       Q.   Is there anything else you can remember
19   about your conversation with Mrs. Faulk about her
20   insurance claim?
21       A.   No.
22       Q.   Are you aware if there are any firsthand
23   accounts or eyewitnesses to damage to your home or
24   to any of the neighboring properties in the
25   immediate vicinity of your home during hurricane

Page 216

1    Katrina?
2        A.   I don't know of any.
3        Q.   Do you know a Mr. James Schiniche?  Does
4    that name sound familiar to you?
5        A.   James Schiniche.
6        Q.   Schiniche, S-C-H-I-N-I-C-H-E, who lives
7    in Bay St. Louis?
8        A.   I've heard of him.  I've heard that name,
9    but I can't think right now how it fits in.
10       Q.   Is he a friend of yours?
11       A.   No, he's not a friend of mine, but I've
12   heard the name.  I don't really.
13       Q.   Do you know a Mr. George Shole
14   (phonetic).
15       A.   George Shole.
16       Q.   He's the Jackson County Emergency
17   Communication Director.  Do you know him?
18       A.   No, I don't know him.
19       Q.   Do you know a Mr. Butch Loper?  Do you
20   know who that is?
21       A.   No.
22       Q.   Okay.  I've already asked you about
23   Mr. John McCann?  You don't know John McCann?
24       A.   No.
25       Q.   Do you know a Carol Snap?

Page 217

1        A.   Carol Snap.
2        Q.   She worked at the Trent Lott
3    International Airport.  Do you know her?
4        A.   No.
5        Q.   Do you know a Larry Snap?
6        A.   No.
7        Q.   What about George Dale, Mississippi
8    Commissioner of Insurance?  Do you know him
9    personally?
10       A.   No.  I know he was the insurance
11   commissioner.
12       Q.   But never met him personally?
13       A.   Not that I remember.
14       Q.   What about Lee Harrell?  Do you know him?
15       A.   No.
16       Q.   Do you know Mr. Daniel Schroeder?
17       A.   The name kind of rings a bell, but I
18   can't connect it.
19       Q.   He's a gentleman who performs real estate
20   appraisals in the -- in the Mississippi area.  Does
21   that help at all?
22       A.   No, I can't.  I don't know.
23       Q.   He's not a friend of yours?
24       A.   No, not a friend.
25       Q.   You mentioned that Mr. Politz suffered

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  - 11/13/08

Page 218

1  from claustrophobia; is that correct?
2      A.   Yes.
3      Q.   It was pretty severe claustrophobia?
4      A.   Yes.
5      Q.   Did he have a history of claustrophobia?
6      A.   Yes.
7      Q.   How far back do you -- do you know that
8  went?
9      A.   As long as I knew him.  He'd had -- he'd
10 been claustrophobic.
11     Q.   Did he have a history of being
12 uncomfortable and anxious in small spaces?
13     A.   Yes.
14     Q.   Did he have trouble riding in cars at
15 all?
16     A.   No, not -- he didn't have any trouble.
17     Q.   Not cars?  What about elevators, riding
18 in elevators?
19     A.   He did not like elevators.  He got stuck
20 in one.  And anyway, he didn't like elevators.
21     Q.   Being stuck in an elevator was probably a
22 pretty traumatic experience for him?
23     A.   Yeah.
24     Q.   What about airplanes?  Did he have
25 problems with airplanes?

Page 219

1      A.   No.  He liked to fly.
2      Q.   But being stuck in a small place would
3  cause him a lot of anxiety; is that right?
4      A.   Yeah.
5      Q.   And moving into the FEMA trailer you had
6  mentioned caused him a lot of anxiety; is that
7  right?
8      A.   Yes.
9      Q.   Because of his claustrophobia?
10     A.   Well, yeah.  It was small and he had
11 problems with small spaces.
12     Q.   Yeah.  The trailer was probably pretty
13 small; is that right?
14     A.   It was.
15     Q.   Probably not a lot of room to move
16 around; is that right?
17     A.   Not when you have to take the table out
18 to put a chair in.  You don't have much room.
19     Q.   It's probably fair to say, then, that
20 Mr. Politz didn't have the same claustrophobic
21 symptoms when he lived in the home in Birmingham; is
22 that right?
23     A.   No, he didn't.
24     Q.   And Mr. Politz sought treatment for his
25 claustrophobia from Dr. Babo.  Are you -- do you

