Helen Politz - 03/24/09

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


JOHN POLITZ and HELEN POLITZ                 PLAINTIFFS


V.              CIVIL ACTION NO. 1:08cv18-LTS-RHW


NATIONWIDE MUTUAL FIRE INSURANCE
COMPANY, U.S. SMALL BUSINESS
ADMINISTRATION, and
JOHN DOES 1 THROUGH 10                        DEFENDANTS


DEPOSITION OF HELEN POLITZ


Taken at the instance of the Defendants at the
offices of Ray Murray, 620 Oak Harbor, Slidell,
Louisiana on Tuesday, March 24, 2009, beginning at
8:52 a.m.


APPEARANCES:


KRISTOPHER W. CARTER, ESQ.
Denham, Backstrom, O'Barr & Hollingsworth
424 Washington Avenue
Post Office Drawer 580
Ocean Springs, Mississippi 39566-0580


COUNSEL FOR PLAINTIFFS

EXHIBIT 27

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

## Page 2

```
 1      Elizabeth M. Locke, Esq.
        Kirkland & Ellis LLP
 2      655 Fifteenth Street, N.W.
        Washington, DC 20005-5793
 3
 4           COUNSEL FOR DEFENDANTS
 5
 6   ALSO PRESENT:  Robert Branning, Videographer
 7
 8
     REPORTED BY:  Lori W. Busick, CSR
 9        Brooks Court Reporting, Inc.
          Post Office Box 2632
10        Jackson, Mississippi 39207
          (601) 362-1995
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1               INDEX
 2   Style and Appearance.......................1
 3   Certificate of Deponent...................142
 4   Certificate of Court Reporter.............143
 5
 6           EXAMINATIONS
 7   Examination by Mrs. Locke...................4
 8   Examination by Mr. Carter.................141
 9
10           EXHIBITS
11   243   SBA Second Modification Notice ......8
12   244   SBA Letter .........................12
13   245   Prudential Gardner Realtors ........22
14   246   SBA Letter .........................27
15   247   SBA Letter - August 6, 2007 ........30
16   226   Contents List ......................40
17   223   Receipts ...........................70
18   248   Mini Warehouse Receipt ............128
19   225   Receipts ..........................130
20
21
22
23
24
25
```

## Page 4

```
 1        VIDEOGRAPHER:  Good morning.  This is the
 2   video deposition of Helen Politz, close enough,
 3   taken by the counsel for the defense in the matter
 4   Politz, et al, versus Nationwide Insurance Company
 5   in the United States District Court for the Southern
 6   District, case number 1:08CV18LTS-RHW, held at the
 7   offices of Ray Murray on the 24th day of March of
 8   2009.  The time now is 8:52 and counsel may
 9   introduce themselves.
10        MR. CARTER:  Kris Carter on behalf of
11   Mrs. Politz.
12        MRS. LOCKE:  Libby Locke on behalf of
13   Nationwide Insurance Company.
14        VIDEOGRAPHER:  The court reporter will now
15   swear in the witness.
16
17             HELEN POLITZ,
18   having been first duly sworn, was examined and
19   testified as follows:
20
21   EXAMINATION BY MRS. LOCKE:
22        Q.  Good morning, Mrs. Politz.
23        A.  Good morning.
24        Q.  It's nice to see you again.
25        A.  Thank you.
```

## Page 5

```
 1        Q.  As you recall, we started the deposition
 2   back in November and I asked you questions.  And
 3   this is, just to explain to process, we have
 4   reopened that deposition because we've received new
 5   materials from your lawyers.  And so we're here
 6   today to ask you about these new materials that
 7   we've gotten since your last deposition.  And some
 8   -- some issues in the last deposition that we were
 9   not able to resolve because of these new materials.
10        A.  Okay.  Hopefully I can be helpful in that.
11        Q.  Just for the record, can you state your
12   full name?
13        A.  Helen Jeanette Politz.
14        Q.  So I know that we've done this before, but
15   just to refresh your memory.  I'm going to go over
16   some ground rules for the deposition today to make
17   things go smoothly and more quickly.
18        A.  Okay.
19        Q.  My job is to ask you questions that you
20   can hear and that you can understand; is that fair?
21        A.  That's fair.
22        Q.  Your job today is to answer those
23   questions as completely and truthfully as you can
24   do; is that fair?
25        A.  That's fair.
```

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

3 (Pages 6 to 9)

| Page 6 |
|---|

1    Q.  Let me know if you don't understand or if
2  you can't hear a question that I've asked.
3    A.  Okay.
4    Q.  But if you answer a question that I've
5  posed I'm going to assume that you've heard it and
6  understood the question; is that fair?
7    A.  Fair.
8    Q.  You need to answer out loud.  We have
9  videographer and court reporter.  And the court
10  reporter will be taking down everything that you
11  say.  So nonverbal answers like head nods will be
12  difficult for her to transcribe; is that fair?
13    A.  That's fair.
14    Q.  Let me know -- in addition to that and to
15  help the court reporter, if you would let me -- I
16  know sometimes my questions are going to be very
17  obvious to you, but if you would let me complete my
18  question.  And then I will let you give a full
19  response and complete your answer before I ask the
20  next question; is that fair?
21    A.  That's fair.
22    Q.  Let me know if you need to take a break at
23  any time.  We can stop, that's not a problem.  But
24  what I would ask is that if I've asked you a
25  question and you would like to take a break that you

| Page 7 |
|---|

1  would answer the question that I've asked before we
2  break; is that fair?
3    A.  Yes.
4    Q.  Is there any reason you're unable to give
5  full and truthful answers today to my questions?
6    A.  Not to my knowledge.
7    Q.  Are you taking any medications that would
8  prevent you from telling the truth today?
9    A.  No.
10    Q.  During our deposition in November we
11  established that you had received an SBA loan; is
12  that correct?
13    A.  Correct.
14    Q.  And we were trying to establish during
15  that deposition the amounts of the SBA loan.
16  Because at some point you had taken on more SBA
17  money; is that correct?
18    A.  Correct.
19    Q.  I'm going hand you a document which has
20  been marked Defense Exhibit 43.  I'm sorry, Defense
21  Exhibit 243.
22
23    (Exhibit 243 marked for identification.)
24
25    MR. CARTER:  Can I see that please,

| Page 8 |
|---|

1  counsel?
2    Q.  (By Mrs. Locke)  Do you recognize your
3  signature on this document?
4    A.  Yes.
5    Q.  Is that Mr. Politz's signature?
6    A.  Yes, it is.
7    Q.  Do you recognize this document?
8    A.  Well, I think so.
9    Q.  Okay.  This document as you will see has a
10  table in it, which -- which has rows and columns.
11  And in the very first column it says original note
12  and it has the date December 21, 2005; do you see
13  that?
14    A.  Yes.
15    Q.  And under that note it says the note
16  amount is $234,000; do you see that?
17    A.  Correct.  Yes.
18    Q.  Does that -- is that consistent with your
19  memory and understanding of what the original SBA
20  loan amount you and Mr. Politz took out?
21    A.  Yes.
22    Q.  And your original payments were $991 per
23  month; is that correct?
24    A.  Yes.
25    Q.  If you look at the second column over it

| Page 9 |
|---|

1  says first modification, July 12, 2006; do you see
2  that?
3    A.  Yes.
4    Q.  And then it says the note amount is
5  $215,000; do you see that?
6    A.  Yes.
7    Q.  With a monthly note of $902; do you see
8  that?
9    A.  Yes.
10    Q.  Is this consistent with your memory of a
11  modification that you made on the SBA loan?
12    A.  I'm not sure.
13    Q.  Do you have any reason to dispute that
14  this is incorrect?
15    A.  No.
16    Q.  If you look at the final column it says
17  this modification March 26, 2007, and the note
18  amount is $340,300; do you see that?
19    A.  Yes.
20    Q.  And your monthly note is $876; do you see
21  that?
22    A.  Yes.
23    Q.  Is this consistent with your recollection
24  that you made a modification to incorporate your
25  original loan at 116 Winters Lane into your SBA

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 10

1 loan?
2    A.  Yes.
3    Q.  And is this the -- the $340,300, is that
4 consistent with your memory of the amount of your
5 SBA loan?
6    A.  Yes.
7    Q.  Moving back to the middle column where it
8 says first modification July 12th.  Do you have any
9 recollection of making that change from 234,000 to
10 $215,000 on an SBA loan?
11    A.  I remember some about it, I think.  But I
12 don't remember the exactness of it.
13    Q.  Do you recall why that modification was
14 made?
15    A.  We talked about so many things I just -- I
16 can't think of it right now.
17    Q.  Do you have any reason to dispute that the
18 figures that are reflected on Defense Exhibit 243
19 are accurate?
20    A.  No, I don't have any reason to dispute
21 that.
22    Q.  You can set that aside for now.
23    A.  Okay.
24    Q.  I'm also going the hand you what's been
25 marked as Defense Exhibit 244.

Page 11

1
2        (Exhibit 244 marked for identification.)
3
4        THE WITNESS:  Excuse me just a moment.  It
5 is getting very hot in here.
6        MRS. LOCKE:  Would you like to take a
7 break and can we --
8        THE WITNESS:  Yeah.
9        MRS. LOCKE:  -- we can find out if we can
10 --
11        THE WITNESS:  I was just wondering if we
12 could have a little air.  Are y'all warm?
13        MRS. LOCKE:  I'm okay, but I can certainly
14 -- we can certainly take care of it.  Why don't we
15 go off the record for a second.
16        VIDEOGRAPHER:  Off record at 8:59.
17
18        (Off the record at 8:59.)
19
20        VIDEOGRAPHER:  Back on record at
21 nine o'clock.
22    Q.  (By Mrs. Locke)  Before we went off the
23 record Mrs. Politz I had handed you Defense
24 Exhibit 244.  This is a letter that Nationwide
25 received from the SBA on your file.  Do you see that

Page 12

1 the letter is dated July 6, 2006?
2    A.  Yes.
3    Q.  And the letter is addressed to you and
4 Mr. Politz?
5    A.  Yes.
6    Q.  Do you recognize this letter at all?
7    A.  I got so many of them, I don't remember
8 for sure.  I mean, I don't have a reason not to.
9 Let me just read through it a little bit.  (Peruses
10 document.)  Okay.  Yes, I remember it now.
11    Q.  In the second paragraph the letter states,
12 "We've approved your request to use SBA funds to
13 relocate from 116 Winters Lane, Long Beach,
14 Mississippi to 5519 Gates Avenue, Long Beach,
15 Mississippi."  The 5519 Gates Avenue address, is
16 that a new home that you purchased?
17    A.  That's where I was living in the FEMA
18 trailer.
19    Q.  The next paragraph says, "The purchase
20 price of the new home is $183,000?
21    A.  That's the one we brought in Gulfport.
22    Q.  So the Gates Avenue is not the $183,000
23 home?
24    A.  Oh, no.  It was the FEMA trailer that I
25 was lucky enough to find a place to get parked in

Page 13

1 somebody's yard.
2    Q.  In the third paragraph it continues, "We
3 understand that your total real estate insurance
4 settlement for this loss was $2,950."  Do you know
5 what money that is referring to?
6    A.  Ask the question again please.
7    Q.  Sure.  In the third paragraph the second
8 sentence reads, "We understand that your total real
9 estate insurance settlement for this loss was
10 $2,950."  Do you know what that number is referring
11 to?
12    A.  Total insurance loss.  No, I don't.
13    Q.  Did you report to the SBA that your total
14 insurance proceeds from your claim on 116 Winters
15 Lane was $2,950?
16        MR. CARTER:  Object to form.
17    A.  I don't remember at this time.
18    Q.  (By Mrs. Locke)  Is it possible that
19 that's what you reported your insurance proceeds as?
20        MR. CARTER:  Object to form.
21    A.  It's possible.
22    Q.  (By Mrs. Locke)  The paragraph continues,
23 "SBA is prohibited from providing loan funds which
24 duplicates compensation from other sources."  Do you
25 understand that SBA when granting you a loan amount

Helen Politz - 03/24/09

Page 14

1   will deduct insurance proceeds or any government
2   benefits that you receive from your -- from your
3   loan?
4       A.  I do understand that.
5       Q.  The paragraph continues, "The portion of
6   this recovery which duplicates -- which duplicates
7   must be deducted from your approved loan amount.
8   This provides net real estate insurance proceeds for
9   this project of $2,950, which must be injected
10  first.  The follow other source of funds must be
11  injected into this project prior to SBA funds; FEMA
12  replacement housing in the amount of $10,500."  Is
13  this consistent with your recollection that your
14  FEMA trailer costs approximately $10,500?
15          MR. CARTER:  Object to foundation.
16      A.  They deducted it because they said I owed
17  that to MEMA and so they took it out.
18          MRS. LOCKE:  Kris, are you going to be
19  foundation objections when you weren't part of the
20  original deposition?  Because we did go through this
21  material in the original deposition.
22          MR. CARTER:  I'm going to make my
23  objections.  And if they're invalid because of
24  something you asked in the first deposition, then
25  you'll obviously win the issue in the court.

Page 15

1           MRS. LOCKE:  Okay.
2           MR. CARTER:  But if not then my objections
3   were made.
4           MRS. LOCKE:  But I hope that you will have
5   gone through the first transcript --
6           MR. CARTER:  Certainly I have.
7           MRS. LOCKE:  -- so that we don't have to
8   keep going back and forth.
9           MR. CARTER:  Certainly I have.  I think
10  that you still haven't laid adequate foundation for
11  that question.
12      Q.  (By Mrs. Locke)  Therefore the last
13  sentence in the third paragraph on Defense Exhibit
14  244 says, "The available SBA funds for this project
15  are $170,500."  Do you see that?
16      A.  Where was that?
17      Q.  The very last sentence of the third
18  paragraph.  "The available SBA funds for this
19  project" --
20      A.  Oh, yes, I see now.
21      Q.  So you understand that SBA deducted the
22  $10,500 as well as $2,950 from the $183,000 purchase
23  price of the home in Gulfport?
24      A.  Yes.
25      Q.  Now the fourth paragraph talks about what

Page 16

1   we looked at on Defense Exhibit 243.  "As a result
2   your approved disaster loan is reduced to $215,000."
3   Do you see that?  The very first --
4       A.  Oh, yes.  Yes.
5       Q.  -- The very first sentence of the fourth
6   paragraph on --
7       A.  Okay, I got it.
8       Q.  -- Defense Exhibit 244.  Does this help
9   refresh your recollection as to --
10      A.  Yes.
11      Q.  -- Can you explain to me why your loan
12  amount was reduced from 234,000 to $215,000?
13      A.  Because they kept some of for MEMA funds.
14  So that it wouldn't be a duplicate payment or
15  whatever.
16      Q.  But wouldn't that -- I'm just, I guess I'm
17  a little confused here, maybe I'm misunderstanding.
18  But wouldn't that increase your loan amount if they
19  were deducting -- if they were deducting the amount
20  of benefits from your FEMA loan?
21          MR. CARTER:  Object to foundation.
22      A.  I don't remember all that at this point.
23  You know, it's been almost four years.
24      Q.  (By Mrs. Locke)  And I'm not trying to
25  trip you up or confuse you.  I'm just trying to

Page 17

1   understand why the loan amount went down?
2       A.  Okay.
3       Q.  If you -- if you turn to the second page
4   of Defense Exhibit 244.  The very top of the page it
5   says paragraph five, "Use of proceeds.  Your loan
6   authorization agreement is amended as follows."  And
7   paragraph A states, "Approximately $40,000 to repair
8   or replace disaster damage personal property
9   excluding motor vehicles in similar kind and
10  quality."  Does this -- is this consistent with your
11  understand that you --
12      A.  Yes.  It's what they allowed me to buy
13  furniture and home replacement supplies with.
14      Q.  -- And then paragraph B talks again about
15  $170,500 and this is the amount SBA permitted you to
16  purchase or construct real estate at the new home in
17  Gulfport, correct?
18      A.  Right.
19      Q.  Paragraph C states that SBA allowed $3,500
20  to repair or replace disaster damaged landscaping;
21  do you see that?
22      A.  Yes, I do.
23      Q.  Was that for repairs to 116 Winters Lane?
24      A.  No.  That was for my new home in Gulfport.
25      Q.  Did your -- did you own the new home in

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 18

1  Gulfport during Hurricane Katrina?
2      A.  No.
3      Q.  Did it still have hurricane damage when
4  you purchased it?
5      A.  No, they had fixed it.
6      Q.  Do you know why you would have received
7  $3,500 for your new home for hurricane damage?
8      A.  To the best of my understanding, they
9  allowed that for ground repairs, anything that
10 needed to be done in the yard that, you know, that
11 was -- they divided it out and told me how to spend
12 it.  And so, I did a few things that had to be done
13 in the yard with that money.
14     Q.  When you say you did a few things that had
15 to be done in the yard, you're talking about the
16 yard in Gulfport not in Long Beach; is that correct?
17     A.  I haven't done anything to the one in Long
18 Beach except have it cleaned.
19     Q.  Is the slab still there?
20     A.  Yes, it is.
21     Q.  So you haven't removed the slab at all?
22     A.  No.
23     Q.  Finally it says, approximately $1,000 for
24 disaster clean-up and debris removal expenses
25 incurred at the Long Beach address?

Page 19

1      A.  Yes.
2      Q.  And did you spend this thousand dollars to
3  repair -- or I'm sorry, to --
4      A.  Not to repair, to have the bricks and big
5  debris picked up.  Yes, I did.
6      Q.  For the $3,500 and the $1,000 listed in
7  paragraph C and D, did the SBA require you to
8  provide receipts at all for this?
9      A.  No.  They said they may come audit it
10 later, but I haven't turned in receipts for it.
11     Q.  Do you have any reason to dispute the
12 accuracy of what we've reviewed in Defense
13 Exhibit 244?
14     A.  No.
15     Q.  If you could take a second to look at the
16 remainder of Defense Exhibit 244 and tell me if
17 there's anything in the letter which you believe is
18 incorrect or inaccurate.
19         MR. CARTER:  Again, object to foundation.
20     A.  Yes.  The 215,000 located at 5519 Gates
21 Avenue, Long Beach.  I didn't purchase any
22 insurance, anything for that.
23     Q.  (By Mrs. Locke) So you're referring to
24 the second page of Defense Exhibit 244, paragraph
25 9A?