Page 220

1  know that?
2      A.   He sought treatment after the storm when
3  he was -- had to live in a FEMA trailer for the
4  first time, the first time he ever sought treatment
5  for that because he was so stressed out.
6      Q.   And he was prescribed a medication?
7      A.   Yes.
8      Q.   That medication was called Xanax.  Do you
9  recall that?
10     A.   Uh-huh (affirmative response).
11     Q.   Yes?
12     A.   Yes.
13     Q.   Had Mr. Politz ever been prescribed an
14 antidepressant like Xanax before that -- before
15 living in a FEMA trailer?
16     A.   No.
17     Q.   And he sought treatment because he was
18 living in the FEMA trailer and the claustrophobia
19 made him very anxious; is that correct?
20     A.   Yes.
21     Q.   You're not blaming Nationwide for
22 Mr. Politz's claustrophobia, are you?
23     A.   No.  I'm blaming them for putting him in
24 that position.
25     Q.   But Nationwide did not cause Mr. Politz

Page 221

1  to get claustrophobia; is that correct?
2      A.   They didn't cause it.  But them not
3  paying us money caused us to have to stay in a FEMA
4  trailer where it reacted.
5      Q.   Has any doctor ever told you that
6  Nationwide's partial denial of your insurance claim
7  caused Mr. Politz's claustrophobia?
8      A.   No doctor has ever told me that.
9      Q.   Did Mr. Politz ever seek treatment for
10 depression?
11     A.   No, not before that.
12     Q.   Do you make a distinction between
13 depression and -- and anxiety?  Do you think they
14 are the same thing?
15     A.   He was depressed.  He was very depressed
16 over what had happened to him.  And the fact that we
17 were having to live like that depressed him.
18     Q.   Do you know if any doctor ever diagnosed
19 him with depression?
20     A.   I believe Dr. Babo did when he gave him
21 that medication because he knew he was very
22 depressed and anxious and claustrophobic and all of
23 that.
24     Q.   So but it's your understanding that the
25 prescription was not just for depression, but

Helen Politz  -  11/13/08

Page 222

1  claustrophobia was a big reason, correct?
2      A.   I think it was more depression than -- I
3  don't know.  I guess it could be 50 percent.  It was
4  both.
5      Q.   Has any doctor ever told you that
6  Mr. Politz suffered depression as a result of
7  Nationwide's partial denial of his insurance claim?
8      A.   No.
9      Q.   Would you agree with me that losing your
10  entire home would cause depression and anxiety?
11      A.   Well, certainly.
12      Q.   And you would agree that losing your
13  entire community and your neighbors, your friends,
14  that could also cause depression and anxiety?
15      A.   Yes.
16      Q.   And I imagine that -- you said you took
17  some sentimental items with you, but I imagine you
18  still lost some; is that correct?
19      A.   Yes.  We lost so very much.
20      Q.   And losing those irreplaceable items,
21  those can also cause depression and anxiety; isn't
22  that the case?
23      A.   I don't think what we lost caused it.  I
24  think had -- I mean, I'm not picking on you.  But if
25  Nationwide would have paid us money at that time and

Page 223

1  let us go on with our lives, I think he could have
2  overcome it.  But they didn't, and one just topped
3  on top of the other one.  And it became a -- a
4  bundle.
5      Q.   But you would agree that losing some very
6  sentimental, precious items, that that could cause
7  anxiety and sadness in your life?  Do you agree with
8  that?
9      A.   In my life, yes.  In his, I had took the
10  pictures that he wanted.  I took his mother's picture.  He
11  lost his mother when he was five years old, and I
12  took her picture for him.  So he had about
13  everything.  I don't think any of that depressed
14  him.
15      Q.   Mr. Politz also had several health
16  problems in the years after hurricane Katrina; is
17  that correct?
18      A.   Yes, he did.
19      Q.   Okay.  He suffered from diabetes; is that
20  correct?
21      A.   Yes, he was a diabetic.
22      Q.   That was type two diabetes; is that
23  correct?
24      A.   Uh-huh (affirmative response).

Page 224

1      Q.   Is that yes?
2      A.   Yes.
3      Q.   He also had a partial removal of his
4  colon in approximately November 2007; is that
5  correct?
6      A.   Yes.
7      Q.   Did he have any other health problems
8  aside from these two issues?
9      A.   He had a little high blood pressure.  It
10  was contained with medication.
11      Q.   Anything else that you can think of?
12      A.   No.
13      Q.   Starting with the diabetes, do you know
14  if Mr. Politz had a family history of diabetes?
15      A.   I think so.
16      Q.   When was his diabetes diagnosed?
17      A.   I don't know.  It was diagnosed before I
18  married him.
19      Q.   Okay.  So he had -- he had the --
20      A.   He had diabetes when I married him.
21      Q.   So he had diabetes since at least 1990;
22  is that correct?
23      A.   Yes.
24      Q.   So you're not blaming Nationwide for
25  Mr. Politz's type two diabetes, are you?