Page 20

1      A.  Yes.
2      Q.  Where it states prior to disbursement of
3  loans in excess 10,000 borrower will purchase hazard
4  insurance including fire lighting extending
5  coverage, including wind storm coverage on the
6  $215,000 located at the Gates Avenue, Long Beach.
7  Is it your understanding that the Gates Avenue Long
8  Beach address probably should have been the Gulfport
9  address of your new property?
10     A.  Yes.
11     Q.  Is there anything else that you see in
12 this letter that you dispute?
13     A.  I feel that they were talking about the
14 address at Gulfport.
15     Q.  Let me direct your attention to the very
16 first page.  And I think there might be something
17 else that may be off and I just want to see if -- if
18 you agree.  Paragraph two at the very bottom of the
19 page it says, collateral, your loan authorization
20 and agreement as amended as follows.  And if you
21 look at B, it says deed of trust mortgage on real
22 estate located at 5519 Gates Avenue, Long Beach.
23 But you didn't have a mortgage or a deed of trust on
24 the Gates Avenue property, correct?
25     A.  No.

Page 21

1      Q.  Is it your understanding that that should
2  have been the Gulfport address as well?
3      A.  Yes.
4      Q.  So other than substituting the Gates
5  Avenue address for the Gulfport address, is there
6  anything else that you dispute the accuracy of this
7  letter?
8      A.  Not that I've noticed.
9      Q.  You can set that aside then.
10         I'm going to hand you what's been marked
11 as Defense Exhibit 245.
12
13         (Exhibit 245 marked for identification.)
14
15     Q.  Do you know who Prudential Gardener
16 Realtors is?
17     A.  It's one of the real estate agents around.
18     Q.  Do you have any relationship with
19 Prudential Gardner Realtors?
20     A.  Oh, yeah.  I used Prudential to buy my
21 house through them.  The real estate agent.
22     Q.  And this was used -- Prudential Gardner
23 Realtors was used to purchase your house in
24 Gulfport?
25     A.  Yes.

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

**Page 22**

1  Q.  Do you know who Sabrina Redmon is?
2  A.  Yes, I do.
3  Q.  And --
4  A.  She was my real estate agent.
5  Q.  -- do you recognize her writing?
6      MR. CARTER:  Objection to foundation.
7  A.  I'm not sure if it's her writing or not.
8  I never really looked at it to compare it against
9  anything.
10  Q.  (By Mrs. Locke)  Sure.  Do you have any
11  reason to dispute that this is her handwriting?
12  A.  No.
13      MR. CARTER:  Same objection.
14  Q.  (By Mrs. Locke)  On the note section of
15  the first page of Defense Exhibit 245 it states,
16  "Here are the receipts for Mrs. Politz.  Let me know
17  if you need anything else.  Thanks, Sabrina."  And
18  the letter, the fax is addressed to SBA; do you see
19  that?
20  A.  On the first page?
21  Q.  On the first page the letter is addressed
22  to a company SBA on the second line; do you see
23  that?
24  A.  Oh, yeah.
25  Q.  And then in the notes section it states,

**Page 23**

1  "Here are receipts from Mrs. Politz.  Let me know if
2  you need anything else.  Thanks Sabrina; do you see
3  that?
4  A.  Yes, I do.
5  Q.  If you could turn the page, second page of
6  Defense Exhibit 245.  Starting at the right side of
7  the page there's receipt that says D&J Tree and
8  Debris Removal in the amount of $1,000.  Do you
9  recognize this receipt?
10  A.  Yes.
11  Q.  Is this your signature at the bottom?
12  A.  Yes.
13  Q.  Can you explain to me what this receipt
14  was for?
15  A.  Picking up -- he's the one that I hired to
16  pick up the debris at Gate -- at Long Beach in the
17  yard.
18  Q.  So this was a receipt for the Winters Lane
19  property; is that correct?
20  A.  Yes.
21  Q.  The receipt says 3/31 06, 15 yards topsoil
22  Bobcat work; do you see that?
23  A.  Yes.
24  Q.  Now, is it your understanding that he
25  picked up debris or that he performed work on the

**Page 24**

1  topsoil at Winters Lane?
2      MR. CARTER:  Object to form and
3  foundation.
4  A.  I think he did a little topsoil.  I
5  didn't ask him to.  Because he said he was going to
6  clean around the slab area and make it nice and
7  through some seeds out so it could start shaping up.
8  Yeah.  And that was all in the $1,000 for picking up
9  the debris.
10  Q.  But you'd agree with me that this does not
11  say removal of debris?
12      MR. CARTER:  Objection to form and
13  foundation and to the extent it misstates the
14  document.
15  A.  Well it says debris removal.
16  Q.  (By Mrs. Locke)  No.  You would agree me
17  that D&J Tree and Debris Removal is the name of the
18  company, correct?
19      MR. CARTER:  Objection to the
20  mischaracterization of the document and to your
21  being argumentative with the witness.  She just
22  testified, it says debris removal.  If counsel will
23  look in the middle of the page.
24      MRS. LOCKE:  Oh, I apologize.
25      MR. CARTER:  It says debris removal right

**Page 25**

1  there and there's a check mark.
2      MRS. LOCKE:  I apologize.  I didn't see
3  that.  So thank you very much for correcting me.  I
4  was looking at the top of the page.
5  Q.  (By Mrs. Locke)  So it's your
6  understanding that this was for both debris removal
7  and topsoil work; is that correct?
8  A.  Yes.
9  Q.  Thank you.  If you would turn the page so
10  we could look at the next two receipts that are at
11  the bottom.
12  A.  Okay.
13  Q.  The next receipt in the middle of the page
14  is dated March 21, 2006 and it says received from
15  Helen Politz for deed of trust SBA in the amount of
16  $17.  Do you see that?
17  A.  Uh-huh (Affirmative Response.)
18  Q.  Do you recall receiving this receipt?
19  A.  Yes.  I had to send in something $17 for
20  -- I guess it was a deed of trust is what it's for.
21  But -- and I remember they sent me a receipt for it.
22  Q.  And then the very bottom receipt is dated
23  May 5, 2006 in the amount of $250 received from
24  Mr. Politz for cert of title; do you see that?
25  A.  Yes.  Certification of the title, uh-huh.

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 26

1     Q.  Do you recall receiving this receipt as
2  well?
3     A.  I don't recall it right now, but...
4     Q.  Now, you testified earlier that you didn't
5  submit anything to SBA.  Do you have any reason to
6  dispute that Sabrina Redmon submitted this on your
7  behalf?
8        MR. CARTER:  Object to the extent it
9  mischaracterizes testimony.
10     A.  No.
11     Q.  (By Mrs. Locke)  Do you recall submitting
12  receipts to SBA?
13     A.  Not right at this moment.
14     Q.  You can set that aside for now.  Let me
15  hand you what's been marked as Defense Exhibit 246.
16
17        (Exhibit 246 marked for identification.)
18
19     Q.  This is another letter that we received
20  from the SBA relating to your file.  You'll see that
21  the letter is dated March 26, 2007; do you see that?
22     A.  Yes.
23     Q.  And it's addressed to Mr. Politz as well
24  as yourself?
25     A.  Right.

Page 27

1     Q.  If you could take a moment to read through
2  Defense Exhibit 246 and see if you recall receiving
3  this letter?
4     A.  I remember it.
5     Q.  The first paragraph of Defense Exhibit 246
6  states, "Received your request for an increase in
7  your disaster loan for refinancing.  After a
8  thorough reevaluation of your disaster losses, we
9  are pleased to inform you that an increase of
10  $125,300 is approved."  Do you see that?
11     A.  Yes.
12     Q.  Is that consistent with your memory of the
13  increase in the amount of SBA loan that you
14  received?
15     A.  Yes.
16     Q.  The next paragraph then lays out the total
17  amount of the loan for $340,300.  Again, this is
18  consistent with your memory of the total SBA loan
19  amount, correct?
20     A.  Yes.
21     Q.  Now, paragraph two collateral.  It looks
22  like the SBA probably got it right here in terms of
23  the deeds and trust and mortgage.  If you look at
24  paragraph A and B it lists the 116 Winters Lane in
25  Long Beach as well as the Huntington Circle in

Page 28

1  Gulfport.
2     A.  Right.
3     Q.  So you would agree with me that these are
4  the collateral properties you had --
5     A.  Both of these are collateral, yes.
6     Q.  -- And then in paragraph four use of
7  proceeds.  Paragraph A,B,C and D lists the same
8  values that we just reviewed in paragraph 244; do
9  you see that?
10     A.  Yes.
11        MR. CARTER:  Counsel, you mean to say
12  Defense Exhibit 244?
13        MRS. LOCKE:  Yes.  Did I -- what did I
14  say?
15        MR. CARTER:  You said paragraph.
16        MRS. LOCKE:  I apologize.
17     Q.  (By Mrs. Locke)  Just to get a clear
18  record.  Paragraph four subparagraphs A through D on
19  Defense Exhibit 246 lists the same values of break
20  out of your SBA loan that we just reviewed on
21  Defense Exhibit 244; is that correct?
22     A.  To the best of my knowledge, yes.
23     Q.  If you'd like to take a look back at
24  Defense Exhibit 244 to compare the numbers?
25     A.  Looks like the same.

Page 29

1     Q.  Now the new paragraph E that has been
2  added to Defense Exhibit 246 reflects the $125,300
3  of the newly acquired loan; is that correct?
4     A.  Correct.
5     Q.  Is there anything in Defense Exhibit 246
6  that you dispute the accuracy of?
7     A.  No.
8        MR. CARTER:  Object to foundation.
9     Q.  (By Mrs. Locke)  You can set that aside.
10  I'm going to hand you what's been marked as Defense
11  Exhibit 247.
12
13        (Exhibit 247 marked for identification.)
14
15     Q.  This is another letter that we received
16  from the SBA relating to your file, your loan.  And
17  the letter is dated August 6, 2007; do you see that?
18     A.  Yes.
19     Q.  And the letter is addressed again to you
20  and Mr. Politz?
21     A.  Correct.
22     Q.  If you could take a moment to review
23  Defense Exhibit 247 and tell me if you recall
24  receiving this letter?
25     A.  Yes, I do.

Helen Politz - 03/24/09

## Page 30

1    Q.   The first paragraph states, "We understand
2  that you received $148,098 from the Mississippi
3  Katrina Homeowner Grant Program."  Is that
4  consistent with your recollection of the amount MDA
5  money that you received?
6    A.   Yes.
7    Q.   The paragraph goes on to state, "SBA is
8  prohibited from providing loan funds that duplicate
9  compensation from other sources for the same loss.
10 The portion of this recovery which duplicates must
11 be deducted from your loan amount."
12   A.   Yes.
13   Q.   The second paragraph then states, "We
14 received a remittance from the Mississippi Katrina
15 Homeowner Grant Program in the amount $139,598."  Do
16 you see that?
17   A.   Yes.
18   Q.   Is that consistent with your recollection
19 that you used the MDA Grant money to pay off part of
20 your SBA loan?
21   A.   Yes.
22   Q.   Do you have any reason to dispute the
23 accuracy of those two figures?
24   A.   I thought it was 135, maybe it's a 135.  I
25 don't remember for sure.

## Page 31

1    Q.   If SBA says it was 139,598 are you
2  disagreeing with their figure?
3    A.   No.
4    Q.   The third paragraph says, "As a result
5  your loan -- you're approved disaster loan is
6  unchanged at $340,300, however the principle loan
7  balance has been reduced by the $139,598 remittance
8  stated above."  And this is consistent with your
9  recollection that the MDA funds you received were
10 used to pay towards your SBA loan?
11   A.   Yes.
12   Q.   Do you know what the current balance of
13 your SBA loan is?
14   A.   About 188 or 189.
15   Q.   And is your monthly payment still $876?
16   A.   To the penny.
17   Q.   You can set that aside.  During the
18 deposition in November we discovered that, you
19 testified that you began taking antidepressants
20 after Hurricane Katrina; is that correct?
21   A.   Yes.
22   Q.   Through the course of this litigation
23 we've requested medical records from some of your
24 physicians.  And we have reason to believe based on
25 those medical records that you started taking

## Page 32

1  antidepressants in approximately February 2008.  Is
2  that consistent with your recollection of when you
3  first began taking antidepressants?
4        MR. CARTER:  Object to the form of the
5  question.
6    A.   I'm not sure exactly when it was.
7    Q.   (By Mrs. Locke)  Do you have any reason to
8  dispute that would have been in late February 2008?
9    A.   No.
10   Q.   Do you recall the --
11   A.   Late 2008?
12   Q.   -- Late February 2008?
13   A.   I had taken some before then, I believe.
14   Q.   How do you -- how do you know this, I
15 mean?
16   A.   Because they weren't really helping me and
17 I had to call the doctor back and get something
18 different, something stronger.
19   Q.   How many times did you change your
20 antidepressant medications?
21   A.   As far as I know just once.
22   Q.   We have reason to believe that your
23 changed your medication in October of 2008.  Is it
24 possible that you first began taking medication,
25 this antidepressant medication in February of 2008

## Page 33

1  and then changed in October 2008?
2        MR. CARTER:  Objection to the form.
3    A.   No.  It didn't happen like that.
4    Q.   (By Mrs. Locke)  Okay.  To the best of
5  your recollection, when did you first began taking
6  antidepressants?
7    A.   Sometime in 2007.
8    Q.   Do you recall what season --
9    A.   No.
10   Q.   -- it would have been?  What month?
11   A.   I don't remember.  I was very depressed.
12   Q.   Do you recall if it was at the beginning
13 or towards the end of the year?
14   A.   I don't remember.
15   Q.   So, if your medical records state that you
16 received -- that you began taking antidepressants in
17 February of 2008 you're disputing that?
18   A.   I think I took some before, yeah.  I think
19 that sounds like about the same time that I -- I was
20 just crying all the time, I was very depressed.  And
21 I called the doctor back and got on something
22 different.  I think it was around that time.
23   Q.   In February 2008 is you think -- is when
24 you changed?
25   A.   I think.

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 34

1      Q.  Do you recall the name of the first
2  antidepressant medication that you took?
3      A.  No, I don't.
4      Q.  Could it have been Prozac?
5      A.  Prozac is what I'm on now.  That's when
6  they made a change.  When the first one wasn't
7  helping then they made it to Prozac.
8      Q.  What about a drug named Klonopin?
9      A.  That might have been the first one.  I'm
10  not sure.
11      Q.  So you're currently taking Prozac?
12      A.  It comes under a different name, but it's
13  Prozac in a generic.  I take everything in generics.
14      Q.  How frequently do you currently take
15  Prozac?
16      A.  I take one pill a day.
17      Q.  Do you know the dosage?
18      A.  No, I don't.
19      Q.  Celexa, does that antidepressant name mean
20  anything to you?
21      A.  That could have been the first one.  I'm
22  not sure.
23      Q.  Do you still take a medication called
24  Celexa?
25      A.  No.  I don't believe I do.  I take quite a

Page 35

1  few medications, but I don't think I'm taking that
2  one.
3      Q.  Let me hand you -- aside from Dr. Babo, is
4  this any other doctor who would have prescribed you
5  antidepressants?
6      A.  No.
7      Q.  So he would have been the only physician
8  to prescribe you antidepressant medication?
9      A.  As far as I know, yes.  As far as I can
10  remember.  He was -- he's my primary physician.
11      Q.  Do you see a gynecologist regularly?
12      A.  Yes, I do.
13      Q.  Does your gynecologist prescribe
14  antidepressant medications for you?
15      A.  Not normally.
16      Q.  Do you have any recollection of your
17  gynecologist ever prescribing antidepressant
18  medications for you?
19      A.  I think possibly one time he might have
20  prescribed something.  Because I think Dr. Babo was
21  out of the country or something and I saw him and I
22  was having a problem.  Seems like maybe once he did.
23      Q.  And who is your gynecologist --
24      A.  But not -- not as a habit.
25      Q.  -- Who is your gynecologist, name?

Page 36

1      A.  Dr. Grecio.
2      Q.  Can you spell that?
3      A.  G-R-E-C-I-O, I think.  Something like
4  that.
5      Q.  Do you recall when this might have
6  occurred?
7      A.  I don't remember.
8      Q.  Would it have been after Hurricane
9  Katrina?
10      A.  Oh, yes.
11      Q.  Would it have been in 2008?
12      A.  Possibly.
13      Q.  At this point again we -- this name wasn't
14  revealed to us in supplemental disclosures and so --
15
16      A.  I hadn't thought about it.
17      Q.  Well, just to --
18      A.  And I'm not even sure it happened.
19      Q.  -- Just to make the record clear.  If
20  there's a possibility that you were prescribed
21  antidepressants by your gynecologist, and that's
22  something that we have requested and are allowed to
23  know under the rules.  We would reserve our right to
24  request those documents and reopen this deposition
25  if need be.