Page 225

1      A.   No.
2      Q.   And no doctor has ever told you that
3  Mr. Politz's type two diabetes was caused by
4  Nationwide's partial denial of his insurance claim?
5      A.   No.
6      Q.   Mr. Politz's high blood pressure, do you
7  know if he had a family history of high blood
8  pressure?
9      A.   I don't know.
10      Q.   Do you know how long he had had high
11  blood pressure?
12      A.   It developed after we were married a
13  couple of years.
14      Q.   But well before hurricane Katrina?
15      A.   Yeah.
16      Q.   So early 1990's; is that fair to say?
17      A.   Yeah, probably in '92, '93, he developed
18  a little high blood pressure and the doctor put him
19  on a little medication.
20      Q.   And he was taking that medication to
21  control his --
22      A.   Ever since, yeah.
23      Q.   Okay.  So you don't blame Nationwide for
24  Mr. Politz's high blood pressure problem, do you?
25      A.   No.

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  - 11/13/08

Page 226

1     Q.   And no doctor has told you that
2  Nationwide's partial amount caused it, correct?
3     A.   No.
4     Q.   Mr. Politz had his -- part of his colon
5  removed in 2007.  He spent several weeks in the
6  hospital; is that correct?
7     A.   Yes.
8     Q.   Do you remember why he needed to have
9  that procedure done?
10     A.   He couldn't have bowel movements and
11  started swelling really bad.  And finally he was got
12  to where he couldn't hardly breathe and he was
13  hurting and I took him to the emergency room.
14     Q.   Did -- did the doctors, or do you recall
15  what the diagnosis was?
16     A.   It was his small intestine.  His colon
17  and small intestines had kind of paralyzed.
18     Q.   Okay.  And he had had a history of
19  problems with constipation and bowel movements;
20  isn't that correct?
21     A.   Yeah, he had -- yeah, some problems with
22  it.
23     Q.   So do you know when -- how long of a
24  history he had or how many -- how far those problems
25  went back?

Page 227

1     A.   A few years, as he got older.
2     Q.   When you say "a few years"?
3     A.   Probably seven, eight years.
4     Q.   So before hurricane Katrina?
5     A.   Oh, yeah.
6     Q.   And so you're not blaming Nationwide for
7  this procedure that was performed on Mr. Politz, the
8  partial removal of his colon, that wasn't caused by
9  Nationwide, correct?
10     A.   Oh, no, that wasn't caused by Nationwide.
11     Q.   And so aside from the diabetes, the colon
12  problems, and the high blood pressure, any other
13  problems that you recall that -- any other medical
14  problems that Mr. Politz had?
15     A.   Just stress and anxiety and --
16     Q.   Let's talk about the stress and anxiety.
17  What symptoms did Mr. Politz have as a result of
18  that stress and anxiety?
19     A.   He'd get very, very quite.  Hang his head
20  a lot.  Just think about the situation he was in,
21  and why.
22     Q.   Did he have any physical manifestations
23  aside from getting quiet and hanging his head as a
24  result of the depression?
25     A.   Yeah, short-tempered.  Very nervous.

Page 228

1  Things like that.
2     Q.   Anything else that you can think of aside
3  from the short temper?
4     A.   He wanted to get out a lot.  He couldn't
5  stand to stay in that trailer.
6     Q.   Now, Mr. Politz passed away in April of
7  this year; is that correct?
8     A.   Yes.
9     Q.   Was there ever an official cause of death
10  that was determined?
11     A.   Osteomyelitis the backbone.
12     Q.   I don't -- I don't know what that is.
13     A.   It's a bone infection.
14     Q.   So he had an infection in his back?
15     A.   Yes.
16     Q.   Did he -- was he hospitalized before he
17  passed away with this?
18     A.   Yes.
19     Q.   Where -- where did that happen?
20     A.   It happened in Ochsner's in New Orleans.
21     Q.   How long was he in the hospital before he
22  passed away?
23     A.   About five months.
24     Q.   He was in the hospital consistently for
25  five months?