Page 37

1      MR. CARTER:  Again, as Mrs. Politz just
2  stated, that's the first time we've ever heard that
3  name either, so.
4      THE WITNESS:  What's that, Dr. Grecio?
5      MR. CARTER:  (Nodded head affirmatively).
6      THE WITNESS:  Well, I use him as
7  gynecologist.  I never used him as a heart doctor or
8  anything like that.  But -- and I don't remember for
9  sure if it happened with him.  I've been depressed
10  for a long time.  I've seen a lot of doctors for
11  different reasons.  I've been sick, been through
12  heart surgery and lot of stuff and I can't remember
13  every little detail.
14      Q.  (By Mrs. Locke)  I -- I completely
15  understand.  I'm not asking you to remember every
16  detail.  Just recall what you can as you're sitting
17  here today.
18      A.  It seems like possibly I may have talked
19  to him one time, I'm not sure.  And it seems like he
20  said, yeah, I could help you out with that until
21  your doctor comes back or something to that.  But
22  I'm not sure and I don't remember what medication it
23  was.  I don't even remember if it was for
24  depression.
25      Q.  How regularly do you see your

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 38

1   gynecologist?
2        A.  Once or twice a year whenever I need to.
3   As a routine once a year.  And if I have a problem I
4   see him.
5        Q.  Thinking back, when was the last time you
6   saw Dr. Grecio?
7        A.  I would say probably about six months ago,
8   probably.  Give or take a month either way.
9        Q.  During this last encounter is that when
10  this occurrence might have happened?
11       A.  I don't remember.
12       MRS. LOCKE:  So we would request that
13  after the deposition you work with Mrs. Politz to
14  get Mr. Grecio -- Dr. Grecio's contact information
15  so that we can secure medical records from him?
16       MR. CARTER:  Certainly.  Is it Grego?  How
17  do you spell that?
18       THE WITNESS:  I think it's like
19  G-R-E-A-C-I-O or something like that.
20       MR. CARTER:  G-R-E-A-C-I-O?
21       THE WITNESS:  He was in Slidell and he
22  moved to Covington.
23       MR. CARTER:  Do you know his first name,
24  Mrs. Politz?
25       THE WITNESS:  I really don't.

Page 39

1        MR. CARTER:  Okay.  Sorry I didn't mean to
2   jump in with questions.
3        MRS. LOCKE:  That's okay.  I'm just trying
4   to get this --
5        THE WITNESS:  I'm sure it's on my medicine
6   bottle at home.
7        MRS. LOCKE:  -- information.
8        Q.  (By Mrs. Locke)  Is he with Ochsner?
9        A.  Yes, he is.
10       Q.  I'm going to hand you what's been marked
11  as Defense Exhibit 226.
12
13       (Exhibit 226 marked for identification.)
14
15       Q.  If you could flip through this and tell me
16  if you recognize it?
17       A.  I do.
18       Q.  And could you tell me what it is?
19       A.  Yeah.  It's things that I lost in my
20  house, the contents when the storm hit.
21       Q.  Did you prepare this list?
22       A.  Yes, I did.
23       Q.  Is this your handwriting?
24       A.  Yes.
25       Q.  Can you tell me when you prepared this

Page 40

1   list?
2        A.  I don't have a date on it?  It was
3   sometime in 2008, because I couldn't find the
4   original one.
5        Q.  The front page of Defense Exhibit 226 says
6   list of contents $100,000.  Can you tell me what the
7   $100,000 reflects?
8        A.  Everything in the house.  My furniture, my
9   clothes, all appliances.
10       Q.  So the $100,000 --
11       A.  Beddings, everything.
12       Q.  -- this would be the total amount that
13  you're claiming Nationwide owes you for contents in
14  your home?
15       A.  Even my medicines.  I had a few with me,
16  but I have a lot that I lost.  I was in Alabama and
17  I had to reestablish everything.  So I lost
18  everything, except a couple pair of cutoffs and a
19  pair a thongs that I took with me.
20       Q.  Just as a reminder, we did this in
21  November during the first part of this deposition.
22  At the very bottom of the page you'll see a number
23  that says Politz and on the first page of Defense
24  Exhibit 266 it says 1195.  That's what we refer to
25  as Bates numbers.

Page 41

1        A.  Okay.
2        Q.  So I'm going to refer Bates number 1195,
3   for example, to identify certain pages.  Okay?
4        A.  Okay.
5        Q.  So if you could turn to Bates number 1196,
6   it's actually the second page of Defense
7   Exhibit 226.
8        A.  Okay.
9        Q.  It's kind of hard to read.  And the top of
10  the page is entitled, sun room used as dining room;
11  do you see that?
12       A.  Yes.
13       Q.  So is this your list of the items located
14  in your sun room?
15       A.  To the best of my knowledge, yes.
16       Q.  At the bottom you have $15,000; do you see
17  that?
18       A.  Uh-huh (Affirmative Response).
19       Q.  How did you arrive at that number?
20       A.  Trying to -- just figuring out how much I
21  paid for different things, each one of those things
22  and it roughly -- it come to about that.  I have no
23  receipts, no nothing to go by, so.
24       Q.  Did you take any other notes to scratch
25  out, to add up to $15,000?

76e0dd4c-daad-478f-9ead-82f978800faf

**Page 42**

```
1      A.  I had all that in the one I lost.  But,
2  no, I didn't.  I'll just answer that.
3      Q.  Now the $15,000 that you value the items
4  in your sun room how, did you come up with the value
5  in terms of -- let me get this out a second.  It may
6  be a little awkward.  But I'm trying to understand
7  the measure that you used.  Were you measuring the
8  value based on the cost to replace a particular
9  item?  Or were you using, for example, the value of
10 the item that you think you could potentially sell
11 the item for?  What -- what measure were you using.
12          MR. CARTER:  Object to form.
13     A.  I used the measure of mostly how much I
14 had paid for it and how much it was worth at this
15 time.  Because I had been collecting things for 30
16 years.  Okay.
17     Q.  (By Mrs. Locke)  So the first item on
18 Defense Exhibit 226 under Bates 1196 is extended
19 dining table plus six chairs; do you see that?
20     A.  Yes, I do.
21     Q.  Of the $15,000, what do you value that at?
22     A.  I would say about 10,000.
23     Q.  Did you -- how did you arrive that number?
24     A.  Because of what I paid for it years ago,
25 but it was along with other furniture that I bought.
```

**Page 43**

```
1  It was all antiques and I had it all redone and
2  refinished.  And what it cost me and what it cost me
3  to get it repaired, get it usable.  And the timing
4  that I had had it and the timing before I had it.
5  It was like 90 years -- 95 years old.
6      Q.  Moving to the second item --
7      A.  And it was like brand new.
8      Q.  -- Moving to the second item.  One folding
9  table with four chairs; what do you value that at?
10     A.  That was about $60, I think.  It was a
11 little folding chair -- or 60 or $70, something like
12 that.
13     Q.  Two china cabinets.  Does that mean that
14 you are claiming that there were two china cabinets?
15     A.  Yes.
16     Q.  And how much do you value each of those
17 at?
18     A.  Well, the one that matched my dining room
19 table and chairs, I would say probably three or
20 4,000.
21     Q.  And the other one?
22     A.  About 300.
23     Q.  Freezer chest; what do you value that at?
24     A.  The freezer chest was $129.  I remember
25 that.
```

**Page 44**

```
1      Q.  And the buffet cabinet?
2      A.  The buffet cabinet is the other one I was
3  talking about.  China cabinet, buffet cabinet.
4      Q.  So where it says two china cabinet and one
5  buffet cabinet, is that a duplicate?
6      A.  No.  I had two china cabinets and I had a
7  buffet.
8      Q.  So the buffet would be valued at $300, is
9  that --
10     A.  No.
11     Q.  -- Let's start with --
12     A.  The china cabinet that I had in there, I
13 think I said around 300.  It's one of those smaller
14 cabinets that sit on the wall I had gotten.  It
15 wasn't a part of the antique.  The buffet and the
16 other one was parts of the antique.
17     Q.  How much do you value the buffet cabinet
18 at?
19     A.  I would say at least 3,000.
20     Q.  When did you arrive at that estimate?
21     A.  I guess when I needed to make a list.
22 Because I had not planned to get rid of it.
23     Q.  Let's just go back through, stopping sort
24 of in the middle of the page.  You state that the
25 extended dining table was valued at 10,000, folding
```

**Page 45**

```
1  table at 60 or $70.  The two china cabinets valued,
2  one at $4,000 one at $3,000.
3      A.  No, I was think about the same one, the
4  buffet cabinet, okay.  But it had a china cabinet
5  also.  But I may have it listed in another room,
6  because it was kind of in a hallway.
7      Q.  Okay.  I guess I'm confused.  How much do
8  you value the two china cabinets separately?
9      A.  One for about 300, one for about 2,000.
10     Q.  And then the buffet cabinet is a $3,000
11 value according to you?
12     A.  Yes.
13     Q.  So looking at the items, and the freezer
14 chest is $129.  With the values you've just given me
15 that already adds up to more than $15,000.  So what
16 I'm trying to get at --
17     A.  Okay.  Let's just take off a couple of
18 thousand for the dining room chairs and tables.  I
19 wouldn't have taken less than 10,000, but maybe -- I
20 never had it appraised.  I never wanted to get rid
21 of it.  Maybe it was not a -- not worth that.  Maybe
22 it was only worth 8,000.  I don't know.
23     Q.  Is it fair to say that you're coming up
24 with these values now as you sit here?
25     A.  No.  I've been -- I've given it some
```

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

13 (Pages 46 to 49)

**Page 46**

1  thought.  I put 15,000 because I knew damn well I
2  had that much in there.
3      Q.  But as you sit here today, your first
4  estimate for the dining table was 10,000 and now
5  you're saying maybe it was 8,000?
6      A.  Possibly.
7      Q.  Let's talk about the dining chair -- the
8  dining table and six chairs.
9      A.  Okay.
10     Q.  You'd agree with me that there's a whole
11  variety of price ranges for dining room table sets,
12  correct?
13     A.  Yes.
14     Q.  You could buy something at a discount
15  store that would cost you maybe less than a thousand
16  dollars?
17     A.  Right.
18         MR. CARTER:  Object to foundation.
19     Q.  (By Mrs. Locke)  You could buy something
20  at an antique store that could cost you many many
21  thousands of dollars, correct?
22     A.  Right.
23     Q.  Based on the list that you've provided
24  here which said extended dining table and six
25  chairs, how is Nationwide supposed to verify the

**Page 47**

1  value that you place on this?
2         MR. CARTER:  Object to foundation, form
3  and argumentative.
4         VIDEOGRAPHER:  Two minutes.
5      A.  Maybe they should have come out and looked
6  at it when they insured it.
7      Q.  (By Mrs. Locke)  But as you sit here today
8  you're not able to tell me precisely whether the
9  value of the table is 8,000 or $10,000, but you're
10  expecting Nationwide to pay you $15,000 --
11     A.  For everything on that page, because I
12  know it was worth it.
13         MR. CARTER:  Object to form and
14  foundation.
15         VIDEOGRAPHER:  Go off record at 9:50.
16  Change tape one.
17
18         (Off the record.)
19
20         VIDEOGRAPHER:  We're back on record at
21  9:56.  Starting tape two.
22     Q.  (By Mrs. Locke)  When we went off the
23  record we were looking at Defense Exhibit 226.  And
24  we're looking at page two of that --
25     A.  Okay.

**Page 48**

1      Q.  -- entitled sun room used as dining room.
2  Moving down the list on the last items that you list
3  are, lots of party glasses and serving dishes and et
4  cetera.  Silver from 25th wedding anniversary, china
5  and crystal and books; you see that?
6      A.  Uh-huh (Affirmative Response).
7      Q.  Is it fair to say that this is not a
8  precise list of the items in your sun room?
9         MR. CARTER:  Object to form.
10     A.  I'm not saying that it's a precise list.
11  I don't remember exactly how many glasses or how
12  many things of silver that I had from my wedding
13  anniversary for 25 years.  But it was all stored in
14  there and it was all things that I had collected
15  over the years.
16     Q.  (By Mrs. Locke)  So, but this doesn't tell
17  us how many place settings, for example, you had for
18  your china, correct?
19     A.  Right.
20     Q.  And it doesn't tell us even the brand or
21  the age of the china, does it?
22     A.  No.
23     Q.  Is it fair to say that Nationwide would
24  have no way to verify the accuracy of the dollar
25  estimate in this list?

**Page 49**

1         MR. CARTER:  Objection to form and
2  foundation.
3      A.  No, it's not fair to say that.
4         MR. CARTER:  And counsel, now is your
5  chance.  You got all the time in the world to ask
6  her about this stuff.
7      Q.  (By Mrs. Locke)  Et cetera?  What do you
8  mean by et cetera?
9      A.  Odds and ends that I don't even remember
10  the value.  They were just valuable to me.
11  Keepsakes, things that people, you know, gave me for
12  my anniversary and all that was lost.
13     Q.  So you don't recall how many place
14  settings you had?
15     A.  No, I don't remember.
16     Q.  You don't recall the number of glasses you
17  had?
18     A.  No.
19     Q.  And you don't recall the odds and ends, do
20  you?
21     A.  No.  Remember this is things that I had
22  been collecting for 30 to 40 years.
23     Q.  Now this is not the original list you
24  prepared; is that correct?
25     A.  Correct.

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 50

1    Q.  You had a list earlier that you gave to
2  your lawyers; isn't that right?
3         MR. CARTER:  Objection to form and
4  foundation.
5    A.  I'm not sure.  I either lost it or gave it
6  to them.  Somehow or other it hasn't been found.
7  And I don't know if it's my fault or if it happened
8  there or what.  I don't know what happened to it.
9         MR. CARTER:  I'll state for the record,
10  counsel, this is the first list that we got.
11    Q.  (By Mrs. Locke)  Please turn to page Bates
12  number 1197 of Defense Exhibit 226.
13    A.  Okay.
14    Q.  The title of this page is kitchen?
15    A.  Yes.
16    Q.  And the total estimate you've come up with
17  is $12,000; is that correct?
18    A.  Uh-huh (Affirmative Response).
19    Q.  Now this list doesn't identify the number
20  of dishes you had, does it?
21    A.  No.
22    Q.  Doesn't identify their age?
23    A.  Well, I had some dishes in there too, but
24  they -- they were just cheaper dishes that I used
25  every day.

Page 51

1    Q.  How cheap?  I mean, what -- what do you
2  mean by that?
3    A.  Something you could buy at Wal-Mart.
4    Q.  What types of dishes did you have?
5    A.  Glass, mostly glass.  I don't like
6  plastics too much.
7    Q.  Do you recall how many place settings you
8  had?
9    A.  I think probably maybe around eight, I
10  don't know.  I don't even know if they all matched.
11  Just every day stuff.
12    Q.  You also list pots and pans.  Do you
13  remember how many pots and pans you had?
14    A.  I don't remember, but I had plenty of
15  them.  I had everything.  I love to cook and I had
16  plenty of everything.
17    Q.  And small electric appliance.  Is that one
18  appliance is that multiple appliances?
19    A.  Multiple.
20    Q.  What do you mean by small electric
21  appliance?
22    A.  I had electric skillets, electric grills,
23  all that kind of stuff.
24    Q.  Aside from your skillet and your grill,
25  what else?

Page 52

1    A.  A wok.  It wasn't electric though I don't
2  think.  No, it wasn't.  A lot of things like that.
3    Q.  Beside your skillet, your grill and your
4  wok, what else?
5    A.  It's been four years, I don't remember all
6  that right now.
7    Q.  Okay.
8    A.  But I do know that if they didn't -- if
9  they didn't want to list why would that ask me for
10  it?  And if they didn't want to insure it, why did
11  they insure it?  It was things that I thought were
12  safe with my insurance, that it would be covered.
13    Q.  Is it fair to say that the items that are
14  listed in the kitchen list, you don't have any
15  receipts for --
16    A.  That's right.  They're all out in the gulf
17  some place.
18    Q.  -- The last paragraph on Bates 1197 with
19  kitchen says "lots of misc items."
20    A.  Miscellaneous items.
21    Q.  What would those include?
22    A.  The same things that you walk into any
23  kitchen and expect to find.  Can openers, sets of
24  knife's that sort of thing.
25    Q.  How did you come up with the value of

Page 53

1  $12,000 for --
2    A.  I tried to remember back and get it as
3  close to what I could come up as an actual figure of
4  what I had.  And I'm not sure if I remembered
5  everything or not.  But I know the water cooler was
6  like $140.  Those electric appliances, one skillet
7  was over $200.
8    Q.  So how many do you value your electric
9  appliances at?
10    A.  At least five or $600.  Electric popcorn
11  popper, everything like that.  Crock-pots.
12    Q.  And your dishes, cooking utensils, pots
13  and pans and skillets, how much do you value that
14  at?
15    A.  The cooking utensils, I had one set of
16  pots that was like over $600.  It's a small set, but
17  it was good stainless still.  Okay.  Then I had a
18  lot of other things.  Probably a couple of thousand.
19    Q.  2,000?
20    A.  2,000, yeah.
21    Q.  And that would be for everything that's
22  listed under dishes, cooking utensils, pots and pans
23  and skillets?
24    A.  No.  That's for the small -- the cooking
25  pans and the small electric appliances.  I had a

Helen Politz - 03/24/09

15 (Pages 54 to 57)

Page 54

1   rice cooker. All that. It takes you time to think
2   of all of this to try to put a figure on that.
3        Q.   That's what I'm trying to get at. I mean,
4   you've come up with $12,000, and your counsel has
5   given me the opportunity here today to try and
6   figure out how you value these things. I mean,
7   dishes, what do you value your dishes at?
8        A.   The dishes, probably five hundred.
9        Q.   And these are dishes from Wal-Mart your
10  said?
11       A.   Not all of them, some of them. And when
12  you say dishes, I don't know if you're just talking
13  about that or are you talking about the glasses, the
14  cups, everything?
15       Q.   Mrs. Politz, you've listed dishes here.
16  That's all that I have to go by.
17       A.   Okay.
18       Q.   What do you include within dishes?
19       A.   I include the plates, cups, saucers,
20  cereal bowls, coffee pots. That's with the pots and
21  pans also and it's electric. And I had a really
22  nice one. It was a hundred dollar coffee pot.
23       Q.   So for dishes, how much do you value,
24  based on your definition of dishes, how much do you
25  value your dishes at?