Page 229

1     A.   Yes.
2     Q.   Did he pass away while he was in the
3  hospital?
4     A.   They sent him to hospice the last two
5  weeks after the infection reached his brain.
6     Q.   I'm very sorry.  I know this is very
7  difficult for you.  And I -- I hate to ask these
8  questions, so trust me.
9     A.   Do what you've got to do.  We'll just
10  finish it.
11     Q.   Are you claiming that Nationwide is
12  responsible in any way for Mr. Politz's death?
13     A.   Not really his death.  But I feel like
14  they contributed to a lot of depression, a lot of
15  anxiety.  And all -- ever since Katrina until the
16  day he died, he was a different person when he lost
17  everything.  And he had no place to go comfortable.
18     Q.   But the infection in his back, that --
19     A.   That was not caused by Nationwide.
20     Q.   Has any doctor ever said that Nationwide
21  contributed or caused in any way Mr. Politz's death?
22     A.   No.  I don't think they even knew who we
23  had insurance with, you know.
24     Q.   Or the denial of his insurance claim by
25  any carrier, I mean, did any doctor tell you that

accc5f30-2973-4075-b796-fbf68e721559

Page 230

1  that was a contributing factor to his death?
2      A.   No.  The doctor said he was very
3  depressed and he knew he was claustrophobic.  And I
4  mentioned to the doctor that our insurance --
5  because he mentioned something to me one time about
6  his health depression.  And I said, "Well, our
7  insurance denied us and he's been very depressed."
8  He was just wondering what some -- what was causing
9  some of the depression.  And that I felt might be
10  contributing to it.  And I said, "Because we can't
11  do what we need to do and he's very uncomfortable
12  the way he's having to live and all of that."
13      Q.   Was this conversation with Dr. Babo?
14      A.   Yes.
15      Q.   But Dr. Babo never said that Nationwide
16  or the denial of his claim was the result of?
17      A.   No.  Never said that.
18      Q.   And he never said that the denial of his
19  claim caused his depression, did he?
20      A.   No.
21      Q.   Do you recall -- did you frequently have
22  conversations with Dr. Babo about --
23      A.   I went in with my husband every time he
24  saw Dr. Babo.  He wanted me there.  Not in the
25  beginning of our marriage, but after the storm.  He

Page 231

1  felt very humble and just totally out of control.
2  He just -- he was so depressed he couldn't focus on
3  everything like he wanted to.  So he asked me to be
4  there with him, so I went.
5      Q.   I want to talk about your health for just
6  a minute.
7      A.   Sure.
8      Q.   Do you consider yourself to be in good
9  health now?
10      A.   Pretty much.
11      Q.   You say "pretty much."  What -- do you
12  have any health problems now?
13      A.   Well, I had open heart surgery in April
14  of '07.  I think March of '07.  And I have to keep
15  in check with that.  And from time-to-time I have
16  little problems.  I have an appointment with a
17  doctor for a checkup shortly.
18      Q.   Aside from your open heart surgery, your
19  heart problems, do you have any other health
20  problems that you're aware of?
21      A.   I stay stressed.
22      Q.   So aside from stress and the heart
23  surgery, do you have any other medical problems that
24  you're aware of?
25      A.   A little allergy problem that I'm aware

Page 232

1  of, sinuses and allergies.  I have high blood
2  pressure.
3      Q.   Anything else you can think of?
4      A.   No.
5      Q.   What caused -- starting with your heart
6  surgery, what was the impetus for having heart
7  surgery?
8      A.   I started having chest pains and went to
9  the hospital.
10      Q.   And what did they tell you about what was
11  wrong?
12      A.   They checked me out and they said it was
13  my heart.  And that they would try to put a couple
14  of stints in, but they weren't able to.  When they
15  pinpointed all of the problems, the location area,
16  they couldn't so they had to do open heart.  I had
17  some blockages behind my heart.
18      Q.   Okay.  So it was your understanding you
19  had some blockage and arteries that needed to be
20  opened and repaired?
21      A.   Yeah, two.
22      Q.   Do you have a history of heart problems
23  or heart disease in your family?
24      A.   No.
25      Q.   Where was the surgery performed?

Page 233

1      A.   Slidell Memorial.
2      Q.   Do you remember the doctor's name who
3  performed the surgery?
4      A.   Dr. Eckert.
5      Q.   Eckert?
6      A.   Eckert or Eckard or something like that.
7      Q.   Okay.  How did you find out that you
8  needed the surgery?
9      A.   They told me in the hospital.
10      Q.   So did you go to the emergency room when
11  you were having heart pains?
12      A.   I went to the emergency room.
13      Q.   You were feeling chest pains and that's
14  what caused you to go to the emergency room?
15      A.   Well, actually, I was having chest pains
16  and I just had a rotator cuff surgery.  And I went
17  back to my doctor for a checkup on my rotator cuff.
18  And he noticed that I was really short of breath.
19  And he said, "Are you out of breath?"  I said,
20  "Well, kind of."  And this was a orthopedic surgeon
21  that I was seeing.  And he said, "Are you feeling
22  all right?"  I said, "Yeah, I feel fine."  He said,
23  "No, you don't."  He said, "You can't hardly catch
24  your breath."  And he took me in a room and he went
25  to get the cardiologist down the hallway, but the