Page 55

1        A.   Probably 500.
2        Q.   Okay.
3        A.   I had a lot of different platters for
4   Thanksgiving and all that kind of stuff.
5        Q.   Cooking utensils, what do you value that
6   at?
7        A.   Cooking utensils, about $60.
8        Q.   Pots and pans?
9        A.   Pots and pans. Is that with the skillets
10  too?
11       Q.   Let's just do pots and pans by itself?
12       A.   Okay. 1,200.
13       Q.   And skillets?
14       A.   Now we're not talking about the electric
15  appliances here, just --
16       Q.   Just the item --
17       A.   -- regular skillets? Okay.
18       Q.   -- Let me -- to get the record clear. I'm
19  talking about the item that you have listed as
20  skillets on the second line of --
21       A.   Okay.
22       Q.   Bates number 1197, what do you value
23  that at?
24       A.   Okay. 250.
25       Q.   And you said small electric appliances you

Page 56

1   value at 600; is that correct?
2        A.   Yeah.
3        Q.   And the water cooler at 140?
4        A.   Yes.
5        Q.   Lots of miscellaneous items; what do you
6   value that at?
7        A.   I don't really -- there's so many
8   different things I have that I can't remember them
9   all right at this moment. Let me have some time to
10  think about that one.
11       Q.   I can wait.
12       A.   Okay. Let's put a thousand dollars.
13       Q.   Hard liquor?
14       A.   I had all my hard liquor in the kitchen.
15  Well, just about all of it. I had a shelf full of
16  it. Had some that wasn't even opened. My husband
17  had -- had a case made for him of Maker's Mark with
18  his name on it through some kind of a organization.
19       Q.   So, totaling up all the hard liquor in the
20  kitchen, how much do you value that at?
21       A.   Probably a thousand dollars.
22       Q.   And beer?
23       A.   Probably $50. I kept a couple of extra
24  cases. Because I don't like to have to run out
25  somebody -- if we decide to have a barbecue and

Page 57

1   invite somebody over.
2        Q.   Grocery and lots of can goods and dry
3   goods. How much do you value that at?
4        A.   1,500. I know I had a lot of them in
5   there.
6        Q.   The next item, it says -- you're going to
7   have to help me read your writing. What does that
8   say? R-A-I-D-S?
9        A.   Radio.
10       Q.   Oh, radio.
11       A.   I had --
12       Q.   How much do you value the radio at?
13       A.   About $50. It's one of those little
14  radios that you put up under the cabinet. Forty or
15  $50, I don't remember. With CD's and tapes and
16  everything.
17       Q.   The TV, how much do you value the TV at?
18       A.   Couple of hundred.
19       Q.   200?
20       A.   Yeah.
21       Q.   And cookbooks, what do you value your
22  cookbooks at?
23       A.   I had about 30 cookbooks and they were --
24  almost all of them were around $30, between 25 and
25  $30. So, I don't know that what figures out to be.

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

16 (Pages 58 to 61)

Page 58

1    Q.  $900?
2    A.  That sounds about right.
3    Q.  Based on the totals that you have given
4  me, the values that you've given me, I add that up
5  to approximately $7,300, which is different from the
6  $12,000 figure that you've given me.  As you sat
7  here today and gave me these estimates, are they the
8  best estimates that you can give me as you sit here?
9    A.  As of right now, yes.  I'm sure I'll think
10  of other things later that I had in there that I'm
11  not thinking about right now.
12    Q.  So would you agree --
13    A.  But as of this moment, that's about the
14  most honest I can be about with it.
15    Q.  So you would agree with me that the $7,300
16  is less than --
17    A.  Yes.
18    Q.  -- the 12,000 that you put on here?
19    A.  Uh-huh (Affirmative Response).
20    Q.  Look at the third page labeled living room
21  on Defense Exhibit 226.  What do you value your two
22  sofas at?
23    A.  One of them was an antique and I value it
24  at about 5,000, 6,000 maybe, I don't know somewhere
25  in there.  The other one was an Italian leather, and

Page 59

1  I'd say about 2,000.
2    Q.  On the antique, where did you purchase
3  this sofa?
4    A.  I purchased this from an individual over
5  30 years ago.  And then had it all redone and some
6  business in Livingston Parish.  I forgot what the
7  name of it was.  And I sent it to another place, I
8  had all the woodwork -- all the re-upholstery done
9  first.  Then sent it and got all the woodwork
10  redone.
11    Q.  How old of a sofa was it?
12    A.  It was 95 years old.  Not when I purchased
13  it.
14    Q.  And then the Italian leather sofa, how old
15  was that?
16    A.  Couple of years.
17    Q.  How many?
18    A.  Two.
19    Q.  Do you recall where you purchased it?
20    A.  Yes.  I bought it in -- I'm trying to
21  think of the name of the place now.  It used to be
22  where Rooms To Go are at right now.  It was the
23  business that was in there on Pass Road in Gulfport.
24  It went out of business, so for Rooms To Go.
25    Q.  Chairs?  What kind of chairs did you have?

Page 60

1    A.  I had one that matched my sofa, my antique
2  sofa.  And I had one that matched my Italian leather
3  sofa.
4    Q.  And how much do you value those at?
5    A.  I have to think about it.  The Italian
6  leather I think was around 800.  And I'm just
7  thinking of something that also I paid 200 for was a
8  footstool.  And I don't even have it on this list.
9  In Italian leather also.  And the antique chair, I
10  would say at least about 700 for it.
11    Q.  How did you come up with that estimate?
12    A.  For what I paid for it and what it cost me
13  to have it redone and the 30 years that I had
14  polished it and kept it up.
15    Q.  How much did you pay for it?
16    A.  I don't remember.  I bought a whole -- I
17  bought three rooms full of furniture way back when.
18  And I think I paid around 10,000 for all of it.  And
19  then I spent a lot of money on it afterward.
20    Q.  How much money did you spend on the
21  antique chair to reupholster it?
22    A.  I don't remember.  I had it done with the
23  sofa and all of that.
24    Q.  The six tables, what do you value that at?
25    A.  Well, three or four of those was the

Page 61

1  antique tables that went with the living room set.
2  And a couple, I think it was three.  And I think the
3  other three was two end tables and a coffee table
4  that went with the Italian sofas and all.  And they
5  were around two to 250 each.  And the antique
6  tables, I just don't really remember what kind of a
7  price I would put on those.  They were very nice
8  tables and I had paid a lot to get them all redone
9  and everything.
10    Q.  So, let me make sure I understand.  For
11  the antique chair, for example, you don't remember
12  precisely how much you paid for it?  You don't
13  remember how much you paid to have it reupholstered?
14  The tables, you don't recall or you don't know what
15  the value would be that you would put on it?  But
16  you've put a total value of your living room at
17  $15,000; is that correct?
18        MR. CARTER:  Object --
19    A.  I'm trying to cover -- excuse me.
20        MR. CARTER:  I was just going to say
21  object to form.
22        THE WITNESS:  Okay.
23        MR. CARTER:  Also, I think you had cut her
24  off when she was answering about the tables.
25    A.  Uh-huh.  The tables, I'm going to try to

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 62

1  and give you an answer on that, but I need to think
2  about it a second. I told you the three that went
3  with the Italian sofa, the Italian leather sofas and
4  all. Okay. The other three, I would say a thousand
5  dollars between the three of them.
6     Q.  (By Mrs. Locke)  So 1,750 for the tables?
7  That would be three times $250 --
8     A.  No, it would -- excuse me just a moment.
9  It would be more than that on the antique tables.
10    Q.  How much for the antique tables?
11    A.  I paid 800 for one of them, it just dawned
12 on me. And then I had three more. I had forgot
13 about that one I paid $800 for and then I had it
14 redone. It cost me a couple of thousand dollars to
15 get it redone.
16    Q.  So for the six tables, what value would
17 you put on that?
18    A.  Four thousand.
19    Q.  And break that down for me. How did you
20 get the $4,000 figure?
21    A.  Because of the antique tables.
22    Q.  There's three antique tables?
23    A.  Okay.
24    Q.  Is that correct?
25    A.  Yes.

Page 63

1     Q.  And --
2     A.  And I know I paid 800 for one. And then I
3  spent a lot -- a lot of money on having it redone.
4     Q.  How much money did you spend having that
5  antique table redone?
6     A.  I think at least a thousand dollars or
7  1,200 something like that. It had a lot of little
8  groves and woodwork and took a little time to do all
9  that little detail.
10    Q.  And what about the two other antique
11 tables, how much do you value those at?
12    A.  Probably about a thousand between the two
13 of them. And then the center table was another
14 probably seven, 800.
15    Q.  And what about for the three non-antique
16 tables? You said those were --
17    A.  I think I answered that was 600 around
18 six, seven hundred.
19    Q.  -- Okay. So I have the total value then
20 is not 4,000, it would be $3,700; is that correct?
21    A.  I don't know. I didn't add it up.
22    Q.  And you said $800 for the original antique
23 table plus between 1,000 and $1,200 to have it
24 redone. So if you take the larger number that would
25 be $2,000 for the antique table. You said $1,000

Page 64

1  between the other two antique tables. And between
2  six and $700 for the three non-antique tables. So
3  taking the higher amounts of all of that 2,000,
4  1,000 and 700, would be $3,700; is that right?
5     A.  For the tables? It's about right I guess.
6     Q.  And how much is the TV?
7     A.  The TV screen was around 2,000.
8     Q.  And the VCR and DVD and lots of CD's?
9     A.  Yeah. The VCR and the DVD was around 450,
10 I paid for that.
11    Q.  Where did you purchase those?
12    A.  At Sears.
13    Q.  When?
14    A.  Several years ago, but they were all
15 working fine. Probably around '98 or '99.
16    Q.  So you're putting a $450 value on a VCR
17 and DVD player that you purchased in 1998 or 1999?
18    A.  That's what I paid for it. It was still
19 working fine.
20    Q.  Pictures and misc?
21    A.  Picture and miscellaneous. Okay, I had
22 lots of CD's. They're anywhere from 10 to $20 each.
23    Q.  So do what do you value the lots of CD's?
24    A.  Probably 70 or 80.
25    Q.  What about pictures and misc; what do you

Page 65

1  value that at?
2     A.  Pictures and miscellaneous. Okay. About
3  2,500.
4     Q.  I think I skipped over lamps. What do you
5  value your lamps at?
6     A.  About 500. Some were less than a hundred,
7  some were more. So it's probably an average of
8  around five.
9     Q.  Well, the total that you gave me does not
10 add up to $15,000?
11    A.  Okay, what does it add up to?
12    Q.  Well, the point being is that there are no
13 values placed next to these and the values that
14 you've given me today do not total $15,000.
15    MR. CARTER: Is that a question?
16    Q.  (By Mrs. Locke)  How is --
17    MRS. LOCKE: There will be if you let me
18 finish.
19    MR. CARTER: Okay.
20    Q.  (By Mrs. Locke)  How is Nationwide
21 supposed to determine the accuracy of this list when
22 the value that you give me today sitting here in the
23 deposition is different than the value that you've
24 placed on the list?
25    A.  Because you didn't much time to think

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 66

1   about it.  I'm here trying to get some answers for
2   you the best I can.
3           MR. CARTER:  Objection --
4       A.  And it's not exactly accurate.
5           MR. CARTER:  -- Objection to form and
6   foundation.  And it's argumentative and move to
7   strike.
8       Q.  (By Mrs. Locke)  Why don't you turn to the
9   last page of Defense Exhibit 226, which is Bates
10  numbered 1206.  It says, is entitled upstairs
11  storage.  Can you tell me where --
12      A.  It was over my garage.
13      Q.  -- And this was a detached garage; is that
14  right?
15      A.  No, it was a built-in double garage.
16      Q.  That's right.  I apologize.  So would this
17  have been an attic area?
18      A.  It had stairs going up to it from the
19  garage to the attic.
20      Q.  Decorations for all holidays.  What do you
21  value that at?
22      A.  Probably 2,000.  I had a lot -- a lot a
23  lot of decorations up there.
24      Q.  What kinds of decorations?
25      A.  All your Christmas tree lights going all

Page 67

1   around your house, all in your bushes, all of that.
2   Easter decorations.  Halloween.  I had quite a few
3   Halloween's.
4       Q.  So aside from the holidays, I mean, what
5   -- and lights that you would put on your house, what
6   other types of decorations would you have?
7       A.  I had lots of Mardi Gras decorations,
8   flags.  Mardi Gras flags.  I had a lot of LSU
9   decorations for when LSU was playing football, stuff
10  like that.
11      Q.  Ice chests?  Is that like a cooler?
12      A.  Yeah.  I had about eight different sizes
13  of them up there.  Because they took up too much
14  room in my garage.
15      Q.  So there was more than one?
16      A.  Yes.
17      Q.  And were they electric ice coolers?
18      A.  No.
19      Q.  They were --
20      A.  They were just regular coolers.
21      Q.  So what do you value those at?
22      A.  They were anywhere from 20 to 40 or $50
23  for each one of them.  I had all different sizes.  I
24  had them on wheels that rolled and pulled for
25  tailgating and everything.  So I would say probably

Page 68

1   300.
2       Q.  All kinds of outdoor items.  What would
3   those include?
4       A.  All kinds of -- I had my burners up there.
5   I had everything that went with crawfish boiling,
6   all but the tanks.  I didn't have the gas tanks up
7   there.  But I had all that kind of equipment.  Had
8   jambalaya pots, stuff like that.
9       Q.  Would this be like barbecue equipment?
10      A.  Uh-huh (Affirmative Response).
11      Q.  And what do you value that at?
12      A.  Geesh, about 800.  Probably eight or 900.
13      Q.  And lots of miscellaneous items.  What do
14  you value that at?
15      A.  About 1,800 at least.
16      Q.  And what do you include in miscellaneous
17  items?
18      A.  I had tents like to set up on the beach,
19  lawn chairs all that type of thing.  I had even
20  boots, the white shrimper boots and all that.  Just
21  lot of different miscellaneous things.
22      Q.  You can set your -- this list aside for
23  now.
24      A.  Okay.
25          MR. CARTER:  Counsel, I just want to state

Page 69

1   for the record that you've only been through a
2   couple of pages here.  And now is your chance to
3   exhaust this list.  If you fail to do so, I don't
4   want you trying to claim prejudice with that later.
5           MRS. LOCKE:  Kris, this is neither the
6   time or the place to start arguing motions.  This is
7   a deposition that we have the, you know, ability to
8   run as -- and ask questions as we see fit.
9           MR. CARTER:  All right.  I'm not trying to
10  argue a motion.  I'm just telling you, don't go tell
11  the judge you didn't have a chance to ask about all
12  of this.
13      Q.  (By Mrs. Locke)  I'm going to hand you
14  what's been marked as Defense Exhibit 223.
15
16          (Exhibit 223 marked for identification.)
17
18      Q.  Do you recognize this?
19      A.  Uh-huh (Affirmative Response).
20      Q.  If you could flip through, obviously there
21  are a lot of pages here.  But if you look at the
22  bottom of the document, you'll see that the first
23  page of Defense Exhibit 223 is Bates number 479 and
24  the last page ends on Bates number 712.
25      A.  Okay.

Helen Politz - 03/24/09

19 (Pages 70 to 73)

Page 70

1    Q.  Do you recognize this document as receipts
2  that you've provided to your attorney?
3    A.  Yes.
4    Q.  And did you provide these receipts to your
5  attorney because you believe Nationwide owes you for
6  the value that is listed in each of these receipts?
7    A.  I furnished these to my attorney because
8  they were asked for them -- they asked for them.  I
9  believe y'all were wanting them and he asked me to
10 make a list for y'all and furnish what I could, so I
11 did.
12   Q.  Are you claiming that you're entitled to
13 insurance money based on these receipts?
14   A.  To a point.
15   Q.  What do you mean by to a point?
16   A.  Well there's things I had to replace to be
17 able to live again, that kind of point.
18   Q.  Are you claiming that they're all --
19   A.  No.  Some of them was just because I got a
20 loan and I was able to start replacing things in my
21 house.
22   Q.  So how is Nationwide able to determine
23 which receipts you're claiming we owe you for and
24 which receipts you're not claiming?
25   A.  You owe me for every one of them.