accc5f30-2973-4075-b796-fbf68e721559

**Page 234**

1  cardiologist was out that day.
2      So he said, "Come here." And I followed
3  him to a room. He did EKG on me. It come back as
4  normal. He put it in my hand and said, "Go straight
5  to the hospital and I'll call them and tell them
6  you're on your way." And so that's what -- that's
7  how I wound up in the hospital straight from the
8  doctor's office. I told him that I had had chest
9  pain coming earlier. And so anyway, the doctor is
10  the one that sent me to the hospital.
11      Q.  Do you recall --
12      A.  Emergency.
13      Q.  The orthopedic surgeon sent you there?
14      A.  Uh-huh (affirmative response).
15      Q.  Do you recall his name?
16      A.  Yeah, Palo.
17      Q.  Dr. Palo?
18      A.  Uh-huh (affirmative response).
19      Q.  Was he also at Ochsner?
20      A.  Yeah, he was an Ochsner doctor.
21      Q.  At Ochsner in Slidell?
22      A.  Yes.
23      Q.  Had you had heart problems prior to March
24  of '07?
25      A.  No.

**Page 235**

1      Q.  Do you blame Nationwide for your having
2  to undergo heart surgery?
3      A.  Yes.
4      Q.  You do. Tell me why.
5      A.  Because they stressed me out so much.
6      Q.  And you believe that the stress caused
7  the blockage in your heart?
8      A.  Yes.
9      Q.  Has any doctor ever told you that stress
10  caused the blockage in your heart?
11      A.  No.
12      Q.  Has any doctor told you that Nationwide
13  or -- let me restart.
14      Has any doctor ever told you that the
15  stress resulting from your partial denial of your
16  insurance claim caused the blockage in your heart?
17      A.  No.
18      VIDEOGRAPHER: Two minutes.
19      Q.  So aside from the stress that you feel,
20  do you have any other reason to think or any other
21  reason to support your claim that Nationwide is
22  responsible for your heart surgery?
23      A.  I never had it before.
24      Q.  Again, your heart surgery was in March of
25  '07; is that correct?

**Page 236**

1      A.  Yep. So I had been through a couple of
2  years of nothing but stress.
3      VIDEOGRAPHER: Off the record at 2:55.
4  End of tape five.
5      (Off the record.)
6      VIDEOGRAPHER: Beginning tape six. On
7  the record at 2:59.
8      Q.  (By Ms. Locke) You said you had a
9  history of high blood pressure. How -- when did --
10  when were you first diagnosed with high blood
11  pressure?
12      A.  I'm trying to remember. In my late 40's,
13  around 50. I'd say 48 to 50, somewhere in there.
14      Q.  So you've had high blood pressure for a
15  significant period of time now?
16      A.  Yes, I have.
17      Q.  And you -- have you taken medication for
18  it?
19      A.  Yes. Once they got me -- once they
20  detected it and they got me on medication that
21  worked with me, I've been on it every since.
22      Q.  About how many years has it been that
23  you've been on medication for high blood pressure?
24      A.  Probably about 15, maybe 17.
25      Q.  Do you believe that your high blood

**Page 237**

1  pressure is any way related to your heart problems?
2      A.  I don't know.
3      Q.  Do you blame Nationwide for your high
4  blood pressure?
5      A.  No.
6      Q.  Has any doctor told you that Nationwide
7  is responsible or the denial of your insurance claim
8  has contributed to your high blood pressure?
9      A.  No.
10      Q.  Have you had your high blood pressure
11  checked consistently from after hurricane Katrina to
12  the present day?
13      A.  Yeah.
14      Q.  How often do you go get those checks?
15      A.  About once every six months. And since
16  my heart surgery I go about every four months.
17      Q.  Do you recall the trend of those readings
18  from after hurricane Katrina to now?
19      A.  Yeah. It's -- they've never had to
20  increase it or decrease it.
21      Q.  When you say --
22      A.  The blood pressure has stayed the same.
23      Q.  So your blood pressure has stayed pretty
24  consistent since hurricane Katrina; is that correct?
25      A.  It's been consistent.

Helen Politz  -  11/13/08

Page 238

1    Q.   And you haven't had to increase your
2  medication for it; is that correct?
3    A.   Correct.
4    Q.   And you would agree with me that
5  stress --
6    A.   Once I had my heart surgery, I got put on
7  another one also.  I stayed on the same one, but he
8  put me on another one too.
9    Q.   So after your heart surgery you're now
10  taking two medications for high blood pressure; is
11  that correct?
12    A.   Yes.
13    Q.   You would -- you would agree with me that
14  stress could cause an increase in blood pressure; is
15  that correct?
16    A.   Yes.  Possibly.  I mean, I don't know.
17    Q.   You don't know or --
18    A.   I can't deny it.  I mean, you know, I
19  just don't know.
20    Q.   That's common knowledge, right?
21    A.   Yeah.
22    Q.   That stress can lead to high blood
23  pressure; is that right?
24    A.   I heard it has, but I had my high blood
25  pressure before I started having stress, so.