Page 71

1    Q.  Okay.
2      MR. CARTER:  And again, argumentative --
3      THE WITNESS:  Okay.
4      MR. CARTER:  -- question, foundation.
5  Counselor, you know that's not a proper question for
6  her to ask how Nationwide is supposed to do its job.
7    Q.  (By Mrs. Locke)  So you just testified
8  that Nationwide owes you money for every one of the
9  receipts; is that correct?
10   A.  I haven't had time to look at this whole
11 catalog you have in front of me.  But is that all
12 receipts that I turned in?  To best of my knowledge
13 this is all receipts that I turned in of things that
14 I bought after the storm.  If I had not lost a lot
15 of this I wouldn't have had to replace it.  So in
16 replacing it, I think Nationwide owes me that.
17 That's the best my -- answer I can give you.
18   Q.  So it's your testimony that these receipts
19 represent the items that you've had to replace due
20 to hurricane damage?
21     MR. CARTER:  Counselor --
22   A.  They --
23     MR. CARTER:  Hang on one second, Mrs.
24 Politz.  Objection.  You've handed her a stack of
25 about 400 dollar -- 400 documents, 300 at least,

Page 72

1  hadn't had time to count them exactly.  If you have
2  specific questions about specific items, you can ask
3  her about them.  I'm going to object to the form.
4  And then you're asking about this bulk document.
5  Y'all have had these for months.  If you have
6  specific questions about specific receipts, ask her
7  about those.  That's my objection.
8    Q.  (By Mrs. Locke)  Are you claiming that the
9  receipts in this document which your lawyers have
10 provided to Nationwide, that Nationwide is
11 responsible for paying -- let me rephrase that.  Are
12 you claiming that these receipts in this document
13 represent items that you've replaced because of
14 hurricane damage?
15   A.  Yes.
16     MR. CARTER:  Same objection.
17     THE WITNESS:  Excuse me.
18   Q.  (By Mrs. Locke)  So in providing receipts
19 to your lawyers, did you understand that Nationwide
20 would be relying on those receipts to make their
21 determination on coverage?
22   A.  No.  I'm not sure quite how to answer
23 that.  Because Nationwide never faced their
24 obligation so far, so why would I think they're
25 going to pay me now?  I'm just trying to furnish

Page 73

1  something is why I'm suing them is because they
2  didn't pay.  I can't assume anything that they're
3  going to do.
4    Q.  But you believe that it's Nationwide
5  obligation --
6    A.  Absolutely or I wouldn't be here.
7    Q.  -- And you believe it's Nationwide's
8  obligation to use these receipts to make an
9  insurance payment; is that right?
10   A.  If they choose to.
11     MR. CARTER:  Same objection.
12   Q.  (By Mrs. Locke)  So Nationwide does not
13 have an obligation to rely on these receipts?
14     MR. CARTER:  Objection.
15   A.  Nationwide has an obligation to pay me.
16     MR. CARTER:  Calls for a legal conclusion.
17   Q.  (By Mrs. Locke)  Would you agree with me
18 that it's important to be honest in the receipts
19 that you submit --
20   A.  As honest as I can be.  I have been and I
21 will continuing being.
22   Q.  -- Okay.  And you consider yourself an
23 honest person?
24   A.  Absolutely.
25   Q.  And you think it's a good moral trait that

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 74

1  you have?
2      A.  Yes.
3      Q.  Do you agree with me that if a receipt was
4  not yours or was not Mr. Politz's then you would not
5  be entitled to recover insurance money for it?
6      MR. CARTER:  Objection to form,
7  foundation.
8      A.  I -- I don't know what you're getting at
9  right now.
10     Q.  (By Mrs. Locke)  If there was a receipt
11 that was submitted that was not your receipt or a
12 receipt incurred by Mr. Politz, would you agree with
13 me that Nationwide does not owe that money?
14     MR. CARTER:  Same objection.  And again,
15 if you have a specific receipt you're asking about
16 ask her about it?
17     A.  Yes, please.
18     Q.  (By Mrs. Locke)  What I'm asking you is,
19 you think it's important to be -- to provide
20 receipts that you or Mr. Politz actually incurred
21 cost for; is that right?
22     A.  That seemed to be what y'all wanted.  So i
23 got it for you the best I could.
24     Q.  So if there's a receipt that was not yours
25 or Mr. Politz's, you would agree with me --

Page 75

1      A.  What specific receipt are you talking
2  about?  Then I can answer your question.
3      Q.  Ma'am, my question is a general one.  If
4  there's a receipt that was not yours and was not
5  Mr. Politz's, do you agree with me that Nationwide
6  would not owe that money to you or Mr. Politz?
7      MR. CARTER:  Same objection.  And again,
8  counselor, rather than trying to rely on "got you"
9  cross-examination if you have a specific question,
10 ask her about it.  She's already answered that one a
11 couple of times.
12     MRS. LOCKE:  Kris, I'm tired of the
13 speaking objections.  It's enough.
14     MR. CARTER:  It's not a speaking
15 objection.  I just asked you -- I made a specific
16 objection on the record.
17     MRS. LOCKE:  You're coaching the witness.
18 I'm asking --
19     MR. CARTER:  I'm not at all.
20     MRS. LOCKE:  I'm asking a general question
21 about receipts that Mrs. Politz and Mr. Politz
22 incurred.  And if she agrees with me that if a
23 receipt was not hers or her husband's, whether
24 Nationwide is obligated to pay for it?
25     A.  I'm not going to answer that until I see a

Page 76

1  receipt.  If you have specific one you want me to
2  look at, I would tell you the honest truth.
3      MRS. LOCKE:  Are you directing the client
4  not to answer the question?
5      MR. CARTER:  Did you hear me direct her
6  not to answer?
7      MRS. LOCKE:  Well, I'm asking -- well,
8  then would you please direct her to answer my
9  question.
10     MR. CARTER:  Counselor, if you have -- if
11 you ask a better question she can answer it.  You're
12 asking her --
13     MRS. LOCKE:  I'm asking --
14     MR. CARTER:  -- And again, let me finish
15 my objection or my statement since you've now asked
16 me to -- for my -- to do something on the record.
17 You've asked her an ambiguous generic question, I'm
18 objecting to the form and the foundation of it.  If
19 you want to lay proper foundation, put the receipt
20 in front of her -- I'm not going to tell you how to
21 do your job -- but put the receipt in front her and
22 ask her about it, do it.  If you're trying to catch
23 her in something then, you know, I mean, I can't
24 help you.
25     Q.  (By Mrs. Locke)  Mrs. Politz, I'm asking

Page 77

1  you to answer the question as you're obligated to
2  and that we agreed to do this morning.  Remember my
3  job is to ask you questions you can understand and
4  your job is to answer them to the best of your
5  ability.  Remember?
6      A.  Okay.
7      Q.  I'm asking if there's a receipt that was
8  not yours and was not your husband's would
9  Nationwide, in your opinion, owe you for that money?
10     MR. CARTER:  Same objection.
11     A.  No, if it's a receipt that was neither one
12 of ours.  I don't know of any.  If there's any in
13 there it's a mistake.
14     Q.  (By Mrs. Locke)  Sure.  That's fine.
15 That's all I was trying to get at.
16     A.  Okay.
17     Q.  Thank you.
18     A.  But I would like for you, if you have one
19 specific thing if you would put it in front of me
20 and question me about it and I can give you an
21 honest answer.
22     Q.  Did you have any -- at the time of
23 Hurricane Katrina did you have any other dependents
24 living in your home aside from you and Mr. Politz?
25     A.  No.

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 78

1     Q.  And all of your children were grown adults
2  at the time of Hurricane Katrina?
3     A.  Yes.
4     Q.  And all of Mr. Politz's from his first
5  marriage were also adults; is that correct?
6     A.  Yes.
7     Q.  Now if there were receipts that were
8  duplicated, you wouldn't be claiming that Nationwide
9  needs to pay you twice would you?
10    A.  I never got any money from them one time
11 to pay for anything, why would I expect it twice?
12    Q.  But my question is a little bit different.
13 If there's a receipt that is reflected, the value of
14 which is reflected twice, you're not expecting
15 Nationwide to pay you twice are you?
16    A.  I'm expecting Nationwide to replace what I
17 lost.
18    Q.  My question --
19    A.  And what they owe me and other than that I
20 don't expect a lot from them.
21    Q.  -- But my question is a little bit
22 different and a little bit narrower.
23    A.  Well, I don't understand why you're asking
24 me these questions.
25    Q.  I understand you don't understand right

Page 79

1  now, but it's a general question and I'm trying to
2  understand.  If you've submitted a receipt twice,
3  you don't believe that Nationwide should pay it
4  twice do you?
5     A.  No.
6     Q.  That's all I'm -- that's all I'm asking.
7  Now if you could turn to Bates number 480 of Defense
8  Exhibit 223.  And we're going to be looking at pages
9  480,481 and 482.  And those are receipts from Sleepy
10 King; is that correct?
11    A.  I haven't even gotten to the pages yet.
12    Q.  If you look at the bottom 480, it's the
13 second page.
14    A.  Oh, it's right here.
15    Q.  So looking at pages 480, 481 and 482,
16 these are receipts from Sleepy King; is that right?
17    A.  Yes.  Yeah, where I bought some mattresses
18 and things for the house.
19    Q.  So you recognize these receipts?
20    A.  480 and 481?
21    Q.  And 482?
22    A.  Yes.
23    Q.  Let's focus on page 481 of Defense
24 Exhibit 223.  The very top of the page it says
25 deliver to Huntington Circle, Gulfport and the

Page 80

1  street address is 13446; is that your address?
2     A.  That's the address -- that's the address
3  in Gulfport of the home we bought.
4     Q.  And the date is July 18, 2006, do you see
5  that?
6     A.  Yes.
7     Q.  And on the items listed it says one Sealy
8  Q set, and I can't make out the last word; do you
9  see that?
10    A.  One queen size is what the "Q" is for.
11    Q.  Is that -- is that consistent with your
12 recollection of purchasing a queen size bedroom --
13 was this a mattress?
14    A.  It was mattresses, yes.
15    Q.  And you purchased a queen size mattress
16 approximately July 18, 2006?
17    A.  Yeah.
18    Q.  And you had it delivered to your new --
19 new home in Gulfport; is that right?
20    A.  Correct.
21    Q.  Did you have a queen mattress in your old
22 home?
23    A.  Yes.
24    Q.  What room was that in?
25    A.  I had two bedrooms in my old house.  And I

Page 81

1  had queen bedroom sets in both of them.
2     Q.  Okay.  If you turn the page to Politz482.
3  The date on this receipt is July 8, 2006.  So this
4  would be just 10 days earlier from the previous
5  receipt; do you see that?
6     A.  Uh-huh (Affirmative Response).
7     Q.  And the address on this receipt the Gates
8  Avenue, which is my understanding was the FEMA
9  trailer; is that correct?
10    A.  Yes.
11    Q.  Did you move between these two dates?
12    A.  I moved in January, I think, or February,
13 something like that -- no, no, no, that's when I got
14 into the FEMA trailer in January, I think.  And I
15 moved out in July when we got our house.  When we
16 got the loan through and got the house and started
17 buying furniture and stuff.  I moved to -- from 5519
18 Gates.
19    Q.  In approximately July of '06 is when you
20 moved from the FEMA trailer to the new home; is that
21 right?
22    A.  Yes.
23    Q.  So that explains the difference in address
24 between these two receipts?
25    A.  Uh-huh (Affirmative Response).

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

22 (Pages 82 to 85)

**Page 82**

1    Q.  Is that the difference?
2    A.  Yes.
3    Q.  Here it says quantity two sleep king Q
4  sets imperial.  Were those mattresses as well?
5    A.  Excuse me.  I'm trying to think.  I bought
6  three queen size mattress sets and two twins.
7    Q.  But you testified in your old home you
8  only had two queen sets; is that right?
9    A.  Yes.
10    Q.  So are you claiming that Nationwide owes
11  you for the two twin sets and the additional third
12  queen set?
13    MR. CARTER:  Object to the extent it calls
14  for a legal conclusion.  You can answer.
15    A.  I had a larger house.  I didn't have time
16  to shop around.  My husband was very stressed, I had
17  to get him out of that FEMA trailer.  And I got into
18  a larger house and I decided to go ahead and try to
19  furnish it the best I could to enjoy it.  Yes, so I
20  got an extra bedroom set.
21    Q.  (By Mrs. Locke)  Sure.  Are you claiming
22  that Nationwide owes you for the extra bedroom set?
23    MR. CARTER:  Same objection.
24    A.  Well, if I hadn't lost my home I wouldn't
25  have bought it.  I had to replace furniture the best

**Page 83**

1  I could, make my home livable.
2    Q.  In your old home at Winters Lane, did you
3  have the two twin mattresses?
4    A.  I had chairs, folding chairs and stuff
5  like that for extra company when they came.  I
6  folded out and the kids slept on them.  I had blow
7  up mattresses and stuff like that.
8    Q.  But you didn't have two mattress sets,
9  twin mattress sets?
10    A.  No, I didn't.  But rather -- since I had
11  the room, rather than buy all the blow-up chairs and
12  fold out chairs and the blow up mattresses and all
13  that, I decided to get the twin beds for the
14  grandkids when they came.
15    Q.  If you look at Bates number 484, which is
16  just -- if you just flip one page over on Defense
17  Exhibit 223.  We're going to be looking at Bates 484
18  through 488.  It appears that that is all one
19  receipt.  But you can tell me if I'm reading that
20  incorrectly.
21    A.  From 484 through 486?
22    Q.  488.
23    A.  Through 488?  Yes.
24    Q.  Can you tell me what this is a receipt
25  for?

**Page 84**

1    A.  Yes.  It's for a lot of furniture that I
2  had to replace and put in my house for bedding, for
3  furniture.  Like living rooms set, refrigerator, TV
4  --
5    Q.  You said --
6    A.  Mattresses, all that, at Ashley Furniture
7  Store at Baton Rouge.
8    Q.  -- Sorry, I didn't mean to interrupt you
9  there.
10    A.  Okay.
11    Q.  You said you old home had two bedrooms and
12  we went through some pictures during the last
13  deposition --
14    A.  Uh-huh (Affirmative Response).
15    Q.  -- of that.  How many bedrooms did your
16  new home have?
17    A.  Four.
18    Q.  Do you know approximately how many square
19  feet your new home had?
20    A.  I think it was around 1,800.
21    Q.  It was larger than your old home; is that
22  right?
23    A.  Right.
24    Q.  And so it required more furnishings than
25  your --

**Page 85**

1    A.  Other one, uh-huh (Affirmative Response).
2    Q.  Is that correct?
3    A.  Correct.
4    Q.  Did you furnish all four bedrooms in your
5  new home?
6    A.  Yes.
7    Q.  Your old home also had a sun room that was
8  used as a dining room?
9    A.  Correct.
10    Q.  And a kitchen and hallway area, if I'm
11  remembering correctly; is that right?
12    A.  (Nodded Head Affirmatively).
13    Q.  And a utility room; is that right?
14    A.  Uh-huh (Affirmative Response).
15    Q.  Were there any other rooms in the main
16  part of the house that I'm -- that I'm leaving out?
17    A.  The kitchen area by the living room kind
18  of between the kitchen and the living room.  It was
19  all a big open area.
20    Q.  So your old home had the two bedrooms, the
21  kitchen area, the hallway, the sun room, the utility
22  room as well as the garage, right?
23    A.  Uh-huh (Affirmative Response).  And two
24  bathrooms.
25    Q.  And your new home had four bedrooms and

Helen Politz - 03/24/09

Page 86

1  also I imagine had a kitchen?
2      A.  Yes.
3      Q.  Did it have a separate kitchen area?
4      A.  It all open, blended together.  But it was
5  -- yeah, it was definitely a kitchen.
6      Q.  Did it have a separate dining room?
7      A.  Yes.
8      Q.  And it probably had a hall --
9      A.  Well, actually it didn't -- it wasn't a
10  separate closed in dining room.  It was an open area
11  as much as we could get it like ours was on Winters
12  Lane.
13      Q.  Did you furnish it as a -- with separate
14  dining room furniture?
15      A.  Yes.
16      Q.  Did your new home have a utility room as
17  well?
18      A.  Yes.
19      Q.  And a garage?
20      A.  Well, actually it had a utility room
21  between the kitchen and the garage.
22      Q.  So the new home also had a garage then?
23      A.  Yes.
24      Q.  How many bathrooms did the new home have?
25      A.  Two.

Page 87

1      Q.  Any other rooms in the new home that I --
2  we haven't listed?
3      A.  Four bedrooms, two baths --
4          VIDEOGRAPHER:  Two minutes.
5      A.  -- utility room and a double garage.
6      Q.  So the items that are listed in Politz --
7  Why don't we switch tapes.  Sorry about that.
8          VIDEOGRAPHER:  Off record at 10:55.
9  Change tape two.
10
11          (Off the record.)
12
13          VIDEOGRAPHER:  Back on record at 10:56.
14  Starting tape three.
15      Q.  (By Mrs. Locke)  Of the furniture items
16  that are listed in Politz484 through 488, did you
17  actually purchase all of these items and receive
18  delivery of these items?
19      A.  Yes.
20      Q.  If I could direct your attention to
21  Politz485.
22      A.  Okay.
23      Q.  One of the last items listed is elite --
24  I'm sorry, three furniture protection elite for
25  $199.99; do you see that?

Page 88

1      A.  Uh-huh (Affirmative Response).
2      Q.  Is that insurance on the furniture?
3      A.  Yes.
4      Q.  Are you asking Nationwide to reimburse you
5  for the insurance that you paid for on this new
6  furniture?
7      A.  I wouldn't have been buying the furniture
8  if Nationwide had paid me like they should have.
9  So, yes, I'm asking it.
10      Q.  If you look up a couple of lines, the
11  third item from the bottom.  It says rest 50
12  mattress --
13      A.  Uh-huh.
14      Q.  -- 439.  Did you also purchase a mattress
15  from Ashley furniture here?
16      A.  I bought one from Ashley Furniture, one
17  set and I bought two from Mattress King.
18      Q.  If I could direct your attention to
19  Politz487.  The very top item says 52-inch DLP cable
20  card?
21      A.  Uh-huh.
22      Q.  Is that a TV?
23      A.  Yes, it is.
24      Q.  Now, in your contents list on Defense
25  Exhibit 226, on Bates 1198 you've listed a 50-inch

Page 89

1  TV?
2      A.  That's the one I lost.  Where was that at?
3      Q.  On page 1198 of Defense Exhibit 226,
4  you've listed a 50-inch TV?
5      A.  Yes.
6      Q.  And that was the TV that you lost,
7  correct?
8      A.  Yes.
9      Q.  And the new TV you purchased was a larger
10  TV; is that right?
11      A.  It was 52.  It thought it was 50, but it
12  looks like it was 52.
13      Q.  Now on -- so your understanding is that
14  you did purchase a 52-inch television; is that
15  right?
16      A.  That's what I understand now.  I thought I
17  had gotten a 50.  So I may have reported a 50, I
18  don't remember.
19      Q.  But you old television was a 50-inch?
20      A.  Yes.
21      Q.  And on Politz487 it also says five warn TV
22  --
23      A.  Uh-huh.
24      Q.  -- for $299.95?
25      A.  Uh-huh.

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 90

1    Q.  Is that a warranty that you purchased on
2  the TV?
3    A.  It is.
4    Q.  And are you also asking Nationwide to pay
5  for the TV warranty?
6    A.  Yes.  Because I had a warranty on my other
7  one when I bought it.  I buy warranties like that.
8  Okay.  And I had paid for a warranty on the one I
9  lost.
10    Q.  On the 50-inch TV that you listed in your
11  living room contents list, how old was that TV?
12    A.  Probably about five or six years old.
13    Q.  Do you recall where you purchased it
14  originally?
15    A.  At Sears.
16    Q.  And you purchased a warranty on that
17  originally as well?
18    A.  Do what?
19    Q.  And you purchased -- when you purchased
20  the 50-inch TV from Sears, did you also purchase a
21  warranty on it?
22    A.  Yes.
23    Q.  If you look at Bates 488.  At the bottom
24  of the page it says merchandise total $9,049.96; do
25  you see that?