Page 239

1    Q.   And since you've started having stress,
2  your high blood pressure has not increased?
3    A.   No.
4    Q.   That's not correct?
5    A.   Oh, that's correct, yeah.  It has not
6  increased that I know of.
7    Q.   At this point, I would like to again
8  reserve our rights to reopen this deposition.  We've
9  requested documents regarding health problems for
10  which physical manifestations of emotional distress
11  that plaintiff has claimed Nationwide is responsible
12  for.  We have not received any of your medical
13  records.  We have not received any disclosure as to
14  who your doctors were for your heart problems.  So
15  we have not been able to seek those medical records.
16    A.   Oh, okay.
17    Q.   So --
18    A.   Dr. Bernstein is my heart doctor right
19  now.
20    Q.   Dr. Bernstein.  And where does he
21  practice out of?
22    A.   He practices in Slidell, Louisiana.
23    Q.   Is he --
24    A.   But he did not do the surgery on me.  I
25  forgot I had a little problem awhile back and I

Page 240

1  wound up in the hospital for two days.  And that's
2  when I met him.
3    Q.   When did you have a problem?
4    A.   It was in late July.
5    Q.   Of '08?
6    A.   Yeah.
7    Q.   And what was that -- what was that
8  problem?
9    A.   Well, I was having chest pains.  I
10  thought it was my heart and they did all kind of
11  tests on me, but it was acid reflux.  But -- but I
12  met a new heart doctor during that time.  And he did
13  some tests and he ruled it out.  Everything was fine
14  with me heart.
15    Q.   And this was Dr. Bernstein?
16    A.   Yeah.  And so I've been using him since
17  because I was needing a new cardiologist.  Mine had
18  left Ochsner's and I don't know where he went.
19    Q.   Is Dr. Bernstein at Ochsner?
20    A.   No, he's not at Ochsner, but I can use
21  him because he's on -- he's -- in other words, he
22  tends to Ochsner patients, but he doesn't work at
23  their facility.  He has his own place at the --
24  right down from the hospital where he -- where I met
25  him at Slidell Memorial.

Page 241

1    Q.   So your surgery was at Slidell Memorial.
2  Where did you go on the last most recent two-day
3  stay at the hospital?  Where was that?
4    A.   Slidell Memorial.
5    Q.   Who was your cardiologist before
6  Dr. Bernstein?
7    A.   Dr. Mace, James Mace.
8    Q.   And he was at Ochsner?
9    A.   He was at Ochsner.  And Dr. Eckert was
10  the cardiovascular doctor that did the surgery on my
11  heart.  Those two.
12    Q.   How long did you see Dr. Mace before --
13  before you were seeing Dr. Bernstein?
14    A.   About six months I guess.  Or maybe a
15  little longer.
16    Q.   Do you recall who your cardiologist was
17  before Dr. Mace?
18    A.   I didn't have one.
19    Q.   Okay.  So this was -- this is -- Dr. Mace
20  was your first doctor in March of '07 when you had
21  your first problems?
22    A.   Yeah.  Uh-huh (affirmative response).
23    Q.   How did you monitor your high blood
24  pressure before March of '07?  Was that through just
25  your general doctor?

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  - 11/13/08

Page 242

1     A.   Through the general doctor.  And when I'd
2  go fill up prescriptions, I'd check at -- at those
3  little drug stores.
4     Q.   But you didn't see a specialized heart
5  doctor before March of '07?
6     A.   No, never needed to.
7     Q.   You also said that you suffer from
8  allergies?
9     A.   Uh-huh (affirmative response).
10     Q.   You don't blame Nationwide for your
11  allergies, do you?
12     A.   No.  I had them way before Nationwide.
13     Q.   You also mentioned a rotator cuff
14  problem.
15     A.   Yeah.
16     Q.   When did that happen?
17     A.   I was recovering from -- I had one about
18  five years ago.  And this one was hurting me again
19  when Katrina hit.  And I had to put it off for
20  awhile and it got so bad I couldn't stand the pain a
21  couple of years later.  So I went in and had the
22  surgery on it probably about a month or six weeks
23  before my heart surgery hit.
24     Q.   Okay.  Do you -- you don't blame
25  Nationwide for your rotator cuff problems, do you?