Page 91

1    A.  Uh-huh (Affirmative Response).
2    Q.  And then there's a --
3    A.  Well, I think it's 92,000 -- I mean,
4  9,299, isn't it?
5    Q.  Correct.  And there's a -- so there's a
6  $250 charge that's also added?
7    A.  Delivery charge, yes.
8    Q.  So the total amount including delivery of
9  all the items you purchased was approximately
10  $9,300; is that right?
11    A.  Yes.
12    Q.  But the exact figure is 9,299.96, right?
13    A.  Correct.
14    Q.  Now, if you could turn to Bates 494.  And
15  look at the receipts beginning on page 494 of
16  Defense Exhibit 223 through 496.  So, three pages.
17  And if I could focus your attention on Bates 496.
18  The very bottom it says sales total is 9,299.96; do
19  you see that?
20    A.  Yes.
21    Q.  -- is it fair to say that the receipt that's
22  in Politz494 to 496 duplicates the receipts that we
23  just looked at beginning on Bates 484 and ending on
24  488?
25    A.  It looks like it does.

Page 92

1    Q.  Olinde's, do you know --
2    A.  Olinde's is where I bought it from.
3    Q.  Is that affiliated with Ashley Furniture?
4    A.  Yes, it is.  Well they sell Ashley
5  furniture, a lot of it.  It's what they mostly --
6    Q.  Is Ashley furniture a brand of furniture?
7    A.  Yes, it is.
8    Q.  So you would agree that --
9    A.  It looks like a duplicate somehow got in
10  there by mistake.
11    Q.  -- Okay.  So you would agree that, you're
12  not asking Nationwide to pay double on that --
13    A.  No.
14    Q.  -- $9,299 --
15    A.  92 -- I'm not asking them to pay double.
16  That must be what you were referring to a while ago.
17  That was a mistake that just happened.
18    Q.  If you could turn to Bates 497.  It's
19  actually before that.  I think you're a little too
20  far.  It has a Cable One logo at the top.  You're --
21  keep going back.  There you go.  Keep going back.
22  There you go right there.
23    A.  Okay.
24    Q.  So we're looking at Bates 497 on Defense
25  Exhibit 223.  Do you recognize this receipt as a

Page 93

1  cable installation bill?
2    A.  It looks like what it was.
3    Q.  Is Cable One a --
4    A.  Cable One was what I had in Gulfport.
5    Q.  And under services it list installation
6  fee $30; do you see that?
7    A.  Uh-huh (Affirmative Response).
8    Q.  And it also list digital basic cable in
9  the amount of $52.45; do you see that?
10    A.  I do.
11    Q.  Are you claiming that Nationwide should
12  pay you for your basic cable bill?
13    A.  It was -- yes, I am.  Because it was
14  something I had paid for that I had in my home I
15  lost.  Therefore I had to pay for it again and it
16  was Nationwide -- it was the storm's fault that it
17  happened, so I felt like they owed it to me.
18    Q.  So you did have cable in your previous
19  home in --
20    A.  Yes.
21    Q.  -- in Long Beach; is that right?
22    A.  Yes.  I was trying to get back to where I
23  was to be comfortable.
24    Q.  So you would agree with me that had the
25  storm not occurred you would have still had cable in

Helen Politz - 03/24/09

Page 94

1    your home in Long Beach; is that right.
2        A.   Yeah.  And I had paid for it, Nationwide
3    didn't.  But I lost it and I felt like they owed me
4    that to get it back.
5        Q.   Do you think Nationwide is obligated to
6    pay your -- continuing to pay your monthly cable
7    bill?
8            MR. CARTER:  Objection to the extent calls
9    for a legal conclusion?
10       A.   That's not for a cable bill.  I pay my own
11   cable bill.  That's for installation and being able
12   to get back to cable where I wanted.  I never sent
13   y'all any bills for cable unless it was a mistake.
14       Q.   (By Mrs. Locke)  Looking at this receipt
15   here, there's a installation fee of $30, correct?
16       A.   Uh-huh (Affirmative Response).
17       Q.   So you're claiming that Nationwide owes
18   you to set up the new cable; is that right?
19       A.   Yes, I do.
20       Q.   But the digital basic cable $52.45, are
21   you claiming that that's a installation fee?
22       A.   No, that's what I'm claiming that I had to
23   get -- to pay to get back where I was in my home on
24   Gates when the storm hit.  Why should -- I mean, I
25   have insurance for my home and for my loss and all

Page 95

1    that.  Why shouldn't, when I have all that insurance
2    coverage, why shouldn't they pay to make me as
3    comfortable as I was before the storm.
4        Q.   I guess I don't understand what you think
5    the digital basic cable dollar amount for $52.45
6    represents?  You agree --
7        A.   It represents me being able to get cable
8    or not being able to get cable.
9        Q.   -- So you would agree me that it's
10   services for cable?  It's not installation services?
11       A.   Yeah, it's services for cable.  Part of it
12   was that.  But it's services that had the storm not
13   come I wouldn't have had it.  Okay.
14       Q.   You agree with me you had cable in your
15   own home?
16       A.   Yes, I did.
17       Q.   And you paid monthly on a cable bill in
18   your old home, correct?
19       A.   Yes.
20       Q.   I'm going to ask you to skip ahead.
21       A.   Okay.
22       Q.   To -- beginning at Bates number 522 on
23   Defense Exhibit 223.  And it's a page that begins
24   with receipts from a store called Chelsea.
25       A.   Okay.

Page 96

1        Q.   Do you recognize these receipts as
2    prescriptions for --
3        A.   Yes.
4        Q.   -- Mr. Politz?
5        A.   It's where we -- when we wound up in
6    Alabama, we was in a town called Chelsea, Alabama
7    and we had to stay there for five months.  And I
8    went to -- he had to have his medication, I did too.
9    So we went to the store and set up getting our
10   prescriptions refilled.  Trying to get our medicines
11   back that we lost and all this type of thing.
12       Q.   Quinapril was a medication that Mr. Politz
13   was on before Hurricane Katrina, correct?
14       A.   Yes.
15       Q.   Now if you focus on Politz522, which is on
16   the left side of the page.  The left side of the
17   page.
18       A.   Okay.
19       Q.   On the top left side of Bates 522, there's
20   a date of September 12, 2005 for Quinapril; do you
21   see that?
22       A.   This one right here?  September the --
23   yeah, the 12th, yes.
24       Q.   And then focusing on the next page on the
25   top left side of the next page.  There's also a

Page 97

1    receipt for October 11, 2005 for Mr. Politz for
2    Quinapril; do you see that?
3        A.   Yes.
4        Q.   So, are you claiming that Nationwide owes
5    you for Mr. Politz's medications, not only in
6    September but also October of 2005?
7        A.   I don't understand about the October.  The
8    September, a lot of it was replacements.  We left
9    you remember -- if you remember, the storm -- we
10   left expecting to be gone one night and come back.
11   So we didn't take all those medicines.  We never
12   dreamed we were going to loose everything.
13       Q.   Right.
14       A.   And so we couldn't -- we had to get some
15   more that might duplicate.
16       Q.   Sure.
17       A.   But, I mean --
18       Q.   So for September 12, 2005, looking on this
19   side of the page, those would have been medications
20   that might have been duplicated, right?
21       A.   Possibly.
22       Q.   But October of 2005, Mr. Politz had to
23   continue taking his medication, right?
24       A.   It was a maintenance.  Yes, he had to have
25   it all the time.

76e0dd4c-daad-478f-9ead-82f978800faf

Page 98

1    Q.  Are you claiming that Nationwide then owes
2  you for Mr. Politz's medicines into October of 2005?
3    A.  No.  I think that was somehow got in there
4  by mistake.
5    Q.  So, be fair to say that in the month or so
6  after Katrina you're expecting Nationwide to pay to
7  reestablish your medications?  But medications that
8  were gotten, you know, in October of '05, you're not
9  claiming Nationwide is responsible for; is that --
10   A.  No, he was taking them as a maintenance.
11   Q.  -- So if you turn to the very next page
12  and it's Politz Bates 525.  It's kind of hard to see
13  looking on this side of the page.
14   A.  Okay.
15   Q.  On the top right side, again, it's a
16  receipt for Quinapril for October 10, 2005; do you
17  see that?
18   A.  Quinapril?
19   Q.  On the top right, right here.
20   A.  Okay.
21   Q.  For Quinapril for October 10, 2005?
22   A.  Uh-huh (Affirmative Response).
23   Q.  Are you claiming that Nationwide should
24  pay for Mr. Politz's medications in November of
25  2005?

Page 99

1    A.  No.
2    Q.  And then if you turn the page to Politz
3  Bates 526 on this -- on this side of the page.
4    A.  Okay.
5    Q.  The very bottom receipt Mr. Politz has a
6  receipt for Quinapril for December 7, 2005.  You're
7  also not claiming that Nationwide owes you for that
8  receipt, correct?
9    A.  No.  My pharmacy bills was all the in like
10  a basket and I didn't have time to get them all
11  straightened out.  And so, I handed them to the
12  attorney that was with me last time when I was
13  fixing to have that deposition.  And to the best of
14  his ability, I'm sure that he logged this all
15  together.  And somehow or the other maybe a
16  duplicate got put in there again.  But, no, I don't
17  expect Nationwide to pay for duplicate medications.
18   Q.  And we've looked at Quinapril for
19  Mr. Politz but he was also on other medications too,
20  correct?
21   A.  Yes.
22   Q.  And so you're not expecting Nationwide to
23  pay for --
24   A.  No.
25   Q.  -- those medications either?

Page 100

1    A.  No.
2    Q.  If you would turn to Bates number 529.
3  And it's going to be kind of hard to tell, but it's
4  -- I think that may be it.  Yeah, that's it.
5    A.  Uh-huh.
6    Q.  You see the Bates 529 right there?
7    A.  Okay.
8    Q.  Now, do you recognize these as your
9  prescriptions?
10   A.  Yes.
11   Q.  Now, Benazepril that's a drug for high
12  blood pressure; is that correct?
13   A.  Yes, it is.
14   Q.  And you were taking that before Hurricane
15  Katrina?
16   A.  Yes.
17   Q.  On the receipt on the top right side of
18  that page the date is September 1, 2005.  That would
19  be medication to reestablish your prescription,
20  correct?
21   A.  Right.
22   Q.  So you would expect Nationwide to
23  reimburse you for that prescription?
24   A.  Yes.
25   Q.  But after that prescription you're not

Page 101

1  expecting Nationwide to reimburse you; is that
2  correct?
3    A.  Correct.
4    Q.  So if you turn -- if you look at the very
5  next page.  Don't -- if you don't flip the page, but
6  just look at the right side of page Bates 530.
7  You'll see receipts for Benazepril the top left for
8  September 27, 2005?
9    A.  It's a maintenance thing that I have to
10  take monthly.  And I only expect Nationwide to pay
11  for it the first month while I was getting
12  established to cover what I lost.
13   Q.  And that would be true for all of the
14  medications that you were taking, correct?
15   A.  Correct.
16   Q.  I'm going to direct your attention to
17  Bates number 534.  Actually, I'm sorry, 536.
18   A.  Okay.
19   Q.  We've seen a receipt that looks similar to
20  this, but this is a little bit different.  It's the
21  same company, D&J Tree and Debris Removal; do you
22  see that?
23      MR. CARTER:  Object to form.
24   A.  Yes.
25   Q.  Do you recognize this receipt?

Helen Politz - 03/24/09

**Page 102**

1      A.  I recognize -- I'm trying to remember it
2  good.
3      Q.  Do you recognize Mr. Politz's signature in
4  the middle of the page?
5      A.  His or mine?
6      Q.  Is that one yours?
7      A.  This one is mine.
8      Q.  Okay.  And you recognize it as yours?
9      A.  Yeah.
10     Q.  The receipt states slab removal $2,500.
11  But you testified earlier that you did not have your
12  slab removed.  Can you explain what this receipt is
13  for?
14     A.  That was what it -- this, I don't know how
15  it got in there with that.  I guess it was just
16  something I wanted to keep and it threw it in the
17  receipt box.  Because the slab is still there.  This
18  is what it was going to cost -- he was going to do
19  it for $3,500.  The slab and pick up.  And I didn't
20  have the money to get the slab removed.  So he
21  quoted me that that's what it would be when he come
22  back to do it.  And I still haven't got him back to
23  do it.  I just paid him for the thousand that he had
24  done.  So this has not been paid yet.
25     Q.  So you're not claiming that Nationwide

**Page 103**

1  owes you for this receipt; is that right?
2      A.  Well --
3          MR. CARTER:  Object to form.  To the
4  extent it calls for a legal conclusion.
5      A.  -- I feel that they will owe me that
6  because I have to have it done before I can rebuild.
7      Q.  (By Mrs. Locke)  But you haven't currently
8  had it done?
9      A.  No.
10     Q.  And so this isn't a receipt that reflects
11  work that's actually been performed?
12     A.  No.  This is just an estimate of what it's
13  going to cost me to get it done.  And that's if I
14  can still get the same man to do it, because it's
15  going to cost me a lot more.  Because he figured
16  that in partially.  Okay.
17     Q.  Let's turn back to Politz534.  Just one
18  page backwards actually.  And this is a receipt that
19  we've looked at earlier today but in a different
20  exhibit, correct?
21     A.  Uh-huh (Affirmative Response).
22     Q.  Is that a yes?
23     A.  Yes.  Sorry.
24     Q.  And we looked at this before.  Part of the
25  work was for debris removal and part of the work was

**Page 104**

1  for topsoil Bobcat work, correct?
2      A.  Uh-huh (Affirmative Response).  Yes.
3  Sorry.
4      Q.  Are you claiming that the wind solely
5  damaged the topsoil and therefore requires -- and
6  required you to undergo this Bobcat work?
7          MR. CARTER:  Object to form and
8  foundation.  To the extent it calls for an expert
9  conclusion.
10         THE WITNESS:  You still want an answer?
11  Do I need to answer?
12         MR. CARTER:  You can answer.
13         THE WITNESS:  Okay.
14         MR. CARTER:  Unless I tell you not to
15  answer it's okay to answer any question.
16         THE WITNESS:  Okay.
17     A.  I feel that none of this would have been
18  done had that storm not happened it wouldn't have
19  needed to be done.  So the storm happened,
20  Nationwide is who I had insurance with.  And
21  whatever happened, the topsoil got all messed up.
22  It destroyed my house.
23     Q.  (By Mrs. Locke)  Now, you agree that -- we
24  established this during the last deposition.  That,
25  flood waters did reach your property?  Meaning --

**Page 105**

1      A.  Uh-huh.
2      Q.  -- the ground of your property, correct?
3      A.  Yes.
4      Q.  Do you agree that the water contributed to
5  the damage to your topsoil?
6          MR. CARTER:  Object to foundation and
7  form.  And to the extent it calls for an expert
8  conclusion.
9      A.  Possibly.  But it rained for hours and
10  hours and stormed before the water ever got there.
11  So I feel like my house was blown away before the
12  water reached.  And so that ground was soaked.  And
13  so anything that hit it with that type of wind would
14  have made an impression on the ground.  It would
15  have had some damage to it.
16     Q.  (By Mrs. Locke)  I'm going to direct your
17  attention to Bates number 540?
18     A.  Okay.
19     Q.  Do you have a cell phone with Cingular?
20     A.  I do -- well, I did have one with
21  Cingular.
22     Q.  Is this a old cell phone that you had?
23     A.  I think I might have got that in Alabama.
24     Q.  You see the number on the middle --
25     A.  I don't remember.  But I know I bought a

76e0dd4c-daad-478f-9ead-82f978800faf

Page 106

1   cell from Cingular there, I think.
2      Q.   The bill, if you look in the middle, sort
3   of top middle of the page, user name, John Politz;
4   do you see that?
5      A.   On 540?  Yes, right here.
6      Q.   John Politz.
7      A.   Uh-huh.
8      Q.   And there's a 205 area code for --
9      A.   Yeah, that was an Alabama area code.
10     Q.   -- Was this Mr. Politz's or your cell
11  phone?
12     A.   I think it was both of ours.  We both used
13  it, but it was under his name.  We both bought it
14  together.
15     Q.   Did you have a cell phone that you used
16  prior to Hurricane Katrina?
17     A.   Yes.
18     Q.   Did you keep that cell phone while you
19  were in Alabama?
20     A.   It went out right afterward, right after I
21  got there and I had to buy one if I remember
22  correctly.
23     Q.   So your contract expired or something?
24     A.   No.
25          MR. CARTER:  Object to form.