Page 243

1     A.   No.
2     Q.   Okay.  Where did you have surgery on your
3  rotator cuff?
4     A.   At Covington at the Ochsner Clinic in
5  Covington as an outpatient.
6     Q.   So aside from your heart surgery, the
7  stints that were put in your heart for blockages,
8  the allergies, the high blood pressure, and the
9  rotator cuff problems, are there any other problems,
10  health problems that you have for which you are
11  claiming Nationwide caused or partially responsible
12  for?
13     A.   I'm not claiming that -- that they are
14  responsible for my high blood pressure and my
15  allergies or anything.  Just stress that may have
16  led to my heart problems.  That's all.
17     Q.   Have you ever been diagnosed with
18  depression?
19     A.   No.
20     Q.   Have you ever sought treatment for
21  depression?
22     A.   Not until I -- well, I have, but not
23  until after Katrina.
24     Q.   You have sought treatment for depression?
25     A.   I'm on Prozac right now.

Page 244

1     Q.   Again, this is another thing that hasn't
2  been disclosed to Nationwide in your -- in your
3  papers.  When did you first seek treatment for
4  depression?
5     A.   Probably about a year ago.
6     Q.   So that would have been?
7     A.   It was after my heart surgery.
8     Q.   November or so of 2007; is that right?
9     A.   Yeah, something like that.
10     Q.   What doctor did you see?
11     A.   Dr. Babo.
12     Q.   Did he diagnose you as -- with
13  depression?
14     A.   Yes.  I told -- I told him how I was
15  feeling.  Very upset.  Crying a lot.  My husband was
16  very sick at the time.  And I was recuperating from
17  heart problems.  And I got stressed out.
18     Q.   You'd agree that your husband's
19  significant health problems --
20     A.   That stressed me too.
21     Q.   -- likely -- likely contributed to your
22  stress; is that right?
23     A.   Yes.
24     Q.   Contributed to your depression?
25     A.   Uh-huh (affirmative response).

Page 245

1     Q.   Is that correct?
2     A.   Yes.
3     Q.   And obviously, his passing also
4  contributed to that?
5     A.   Very much.
6     Q.   And you're currently taking Prozac; is
7  that correct?
8     A.   Yes.  I think it's Prozac.  It's a
9  generic name for it, but I don't remember what it
10  is.
11     Q.   When did you first -- when were you first
12  prescribed Prozac?
13     A.   It hasn't been too long ago.  I was on
14  something else for awhile and I couldn't see where
15  it was helping me so I decided to get off of it.
16  And so I gradually got off of it.  And then I
17  started having crying spells where I'd cry for two
18  or three days, stay very depressed, and nervous.
19  And so I called him back and that must have been
20  about a month ago.
21     Q.   So you've been on Prozac for a month now?
22     A.   Yeah, about like that.
23     Q.   Do you recall the name of the drug you
24  were taking before you were on Prozac?
25     A.   I don't remember.  I got -- it's all in

accc5f30-2973-4075-b796-fbf68e721559

Helen Politz  -  11/13/08

Page 246

1 Dr. Babo's records, I'm sure. He's the one that
2 prescribed it.
3     Q.  Do you recall when that medication was
4 prescribed for the first time?
5     A.  Probably about a year ago.
6     Q.  You said you have crying spells. What
7 other symptoms do you have as a result of your
8 depression?
9     A.  Nervousness, anxiety. The least little
10 thing makes me cry.
11     Q.  But you don't blame Nationwide for all of
12 your depression, do you?
13     A.  No, no.
14     Q.  If you could apportion out percentage of
15 it, how much of your depression do you think
16 Nationwide is responsible for?
17     A.  I think probably about 50 percent because
18 of the position I'm in. And by them not taking care
19 of their duties like I felt like they should --
20     Q.  So --
21     A.  -- led to a lot of the other problems
22 that's causing me stress.
23     Q.  Let me -- I'm not trying to be harsh
24 here.
25     A.  Okay.

Page 247

1     Q.  But you've lost your home and a lot of
2 your personal belongings. You've had to move
3 several times. You lived in a FEMA trailer. You've
4 lost your husband. And you're claiming that
5 Nationwide is 50 percent responsible for the stress
6 because of partial denial of your insurance claim?
7     A.  Well, if tonight you had to leave with
8 nothing on but a pair of shorts and a pair of thongs
9 and you woke up tomorrow morning and you had nothing
10 left, no neighborhood, no job, nothing. And you had
11 insurance that you thought was going to take care of
12 you and it denies you, don't you think that would
13 stress you out? I mean, I'm not being ugly either.
14     Q.  No.
15     A.  I'm not trying to be harsh. I'm just
16 asking.
17     Q.  But the loss of your home and loss of
18 your personal items, that's not Nationwide's fault,
19 correct?
20     A.  No, it's not their fault, but it's their
21 fault that I had to live like I've had to live.
22     Q.  Have you ever sought counseling for your
23 depression?
24     A.  No.
25     Q.  You've never seen a psychiatrist?