Page 107

1      A.   I don't remember if it got damaged or
2   what.  I just know that I had to have a phone to
3   communicate with FEMA, SBA and Nationwide and
4   everybody else that I was needing to talk to at that
5   time.
6      Q.   (By Mrs. Locke)  When you were in Alabama
7   you rented a home there, correct?
8      A.   Correct.
9      Q.   Did you have land line in your home?
10     A.   Yes.
11     Q.   So are you claiming that Nationwide owes
12  you for your cell phone bill that you had in
13  Alabama?
14          MR. CARTER:  Object to the extent it calls
15  for a legal conclusion.
16     A.   Parts of it.  My personal things, no.  But
17  the business end of it that cost me a lot of money,
18  yes.  Because it was all the businesses between
19  insurance, FEMA, everything to do with that storm.
20     Q.   (By Mrs. Locke)  If you could turn to
21  Bates 542.
22     A.   Okay.
23     Q.   This is another Cingular bill.  Will you
24  look at the top right corner, the dates are
25  August 20, 2005 to September 19, 2005; do you see

Page 108

1   that?
2      A.   Uh-huh (Affirmative Response).
3      Q.   And you agree with me that August 20 was
4   before Hurricane Katrina?
5      A.   Yeah.
6      Q.   The wireless number on the left side of
7   the page, (205)317-5055; do you see that?
8      A.   Uh-huh (Affirmative Response).
9      Q.   That's the same wireless phone number
10  that's listed on Politz540; is that right?
11     A.   Well, I guess that was mine before it went
12  out or before I had to buy a new one.  If you
13  remember, I just told you I had to buy one when I
14  was in Alabama.
15     Q.   So you had the same wireless number both
16  before Hurricane Katrina and if you look at Bates
17  540 into January 2006; do you see that?
18     A.   Yes.
19     Q.   And are you claiming that Nationwide is
20  responsible for paying these two bills?
21          MR. CARTER:  Objection to the extent it
22  calls for a legal conclusion.
23     A.   Not the one before Katrina, but the one
24  after I had to get a new phone and I wanted the same
25  number because I was dealing with FEMA and all the

Page 109

1   insurances and everything.  And I had already given
2   them that number.  So I was wanting to keep the same
3   number.  I don't remember exactly how all that went
4   to tell you the truth.
5      Q.   If you look at Bates 542.  The total
6   current charges on the bill was $101.28; do you see
7   that?
8      A.   Uh-huh (Affirmative Response).
9      Q.   But after the storm on December -- between
10  December 20, 2005 and January 19, 2006, your total
11  monthly charges if you look on the back of that
12  bill, that Politz 541 are $68.61?
13     A.   541?
14     Q.   541.  541.
15     A.   Oh, on back of the bill, 68.61.
16     Q.   This one right here.
17     A.   Uh-huh (Affirmative Response).
18     Q.   68.61.  So would you agree with me that
19  your cell phone bill actually went down after the
20  storm?
21     A.   No.
22          MR. CARTER:  Object to form.
23     A.   Probably that one month it might -- might
24  have been down, but other than that it was up most
25  of the time.  If you check for the next year, I know

Helen Politz - 03/24/09

Page 110

1   it was an average of being up.
2       Q.  If you could look at Bates 551.  I'm going
3   to ask you to jump forward a couple of pages.
4       A.  Okay, 551.  Okay.
5       Q.  I'm looking at the -- it's a BellSouth
6   bill, page -- on Bates 551 to 552; do you see that?
7       A.  BellSouth, yeah.
8       Q.  551 to 552?
9       A.  BellSouth, yes.
10      Q.  You see the BellSouth bill?
11      A.  Uh-huh (Affirmative Response).
12      Q.  And you see that on Bates 551 the total
13  amount due is a negative $93.23; do you see that?
14      A.  Yes.
15      Q.  And then do you recognize your handwriting
16  below?
17      A.  Yeah.
18      Q.  And it says, "They will mail me a credit
19  check."  Do you see that?
20      A.  Yeah.
21      Q.  You're not claiming that Nationwide owes
22  you for credit that you received, are you?
23      A.  No.  That's just notes I made to myself to
24  remember what I talked to them about.
25      Q.  And then the same would be true for

Page 111

1   Politz552 on Bates -- on Defense Exhibit 223.  It's
2   a BellSouth bill where there's a credit of $94.79;
3   do you see that?
4       A.  No.  What Bates number is that?
5       Q.  552.  The one that's right behind here.
6       A.  Oh, okay.  The 94.79?
7       Q.  Yep.  There's a --
8       A.  Yeah, Katrina relief credit.  Because my
9   bill, I don't even know where it's at or if it's
10  even in here, but it went to around five or six
11  hundred dollars one month.  And I called them up and
12  told them that it was -- everything was just about
13  Katrina.  If there was any relief they could give me
14  in any way on that bill.  Because a lot of it was
15  800 numbers and I was just on hold and all that.
16  And that's when I decided I think during that time
17  to go ahead and get a land phone so I could use the
18  800 number and not have to use so much on the cell
19  phone.  But I'm not sure if this was what was there
20  at that time or not.  I remember I had gotten both.
21  At first I was going to use just the telephone and
22  then I decided, well, it's going to cost me too much
23  money.  I'm going to have to get a land phone too.
24      Q.  The $94.79 credit that's listed of 552,
25  again, Nationwide wouldn't owe you what money,

Page 112

1   correct?
2       A.  No, not that.  That was a credit that they
3   gave me due to hurricane relief of probably that
4   five or six hundred dollar bill that I had had to
5   pay.
6       Q.  If you could look at Bates 554?
7       A.  Okay.
8       Q.  This is Mississippi power bill?
9       A.  Yes.
10      Q.  In the middle of the page there's a date
11  of August 23rd through August 29th; do you see that?
12      A.  August -- yeah.
13      Q.  And you would agree with me that that's
14  before Hurricane Katrina, correct?
15      A.  Yeah.
16      Q.  And the balance that was due on the bottom
17  of the page is $33.60; do you see that?
18      A.  Correct.
19      Q.  You're not claiming that Nationwide is
20  responsible to pay your power bill before Hurricane
21  Katrina are you?
22      A.  No.  It's like I said, some of these
23  things got in here by mistake.  I haven't figured it
24  all out.  I don't know if you have or not.  But I'm
25  sure that it came to quite a bit.  But it was the

Page 113

1   best we could do at the time with what we had.
2       Q.  If you could look at Bates 555 and 556.
3   Again, it's another BellSouth bill, 555 and 556?
4       A.  Uh-huh (Affirmative Response).  Whoops,
5   excuse me.
6       Q.  Is -- was BellSouth your land line
7   provider?
8       A.  I don't remember.  That was four years
9   ago.
10      Q.  Did you have a land line in your home at
11  Winters Lane?
12      A.  Yes.
13      Q.  And you had a land line in your home in
14  Alabama, correct?
15      A.  Yes.
16      Q.  And you had a land line in your home in
17  Gulfport, correct?
18      A.  Yes.
19      Q.  Do you agree with me that a land line is
20  also a continuing maintenance like that you --
21      A.  Yes.
22          MR. CARTER:  Object to form.
23      Q.  (By Mrs. Locke)  Are you claiming that
24  Nationwide is responsible for paying -- continuing
25  to pay your home land line bill?

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 114

1     MR. CARTER: Object to form.
2     A.   Partly.  Because a lot of it was business
3  that I was tending to due to the storm and that I
4  wouldn't not -- I wouldn't have had other than that.
5  But the average calls to my family, to my friends,
6  to acquaintances, no, I don't expect Nationwide to
7  pay for any of that.
8     Q.   (By Mrs. Locke)  I'm going to ask you to
9  turn to Bates 570?
10    A.   Okay.
11    Q.   On Bates 570 on the left hand side of the
12 page there's a Public's receipt; do you see that?
13    A.   Uh-huh (Affirmative Response).
14    Q.   And there are a lot of different grocery
15 receipts --
16    A.   Uh-huh (Affirmative Response).
17    Q.   -- in this pack, but I'm going to focus on
18 a couple of specific ones.  The bottom of this
19 page -- I'm -- the bottom of this page you'll see
20 that it says amount $61.93; do you see that?
21    A.   Uh-huh (Affirmative Response).
22    Q.   And you see that it says cash back $50?
23    A.   Uh-huh (Affirmative Response).
24    Q.   Are you asking Nationwide to pay you for
25 your cash back of $50?

Page 115

1     A.   Depending on what I used that $50 for.
2     Q.   Do you know what you used this $50 for?
3     A.   Not right now.  This is four years down
4  the road.  If they would have paid me then I could
5  have told them.
6     Q.   I understand.  But these are the receipts
7  that we have right now.
8     A.   Okay.
9     Q.   And we're trying to establish, you know
10 what you think Nationwide is responsible for and
11 what they're not responsible for.  Are you claiming
12 that on grocery receipts like this where there's a
13 cash back amount Nationwide is responsible for
14 paying you that cash back amount?
15    A.   Like I said, it depends on what I used it
16 for.  I don't remember why I got the cash back right
17 then.  A lot of time it was to go eat something
18 before we got established with groceries in the
19 house and all that kind of stuff.  And yeah, I think
20 that they should have.  We -- we were paying for
21 extended living expenses, which they only covered
22 $6,000 for that.  And we had around 18,000.
23    Q.   In your home in Alabama did you have a
24 kitchen?
25    A.   I did.

Page 116

1     Q.   And you were able to cook there?
2     A.   Yes.
3     Q.   And a lot of these receipts are reflected
4  in that time period?
5     A.   In groceries, yes, and stuff to restock
6  the kitchen.
7     Q.   You would agree with me that groceries go
8  bad after a certain point in time, correct?
9     MR. CARTER: Object to form.
10    A.   Yes.
11    Q.   (By Mrs. Locke)  And that like your
12 medications groceries are a maintenance item,
13 correct?
14    MR. CARTER: Object to form.
15    A.   Yes.  But when you lose a bunch of them
16 that you had just stocked up on, which I did because
17 we were having a lot of company coming in for that
18 baptismal, twin baptismal and all this kind of
19 stuff.  I had a freezer full of meats and all my
20 cabinets was full of stuff.  All because we were
21 going to have it that next weekend.  And so that was
22 a lot of extra money I spent and then I lost it all.
23    Q.   (By Mrs. Locke)  But you would agree with
24 me that receipts six months after the storm for
25 groceries are likely receipts that you would have

Page 117

1  incurred for groceries had the storm not occurred?
2     MR. CARTER: Object to form and
3  foundation.
4     A.   Six months down the road, probably so on
5  some things.  Some things I didn't even think about
6  until six months down the road.  Spices, when I go
7  to buy a spice, I'd go to cook something.  I had all
8  kind of spices, everything you could want in my
9  kitchen.  When I went to get it to cook it, I didn't
10 have that spice and I'd have to go out and buy it.
11 Spices are very expensive.
12    Q.   I know that.
13    A.   Okay.
14    Q.   I have to say my husband yells at me when
15 I ask him to go out and get me nutmeg.  Because he's
16 like it's $8 for a little thing of nutmeg.
17    A.   I know.  But when I would have to go get
18 something like that that was all part of it, but not
19 just regular maintenance.
20    Q.   Okay.  I'm going to direct your attention
21 to Bates page 590.
22    A.   Okay.
23    Q.   Did you have AT&T credit card?
24    A.   I used to have one, yeah.
25    Q.   And you recognize Bates 590 and 591 as a

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 118

1  credit card that you and Mr. Politz had?
2      A.  Yes.
3      Q.  Okay.  If you look at page 591.  This AT&T
4  credit card statement itemizes individual purchases;
5  do you see that?
6      A.  Uh-huh (Affirmative Response).
7      Q.  Is that -- is that a yes?
8      A.  Yes.  Sorry.  Yes.
9      Q.  And this would reflect all the purchases
10 that you made in that statement period on this
11 credit card?
12     A.  Yes.
13     Q.  So, for example, on December 13, 2005 the
14 very first item you purchased $20.62 worth of goods
15 from Stop & Shop; do you see that?
16     A.  Uh-huh (Affirmative Response).  Yes.
17     Q.  Now, if you look with me on the very next
18 page, Bates 592.  The very top left corner there's a
19 receipt for Stop & Shop; do you see that?
20     A.  Yes.
21     Q.  And it's the same amount for $20.62; do
22 you see that?
23     A.  Yes.
24     Q.  And it's for the date of December 13,
25 2005; do you see that?

Page 119

1      A.  Yes.
2      Q.  So you would agree with me that the Stop &
3  Shop receipt is the same as --
4      A.  It's the same bill, I save all my
5  receipts.
6      Q.  -- Well, let's look at the second item on
7  --
8      A.  And I check them off according to this and
9  that's how that probably got in there.
10     Q.  -- Okay.  Well, let's look at the second
11 item on the credit card receipt.  A purchase at WM
12 Super Center, which I'm assuming is Wal-Mart Super
13 Center?
14     A.  Yes.
15     Q.  On December 15th in the amount of $21.88;
16 do you see that?
17     A.  Yes.
18     Q.  Let's look at Bates 592.  The middle
19 receipt, Wal-Mart self check out receipt in the
20 amount of $21.88; do you see that?
21     A.  Yes.
22     Q.  And it's for the same date, December 15,
23 2005; do you see that?  The very bottom of the
24 receipt?
25     A.  Yes.

Page 120

1      Q.  So again, that would be a duplicate
2  receipt?
3      A.  That's a duplicate of this right here,
4  21.88.  All this are supports for this one.
5      Q.  Okay.  That can help move things along a
6  little bit.  The credit card statements that are in
7  this packet would reflect duplicates of receipts
8  that you've provided, correct?
9      A.  Yes.
10     Q.  So you're not claiming that Nationwide
11 owes for what's on the credit card statement as well
12 as the receipts, correct?
13     A.  I am not.
14     Q.  Let's turn to Bates 612.  It's a receipt
15 from Chelsea Animal Hospital; do you see that?
16     A.  Uh-huh (Affirmative Response).
17     Q.  And the name of the receipt is Mr. Jason
18 Politz.  Is he your son?
19     A.  My husband's son, yes.
20     Q.  And the receipt is for John Boy; is that a
21 dog?
22     A.  That's my dog.
23     Q.  That's your dog?
24     A.  Yes.
25     Q.  What kind of dog is he.

Page 121

1      A.  He's a dachshund, miniature.
2      Q.  And you took -- did you have John Boy
3  before Hurricane Katrina?
4      A.  Yes, I did.
5      Q.  And you took him with you when you
6  evacuated to --
7      A.  Yes.
8      Q.  -- Alabama?  And so, your husband's son
9  took him to the vet and that's what's reflected in
10 this receipt?
11         MR. CARTER:  Object to form.
12     A.  Jason, his son -- he swallowed a fishhook
13 and it was an emergency deal and I didn't know where
14 to take him.  Because we hadn't been in Alabama that
15 long.  Jason is our son that lived up there and he
16 had a dog.  So I called him to see where he takes
17 his dog so I could take mine for an emergency.  And
18 that's how come it got listed under his name.
19     Q.  Okay.
20     A.  Okay.  And my husband and I took him
21 together and got the fishhook taken out of his
22 throat.
23     Q.  Now, are you claiming that Nationwide
24 should be paying for your vet bills?
25     A.  No.  That just got in that basket by

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

32 (Pages 122 to 125)

Page 122

1  mistake and I didn't have time to filter through it
2  all.
3      Q.  Let's look at Bates 627.  On the right
4  side of the page there's a Piggly Wiggly receipt.
5  Did you shop at Piggly Wiggly?
6      A.  Sometimes, yes.
7      Q.  And the receipt lists -- it's kind of hard
8  to make out, but I think, what it's Miller Best
9  Light Beer; do you see that?
10     A.  Uh-huh (Affirmative Response).
11     Q.  For $11.29?
12     A.  Yeah.
13     Q.  You agree with me that sometimes when you
14  purchase alcohol they -- the clerk will require a
15  photo identification or your date of birth?
16     A.  Right.
17     Q.  At the bottom of this receipt it says date
18  of birth January 22, 1983; do you see that?
19     A.  Yeah.
20     Q.  That's not your date of birth is it?
21     A.  No.
22     Q.  That's not your husband's date of birth is
23  it?
24     A.  No.  That's just something the cashier
25  just punched in to give it a good date to go.

Page 123

1  Because she looked at me and knew I was old enough
2  to buy beer.
3      Q.  So you're still claiming that this is your
4  receipt?
5      A.  Yeah, it's my receipt.
6      Q.  So you're claiming that the cash register
7  made up a birth date?
8          MR. CARTER:  Object to form.
9      A.  I worked as a cashier, okay.  And we were
10  told if they don't have gray in their hair make them
11  show it.  Once they've got gray hair, you don't have
12  to aggravate them by showing that.  They're old
13  enough.  So yes, I never question them when they do
14  because I know exactly what they're doing.
15     Q.  (By Mrs. Locke)  Hopefully Natalie, who's
16  the cashier at the top of the page, hopefully she
17  won't get in trouble for that.
18         MR. CARTER:  Form.
19     A.  If that's the biggest thing she ever does
20  wrong in her life she'll be all right.
21     Q.  (By Mrs. Locke)  If you could look at
22  Bates 634?
23     A.  Okay.
24     Q.  And this is a receipt for Michelob Ultra?
25     A.  Uh-huh (Affirmative Response).

Page 124

1      Q.  And again, it says age confirmed,
2  11/11/1911?
3      A.  Again, same answer.
4      Q.  It's certainly not your birthday?
5      A.  No.
6      Q.  Not your husband's birthday?
7      A.  No.
8      Q.  So, you're still claiming this is your
9  receipt?
10     A.  Yeah.
11     Q.  And the cashier just made up the birth
12  date?
13     A.  Yes.
14     Q.  If you look at Politz Bates 638.  There's
15  a Rite Aid receipt on the right side of the page?
16     A.  Uh-huh (Affirmative Response).
17     Q.  And the date is February 18, 2006, you see
18  that sort of at the top middle part of the receipt?
19     A.  Yeah.
20     Q.  And the items listed, there's one, two,
21  three, four, five items listed and they each say
22  scanned pharmacy?
23     A.  Uh-huh (Affirmative Response).
24     Q.  For a total of $30 --
25     A.  Right.

Page 125

1      Q.  -- do you see that?  And they each have
2  prescriptions numbers by them; do you see that?
3      A.  Yes.
4      Q.  So you would agree with me that these are
5  receipts for prescription medications, correct?
6      A.  Yes.
7      Q.  And we've already established that you're
8  not claiming Nationwide is responsible --
9      A.  That's right.  I thought y'all wanted
10  receipts for everything and I just picked up the
11  basket and took it.  Everything that I had was in
12  it.
13         MR. CARTER:  Mrs. Politz, if you could
14  just watch when she's asking about stuff the,
15  uh-huh, try to say yes or no.
16         THE WITNESS:  Okay.
17         MR. CARTER:  I know it's hard.
18         THE WITNESS:  I'm sorry.
19     Q.  (By Mrs. Locke)  If you could turn to
20  Bates 668.  On the right-hand side of the page
21  there's a Dollar General Store receipt for Long
22  Beach, Mississippi; you see that?  On page 668?
23     A.  Oh, excuse me.  Dollar General, yes.
24     Q.  Again, just for the record, we are still
25  looking at Defense Exhibit 223, Bates 668.  The

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

33 (Pages 126 to 129)

Page 126

1  bottom of the receipt there's a date of August 26,
2  2005; do you see that?
3      A.  Yes.
4      Q.  Again, this is before Hurricane Katrina,
5  correct?
6      A.  It was in the basket.  I come in and put
7  all of that in my basket.
8      Q.  And so you're not claiming that Nationwide
9  is responsible for this receipt?
10     A.  No, it's just in there.
11     Q.  If you could turn to the very last page of
12 the document, Bates 712?
13     A.  Okay.
14     Q.  This is an AARP insurance bill, personal
15 automobile insurance.  Is that who you have your
16 auto insurance coverage through?
17     A.  Yes.
18     Q.  And you -- if you look at the bill on the
19 column on the right, the third item down is
20 statement date, September 22, 2005; do you see that?
21     A.  September 22?  Oh, yeah.  Uh-huh
22 (Affirmative Response).  Yes, I'm sorry.
23     Q.  So this would be right after Hurricane
24 Katrina?
25     A.  Yes.