Page 248

1     A.  No.
2     Q.  Ever seen a social worker for it?
3     A.  I saw one in Alabama when I was there.
4 Just she was onsite. I didn't make an appointment
5 or nothing.
6     Q.  This was immediately after the storm?
7     A.  Yeah.
8     Q.  And that's because you were anxious about
9 losing your home, correct?
10     A.  Well, sure. I didn't know where my life
11 was going. I didn't know any -- where I was going
12 to go, what was going to happen, anything.
13     Q.  Did Mr. Politz ever seek counseling for
14 his depression?
15     A.  No.
16     Q.  Did you ever encourage him to seek
17 counseling for his depression?
18     A.  Not really. He didn't believe in it.
19     Q.  So you never said to him, "Hey, I really
20 think you should go talk to someone about this. It
21 might make things better"?
22     A.  I have asked him if he would like to go
23 to counseling or to try counseling, that maybe we
24 could get someone, you know, to do the counseling
25 for him or something, to help him try to understand

Page 249

1 why he's so depressed and all this. And he said,
2 "No, it's nobody's problem but mine."
3     Q.  Is there anything else -- and thinking
4 about the questions that I've asked you today, is
5 there anything else that you think that we need to
6 know about your claim?
7     A.  I think you know everything. More than I
8 know.
9     Q.  All right. Why don't we -- why don't we
10 take a quick break? I'm going to just look at my
11 notes. Make sure I've covered everything I need to
12 cover, but I think we're probably done here.
13     A.  Okay.
14     VIDEOGRAPHER: Off the record at 3:14.
15     (Off the record.)
16     VIDEOGRAPHER: On the record at 3:20.
17     Q.  (By Ms. Locke) Mrs. Politz, thank you
18 very much for your time this afternoon. You've been
19 very patient with me.
20     A.  You're welcome.
21     Q.  At this time, I don't have any further
22 questions. I have reserved the right to reopen the
23 deposition based on the medical records. And so I
24 may see you in the future.
25     A.  Okay. I do have one thing to bring up

accc5f30-2973-4075-b796-fbf68e721559

**Page 250**

1 that I had forgotten.
2  Q. Okay.
3  A. And that was you asked me if I had had
4 any previous heart problems before that day.  Six
5 weeks before I had started hurting at my home.
6  Q. Okay.
7  A. And my husband drove me to the hospital
8 that morning, the one in Gulfport.  And they checked
9 it out and said everything was fine.
10  Q. And this was six weeks before your open
11 heart surgery; is that correct?
12  A. Yes.
13  Q. And that was the first time you
14 experienced heart --
15  A. That was it.
16  Q. Okay.
17  A. And when you asked me if I had any
18 problems before that, I forgot about that.
19  Q. Okay.  Anything else that you want to
20 clear up or --
21  A. No, I think that's all.  That's all I
22 could remember that I, you know, forgot that I
23 hadn't been straight with you on.
24  Q. Okay.
25  A. Okay.

**Page 251**

1  MS. LOCKE:  Do you have any questions?
2  MR. EMBRY:  No questions.
3  VIDEOGRAPHER:  Off the record at 3:21.
4 End of deposition.
5
6  (Time noted:  3:21 p.m.)
7
8 Original:Elizabeth M. Locke, Esq.
9 Copy: D. Jason Embry, Esq.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 252**

CERTIFICATE OF DEPONENT
DEPONENT: Helen Politz
DATE: November 13, 2008
CASE STYLE: Politz v. Nationwide, et al.
ORIGINAL TO: Elizabeth M. Locke, Esq.

I, the above-named deponent in the deposition taken in the herein styled and numbered cause, certify that I have examined the deposition taken on the date above as to the corrections thereof, and that after reading said pages, I find them to contain a full and true transcript of the testimony as given by me.

Subject to these corrections listed below, if any, I find the transcript to be the correct testimony I gave at the aforestated time and place
Page Line   Comments

This the ___ day of _____, 2008.

    Witness
STATE OF MISSISSIPPI
COUNTY OF _____
  Subscribed and sworn to before me, this
the ___ day of _____, 2008.

    Notary Public
My Commission Expires

253

CERTIFICATE OF COURT REPORTER
I, Julie Brown, Court Reporter and Notary Public, in and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.
I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in the matter.
I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.
Witness my signature and seal that the ___ day of _____, 2008.

   JULIE BROWN (License #1507)

My Commission Expires
April 2, 2012

accc5f30-2973-4075-b796-fbf68e721559