Page 127

1      Q.  Are you claiming that Nationwide should be
2  paying your auto insurance bill?
3      A.  No.
4      Q.  Sorry, let me just turn back.  Actually,
5  you can put that aside.  I'm going to hand you
6  what's marked as Defense Exhibit 248.
7
8          (Exhibit 248 marked for identification.)
9
10     Q.  Do you recognize this receipt?
11     A.  Yes.  I rented storage when I came back to
12 Mississippi to put some things that had been given
13 to me while I was in Mississippi by friends, people
14 who just wanted to help.  And I didn't have a place
15 to store them when I came back because I was going
16 into a FEMA trailer.  And so I rented this little
17 mini-warehouse to store it in until I could get a
18 home.
19     Q.  And you're claiming that Nationwide should
20 reimburse you for the mini-warehouse storage?
21     A.  Yes.  Because if it wouldn't have been for
22 the storm I wouldn't have had the mini-warehouse.
23     Q.  If you look at the top, sort of on the
24 right side of the page, you know, top right.  It
25 talks about the fee per month is $45?

Page 128

1      A.  Yes.
2      Q.  And that the lessor acknowledges receipt
3  of $76.  And then there was the process fee and a
4  January fee.  And that all added up to --
5      A.  Yes.
6      Q.  -- $76; do you see that?
7      A.  Yeah.
8      Q.  How many months -- is it your
9  understanding that your rent was $45 a month?
10     A.  Yes.
11     Q.  How many months did you have this storage
12 unit?
13     A.  For the whole time I was in the FEMA
14 trailer, probably six or seven.  If you notice this
15 was in January.  That's when we came to get the FEMA
16 trailer from Alabama.
17     Q.  Okay.  And so the first month that you
18 paid would be January and then the last month would
19 have been July approximately?
20     A.  Approximately.  It may have been August,
21 because it took me a little time to get all the
22 stuff out and get organized.
23     Q.  What kinds of items were you storing in
24 the warehouse?
25          VIDEOGRAPHER:  Two minutes.

Page 129

1      A.  Some lamps, odd and end dishes, towels.
2  Things that I couldn't put into the home that I
3  thought maybe I could use later in a home that
4  people had given me.
5      Q.  What about any -- did you have furniture
6  in there as well?
7      A.  I had one table and three chairs, I
8  believe.
9          MRS. LOCKE:  Why don't we go ahead and
10 switch.
11         VIDEOGRAPHER:  Off record at 11:55.  End
12 of tape three.
13
14         (Off the record.)
15
16         VIDEOGRAPHER:  Back on record at 12:04.
17 Starting tape four.
18     Q.  (By Mrs. Locke)  I'm going to hand you
19 what's been marked as Defense Exhibit 225.
20
21         (Exhibit 225 marked for identification.)
22
23     Q.  This is another group of receipts that
24 your attorneys have provided to Nationwide.  And
25 these were provided to Nationwide after the original

Helen Politz - 03/24/09

Page 130

1  close of discovery in this case. Now flipping
2  through this, do you recognize these as receipts
3  that you would have provided to your attorney?
4      A. Yes.
5      Q. If you could turn to Bates 815 and 816.
6      A. Okay.
7      Q. Now, let's start at the receipt at the
8  bottom of 815 that's -- that you can barely see --
9      A. 815, okay.
10     Q. Now receipts that are provided to
11 Nationwide in a format like this, you're not
12 expecting Nationwide to --
13     A. No.
14     Q. -- try to make out something like that to
15 reimburse you, are you?
16     A. No. That was just in the basket with
17 receipts.
18     Q. Now let's look at the two receipts that
19 are legible on Politz815?
20     A. Okay.
21     Q. The one on the left-hand side of the page
22 is a receipt for 5.311 gallons totaling $15.08; do
23 you see that at the bottom of the receipt?
24     A. I do.
25     Q. And the date of that receipt is June 19,

Page 131

1  2007; do you see that? Sort of in the middle top of
2  the receipt?
3      A. Yes, I do.
4      Q. Now, are you claiming that Nationwide
5  should be paying for your gas --
6      A. No.
7      Q. -- in 2007?
8          MR. CARTER: Object to the extent it calls
9  for a legal conclusion. Go ahead.
10     A. That's just some receipts that got put in
11 the basket and I forgot they were even there and I
12 turned them into them.
13     Q. (By Mrs. Locke) So for how long after --
14 are you claiming that Nationwide should be paying
15 for any of your gas?
16         MR. CARTER: Same objections.
17     A. Only the ones that I used back and forth
18 to tend to business from Alabama to Gulfport.
19     Q. (By Mrs. Locke) Now, I know that this is
20 tough, but are you able to identify in either
21 Defense Exhibit 225 or 223 which of those receipts
22 --
23     A. I could if I took the time and looked
24 through them all and figured them out and the days
25 and the places and the times, I could identify them,

Page 132

1  yes, whether they were used for Katrina or not. But
2  I'm saying all of these were not used for Katrina
3  gas and I don't expect Nationwide to pay for those.
4      Q. How -- if there are receipts in here that
5  you agree Nationwide is not responsible for paying,
6  what criteria should Nationwide use to establish
7  what we owe you and what we don't owe you?
8          MR. CARTER: Objection.
9      A. I didn't know they were going to use any
10 criteria, because they never would pay me anything.
11         MR. CARTER: Form and foundation.
12     Q. (By Mrs. Locke) I understand that you're
13 frustrated --
14     A. Yes.
15     Q. -- with Nationwide.
16     A. Very.
17     Q. But how, if I'm sitting here today trying
18 to figure out, okay, we owe for this receipt, we
19 don't owe for this receipt. What should I do to
20 make that determination based on the hundreds of
21 pages of receipts we have here?
22         MR. CARTER: Same objections.
23     A. They can give me a copy of the book and I
24 would go through it and highlight it for them.
25     Q. (By Mrs. Locke) And that's something that

Page 133

1  you're willing to do?
2      A. I am, but not in a short length of time.
3  If you want to do it, you got to give it to me. I'm
4  working, I'm a busy person and I need the time. And
5  I'd be willing to do it, yes.
6      Q. Let's look at Bates 910. Again, this is
7  of Defense Exhibit 225, Bates number 910.
8      A. Okay.
9      Q. Do you recognize this as a receipt that
10 you -- of yours?
11     A. Yes.
12     Q. Did you take a trip to Pensacola, Florida?
13     A. I never really took a trip there. I think
14 I might have stopped in Pensacola over night. I
15 took a trip to Florida at some point.
16     Q. The date on this receipt, if you look at
17 the top right side is October 9, 2007; do you see
18 that?
19     A. Yeah.
20     Q. Do you recall why you took this trip or
21 stopped here?
22     A. Because we were going a long ways. It was
23 a two day driving trip and we had to stop.
24     Q. What was the purpose of the trip?
25     A. We were going to visit one of our sons

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

Page 134

1    that lives in Tampa, Florida.
2        Q.  So, was the trip for family purposes?
3        A.  Yeah.
4        Q.  So you're not claiming that Nationwide
5    should be paying for your hotel bill?
6        A.  No.
7        Q.  Let's look at Bates 963.  This is a
8    receipt from Marriott Sawgrass Resort; do you see
9    that?
10       A.  Yes, I do.
11       Q.  And is this a receipt that is -- that's
12   yours?
13       A.  Yes, it is.
14       Q.  And if you look at the top in the shaded
15   box in the middle -- the top line of the shaded box
16   in the middle of the top line, the date is June 13,
17   2007; do you see that?
18       A.  Yes.
19       Q.  And this is the Sawgrass Resort is in
20   Ponte Vedra; is that correct?
21       A.  Yeah.  It was in Florida.
22       Q.  Ponte Vedra --
23       A.  Yeah.  Yeah, Ponte Vedra.
24       Q.  And Ponte Vedra is over on Atlantic side,
25   correct?

Page 135

1        A.  Right.
2        Q.  Was this a vacation trip?
3        A.  It was a conference that my husband
4    belonged to when he was working, and every year they
5    hold it.  And he's a past President of it, so he's
6    invited to come and participate in it.  And it's
7    like an extended family over the years.  We look
8    forward to seeing these people once a year.  And we
9    couldn't go the first year after Katrina, but we did
10   make it that one year.
11       Q.  And again, Nationwide wouldn't be
12   responsible for --
13       A.  No.  No.  It's just in receipt box.
14       Q.  -- I'm going to ask you to flip backwards
15   a little bit to Bates 927 on Defense Exhibit 225.
16   On the right-hand side of the page there's a receipt
17   for the amount of $64.36; do you see that?
18       A.  On 920 -- oh, yeah.
19       Q.  And the receipt is for a dinner or a meal
20   that was had at Bonefish Grill; do you see that?
21       A.  Yes.
22       Q.  And the date on the receipt is
23   September 5, 2007?
24       A.  Yes.
25       Q.  Are you claiming that Nationwide should be

Page 136

1    paying for restaurant receipts in 2007?
2        A.  No, not that one.
3        Q.  Similarly on page 928.  On the left side
4    of the page there's a receipt for the Fish Market
5    Restaurant in Hoover, Alabama?
6        A.  928?  I remember that one.  No, I'm not
7    claiming that they need to pay that bill.  That was
8    a personal.
9        Q.  Let's turn then to Bates 1117?
10       A.  Okay.
11       Q.  It's a bill from Riddex Plus; do you see
12   that?
13       A.  Yes.
14       Q.  And the date on the right side of the page
15   is October 23, 2007; do you see that?
16       A.  Yes.
17       Q.  And Riddex Plus, you would agree with me
18   is a pest control, correct?
19       A.  Correct.
20       Q.  So you're not claiming that Nationwide
21   should be paying for your pest control in 2007, are
22   you?
23       A.  No.
24       Q.  And if you could turn to Bates 1178.  This
25   is a Mississippi Power bill.  Are you able -- if you

Page 137

1    need to move the clip.
2        A.  Mississippi Power bill.  I think I might
3    have to move the clip to see that one.
4        Q.  Sorry about that.  It's a big stack here.
5        A.  I'll just take your word.
6        Q.  You got it?  Well, if you look, regardless
7    of what type of bill it is.  If you look at the
8    middle of the page the dates -- well, if you look at
9    the draft date on the top it's 9/13/2005; do you see
10   that?
11       A.  Uh-huh (Affirmative Response).  Yes.
12       Q.  And then in the middle of the page -- the
13   middle of the page is residential all electric
14   services from July 25th to August 23rd; do you see
15   that?
16       A.  Yeah.
17       Q.  Again, this would be a pre-Katrina bill
18   that you're not asking Nationwide to compensate you
19   for?
20       A.  Well, I think some of that bill was before
21   and part of it was after.  It was a finalizing of
22   the last bill after -- the first bill after Katrina.
23   It was the finalizing of the last bill at that
24   address.
25       Q.  What portion of this bill then is it your

76e0dd4c-daad-478f-9ead-82f978800faf

Helen Politz - 03/24/09

36 (Pages 138 to 141)

| Page 138 | Page 140 |
|---|---|
| 1  understanding is after Hurricane Katrina? | 1     (Off the record.) |
| 2     A.  Anything after August 29th is a portion. | 2 |
| 3  I mean, before was mine.  Whatever.  I'm really not | 3     VIDEOGRAPHER:  We're back on record at |
| 4  expecting them to pay this one.  It's a little hard | 4  12:28. |
| 5  to define that. | 5     Q.  (By Mrs. Locke)  Mrs. Politz, I thank you |
| 6     Q.  So you would agree with me that on both | 6  for you patience.  At this time I don't have any |
| 7  Defense Exhibit 223 and Defense Exhibit 225 we've | 7  further questions for you. |
| 8  looked at a lot of different examples of bills that | 8     A.  You're welcome. |
| 9  you're not expecting Nationwide to pay for? | 9 |
| 10     A.  You got a lot in here that I don't expect | 10  EXAMINATION BY MR. CARTER: |
| 11  them to pay for, right. | 11     Q.  I'm just going to ask you one for my own |
| 12     Q.  And based on this submission, how should | 12  -- |
| 13  we determine which of these receipts we should | 13     A.  Me? |
| 14  consider and which receipts we should not consider? | 14     Q.  -- peace of mind, because we talked about |
| 15     MR. CARTER:  Objection to form, | 15  it many times before.  Other than Dr. Greico, any |
| 16  foundation, to the extent it calls for a legal | 16  other doctors in the world that you can think of |
| 17  conclusion.  And the extent it asks her to tell | 17  other than the ones we've already told to them? |
| 18  Nationwide how to do its job. | 18     A.  No.  And I would have turned him in if I |
| 19     A.  Repeat your question again please? | 19  had even thought about him.  At the time he was a |
| 20     Q.  (By Mrs. Locke)  Do you think it's fair to | 20  gynecologist, had nothing to do with my heart and |
| 21  ask Nationwide to hold it to trying to figure out | 21  all that.  So I was just thinking the line of my |
| 22  which of these receipts you're expecting us to pay? | 22  primary physician and the doctors that I used for |
| 23     MR. CARTER:  Same objections. | 23  heart conditions and stuff.  I was thinking more of |
| 24     A.  I can go through that book and highlight | 24  that.  And I'm sorry about Dr. Greico.  I realize |
| 25  what I expect them to pay and then you go over it | 25  that that was like throwing a briar in there. |

| Page 139 | Page 141 |
|---|---|
| 1  again with me if you'd like. | 1     Q.  That's all right.  We understand you've |
| 2     Q.  But based on what we have before us, do | 2  been through a lot. |
| 3  you think it's fair for Nationwide to -- | 3     A.  Yeah.  It's been stressful for a long |
| 4     A.  To pay all of them in there?  No. | 4  time. |
| 5     Q.  Do you think it's fair for Nationwide to | 5     Q.  That's all I've got. |
| 6  try and figure out what you're expecting us to pay. | 6     A.  Okay.  I'll try not to throw another one |
| 7     MR. CARTER:  Same objections. | 7  on you. |
| 8     A.  I don't know what Nationwide's got on | 8     Q.  Okay. |
| 9  their mind. | 9     VIDEOGRAPHER:  We're going off record at |
| 10     Q.  (By Mrs. Locke)  Do you think it's fair? | 10  12:29.  This completes the deposition for today. |
| 11     MR. CARTER:  Same objections. | 11 |
| 12     A.  Sometimes. | 12     (Off the record at 12:29) |
| 13     Q.  (By Mrs. Locke)  So you think that these | 13 |
| 14  hundreds of pages of receipts, many of which you've | 14 |
| 15  said as we sit here today that you're not expecting | 15 |
| 16  us to pay, yet have been submitted to Nationwide, | 16 |
| 17  you think it's fair for us to -- | 17 |
| 18     A.  I think if Nationwide using common sense | 18 |
| 19  they can look at it and tell the different of what | 19 |
| 20  need to pay and what they don't need to pay. | 20 |
| 21     MR. CARTER:  Same objections. | 21 |
| 22     MRS. LOCKE:  Okay.  I'm going to take -- | 22 |
| 23  let's go off the record for a second. | 23 |
| 24     VIDEOGRAPHER:  Off record at 12:20. | 24 |
| 25 | 25 |

76e0dd4c-daad-478f-9ead-82f978800faf

**Page 142**

1    CERTIFICATE OF DEPONENT
2  DEPONENT:  Helen Politz
   DATE:  March 24, 2009
3  CASE STYLE:  politz vs. Nationwide
   ORIGINAL TO:  Mickey Cowen, Esq.
4        I, the above-named deponent in the
   deposition taken in the herein styled and numbered
5  cause, certify that I have examined the deposition
   taken on the date above as to the correctness
6  thereof, and that after reading said pages, I find
   them to contain a full and true transcript of the
7  testimony as given by me.
        Subject to those corrections listed below,
8  if any, I find the transcript to be the correct
   testimony I gave at the aforestated time and place.
9  Page   Line         Comments
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16
17   This the ____ day of _____, 2009.
18             _____
                  Helen Politz
19  State of Mississippi
    County of _____
20
       Subscribed and sworn to before me, this the
21   ____ day of _____, 2009.
22  My Commission Expires:
23             _____
                  Notary Public
24
25

**Page 143**

1        CERTIFICATE OF COURT REPORTER
2        I, Lori Wright Busick, Court Reporter and
3   Notary Public, in and for the State of Mississippi,
4   hereby certify that the foregoing contains a true
5   and correct transcript of the testimony, as taken by
6   me in the aforementioned matter at the time and
7   place heretofore stated, as taken by stenotype and
8   later reduced to typewritten form under my
9   supervision by means of computer aided
10  transcription.
11       I further certify that under the authority
12  vested in me by the State of Mississippi that the
13  witness was placed under oath by me to truthfully
14  answer all questions in the matter.
15       I further certify that I am not in the
16  employ of or related to any counsel or party in this
17  matter and have no interest, monetary or otherwise,
18  in the final outcome of this matter.
19       Witness my signature and seal this the
20  ____ day of _____ 2009.
21
22             _____
                  Lori Wright Busick, CSR
23
24  My Commission Expires:
    September 19, 2010
25

76e0dd4c-daad-478f-9ead-82f978800faf